**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| KAPTAN DEMIR ÇELIK ENDÜSTRISI VE TICARET A.Ş., <br><br>                   Plaintiff, <br> and <br><br> ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI, A.S., <br><br>                 Plaintiff-Intervenor, <br><br>            v. <br><br> UNITED STATES, <br><br>                 Defendant, <br> and <br><br> REBAR TRADE ACTION COALITION, <br><br> Defendant-Intervenor. | **Court No. 23-cv-00131** |

**RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD OF KAPTAN DEMIR ÇELIK ENDÜSTRISI VE TICARET A.Ş.**

David L. Simon, Esq.
Mark B. Lehnardt, Esq.

LAW OFFICES OF DAVID L. SIMON, PLLC
1025 Connecticut Ave., N.W., Ste. 1000
Washington, D.C. 20036
Tel.: (202)481-9000
Email: DLSimon@DLSimon.com

Date: November 13, 2023

*Counsel to Kaptan Demir Çelik Endüstrisi ve Ticaret A.Ş.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. i

INTRODUCTION ............................................................................................... 2

STATEMENTS PURSUANT TO RULE 56.2(c)(1).............................................. 3

    I.   Administrative Determination To Be Reviewed ....................................... 3

    II.  Issues Presented ...................................................................................... 3

    III. Relief Sought ........................................................................................... 4

STATEMENT OF FACTS .................................................................................. 5

    I.   Factual Background .................................................................................. 5

        A.   Bank and Insurance Transactions Tax ............................................. 5

        B.   Law 5084 Land ............................................................................... 8

    II.  Legal Background .................................................................................. 12

        A.   *De Jure* Specificity ....................................................................... 12

        B.   Land Benchmark ........................................................................... 14

STANDARD OF REVIEW ............................................................................... 15

SUMMARY OF THE ARGUMENT .................................................................. 16

ARGUMENT .................................................................................................... 18

    I.   Commerce Improperly Found BITT Exemptions To Be *De Jure* Specific ..... 18

        A.   Turkish Law Clearly Defines Industrial Registry Certificate Requirements ................................................................................. 19

        B.   Commerce's *De Jure* Analysis Ignores the Plain Language of Turkish Law And Relies Upon Irrelevant Analyses ..................................... 20

    II.  Commerce Improperly Rejected The C&W benchmark ........................... 24

        A.   The C&W Benchmark Contains As Much Public Information As The Collier's Benchmark ..................................................................... 24

        B.   The C&W Benchmark Is More Credible Than The Collier's Benchmark ................................................................................... 28

        C.   Commerce Fails To Provide A Reviewable Explanation For Its Final Justification For Disqualifying The C&W benchmark ...................... 33

        D.   Commerce Improperly Discarded Considerations Of Factors Affecting Comparability When Selecting The Distortive Collier's Benchmark ..... 34

CONCLUSION ................................................................................................. 41

# TABLE OF AUTHORITIES

## Cases

*Am. Lamb Co. v. United States*, 785 F.2d 994 (Fed. Cir. 1986) .................................................15

*Anshan Iron & Steel Co. v. United States*, 358 F. Supp. 2d 1236 (Ct. Int'l Trade 2004) ..............................................................................................................................................32

*BGH Edelstahl Siegen GmbH v. United States*, 600 F. Supp. 3d 1241 (Ct. Int'l Trade 2022)..........................................................................................................................13, 22

*BGH Edelstahl Siegen GmbH v. United States*, 639 F. Supp. 3d 1237 (Ct. Int'l Trade 2023)..........................................................................................................................22

*Buffington v. McDonough*, 143 S. Ct. 14, 214 L. Ed. 2d 206 (2022) .......................................15

*Burlington Truck Lines Inc. v. United States*, 371 U.S. 156, 83 S. Ct. 239, 9 L. Ed. 2d 207 (1962)..........................................................................................................................34

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)........................................................................................15

*Citizens to Preserve Overton Park, Inc., v. Volpe*, 401 U.S. 402, 91 S. Ct. 814 (1971)............................................................................................................................................32

*Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. v. United States*, 413 F. Supp. 3d 1347 (Ct. Int'l Trade 2019)...............................................................................33

*Kisor v. Wilkie*, 139 S. Ct. 2400, 204 L. Ed. 2d 841 (2019) ......................................................32

*Loper Bright Enters. v. Raimondo*, 216 L. Ed. 2d 414 (Sup. Ct. 2023).....................................15

*Michigan v. EPA*, 576 U.S. 743, 135 S. Ct. 2699, 192 L. Ed. 2d 674 (2015) ...........................15

*Mittal Steel Galati S.A. v. United States*, 31 CIT 1121, 502 F. Supp. 2d 1295 (2007)............................................................................................................................................35

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983) ...........................................................................................34

*Özdemir Boru San. ve Tic. Ltd. Sti. v. United States*, 273 F. Supp. 3d 1225 (Ct. Int'l Trade 2017)................................................................................................................33, 37

*Özdemir Boru San. ve Tic. Ltd. Sti. v. United States*, 282 F. Supp. 3d 1352 (Ct. Int'l Trade 2018)..................................................................................................................37

*Özdemir I*, 273 F. Supp. 3d ...............................................................................34, 35

*Rautaruukki Oy v. United States*, 23 CIT 257 (1999).................................................31

*Sandt Tech. v. Resco Metal & Plastics Cor.*, 264 F.3d 1344 (Fed. Cir. 2001)....................30, 31

*SCM Corp. v. United States*, 84 Cust. Ct. 227, 487 F. Supp. 96 (1980)....................................32

*Skidmore v Swift & Co.* 323 U.S. 134, 89 L.Ed. 124, 65 S.Ct. 161(1944) ................................15

*Toscelik Profil ve Sac Endustrisi A.S. v. United States*, 38 CIT 1534 (2014) ...........................35

*Zhaoqing New Zhongya Aluminum Co. v. United States*, 929 F. Supp. 2d 1324
    (Ct. Int'l Trade 2013) ...................................................................................37

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)............................................................................15

19 U.S.C. § 1677(5) ......................................................................................12

19 U.S.C. § 1677(5)(E) ...................................................................................14

19 U.S.C. § 1677(5A) ..........................................................................12, 13, 20, 22

19 U.S.C. § 1677(5A)(D)(i)...............................................................12, 13, 20

19 U.S.C. § 3511(a) ......................................................................................13

19 U.S.C. § 3512(d) ......................................................................................13

**Other Authorities**

*Statement of Administrative Action accompanying the Uruguay Round
    Agreements Act*, H. Doc. 103-316, *reprinted in* 1994 U.S.C.C.A.N. 4040 ................... passim

**Regulations**

19 C.F.R. § 351.511(a)(2)...............................................................................14, 26, 34

19 C.F.R. § 351.511(a)(2)(i) ............................................................................34

**Administrative Determinations**

*Affirmative Countervailing Duty Determination: Honey From Argentina*, 66 Fed. Reg. 50,613 (Dep't of Commerce Oct. 4, 2001)......................................................................27

*Certain Softwood Lumber Products from Canada: Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 Fed. Reg. 51,814 (Dep't of Commerce Nov. 8, 2017) ............................................................................................................................30

*Certain Softwood Lumber Products From Canada: Final Affirmative Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances*, 82 Fed. Reg. 51,806 (Dep't of Commerce Nov. 8, 2017)......................................................................................27

*Certain Softwood Lumber Products From Canada: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 82 Fed. Reg. 19,657 (Dep't of Commerce Apr. 28, 2017) ..............................................................27

*Certain Tool Chests and Cabinets From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 82 Fed. Reg. 56,582 (Dep't of Commerce Nov. 29, 2017)......................................................................27

*Certain Uncoated Groundwood Paper From Canada: Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 39,414 (Dep't of Commerce Aug.9, 2018) ..............................................................................................26

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review, and Rescission of Review, in Part, 2015*, 83 Fed. Reg. 1235 (Dep't of Commerce Jan. 10, 2018) ....................................27

*Honey from Argentina: Preliminary Affirmative Countervailing Duty Determination and Alignment with Final Antidumping Duty Determination on Honey from the People's Republic of China*, 66 Fed. Reg. 14,521 (Dep't of Commerce Mar. 13, 2001) ....................................................................26

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results and Partial Rescission of Countervailing Duty Administrative Review the Review; 2015*, 83 Fed. Reg. 16,051 (Dep't of Commerce April 13, 2018)..........................27

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020–2021*, 88 Fed. Reg. 7,941 (Dep't of Commerce Feb. 7, 2023)....................5

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Countervailing Duty Administrative Review and Rescission, in Part; 2020*, 88 Fed. Reg. 34,129 (Dep't of Commerce May 26, 2023) ..........................................................3

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Preliminary Results of Countervailing Duty Administrative Review and Intent To Rescind the Review in Part; 2015*, 82 Fed. Reg. 57,574  (Dep't of Commerce Dec. 6, 2017).................27

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| KAPTAN DEMIR ÇELIK ENDÜSTRISI VE TICARET A.Ş.,<br><br>                     Plaintiff,<br><br>and<br><br>ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI, A.S.,<br><br>                     Plaintiff-Intervenor,<br><br>                     v.<br><br>UNITED STATES,<br><br>                     Defendant,<br><br>and<br><br>REBAR TRADE ACTION COALITION,<br><br>Defendant-Intervenor. | **Court No. 23-cv-00131** |

## RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD OF KAPTAN DEMIR ÇELIK ENDÜSTRISI VE TICARET A.Ş.

Kaptan Demir Çelik Endüstrisi ve Ticaret A.Ş. ("Kaptan") respectfully moves for judgment on the agency record regarding the final results of the Department of Commerce ("Commerce") in the 2020 administrative review of the countervailing duty ("CVD") order on steel concrete reinforcing bar from the Republic of Turkey and submits this brief in support thereof.  For the reasons set forth below, Kaptan respectfully requests that this Court remand this case to Commerce for reconsideration, consistent with the decision of this Court.

## INTRODUCTION

This action challenges two decisions by the Department of Commerce ("Commerce") in the final results of the 2020 administrative review of the countervailing duty (CVD) order on steel concrete reinforcing bar from Turkey.

Kaptan first challenges Commerce's decision that exemptions from Turkey's Bank and Insurance Transactions Tax (BITT) are countervailable as *de jure* specific.  The record shows that the BITT exemption is available to all establishments that have industrial registration certificates, and Turkish law requires that nearly every company in nearly every sector of the Turkish economy obtain an industrial registration certificate before starting production activities.  Thus, nearly every company in Turkey is eligible for BITT exemptions.  This makes BITT exemptions noncountervailable, as they are generally available throughout Turkey's economy.

Kaptan also challenges Commerce's benchmark selection for valuing unimproved industrial land outside a small village about 1,000 km from Istanbul.  Commerce selected petitioner's suggested benchmark for improved industrial leases in a major industrial and transportation hub in the Istanbul area and rejected Kaptan's benchmark based on similar unimproved industrial land in the region where the small village is located.  Commerce rejected Kaptan's benchmark, in part, because it was prepared for purposes of the review, applying a *per se* rejection based on the partial reading of an inapposite decision by the Court of Appeals for the Federal Circuit.

Both decisions were made without the support of substantial evidence and are otherwise not in accordance with law.  Kaptan seeks a remand with instructions to find that BITT exemptions not countervailable because they lack specificity, and to accept Kaptan's benchmark.

## STATEMENTS PURSUANT TO RULE 56.2(c)(1)

### I.  Administrative Determination To Be Reviewed

Plaintiff seeks judicial review of the Commerce's decision in the CVD order on Turkish steel concrete reinforcing bar in *Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Countervailing Duty Administrative Review and Rescission, in Part; 2020*, 88 Fed. Reg. 34,129 (Dep't of Commerce May 26, 2023) ("*Final Results*"), and accompanying Issues and Decisions Memorandum ("*Dec.Mem.*").

### II.  Issues Presented

The issues raised in this case concern two programs: (i) a generally available exemption from a tax on foreign-exchange transactions, and (ii) the benchmark for the valuation of a land grant.

> **Issue 1**:  Commerce found BITT exemptions countervailable as *de jure* specific, that is, limited at least to a small group of enterprises or industries.  BITT exemptions are available to, among others, all Turkish companies with industrial registry certificates.  Companies throughout the Turkish economy are required by law to obtain an industrial registration certificate before beginning operations, with 140,071 companies in all sectors of the economy on the industrial registry. Did Commerce err in concluding that  BITT exemptions are *de jure* specific as limited to a small group of enterprises or industries?
>
> **Short Answer**:  No.  BITT exemptions are not *de jure* specific, and hence not countervailable, because they are not limited to a small group of enterprises or industries, but are available widely throughout the general economy.
>
> **Issue 2**:  Commerce's decisions must be supported by substantial record evidence.  Commerce rejected a benchmark (the Cushman and Wakefield ("C&W") benchmark) for rents of vacant industrial land based on the agency's characterization of the benchmark as BPI in its entirety, and as *per se* unreliable (based on a Federal Circuit case) because it was prepared for the underlying review. The rents reported in the C&W benchmark are public, however, and the Federal Circuit case requires a thorough analysis rather

than allowing a *per se* rule.  Is Commerce's decision supported by substantial evidence and in accordance with law?

**Short Answer**:  No. Commerce's decision finds no factual support for its claim that the C&W benchmark is BPI in its entirety, and its application of a *per se* rule is contrary to law.

**Issue 3:**  Commerce must use comparable goods to calculate the benefit received for goods provided for less than adequate remuneration.  A shipbuilding affiliate of Kaptan, Nur Gemicilik A.S.  ("Nur"), was granted rent-free usage for 49 years of a parcel of vacant land outside Sürmene, a small village in a sparsely-populated province about 1,000 km from Istanbul.  To calculate the benefit from the rent-free right of use, Commerce chose a benchmark, submitted by the petitioner from information obtained from the realtor Collier's International, based on short- and long-term industrial and logistic facility leases in the Istanbul area.  Commerce rejected the C&W benchmark that is based on comparable land near Sürmene.  Did Commerce properly calculate the benefit received from Nur's land use?

**Short Answer**:  No.  Commerce's decision to reject the C&W benchmark as not usable and to use the Collier's benchmark based on leases for noncomparable land failed to satisfy the statutory and regulatory requirements for comparability and resulted in an unlawful benchmark.  Thus, Commerce's benefit calculation is not supported by substantial evidence or in accordance with law.

## III. Relief Sought

Plaintiff respectfully requests that this Court enter judgment holding Commerce's decision as to (i) the BITT tax exemption and (ii) the benchmark valuation is unlawful as not supported by substantial evidence or in accordance with law and remanding the matter to Commerce for a redetermination consistent with the decision of this Court.

4

## STATEMENT OF FACTS

### I.  Factual Background

### A.  Bank and Insurance Transactions Tax

Commerce calculated a 0.89% benefit rate for Exemptions from Bank and Insurance

Transactions Tax (BITT) on Foreign Exchange Transactions received by Kaptan on the basis of

Commerce's determination that BITT exemptions are *de jure* specific.

The BITT was established in 1998, but the rate was 0% for foreign exchange sales until

May 15, 2019, when the Turkish government imposed the tax to combat "speculative and high

frequency foreign exchange movements."  *See* PR48/CR51, *Government of Turkey ("GOT")*

*Initial Questionnaire Response ("IQR")*, at 76-77.  The BITT application to sales of foreign

currency corresponded to the beginning of a period of high inflation of the Turkish Lira.  *See*

*ICDAS Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States*, Slip Op. 2023-124 at 18-

19, 21 (Ct. Int'l Trade Aug. 23, 2023) (stating, "Respondents reported that, based on Turkish

Statistical Institute data and the producer price index ('PPI'), inflation exceeded 25 percent

during the POR, which was July 1, 2018, to June 30, 2019," but affirming Commerce's finding

that inflation was only 22.87 percent); *see also, Steel Concrete Reinforcing Bar From the*

*Republic of Turkey: Final Results of Antidumping Duty Administrative Review and Final*

*Determination of No Shipments; 2020–2021*, 88 Fed. Reg. 7,941 (Dep't of Commerce Feb. 7,

2023), and accompanying Dec.Mem., cmt.7 at 30 (determining for the July 1, 2020 to June

30,2021 POR, "to apply both the high inflation and shorter cost-averaging period methodologies

to calculate Colakoglu's and Kaptan's costs").

On May 15, 2019, the BITT rate for certain exchange sales was raised from 0.0% to

0.1%.  P.R.48/C.R.51, *GOT IQR*, at 76-77.  Seven months later, in December 2019, the GOT

doubled the BITT rate to 0.2%, and then increased the BITT rate again 6 months later to 1.0% in

May 2020, before lowering the BITT rate back to 0.2% about four months later in September

2020. *Id.*, at 77. The GOT provided the following summary chart:

| Date | Applicable BITT Rate | Relevant Legislation |
|---|---|---|
| Until 15 May 2019 | 0% | Annexed Decision of the Cabinet Decree No. 98/11591 |
| 15 May 2019-7 December 2019 | 0,1% | Decree No. 1106 |
| 7 December 2019-24 May 2020 | 0,2% | Law No. 7194 |
| 24 May 2020-30 September 2020 | 1% | Decree No.2568 |
| 30 September 2020 - … | 0,2% | Decree No. 3031 |

*Id.* BITT laws, intending only "to restrict speculative and high frequency foreign exchange

movements," however, exempt several types of foreign exchange and foreign currency sales

from the BITT:

- Foreign exchange sales between banks and authorized institutions or among each other;

- Foreign currency sales that are made to the Ministry of Treasury and Finance; and

- Foreign currency sales made to corporate borrowers having foreign currency loan payables, by the lender banks or the banks that act as intermediary to the utilization of the foreign currency loan.

- Foreign exchange sales to enterprises having industrial registry certificate,

- Foreign exchange sales to exporters which are members of Exporters' Associations.

*Id.* The first three exempted sales were included under Presidential Decree 1106 at the time the

BITT on foreign exchange sales entered into force with the May 15, 2019 law. *See* PR84/CR95,

*GOT IQR*, Ex.31 at 3; P.R.48/C.R.42, *Kaptan IQR*, Ex.27 at 25. The last two exemptions –

foreign exchange sales to enterprises having industrial registry certificates and to exporters who

are members of exporters associations – were added a month later under Presidential Decree

1149. *Id.*; P.R.48/C.R.42, *Kaptan IQR*, Ex.27 at 27.

Regarding industrial registry certificates, the GOT explained that "all manufacturers in Türkiye are required to have an industrial registry certificate,"  PR48/CR51, *GOT IQR*, at 81. Turkish law defines "industrial establishment" to include nearly every type of manufacturer in almost every sector of the economy:  any place that changes the characteristics of material or substance "with the help of machinery, equipment, looms, tools or other means and forces or only by manual labor," and includes mines, repair shops (of any kind), energy producers, large construction sites (including shipbuilders), and information technology and software companies. *See* P.R.48/C.R.94, *GOT IQR*, Ex.32 at 2; P.R.48/C.R.43, *Kaptan IQR*, Ex.27 at 35.  Only "{h}andicrafts and domestic crafts and small repair shops" are not required to obtain industrial registry certificates.  *Id.*  Otherwise, all entities subject to the law must obtain an industrial registry certificate "before starting production activities" or within two months of starting operations:

> It is obligatory for industrial enterprises to be registered in the industrial registry to be kept at the Ministry of Science, Industry and Technology and to submit the corresponding industrial registry certificate to authorized officials.
> Industrial enterprises must pre-register with the industrial registry before starting production activities. For industrial enterprises to be issued business and working licenses, the letter stating that they are registered in the industrial registry is sought by the administrations that issue business and working licenses.
> Newly opened industrial enterprises are obliged to fill out the declarations to be issued by the Ministry of Science, Industry and Technology in accordance with Article 3 and send them electronically to the Ministry of Science, Industry and technology, within two months from the date of their start of operation.

*Id.*  The GOT further, explained that, "this alleged subsidy program is broadly available and widely used throughout the economy," adding that "as of 2020 there are 140,071 enterprises having an industrial registry certificate."  PR48, PR/CR51, *GOT IQR*, at 81.  The GOT provided

7

a list of all the sectors of the economy for which enterprises have industrial registry certificate. *Id.*, Ex.33.  And these 140,071 enterprises from all sectors of the Turkish economy are in addition to entities exempted Presidential Decrees 1106 and 1149: banks, authorized institutions, corporate borrowers with foreign currency loan payables, and exporters who are members of exporters' associations.

### B.  Law 5084 Land

Commerce also calculated a countervailing duty rate of 0.86% for the alleged receipt of subsidies under Law 5084 by Nur Gemicilik A.S.  ("Nur") for a rent-free right to occupy and use for 49 years certain unimproved industrial land located outside the village of Sürmene in the Black Sea province of Trabzon, 1,000 km from Istanbul.  *See* P.R.48/C.R.26-50, *Kaptan IQR*, at 25-26; P.R.121/C.R.114-117, *Kaptan Benchmark Submission*, Ex.1; P.R.123/C.R.118, *Petr's Benchmark Rebuttal*, Ex.2 at 1-2 (comparing the unimproved land used by Nur to the developed industrial/logistical properties in Petitioner's proposed benchmark).  Commerce used as the benchmark, purportedly average rent for short- and long-term industrial and logistical property in Çerkezköy of Tekirdağ providence, which is an important industrial and logistic hub outside Istanbul.  *See* P.R.152, *Final Dec.Mem.* at 8; P.R.123/C.R.118, *Petr's Benchmark Submission*, Ex.2, at 9-10; P.R.124-125, *Kaptan Benchmark Rebuttal*, Ex.2 at 2-32.  Nur is Kaptan's ship-building affiliate.  Nur received rights to use the land for 49 years in exchange for investment and employment guarantees.  The precise location is approximately 7 km outside the village center of Sürmene (a village of 26,824 population), *see* P.R.121/C.R.114-117, *Kaptan Benchmark Submission*, Ex.1 at 11; P.R.123/C.R.118, *Petr's Benchmark Rebuttal*, Ex.3, at 1, and approximately 45 km from the city of Trabzon, the capital of Trabzon province.  Only approximately 7% of the population of Turkey resides in villages like Sürmene; the remaining

93% live in province centers and district centers.  *See id.*, Ex.2, at 11.  Trabzon's per-capita GDP of 42,799 TL is significantly below the average per-capita GDP in Turkey of 62,525 TL; thus, Trabzon is among the economically weakest provinces in Turkey.  *See* P.R.124-125, *Kaptan Benchmark Rebuttal*, Ex.1 at 1, 3.

The parties submitted two benchmarks for calculating the benefit for the land use. Petitioners submitted a report published by Collier's International about turnkey industrial leases in the large commercial and transportation hubs in the Istanbul area, based on unidentified information Collier's claims to have.  The Collier's report lists only what it claims are average rents.  Further, Collier's only identifies the source of the information as "Sources: Colliers International," but does not include copies of any actual leases on which the average is based or otherwise provide any detail about the source of the underlying data.  *See id.*, Ex.2, at 11.

Further, there is no statement regarding the experience and qualifications of the individuals compiling the data for *Colliers*, nor any statement about whether Colliers followed any internationally-recognized standards in reaching the projections reported in *Colliers*. *Compare* P.R.121/C.R.114-117, *Kaptan Benchmark Submission*, Ex.1 at 8, Ex.3.  And *Colliers* does not provide an assurance of reliability, instead disavowing the accuracy of any of the data, stating, "no warranty is given as to the accuracy of … the forecasts, figures, or conclusions contained in this report" and the data "must not be relied upon for investment or any other purpose."  *See* P.R.123/C.R.118, *Petr's Benchmark Submission*, Ex.2, at 21.

Petitioner's benchmark describes the property-types included in the report:  *developed* industrial and logistics locations in the three provinces (Istanbul and neighboring Kocaeli and Tekirdağ), comprising "8 sub-regions in Istanbul and its vicinity." *Id*., Ex.1, at 9-10.  The per-capita GDP of Istanbul, Kocaeli, Tekirdağ (in which Çerkezköy is located), and the capital,

Ankara, are the four highest in Turkey and are double the per-capita GDP of Trabzon, while the

average per-capita GDP of the entire country 50% is higher:

| | |
|---|---|
| Istanbul | 97,950 TL |
| Kocaeli | 96,745 TL |
| Ankara | 85,396 TL |
| Tekirdağ | 84,522 TL |
| Turkey (avg) | 60,525 TL |
| . . | . |
| Trabzon | 42,799 TL |

*See* P.R.124-125, *Kaptan Benchmark Rebuttal*, Ex.1 at 1, 3.  The record establishes that

Çerkezköy "is one of the largest and most established industrial zones in Turkey"; it is "an

industrial/transportation hub just outside Istanbul and is the staging area for imports from the rest

of Europe into Turkey."  *Id.*, Ex.2 at 2-32.

Kaptan submitted a lease rate study by internationally recognized real estate brokerage

Cushman & Wakefield[1] based on leases of unimproved industrial land in the region of Sürmene

where Nur operates.  The C&W report was prepared by those with the specialized knowledge,

with years of relevant experience, in accordance with internationally recognized valuation

standards to prepare the survey.  *See* P.R.124-125/C.R.114-117, *Kaptan Benchmark*

*Submission*, Ex.1 at 8, Ex.3.  The C&W Report includes a survey of 2022 rental prices for

thirteen different properties in Trabzon province, including commercial, industry, private use,

tourism, land, and field property types.  *See id.*, Ex.1 at 24-25.  The report provides detailed

information about each property included in the survey.  *See id.*  Although much of the report is

confidential, thus available for full review only by Commerce and counsel for Petitioner,

Kaptan submitted the average 2022 rent for these properties as public information.  *See id.*

---

[1] C&W is a well-known for the accuracy of its real estate valuations.  *See* **Attachment 1**, *People Of The State Of New York, By Letitia James, Attorney General Of The State Of New York, v. Donald J. Trump, et al.,* Decision + Order on Motions*, Index No. 452564/2022 (Supreme Court Of The State Of New York, New York County, Sept. 26, 2023), at 22-24, 30.

In contrast to Colliers' disavowal of accuracy and disclaimer of responsibility for detrimental reliance upon data Colliers provides, the C&W study accepts liability if it fails to provide an accurate estimate.  *See id.* at 9.

Commerce rejected the C&W report for three reasons:  (1) most of the C&W report was confidential; (2) the C&W report was prepared specifically for purposes of the review; and (3) some of the benchmark rates in the C&W study may have been based on prices provided by non-private entities.

Commerce rationalized using the *Colliers* benchmark by calling it the only available benchmark on the record (after disqualifying the *C&W* report), and by "adjusting" the benchmark to use only the reported average lease rate for turnkey improved industrial leases in the important industrial and transportation hub, Çerkezköy (in Tekirdağ province), based on a comparison of population density.  P.R.152, *Final Dec.Mem.*, at 9; P.R.131, *Prelim Dec.Mem.* at 12-13 ("petitioner placed population density information on the record showing that the area in Sürmene, Trabzon, where the land in question is located, is most similar in population density to Cerkezkoy")*.*

Commerce conceded that it did not evaluate other factors of comparability, ignoring Turkish government statistics showing that the per-capita GDP for Tekirdağ province is double the per-capita GDP of Trabzon province in which Sürmene lies, and other information establishing the importance of Çerkezköy as an industrial and transportation hub connecting Europe to Asia and the 15,000,000 population in Istanbul's metropolitan area.  *See* P.R.152, *Final Dec.Mem.* at 9 ("we did not opine as to the remaining factors because the record did not contain multiple data sources to choose from").

## II.  Legal Background

A countervailable subsidy exists when (1) a government or public authority, (2) provides a financial contribution; (3) a benefit is thereby conferred upon the recipient of the financial contribution; and (3) the subsidy is specific to a foreign enterprise or foreign industry, or a group of such enterprises or industries. 19 U.S.C. § 1677(5).  The decisions Kaptan challenges here arise under Commerce's decisions about specificity and the calculation of benefit.

### A.  *De Jure* Specificity

Commerce decided that BITT exemptions are *de jure* specific.  *De jure* specificity is defined under 19 U.S.C. § 1677(5A)(D)(i) and hinges on the availability of the subsidy being limited under the law to an enterprise or industry, or group of enterprises or industries.  Section 1677(5A), in relevant part, provides as follows:

> (D)  Domestic subsidy
> In determining whether a subsidy (other than a subsidy described in subparagraph (B) or (C)) is a specific subsidy, in law or in fact, to an enterprise or industry within the jurisdiction of the authority providing the subsidy, the following guidelines shall apply:
>
> (i)  Where the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry, the subsidy is specific as a matter of law.
>
> (ii)  Where the authority providing the subsidy, or the legislation pursuant to which the authority operates, establishes objective criteria or conditions governing the eligibility for, and the amount of, a subsidy, the subsidy is *not* specific as a matter of law, if—
>
> (I)    eligibility is automatic,
> (II)   the criteria or conditions for eligibility are strictly followed, and
> (III)  the criteria or conditions are clearly set forth in the relevant statute, regulation, or other official document so as to be capable of verification.

12

> For purposes of this clause, the term "objective criteria or conditions" means criteria or conditions that are neutral and that do not favor one enterprise or industry over another.
>
> .    .    .
>
> For purposes of this paragraph and paragraph (5B), any reference to an enterprise or industry is a reference to a foreign enterprise or foreign industry and includes a group of such enterprises or industries.

19 U.S.C. § 1677(5A).

The *Statement of Administrative Action* clarifies that "a group of such enterprises or industries," 19 U.S.C. § 1677(5A), means "a sufficiently small number of enterprises, industries, or groups thereof," or "narrowly focused subsidies provided to or used by *discrete segments of an economy*." *Statement of Administrative Action accompanying the Uruguay Round Agreements Act*, H. Doc. 103-316, at 930, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4242 ("*SAA*"),[2] (emphasis added); *BGH Edelstahl Siegen GmbH v. United States*, 600 F. Supp. 3d 1241, 1255 (Ct. Int'l Trade 2022) ("{w}here an authority or legislation expressly limits access to a subsidy *to a sufficiently small number* of enterprises, industries, or groups, the subsidy is specific as a matter of law" (*citing* 19 U.S.C. § 1677(5A)(D)(i); *SAA*, 1994 U.S.C.C.A.N. at 4242) (emphasis added)).

Further, for purposes of the statutory declaration that a subsidy not specific under certain criteria set forth in 19 U.S.C. § 1677(5A)(D)(ii), the *SAA* explains that "objective criteria" are criteria that are "neutral and that do not favor one enterprise or industry over another":

> the eligibility criteria or conditions must be objective, clearly documented, capable of verification, and strictly followed. In

---

[2] "The statement of administrative action approved by the Congress under {19 U.S.C. § 3511(a)} shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

> addition, eligibility for the subsidy must be automatic where the
> criteria are satisfied. Finally, the objective criteria or conditions
> must be neutral, must not favor certain enterprises or industries
> over others, and must be economic in nature and horizontal in
> application, such as the number of employees or the size of the
> enterprise.

*SAA*, 1994 U.S.C.C.A.N. at 4243.

## B. Land Benchmark

For any provision of goods or services allegedly for less than adequate remuneration

("LTAR"), "adequacy of remuneration shall be determined in relation to prevailing market

conditions…. Prevailing market conditions include price, quality, availability, marketability,

transportation, and other conditions of purchase or sale."  19 U.S.C. § 1677(5)(E).  Commerce

normally seeks a benchmark to "measure the adequacy of remuneration by comparing the

government price to a market-determined price for the good or service resulting from actual

transactions in the country in question."  19 C.F.R. § 351.511(a)(2).  When determining whether

the comparison price, or benchmark, Commerce has explained that it "will consider product

similarity; quantities sold, imported, or auctioned; and other factors affecting comparability."  *Id.*

> (2) "Adequate Remuneration" defined—(i) In general. The
> Secretary will normally seek to measure the adequacy of
> remuneration by comparing the government price to a market-
> determined price for the good or service resulting from actual
> transactions in the country in question. Such a price could include
> prices stemming from actual transactions between private parties,
> actual imports, or, in certain circumstances, actual sales from
> competitively run government auctions. In choosing such
> transactions or sales, the Secretary will consider product similarity;
> quantities sold, imported, or auctioned; and other factors affecting
> comparability.

19 C.F.R. § 351.511(a)(2).  To calculate any benefit from Nur's use of unimproved industrial

land on the Black Sea some 1,000 km from Istanbul outside the village of Sürmene, Commerce

selected the benchmark based on turnkey improved industrial leases in a major industrial and

transportation hub in the Istanbul area, ignoring the benchmark based on similar land use in the vicinity of Sürmene.

## STANDARD OF REVIEW

 "The court shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." *See* 19 U.S.C. § 1516a(b)(1)(B)(i).

For issues of statutory construction, this Court must first evaluate "whether Congress has spoken to the precise question at issue." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). "If the intent of Congress is clear, that is the end of the matter." *Id*., at 842.  If the intent of Congress is not clear, this Court must decide whether the Commission's interpretation "is based on a permissible construction of the statute."  *Id*. at 843.

Although the law of the Circuit generally gives "substantial weight to an agency's interpretation of a statute it administers," *Am. Lamb Co. v. United States*, 785 F.2d 994, 1001 (Fed. Cir. 1986), the amount of deference granted to an agency's interpretation is unclear given recent statements in Supreme Court decisions, including that court's current docket.  *See Buffington v. McDonough*, 143 S. Ct. 14, 214 L. Ed. 2d 206, 207-214 (2022) (Gorsuch, J., dissenting); *Michigan v. EPA*, 576 U.S. 743, 760-764, 135 S. Ct. 2699, 192 L. Ed. 2d 674 (2015) (Thomas, J., concurring) (questioning constitutionality of *Chevron* deference); *see also Loper Bright Enters. v. Raimondo*, 216 L. Ed. 2d 414 (Sup. Ct. 2023) (granting certiorari review of case decided upon *Chevron* deference).  Commerce is at least granted *Skidmore* deference "to claim respect according to its persuasiveness," or according to its "power to persuade." *See Skidmore v Swift & Co*. 323 U.S. 134, 140, 89 L.Ed. 124, 65 S.Ct. 161(1944).

## SUMMARY OF THE ARGUMENT

Commerce found that exemptions to Turkey's Bank and Insurance Transactions Tax provided a *de jure* specific subsidy.  A *de jure* specific subsidy is one that is only provided to "an enterprise or industry" or to "a group of such enterprises or industries."  The SAA clarifies that "a group of such enterprises or industries," means a sufficiently small number of enterprises, industries, or groups thereof," or "narrowly focused subsidies provided to or used by discrete segments of an economy."  Thus, if BITT exemptions are available to more than a small number of enterprises, industries, or groups thereof, or are not narrowly focused for discrete segments of the Turkish economy, BITT exemptions are not *de jure* specific.

The BITT was amended in 2019, coincident to the beginning of a period of high inflation in Turkey, to tax certain foreign exchange and foreign currency transactions.  The 2019 amendments were intended only "to restrict speculative and high frequency foreign exchange movements," and so exempted from the BITT every type of business needing access to foreign exchange and foreign currency sales to run their operations.  While the 2019 amendment identified sales between banks, sales involving government ministries, and sales related to foreign-currency-denominated loans, the amendments also exempted sales to "enterprises having industrial registry certificate."  This exemption reached 140,071 enterprises throughout the Turkish economy.  The general availability of BITT exemptions across the business economy establishes that the exemptions are not *de jure* specific.

Commerce also found that the provision of land, rent-free, to Kaptan's affiliate Nur gave a countervailable subsidy.  Kaptan does not contest the conclusion that the rent-free grant of usage rights is countervailable, but, rather, challenges Commerce's benchmark selection.  The land in question is located outside a village on the Black Sea (Sürmene village, Trabzon

province), about 1,000 km from Istanbul, and was vacant when provided to Nur.  When selecting a benchmark, Commerce must "consider product similarity; quantities sold, imported, or auctioned; and other factors affecting *comparability*."  (Emphasis added.) To calculate the benefit, Commerce selected a benchmark provided by petitioners, rather than that provided by Kaptan.

The benchmark Kaptan submitted is a study prepared by international real estate brokerage firm, Cushman & Wakefield ("C&W benchmark").  The C&W benchmark evaluates long-term leases of vacant and similar land in Trabzon province following internationally-recognized standards for valuing property.  Petitioners submitted a report prepared by another international real estate brokerage, Collier's International ("Collier's benchmark").  This report does not disclose the source of its information beyond "Collier's International," the methodologies used, or the qualifications of those preparing the report.  Further, the Collier's benchmark specifically disavows the accuracy of the figures contained in the report.  The Collier's benchmark reports average value for turnkey short- and long-term leases of developed industrial and logistical facilities, in and proximate to Istanbul, the fifth largest city in the world, and a key transportation and commercial hub between Europe and Asia.

The benchmark rents in Turkish Lira ("TL") per square meter per year from both benchmarks are public.  Commerce, however, rejected as unusable the C&W benchmark, claiming that the C&W Report was BPI in its entirety and not credible because it was prepared specifically for the underlying administrative review.  Commerce's decision to reject the C&W benchmark as unusable, and to accept the Collier's benchmark, is unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law.

**ARGUMENT**

Commerce improperly countervailed BITT exemptions that are widely available throughout the Turkish economy.  Commerce also used an improper benchmark to value land used by Kaptan's shipbuilding affiliate, Nur.  This Court should remand both decisions as unsupported by substantial evidence on the administrative record and otherwise not in accordance with law.

## I.   Commerce Improperly Found BITT Exemptions To Be *De Jure* Specific

The exemption from the tax on foreign exchange transactions (the "BITT" exemptions) are broadly available throughout the Turkish economy; thus, Commerce's conclusion that the BITT exemptions are *de jure* specific is unsupported by record evidence.  Commerce focuses its analysis on foreign exchange sales to enterprises having industrial registry certificate, ignoring four other categories of exempted foreign currency sales, claiming that Kaptan and the GOT failed to establish that BITT exemptions are widely available.  Moreover, Commerce fails to acknowledge enterprises with industrial registry certificates span virtually every corner of the economy.  Thus, the BITT exemption for companies with industrial registration are broadly available and thus are not countervailable.

The BITT's purpose is "to restrict speculative and high frequency foreign exchange movements," but not to impede business operations of domestic businesses.  PR48/CR51, *Government of Turkey ("GOT") Initial Questionnaire Response ("IQR")*, at 76-77. Accordingly, Turkish law exempts five types of foreign exchange sales from BITT, the most extensive exempted foreign exchanges sales are those to enterprises having industrial registry certificate.

**A.  Turkish Law Clearly Defines Industrial Registry Certificate Requirements**

Turkish law clearly defines industrial establishments and the automatic qualification such establishments have for BITT exemption.  *See GOT IQR*, at 76-77, Exs.31-32; *Kaptan IQR*, at 50-54, Ex.27 at 20-35.  The definition of "industrial establishment" includes any place that changes the characteristics of material or substance "with the help of machinery, equipment, looms, tools or other means and forces or only by manual labor," and includes mines, repair shops (of any kind), energy producers, large construction sites (including shipbuilders), and information technology and software companies.  *See* PR48/CR94, *GOT IQR*, Ex.32 at 2; PR48/CR43, *Kaptan IQR*, Ex.27 at 35.

Further, *all* industrial enterprises are required to obtain an industrial registry certificate before beginning operations:  Turkish law makes it "obligatory for industrial enterprises to be registered in the industrial registry," and further requires that they "pre-register with the industrial registry before starting production activities," and at least "within two months from the date of their start of operation.  *See id.*

The Government of Turkey stated that there are 140,071 industrial enterprises on the industrial registry.  *Id.* at 77, & Ex.33 at 1.  The Government of Turkey explained, "foreign exchange sales that are made to any enterprise having an industrial registry certificate are subject to 0% BITT rate *without any exceptions*."  *See id.* (emphasis added).

Kaptan explained the simple process to claim the exemption:  it sent a qualifying document to the bank, and the banks automatically applied the exemption:

> Kaptan Demir and Geri Dönüşüm sent their banks the exporter association membership documents in Exhibit 27, although they could just have easily sent a copy of their industrial registry certificates. Once received, the bank automatically applied the exemption to Kaptan Demir's and Geri Dönüşüm's transactions. There was no additional application or approval process.

19

*See* P.R.48/CR26, *Kaptan IQR*, at 52.*.

In addition to industrial registry certificate holders, Turkish law also grants BITT exemptions on foreign exchange sales to banks, authorized institutions, corporate borrowers with foreign currency loan payables, and transactions involving the other group identified under Presidential Decree 1149, exporters who are members of exporters' associations. These provisions, coupled with the exemption for companies on the industrial registry, establishes that BITT exemptions are generally available throughout the Turkish economy, and thus are not specific under section 771(5A)(D)(i) of the Act (19 U.S.C. 1677(5A)(D)(i)). *See GOT IQR*, at 76-101, Exs.31-33.  The large collection of exempted foreign exchange sales along with the 140,071 industrial enterprises that are industrial registry certificates do not combine to form "a *sufficiently small number* of enterprises, industries, or groups thereof," or "narrowly focused subsidies provided to or used by *discrete segments* of an economy."  *SAA*, 1994 U.S.C.C.A.N. at 4242.

**B.  Commerce's *De Jure* Analysis Ignores the Plain Language of Turkish Law And Relies Upon Irrelevant Analyses**

Despite the evidence and arguments presented in the 2020 review, Commerce refused to reconsider its earlier decision that the BITT exemptions are *de jure* specific.  Commerce cited four reasons why it continued to find BITT exemptions de jure specific: (1) the industrial registry law is not obligatory ("this only establishes that the industrial registry certificate *can be obtained* by all industrial enterprises," (emphasis added)); (2) the Government of Turkey did not demonstrate that all eligible enterprises actually applied for and obtained industrial registry certificates; (3) the number of companies that benefit from BITT exemptions is limited to those that fit under one of the five exemptions and engage in foreign currency transactions; and (4)

record evidence does not address whether all companies that make foreign currency transactions receive the benefit under the law.  PR152, Final Dec.Mem. at 12.

Commerce is wrong on all four points.  First, Commerce's claim is plainly wrong that the definition of industrial establishments and criteria for granting industrial registry certificates "only establishes that the industrial registry certificate *can be obtained* by all industrial enterprises."  *Id.* (emphasis added).  Contrary to Commerce's claim, the GOT and Kaptan both explained that Turkish law makes obtaining an industrial registry certificate obligatory before beginning production activities and no later than two months after beginning operations.  *See* PR48/CR94, *GOT IQR*, Ex.32 at 2; PR48/CR43, *Kaptan IQR*, Ex.27 at 35.  The law states:  "{i}t is obligatory for industrial enterprises to be registered in the industrial registry."  *Id.*  Further, industrial enterprises must obtain the industrial registry certificate "before starting production activities," and at least "within two months from the date of their start of operation."  *Id.*  Record evidence wholly contradicts Commerce's first assertion; Commerce reads "must be obtained" as if it meant "can be obtained," converting the mandatory to the precatory.

Second, Commerce makes the awkward and irrelevant claim that the GOT's discussion of the law "does not demonstrate that all industrial enterprises eligible actually apply and obtained industrial registry certificates."  PR152, Final Dec.Mem. at 12.  Commerce apparently wants the GOT to provide evidence establishing that all companies in Turkey follow the law that requires all industrial enterprises to register.  But the GOT is not required to prove a negative.  In the *de jure* specificity analysis, the question is whether the Turkish laws limit BITT exemptions are limited to "a sufficiently small number of enterprises, industries, or groups thereof," or are "narrowly focused subsidies provided to or used by discrete segments of an economy."  *SAA*, 1994 U.S.C.C.A.N. at 4242.  It is enough that the GOT reported that there are 140,071 registered

21

enterprises in nearly every sector of the Turkish economy.  *See* PR48/CR94, *GOT IQR*, at 81 & Ex.33.

Further, the law is plain on its face in terms of both the obligatory nature of obtaining an industrial registry certificate, and the automatic BITT exemptions such certificate holders receive.  *See* 19 U.S.C. § 1677(5A)(D)(ii) (stating that an alleged subsidy is not specific if "eligibility is automatic," the "criteria or conditions for eligibility are strictly followed," and "the criteria or conditions are clearly set forth in the relevant statute, regulation, or other official document so as to be capable of verification").

Third, Commerce's rationale that "the universe of companies that may benefit from the program is necessarily limited to companies that make foreign exchange transactions, which inevitably limits the universe of companies that may benefit from it," suffers from the same defect as the argument this Court has twice rejected in *BGH I*, 600 F. Supp. 3d 1241; and *BGH Edelstahl Siegen GmbH v. United States*, 639 F. Supp. 3d 1237 (Ct. Int'l Trade 2023) ("*BGH II*"):  failure to address 19 U.S.C. § 1677(5A)(D)(ii) factors.  In *BGH*, this Court first found that "Commerce does not explain how this program favors certain industries over others or otherwise explicitly limits usage as to who may apply."  *BGH I*, 600 F. Supp. 3d at 1269.  After a first remand, this Court remanded again because "Commerce fail{ed} to explain how the {terms of the program} are not economic in nature."  *BGH II*, 639 F. Supp. 3d at 1243-44.

Commerce merely speculates about limitations on the universe of companies that may benefit from BITT exemptions.  Instead, if Commerce bases its finding of *de jure* specificity on a speculative limitation not found in the law, Commerce must explain how the explicit criteria of the law are not "economic in nature and horizontal in application."  *BGH II*, 639 F. Supp. 3d at

1243-44; *SAA*, 1994 U.S.C.C.A.N. at 4243.  Commerce's single sentence falls woefully short of the standard.

Commerce also asserts that the law "further limits the universe by adding conditions to apply for BITT exemptions," but does not enumerate any additional conditions it believes the law adds.  *Dec.Mem.* at 12.  For those with industrial registry certificates, there is no other condition.  The industrial registry certificate provided to the bank is all the that its required.

Fourth, Commerce argues that "{e}vidence on the record does not address whether all companies that make foreign exchange transactions receive the benefit under the law, which would show that the BITT exemptions are generally available." *Dec.Mem.* at 12.  Commerce's conclusion has a fatal defect:  a *de jure* specificity analysis does not look at who receives the benefit, but who is eligible under the law to receive the benefit.  On this score, the record is clear: those eligible under the law for the exemptions include 140,071 industrial enterprises, in addition, to banks authorized institutions, corporate borrowers with foreign currency loan payables, and exporters who are members of exporters' associations.  *See* PR48/CR94, *GOT IQR*, Ex.32 at 2; PR48/CR43, *Kaptan IQR*, Ex.27 at 35.  Whether these eligible companies take advantage of their eligibility, and to what extent, are questions that are irrelevant in a *de jure* analysis.

Commerce's determination that BITT exemptions are *de jure* specific is wholly contradicted by record evidence and is otherwise based on irrelevant and unproved speculation.  Accordingly, this Court should reject Commerce's arguments and remand with instructions stating that the Record only admits a finding that BITT exemptions are not specific and not countervailable.

## II.  Commerce Improperly Rejected The C&W benchmark

Commerce improperly rejected the C&W benchmark, instead selecting the Collier's benchmark as the only usable benchmark on the record, to calculate any benefit arising under Nur's land use under Law 5084.  Commerce failed, however, to present any distinction between the two benchmarks or other coherent rationale that would disqualify the C&W benchmark or set the Collier's benchmark apart.  We demonstrate, below, that each of Commerce's justifications for rejecting the C&W benchmark is invalid, and that the Collier's benchmark cannot be used because it is distortive.

In the *Final Results*, Commerce rejected the C&W benchmark as unusable based on invalid claims regarding the public nature, credibility, and underlying data of the C&W benchmark:  (1) the C&W benchmark "is business proprietary information in its entirety"; (2) the C&W benchmark "was commissioned by Kaptan for the purposes of this review or litigation related to the review"; and (3) "that prices in the {C&W benchmark} may have been partially based on prices provided by non-private entities."  P.R.152, *Final Dec.Mem.*, at 9-10. Commerce then selected the Collier's benchmark as the only usable benchmark on the record, with an adjustment based on "population density."  *Id.*, at 9.  The C&W benchmark, however, has the same or superior quality information in terms of its public nature, credibility, and underlying data.  Further, Commerce improperly ignored relevant factors affecting comparability when finding the Collier's benchmark to be usable.

### A.  The C&W Benchmark Contains As Much Public Information As The Collier's Benchmark

Commerce's first justification for rejecting the C&W benchmark as unusable improperly relies on a putative preference for public information.  Commerce mischaracterizes the C&W benchmark as entirely business proprietary information (BPI) when it is not:  the administrative

record contains identical amounts of relevant public information about the C&W and Collier's benchmark rents.  Thus, the Court should find Commerce's preference for public information, as applied here, to be an invalid justification for rejecting the C&W benchmark.

Contrary to Commerce's mischaracterization, the C&W benchmark is not "business proprietary information in its entirety."  P.R.152, *Final Dec.Mem.* at 9.  Although much of the analysis underlying the C&W benchmark is BPI, Kaptan made public the average rents calculated in the C&W benchmark:  "{the C&W benchmark} establishes the appropriate benchmark for undeveloped industrial property in rural provinces similar to Trabzon under different valuation methodologies as ranging from TL 2.46 to TL 3.46 per square meter per annum."  P.R.121/C.R.112-117, *Kaptan Benchmark Submission*, at 2, Ex.1 at 25; *see also* P.R.127/C.R.120, *Kaptan Pre-Prelim Cmts.*, at 3; P.R.128/C.R.121, *Kaptan Pre-Prelim Rebuttal Cmts.*, at 4; P.R.139/C.R.126, *Kaptan Case Br.*, at 12, 15.

Precisely the same amount of relevant public information – location and rent in TL per square meter – is the full extent of relevant benchmark information contained in the Collier's benchmark.  *See* P.R.122, *Petr. Benchmark Submission*, Ex.1 at 11, Ex.2.  Besides basic location and average rent numbers, the Collier's benchmark provides only a general background discussion of market trends in vacancy rates and types of prospective lessees in the Istanbul area. *Id.* The Collier's benchmark does not provide any information – public or BPI – about the data underlying what it reports as average rents in the Istanbul area.  *Id.*

Thus, not only has Commerce mischaracterized the C&W benchmark as BPI "in its entirety" when it is not, but Commerce also has overlooked the fact that the same amount of public information is provided in the C&W and Collier's benchmarks.  Commerce's rejection of

the C&W benchmark is contradicted by record information and by its selection of the Collier's benchmark.

Even if the C&W benchmark were BPI in its entirety, it could not be disqualified as a usable benchmark.  Commerce has only stated that it has a preference for public information, not a statutory or regulatory requirement, without providing any legal support for its preference and without even showing that its purported "preference" represents a consistent practice.  P.R.152, *Final Dec.Mem.*, at 9.  Commerce, itself, has explained that nothing prevents the use of BPI benchmarks:

> We also disagree that Commerce requires that information used to measure the adequacy of remuneration under 19 CFR 351.511(a)(2) be public. Nowhere in 19 CFR 351.511(a)(2) does the regulation state such a requirement, or even a preference, for public data. Rather, 19 CFR 351.511(a)(2) states a preference for "prices stemming from actual transactions between private parties, actual imports, or, in certain circumstances, actual sales from competitively run government auctions." In many cases, these prices are non-public prices which parties place on the record; the petitioner cited to numerous cases in its case brief where Commerce has used proprietary information to measure adequacy of remuneration in recent determinations. No party cited to any CVD case precedent where Commerce required, or expressed a preference for, public information to measure adequacy of remuneration under 19 CFR 351.511. Further, in the instant proceeding, Commerce has used proprietary information from Catalyst, as Catalyst itself has requested, to value barge freight as part of the benchmark calculation.

*Certain Uncoated Groundwood Paper From Canada: Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 39,414 (Dep't of Commerce Aug.9, 2018), *and accompanying Dec.Mem.*, at 127-128 (footnotes omitted); *see also, e.g., Honey from Argentina: Preliminary Affirmative Countervailing Duty Determination and Alignment with Final Antidumping Duty Determination on Honey from the People's Republic of China*, 66 Fed. Reg. 14,521, 14,531 (Dep't of Commerce Mar. 13, 2001) ("the Secretary will normally measure the adequacy of

remuneration by assessing whether the government price is consistent with market principles. Based on our analysis of the proprietary data provided by the GOA"), *unchanged in Final Affirmative Countervailing Duty Determination: Honey From Argentina*, 66 Fed. Reg. 50,613 (Dep't of Commerce Oct. 4, 2001); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review, and Rescission of Review, in Part, 2015*, 83 Fed. Reg. 1235 (Dep't of Commerce Jan. 10, 2018), *Dec.Mem.,* at 15-16; *Steel Concrete Reinforcing Bar From the Republic of Turkey: Preliminary Results of Countervailing Duty Administrative Review and Intent To Rescind the Review in Part; 2015*, 82 Fed. Reg. 57,574  (Dep't of Commerce Dec. 6, 2017), *Dec.Mem.*, at 15-16 (unchanged in *Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results and Partial Rescission of Countervailing Duty Administrative Review the Review; 2015*, 83 Fed. Reg. 16,051 (Dep't of Commerce April 13, 2018)); *Certain Tool Chests and Cabinets From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 82 Fed. Reg. 56,582 (Dep't of Commerce Nov. 29, 2017), *Dec.Mem.*, cmt.5 & n.109; *Certain Softwood Lumber Products From Canada: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 82 Fed. Reg. 19,657 (Dep't of Commerce Apr. 28, 2017), *Dec.Mem.*, at 52 & n.337 (unchanged in *Certain Softwood Lumber Products From Canada: Final Affirmative Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances*, 82 Fed. Reg. 51,806 (Dep't of Commerce Nov. 8, 2017)).

Commerce's practice in this regard cannot be questioned:  the BPI nature of a potential benchmark is not disqualifying.  Accordingly, this Court should reject Commerce's false assertion that the information underlying a proposed benchmark must be publicly available.

### B.   The C&W Benchmark Is More Credible Than The Collier's Benchmark

Commerce's second justification for rejecting the C&W benchmark – questioning its credibility – is equally invalid.  Commerce unlawfully presumes that any proposed benchmark that utilizes a report prepared for purposes of the litigation is *ipso facto* lacking in credibility. At the same time,  Commerce trumpets the presumed credibility of the Collier's benchmark based on information found nowhere on the administrative record.  Both decisions are unsupported by substantial record evidence and otherwise not in accordance with law.

Kaptan highlighted for Commerce's consideration the lack of credibility inherent in the Collier's benchmark because the Collier's study explicitly disavows responsibility for the accuracy of its own figures. *See* R.139/C.R.126, *Kaptan Case Br.* at 5-6.  Commerce exposes its selectivity by asserting that the "disclaimer of liability is not at issue." P.R.152, *Final Dec.Mem.*, at 9.  Collier's, however, not only disclaimed liability but also disavowed the accuracy of the underlying data, "no warranty is given as to the accuracy of … the forecasts, figures, or conclusions contained in this report."  *See* P.R.122, *Petr's Benchmark Submission*, Ex.2, at 21; P.R.139/C.R.126, *Kaptan Case Br.* at 5-6.  Commerce does not address Collier's disavowal of accuracy.

Further, despite Commerce's recognition that Collier's cited only "Collier's International" as the data source, *see* P.R.126/C.R.119, *Petr's Pre-Prelim Cmts.*, Ex.2, at 11, Commerce defends credibility of the Collier's benchmark, stating, "the fact that the Colliers report is based on numbers compiled by Colliers does not disqualify the data, but rather

strengthens the case to use the Colliers report as it is not using secondary sources or compiling sets of data from other sources." P.R.152, *Final Dec.Mem.*, at 9. But the record does not contain any information describing Collier's data source: its underlying data and methodology are secret. *See* P.R.122, *Petr. Benchmark Submission*, Ex.1 at 11, Ex.2. There is no indication in the *Colliers* benchmark whether the reported rates are based on public listings, private offers, actual leases, or guesses based on leases entered in prior years and adjusted upwards for inflation. Further, there is no statement regarding the experience and qualifications of the individuals compiling the data for *Colliers*, nor any statement about whether Colliers followed any internationally-recognized standards in reaching the projections reported in *Colliers*. There is nothing on the record to support Commerce's bald assertion that Colliers "is not using secondary sources or compiling sets of data from other sources." P.R.152, *Final Dec.Mem.*, at 9.

In contrast, the C&W benchmark was developed under internationally-recognized RICS (Royal Institute of Chartered Surveyors) valuation standards by an External Valuer, as defined by those standards, who "possesses special knowledge and many years of experience in the field of property valuation and possesses the knowledge that is needed," P.R.123/C.R.112-117, *Kaptan Benchmark Submission*, Ex.1, at 5, Ex.3, and who "must take reasonable steps to verify the information relied on in the preparation of the valuation." *See id.*, Ex.1 at 5,7, 10-17, 29-79; Ex.3 at 43 ("Inspections and investigations must always be carried out to the extent necessary to produce a valuation that is professionally adequate for its purposes. The valuer must take reasonable steps to verify the information relied on in the preparation of the valuation…."). The C&W benchmark explained all assumptions, demonstrated full awareness of the property to be compared through a site visit on April 22, 2022, *id.*, Ex.1 at 5-6, and provided comprehensive

information in its appendices, including documentation related to the property and adjustments made to the size, conditions, and use of the property.  *Id.*, Ex.1 at 29-143.

The C&W benchmark includes all the underlying information upon which it is based for Commerce and Petitioner to evaluate.  *See* P.R.123/C.R.112-117, *Kaptan Benchmark Submission*, Ex.1.  Further, the C&W accepts liability if the benchmark fails to provide an accurate estimate.  *See id.,* at 9; P.R.124-125, *Kaptan Benchmark Rebuttal*, Ex.1 at 1, 3; P.R.139/C.R.126, *Kaptan Case Br.*, at 15 n.54.  On the question of credibility, the Collier's benchmark flounders while the C&W benchmark flies.

Commerce attacks the credibility of the C&W benchmark by observing that it was "commissioned by Kaptan for purposes of this review," and then citing "'the risk of litigation-inspired fabrications or exaggerations.'"  P.R.152, *Final Dec.Mem.* at 9-10 (*citing Certain Softwood Lumber Products from Canada: Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 Fed. Reg. 51,814 (Dep't of Commerce Nov. 8, 2017), *and accompanying Dec.Mem.* at 82 (*citing Sandt Tech. v. Resco Metal & Plastics Cor.*, 264 F.3d 1344, 1350-51 (Fed. Cir. 2001) ("*Sandt*").  Commerce does not further evaluate the C&W benchmark to assess its credibility, but rather applies a *per se* rule rejecting as unreliable any report prepared for use in litigation.  Contrary to Commerce's assertion, *Sandt* is inapplicable to the case at bar.

In *Sandt*, the Federal Circuit evaluated the sufficiency of prior-inventorship evidence supporting a challenge to the validity of a patent.  *Sandt*, 264 F.3d at 1350.  The Court explained that, in the context of supporting prior-inventorship arguments, "post-invention oral testimony is more suspect, as there is more of a risk that the witness may have a litigation-inspired motive to corroborate the inventor's testimony, and that the testimony may be inaccurate." The Court

therefore found that further analysis of the credibility of the evidence – oral testimony of an interested party, not an expert report prepared by an independent third party – was required. *Sandt*, 264 F.3d at 1351.  That further analysis includes eight factors:

> 1) the relationship between the corroborating witness and the alleged prior user; 2) the time period between the event and trial; 3) the interest of the corroborating witness in the subject matter in suit; 4) contradiction or impeachment of the witness' testimony; 5) the extent and details of the corroborating testimony; 6) the witness' familiarity with the subject matter of the patented invention and the prior use; 7) probability that a prior use could occur considering the state of the art at the time; and 8) impact of the invention on the industry, and the commercial value of its practice.

*Id.*  Thus, the precedent *Sandt* sets is not that a court may dismiss post-invention oral testimony because it is suspect, but that a court must conduct a reasonable evaluation of credibility factors before rejecting the testimony.  There is nothing in *Sandt* that would countenance the *per se* rule Commerce has here applied to a written report prepared by a third-party expert.

Commerce's reliance on *Sandt* is ultimately pretextual, doing away with any substantive analysis and misapplying the rationale of a Federal Circuit patent case concerning oral testimony of an interested party to a Commerce Department CVD case concerning a written report by an independent third-party expert.

Similarly, in *Rautaruukki Oy v. United States*, 23 CIT 257 (1999), this Court remanded for Commerce to reopen the record to allow parties to submit nonsubjective evidence Commerce wanted on consumer conduct.  *Id.*  Rautaruukki Oy submitted affidavits with "testimony of a materials scientist and a naval engineer, both experts familiar with the materials and the market," which Commerce disregarded as "subjective," and not the kind of evidence it was required to review.  *Id.*  The Court observed that, although "Commerce claims it did not disregard the expert testimony{, Commerce} apparently observed the evidence only to the extent necessary to

31

conclude that it was 'subjective' and did not need to be considered." *Id.* The Court remanded

for Commerce to evaluate the information, prohibiting Commerce from disregarding the

evidence based on "its own unsubstantiated assertions to the contrary." *Id.*

Here, Commerce claims it considered all evidence, but Commerce's failure to conduct

any evaluation of credibility factors related to the C&W report undermines that assertion:

> Although we consider all evidence on the record of a proceeding,
> in determining the weight to be accorded to a particular piece of
> evidence, we consider whether the evidence in question was
> prepared in the ordinary course of business, or for the express
> purpose of submission in the ongoing administrative proceeding.
> When evidence has been generated expressly for the purpose of an
> administrative proceeding, we find that said evidence is at "risk of
> litigation-inspired fabrication or exaggeration," which diminishes
> its weight and results in the evidence being unreliable.

P.R.152, *Final Dec.Mem.* at 9. Simply referencing the report and noting the circumstances of its

creation, only to dismiss it without meaningfully addressing its substance, does not represent the

"thorough, probing, in-depth review" that the law requires. *SCM Corp. v. United States*, 84 Cust.

Ct. 227, 230-31, 487 F. Supp. 96, 99 (1980) (*quoting Citizens to Preserve Overton Park, Inc.*, *v.

Volpe*, 401 U.S. 402, 415, 91 S. Ct. 814 (1971)).

And although Commerce may claim expertise in the administration of U.S. trade laws, it

does not have expertise in real property valuation analysis. The level of deference owed to

Commerce here is at its nadir because Commerce is acting outside of its substantive expertise.

*Kisor v. Wilkie*, 139 S. Ct. 2400, 2417, 204 L. Ed. 2d 841 (2019) ("the agency's interpretation

must in some way implicate its substantive expertise"); *Anshan Iron & Steel Co. v. United States*,

358 F. Supp. 2d 1236, 1243 (Ct. Int'l Trade 2004) ("{D}eference is not due an agency

determination which relies upon {an} inadequate factual basis or is inconsistent with

congressional intent."). Ultimately, Commerce's analysis regarding the C&W benchmark

amounts to a few assertions without analysis, and thus cannot stand. *Habaş Sinai ve Tibbi*

*Gazlar Istihsal Endüstrisi A.Ş. v. United States*, 413 F. Supp. 3d 1347, 1358 (Ct. Int'l Trade 2019) (finding that "a bald assertion" did not constitute "a reasonable explanation").  Commerce thoroughly failed to consider the merits of the C&W report.

Accordingly, this Court must reject Commerce's creation of an unlawful rule excluding from consideration in CVD LTAR analyses any and all reports prepared by independent third parties as the request of an interested party.

### C.  Commerce Fails To Provide A Reviewable Explanation For Its Final Justification For Disqualifying The C&W benchmark

As we have demonstrated, the C&W benchmark objectively is as public as, and is more credible than the Collier's benchmark, invalidating Commerce's first two reasons for rejecting the C&W benchmark as unusable.  Commerce's last justification for finding the C&W benchmark unusable questions the substance of the information underlying the benchmark. Commerce provides no explanation how this third justification supports finding the C&W benchmark unusable.  Further, the C&W benchmark has superior underlying data and transparency when compared to the Collier's benchmark.  Thus, this last justification also fails to support Commerce's conclusion that the C&W benchmark is unusable.

Commerce's last justification for finding the C&W benchmark not usable is the speculation "it appears from information contained in the benchmark methodology of Kaptan's benchmark that prices in the {C&W benchmark} may have been partially based on prices provided by non-private entities."  P.R.152, *Final Dec.Mem.*, at 10.  Commerce does not provide any more analysis or otherwise describe why this speculation supports finding the C&W benchmark unusable.  Indeed, "Commerce has failed, in constructing and applying its land benchmark, to articulate a rational connection between the facts it found and the choices it made." *See Özdemir Boru San. ve Tic. Ltd. Sti. v. United States*, 273 F. Supp. 3d 1225, 1250-53

(Ct. Int'l Trade 2017) (*citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463

U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983) (*quoting Burlington Truck Lines Inc. v.*

*United States*, 371 U.S. 156, 168, 83 S. Ct. 239, 9 L. Ed. 2d 207 (1962))).

Commerce's three justifications for rejecting the C&W benchmark are invalid.

Accordingly, this Court should remand this case to Commerce to reconsider the C&W

benchmark for purposes of calculating any benefit from Nur's land use outside Süreme village.

### D. Commerce Improperly Discarded Considerations Of Factors Affecting Comparability When Selecting The Distortive Collier's Benchmark

Commerce failed in its evaluation of potential benchmarks by ignoring comparability

when selecting the non-comparable and distortive Collier's benchmark.  The sole factor

Commerce reviewed was population density (which is largely irrelevant), excusing itself from

evaluating any other relevant factor affecting comparability on the mistaken premise that the

Collier's benchmark was the only valid benchmark on the record.  We have demonstrated that

Commerce improperly rejected the C&W benchmark from consideration, thus this Court should

remand with instructions to reevaluate potential benchmarks, considering all relevant factors

affecting comparability, and select a reasonable benchmark that is not distortive.

#### 1. Commerce Must Consider Factors Affecting Comparability When Selecting Benchmark Rental Rates

Commerce's regulations set the standard for selecting a benchmark: "In choosing such

transactions or sales, {Commerce} will consider product similarity; quantities sold, imported, or

auctioned; and other factors affecting comparability."  *See* 19 C.F.R. § 351.511(a)(2)(i).  That is,

"Commerce must consider relevant record evidence in determining the comparability of land

parcels it uses in creating a reasonable benchmark that lacks distortive pricing." *Özdemir I*, 273

F. Supp. 3d at1250-53.  Further, "'When confronted with a colorable claim that the data that

Commerce is considering is aberrational, Commerce must examine the data and provide a reasoned explanation as to why the data it chooses is reliable and non-distortive.'" *Özdemir I*, 273 F. Supp. 3d at 1251 (*quoting Mittal Steel Galati S.A. v. United States*, 31 CIT 1121, 1135, 502 F. Supp. 2d 1295, 1308 (2007).

Kaptan argued "that the Colliers report provides data that are distortive and not comparable to the land area used by Nur." P.R.152, *Final Dec.Mem.*, at 9; P.R.139/C.R.126, *Kaptan Case Br.*, at 6-11. Kaptan further observed "that Commerce has not considered any other factors such as the geographical location of the land within the country of Turkey in terms of its proximity to a commercial hub, or any other factors which would affect comparability." *Id.*; P.R.139/C.R.126, *Kaptan Case Br.*, at 7-8. In response, Commerce simply disclaimed any responsibility to review these factors: "This argument is predicated on Kaptan's assumption that there are multiple data sources Commerce could choose from. However, the only usable data source on the record is the Colliers report, and is thus the only source Commerce may consider." *Id.* Despite acknowledging these factors affecting comparability, Commerce explained, "we did not opine as to the remaining factors because the record did not contain multiple data sources to choose from." *Id.*

Ultimately, Commerce must evaluate whether a proposed benchmark is suitable at all. *Toscelik Profil ve Sac Endustrisi A.S. v. United States*, 38 CIT 1534, 1541 (2014). Commerce's failure to consider factor affecting comparability led it to select an unreasonable and distortive benchmark. In short, the eastern Black Sea village of Sürmene is not comparable to Istanbul.

## 2. The Quality Of The Data Underlying The C&W benchmark Is Superior To, And More Transparent Than, The Data Underlying The Collier's Benchmark

The quality and usability of a benchmark must begin with an understanding of what needs to be valued. Rather than assess the land Nur used and evaluate the comparability of

benchmarks, Commerce accepted the Collier's benchmark because it was "the only usable data source on the record." P.R.152, *Final Dec.Mem.*, at 9. A comparison of the C&W and Collier's benchmarks, in light of the property to be valued, demonstrates that the C&W benchmark is far superior and more transparent.

Here, the land Nur received pursuant to Law 5084 and used during the period of review was about 144,856.66 square meters of land (about 36 acres) recovered from the Black Sea. P.R.48/C.R.26-50, *Kaptan IQR* at 26, Ex.30. Nur was granted the right to use the 36 acres for 49 years, free of rent, if it satisfied certain investment and employment requirements. *Id.* Nur's use includes "'construction and utilization of Shipyard Loading, Unloading and Logistic Operations Facilities.'" *Id.* The property is located on the Black Sea, outside the village of Sürmene, province of Trabzon, about 1,000 km from Istanbul. *See* P.R.121/C.R.114-117, *Kaptan Benchmark Submission*, Ex.1 at 10-11. Nur received the land vacant. *Id.* at 16. The C&W benchmark took the precise property to be valued as its starting point: vacant land outside a small village on the Black Sea, far from any significant trade route, rail, or population center. P.R.121/C.R.114-117, *Kaptan's Benchmark Submission*, Ex.1, at 5-7.

In contrast, the Collier's benchmark describes industrial and logistic leases in the greater Istanbul area with its population of approximately 15,000,000. Although the Collier's benchmark does not disclose what types of leases are included in its reported rental rates, the discussion of industrial property highlights short-term leases ("{t}here was a rise in companies looking for additional warehouse spaces on short-term (3- to 9-month) contracts") and a significant number of logistic facilities ("{t}he increased need for logistic facilities led to a significant growth in the volume of new leases in the second half of 2020") as "one of the principal causes of these rent hikes." P.R. 122, *Pet'r Benchmark Submission*, Ex.1 at 9-10.

36

Commerce rationalized using the *Colliers* benchmark by calling it the only usable benchmark on the record, and adjusted the benchmark to use only the reported average lease rate for improved industrial leases in Çerkezköy, Tekirdağ province, based on a comparison of population density.  P.R.152, *Final Dec.Mem.*, at 9; P.R.131, *Prelim Dec.Mem.* at 12-13 ("petitioner placed population density information on the record showing that the area in Sürmene, Trabzon, where the land in question is located, is most similar in population density to Cerkezkoy")  The industrial zone in Çerkezköy is described as "one of the largest and most established industrial zone in Turkey," with 1273 hectares (about 3146 acres) "within two municipal boundaries," Çerkezköy and Kapaklı.  P.R.124-125, *Kaptan Benchmark Rebuttal*, Ex.2 at 2-4.  There are 77,000 employees in just the industrial zone – 3 times the population of Sürmene village – and "extensive transportation facilities." *Id.*, Ex.2 at 3; P.R.123/C.R.121, *Petr's Benchmark Rebuttal*, Att.2 at 18 (population of Sürmene).   Further, Çerkezköy is "an industrial/transportation hub just outside Istanbul and is the staging area for imports from the rest of Europe into Turkey."  P.R.124-125, *Kaptan Benchmark Rebuttal*, Ex.2 at 2-3.

The Court of International Trade has ruled, and Commerce has agreed, that land benchmarks in Istanbul and the Istanbul area are inappropriate as benchmarks for land located in less-developed areas in Turkey because Istanbul-area benchmarks "deviate substantially from the other prices." *Özdemir I*, 273 F. Supp. 3d at 1250-53; *Özdemir Boru San. ve Tic. Ltd. Sti. v. United States*, 282 F. Supp. 3d 1352 (Ct. Int'l Trade 2018) ("*Özedemir II*") (noting Commerce's agreement that prices in Istanbul and Istanbul area "deviate substantially from the other prices in the dataset," skewed the benchmark, and should be removed); *Zhaoqing New Zhongya Aluminum Co. v. United States*, 929 F. Supp. 2d 1324, 1328-1330 (Ct. Int'l Trade 2013) (rejecting benchmark of developed urban land to value undeveloped land).  This guidance holds true here.

The C&W benchmark and Collier's benchmark evaluate vastly different parcels of land, not only in terms of vacant land versus turnkey industrial and logistic facilities, but also in terms of geographic location, proximity to population, commercial centers, transportation hubs, and trade routes.  Only the C&W benchmark provides values for comparable land.

The per-capita GDP comparison of Istanbul and its neighboring provinces, Kocaeli and Tekirdağ, the capital, Ankara, and Trabzon also undermines the comparability of Sürmene to Istanbul, which petitioner's information calls "the fifth largest city in the world."  *See* P.R.123/C.R.118, *Pet'r Benchmark Rebuttal*, Ex.2 at 2, 8, 11.  Istanbul, Kocaeli, Tekirdağ, and Ankara have four highest per-capita GDP in Turkey and are double or more the per-capita GDP of Trabzon:

| | |
|---|---|
| Istanbul | 97,950 TL |
| Kocaeli | 96,745 TL |
| Ankara | 85,396 TL |
| Tekirdağ | 84,522 TL |
| Turkey (avg) | 60,525 TL |
| . . . | |
| Trabzon | 42,799 TL |

*See* P.R.124-125, *Kaptan Benchmark Rebuttal*, Ex.1 at 1, 3.  The relative economic strength of the provinces further undermines the comparability of vacant land in Trabzon province versus turnkey industrial and logistic facilities in the Istanbul area.

The population-density adjustment Commerce made has questionable relevance because the properties described in the Collier's benchmark are so radically different from the Nur land. Information submitted by petitioner provides only population and population density information within the city limits of Çerkezköy and within the town limits of Sürmene:  for Çerkezköy, 174,529 people with 111,949 people per square kilometer; and for Sürmene, 26,824 people at a density rate of 74,719 people per square kilometer.  *See* P.R.123, *Petr's Benchmark Rebuttal*, Att.2 at 15, 18.  The population of Çerkezköy is nearly 7 times the population of Sürmene, while

the population density of Çerkezköy is only 50% higher than the population density of Sürmene; one would not expect a significant residential population within municipal boundaries that are dominated by "one of the largest and most established industrial zone{s} in Turkey." *See* P.R.124-125, *Kaptan Benchmark Rebuttal*, Ex.2 at 2-5. Çerkezköy's population is 174,529, but about 77,000 people work in the Çerkezköy Organized Industrial Zone. *See id.*, Ex.2 at 2-5.

Further, the population-density measure Commerce used does not provide an adequate guide because it ignores the context of the larger geographic areas. Çerkezköy is located in the Tekirdağ province, which neighbors Istanbul, and is characterized by *Colliers* as part of the "Greater Istanbul Area Industrial Market." *See* P.R.122, *Petr's Benchmark, Submission*, Ex.1 at 9. Although Çerkezköy has a population of 174,529, it is part of the greater Istanbul area, which includes Istanbul's population of more than 15 million people. *See* Petr's Benchmark Rebuttal, Att.2 at 15. The greater area where Sürmene (population 26,824) is located – the entire Trabzon province on the Black Sea – has a population of only 816,684, about 1/20th the population of the greater Istanbul industrial area. *See id.*, Att.2 at 18; Kaptan Benchmark Submission, Ex.1 at 10. The population served by industrial land Sürmene does not compare to the population served by industrial and logistical facilities in Çerkezköy.

The benchmark Commerce used to value the Nur property is like using a turnkey industrial site in Bayonne, New Jersey, or in Philadelphia or Baltimore to value unimproved land on the shore of Lake Superior three hours outside Duluth, Minnesota. A small town on Lake Superior with a relatively small geographic footprint may have the same population density as any of the other three cities, but the lack of proximity to any major population centers or logistical supply lines makes population density a farce of a comparison measure.

39

To summarize:  Petitioners and Kaptan each placed a proposed benchmark on the record. Commerce found Kaptan's benchmark to be unusable – utterly null and void – because it violated the putative principle of the Federal Circuit's *Sandt* case, *supra*.  Commerce claimed to find in *Sandt* an absolute bar against the use of a third-party expert report, when, in fact, *Sandt* is inapposite insofar as it was a patent case; it concerned oral testimony by an interested party rather than a written report of an independent third party operating under well-recognized international standards.  In any event, *Sandt* does not pose an absolute bar, but merely instructs the trier of fact to make a searching examination as to the credibility of the evidence – whether testimonial or documentary – in question.  Commerce has many times used reports prepared for purposes of litigation in valuing benchmarks, and it should have made an evaluation on the merits here. Finally, the notion that a benchmark must be grounded in generally available public information – for example, a Google search – is simply not a statement of the law.  There is no legal or policy bar to the use of a proprietary report in determining a benchmark, particularly when, as here, the actual benchmark figures are public information.

Thus, Commerce was wrong simply to declare, *ipse dixit*, that Kaptan's proposed benchmark was unusable.  At the very least, Commerce was required to consider whether the C&W report had the hallmarks of credibility or not.

On the merits, the C&W benchmark is superior in terms of credibility, transparency, data quality, and comparability to the Collier's benchmark.

Commerce's failure to consider the C&W benchmark on its merits is not supported by substantial record evidence or in accordance with law.  Thus, this Court should remand this case to Commerce to reconsider  the benchmark; to make a searching analysis of the credibility of the C&W benchmark report; and to make a detailed analysis of which benchmark more nearly

provides a valuation of properties more comparable to Nur's actual property. In the end, Commerce must ascertain, on the merits, whether the Trabzon properties in the C&W report are more comparable to the actual Nur property than the Istanbul-area properties in the Collier's report.

## CONCLUSION

For the reasons stated above, this Court should find that BITT exemptions are not *de jure* specific, and that Commerce improperly rejected the C&W benchmark, and remand for a redetermination by Commerce in harmony with this Court's decision.

Respectfully submitted,

/s/ *Mark B. Lehnardt*

David L. Simon
Mark B. Lehnardt

Law Offices of David L. Simon, PLLC
1025 Connecticut Ave., N.W., Ste. 1000
Washington, D.C. 20036

Email: MarkLehnardt@DLSimon.com

November 13, 2023                    *Counsel to Kaptan Demir Çelik Endüstrisi ve Ticaret A.Ş.*

# ATTACHMENT 1

*People Of The State Of New York, By Letitia James, Attorney General Of The State Of New York, v. Donald J. Trump, et al.*

**Decision + Order on Motions, Index No. 452564/2022**

# SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

| | |
|---|---|
| PRESENT: **HON. ARTHUR F. ENGORON** | PART 37 |
| *Justice* | |

------------------------------------------------------------------X

PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK,

                Plaintiff,

- v -

DONALD J. TRUMP, DONALD TRUMP JR, ERIC TRUMP, ALLEN WEISSELBERG, JEFFREY MCCONNEY, THE DONALD J. TRUMP REVOCABLE TRUST, THE TRUMP ORGANIZATION, INC., TRUMP ORGANIZATION LLC, DJT HOLDINGS LLC, DJT HOLDINGS MANAGING MEMBER, TRUMP ENDEAVOR 12 LLC, 401 NORTH WABASH VENTURE LLC, TRUMP OLD POST OFFICE LLC, 40 WALL STREET LLC, SEVEN SPRINGS LLC,

                Defendants.

------------------------------------------------------------------X

| | |
|---|---|
| INDEX NO. | 452564/2022 |
| MOTION DATES | 08/30/2023, 08/30/2023, 09/05/2023 |
| MOTION SEQ. NO. | 026, 027, 028 |

**DECISION + ORDER ON MOTIONS**

The following e-filed documents, listed by NYSCEF document number (Motion 026) 765, 766, 767, 768, 769, 770, 771, 772, 773, 774, 775, 776, 777, 778, 779, 780, 781, 782, 783, 784, 785, 786, 787, 788, 789, 790, 791, 792, 793, 794, 795, 796, 797, 798, 799, 800, 801, 802, 803, 804, 805, 806, 807, 808, 809, 810, 811, 812, 813, 814, 815, 816, 817, 818, 819, 820, 821, 822, 823, 824, 825, 826, 827, 828, 829, 830, 831, 832, 833, 874, 875, 876, 877, 878, 879, 880, 881, 882, 883, 884, 885, 886, 887, 888, 889, 890, 891, 892, 893, 894, 895, 896, 897, 898, 899, 900, 901, 902, 903, 904, 905, 906, 907, 908, 909, 910, 911, 912, 913, 914, 915, 916, 917, 918, 919, 920, 921, 922, 923, 924, 925, 926, 927, 928, 929, 930, 931, 932, 933, 934, 935, 936, 937, 938, 939, 940, 941, 942, 943, 944, 945, 946, 947, 948, 949, 950, 951, 952, 953, 954, 955, 956, 957, 958, 959, 960, 961, 962, 963, 964, 965, 966, 967, 968, 969, 970, 971, 972, 973, 974, 975, 976, 977, 978, 979, 980, 981, 982, 983, 984, 985, 986, 987, 988, 989, 990, 991, 992, 993, 994, 995, 996, 997, 998, 999, 1000, 1001, 1002, 1003, 1004, 1005, 1006, 1007, 1008, 1009, 1010, 1011, 1012, 1013, 1014, 1015, 1016, 1017, 1018, 1019, 1020, 1021, 1022, 1023, 1024, 1025, 1026, 1027, 1028, 1062, 1063, 1064, 1065, 1066, 1067, 1068, 1069, 1070, 1071, 1072, 1073, 1074, 1075, 1076, 1077, 1078, 1079, 1080, 1081, 1082, 1083, 1084, 1085, 1086, 1087, 1088, 1089, 1090, 1091, 1092, 1093, 1094, 1095, 1096, 1097, 1098, 1099, 1100, 1101, 1102, 1103, 1104, 1105, 1106, 1107, 1108, 1109, 1110, 1111, 1112, 1113, 1114, 1115, 1116, 1117, 1118, 1119, 1120, 1121, 1122, 1123, 1124, 1125, 1126, 1127, 1128, 1129, 1130, 1131, 1132, 1133, 1134, 1135, 1136, 1137, 1138, 1139, 1140, 1141, 1142, 1143, 1144, 1145, 1146, 1147, 1148, 1149, 1150, 1151, 1152, 1153, 1154, 1155, 1156, 1157, 1158, 1159, 1160, 1161, 1162, 1163, 1164, 1165, 1166, 1167, 1168, 1169, 1170, 1171, 1172, 1173, 1174, 1175, 1176, 1177, 1178, 1179, 1180, 1181, 1182, 1183, 1184, 1185, 1186, 1187, 1188, 1189, 1190, 1191, 1192, 1193, 1194, 1195, 1196, 1197, 1198, 1199, 1200, 1201, 1202, 1203, 1204, 1205, 1206, 1207, 1208, 1209, 1210, 1211, 1212, 1213, 1214, 1215, 1216, 1217, 1218, 1219, 1220, 1221, 1222, 1223, 1224, 1225, 1226, 1227, 1228, 1229, 1230, 1231, 1232, 1233, 1234, 1235, 1236, 1237, 1238, 1239, 1240, 1241, 1242, 1243, 1244, 1245, 1246, 1247, 1248, 1249, 1250, 1251, 1252, 1253, 1254, 1255, 1256, 1257, 1258, 1259, 1260, 1261, 1262, 1292, 1293, 1294, 1394, 1395, 1396, 1397, 1398, 1399, 1400, 1401, 1402, 1403, 1404, 1405, 1406, 1407, 1408, 1409, 1410, 1411, 1412, 1413, 1414, 1415,

452564/2022  PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. TRUMP, DONALD J. ET AL
Motion Nos.  026, 027, 028

Page 1 of 35

1 of 35

1416, 1417, 1418, 1419, 1420, 1421, 1422, 1423, 1424, 1425, 1426, 1427, 1428, 1429, 1430, 1431, 1432, 1433, 1434, 1435, 1436, 1437, 1438, 1439, 1442, 1443, 1444, 1445, 1446, 1447

were read on this motion for              _____ PARTIAL SUMMARY JUDGMENT _____.

The following e-filed documents, listed by NYSCEF document number (Motion 027) 834, 835, 836, 837, 838, 839, 840, 841, 842, 843, 844, 845, 846, 847, 848, 849, 850, 851, 852, 853, 854, 855, 856, 857, 858, 859, 860, 861, 862, 863, 864, 865, 866, 867, 868, 869, 870, 871, 872, 873, 1029, 1030, 1031, 1032, 1033, 1034, 1035, 1036, 1037, 1038, 1039, 1040, 1041, 1042, 1043, 1044, 1045, 1046, 1047, 1048, 1049, 1050, 1051, 1052, 1053, 1054, 1055, 1056, 1057, 1058, 1059, 1060, 1061, 1277, 1278, 1279, 1280, 1281, 1282, 1283, 1284, 1285, 1286, 1287, 1288, 1289, 1290, 1291, 1295, 1296, 1297, 1298, 1299, 1300, 1301, 1302, 1303, 1304, 1305, 1306, 1307, 1308, 1309, 1310, 1311, 1312, 1313, 1314, 1315, 1316, 1317, 1318, 1319, 1320, 1321, 1322, 1323, 1324, 1325, 1326, 1327, 1328, 1329, 1330, 1331, 1332, 1333, 1334, 1335, 1336, 1337, 1338, 1339, 1340, 1341, 1474

were read on this motion for              _____ SUMMARY JUDGMENT _____.

The following e-filed documents, listed by NYSCEF document number (Motion 028) 1263, 1264, 1265, 1276, 1448, 1449, 1450, 1451, 1452, 1453, 1454, 1455, 1456, 1457, 1458, 1459, 1460, 1461, 1462, 1463, 1464, 1465, 1466, 1467, 1468, 1469, 1470, 1471, 1472, 1473

were read on this motion for              _____ SANCTIONS _____.

Upon the foregoing documents, it is hereby ordered that defendants' motion for summary judgment is denied, plaintiff's motion for partial summary judgment is granted in part, and plaintiff's motion for sanctions is granted in part, all as detailed herein.

This action arises out of a years-long investigation that plaintiff, the Office of the Attorney General of the State of New York ("OAG"), conducted into certain business practices that defendants engaged in from 2011 through 2021. OAG alleges that the individual and entity defendants committed repeated and persistent fraud by preparing, certifying, and submitting to lenders and insurers false and misleading financial statements, thus violating New York Executive Law § 63(12).

Procedural Background
In 2020, OAG commenced a special proceeding seeking to enforce a series of subpoenas against various named defendants and other persons and entities. This Court presided over that proceeding and issued several orders compelling compliance with OAG's subpoenas. See People v The Trump Org., Sup Ct, NY County, Index No. 541685/2020. During that proceeding, OAG and the Trump Organization entered into an agreement, which, broadly speaking, tolled the statute of limitations from November 5, 2020, through May 31, 2022. NYSCEF Doc. No. 1260.

On November 3, 2022, this Court found preliminarily that defendants had a propensity to engage in persistent fraud by submitting false and misleading Statements of Financial Condition ("SFCs") on behalf of defendant Donald J. Trump ("Donald Trump"). NYSCEF Doc. No. 183. Accordingly, the Court granted a preliminary injunction against any further fraud and appointed the Hon. Barbara S. Jones (ret.) as an independent monitor to oversee defendants' financial statements and significant asset transfers. NYSCEF Doc. Nos. 193 and 194.

452564/2022  PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. TRUMP, DONALD J. ET AL
Motion Nos. 026, 027, 028

Page 2 of 35

2 of 35

Defendants moved to dismiss the complaint. In a Decision and Order dated January 6, 2023, this Court denied the motion. NYSCEF Doc. Nos. 453. Defendants appealed, resulting in a January 6, 2023 Order wherein the Appellate Division, First Department modified this Court's order to the extent of: (1) declaring that the "continuing wrong doctrine does not delay or extend [the statute of limitations]"; (2) finding that claims are timely against defendants subject to the tolling agreement if they accrued after July 13, 2014, and timely against defendants not subject to the tolling agreement if they accrued after February 6, 2016; and (3) dismissing the complaint as against defendant Ivanka Trump on statute of limitations grounds, finding that she was not an employee of the Trump Organization at the time at which the parties entered into the tolling agreement. People v Trump, 217 AD3d 609 (1st Dept 2023).

The Appellate Division declined to dismiss *any* other defendants or *any* causes of action.

Discovery ended on July 28, 2023, and OAG filed a note of issue shortly thereafter. NYSCEF Doc. No. 644. OAG now moves for partial summary judgment on its first cause of action, for fraud under Executive Law § 63(12). NYSCEF Doc. No. 765. Separately, plaintiff now moves, pursuant to 22 NYCRR 130-1.1, to sanction defendants for frivolous motion practice. NYSCEF Doc. No. 1263. Defendants also move for summary judgment, seeking to dismiss the complaint in its entirety. NYSCEF Doc. No. 834.

Executive Law § 63(12)
Executive Law § 63(12) provides, as here pertinent, as follows:

> Whenever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business, the attorney general may apply, in the name of the people of the state of New York, to the supreme court of the state of New York, on notice of five days, for an order enjoining the continuance of such business activity or of any fraudulent or illegal acts, directing restitution and damages and, in an appropriate case, cancelling any certificate filed under and by virtue of the provisions of section four hundred forty of the former penal law or section one hundred thirty of the general business law, and the court may award the relief applied for or so much thereof as it may deem proper. The word "fraud" or "fraudulent" as used herein shall include any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions. The term "persistent fraud" or "illegality" as used herein shall include continuance or carrying on of any fraudulent or illegal act or conduct. The term "repeated" as used herein shall include repetition of any separate and distinct fraudulent or illegal act, or conduct which affects more than one person.

452564/2022  PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. TRUMP, DONALD J. ET AL
Motion Nos. 026, 027, 028

Page 3 of 35

3 of 35

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON ALL CAUSES OF ACTION

### Arguments Defendants Raise Again

#### Standing and Capacity to Sue

Defendants' arguments that OAG has neither capacity nor standing to sue under Executive Law § 63(12), and that the disclaimers of non-party accountants Mazars insulate defendants, invoke the time-loop in the film "Groundhog Day." This Court emphatically rejected these arguments in its preliminary injunction decision and in its dismissal decision, and the First Department affirmed both. Defendants' contention that a different procedural posture mandates a reconsideration, or *a fortiori*, a reversal, is pure sophistry[1].

As this Court and others have made abundantly clear, "[i]t is not disputed that the Attorney General is empowered to sue for violations of [Executive Law § 63(12)]." People v Greenberg, 21 NY3d 439, 446 (2013) (finding Executive Law § 63(12) to be broadly worded anti-fraud device); People v Ford Motor Co., 74 NY2d 495, 502 (1989) ("Executive Law § 63(12) is the procedural route by which the Attorney-General may apply to Supreme Court for an order enjoining repeated illegal or fraudulent acts").

#### *Parens Patriae* and Consumer Ambit

Defendants repeat the erroneous argument that the complaint must be dismissed because OAG cannot demonstrate the requirements of a *parens patriae* action, which is one in the public interest. "*Parens patriae* is a common-law standing doctrine that permits the state to commence an action to protect a public interest, like the safety, health or welfare of its citizens." People v Grasso, 11 NY3d 64, 72 at n 4 (2008). Invocation of such doctrine, or its requirements, is not necessary where, as here, the New York legislature has specifically empowered the Attorney General to bring such an action pursuant to Executive Law § 63(12). People v Credit Suisse Sec. (USA) LLC, 31 NY3d 622, 633 (2018) ("it is undisputed that Executive Law § 63(12) gives the Attorney General standing to redress liabilities recognized elsewhere in the law, expanding the scope of available remedies"); People v Trump Entrepreneur Initiative LLC, 137 AD3d 409, 417 (1st Dept 2016) ("[E]ven apart from prevailing authority, the language of the statute itself appears to authorize a cause of action; like similar statutes that authorize causes of action, § 63(12) defines the fraudulent conduct that it prohibits, authorizes the Attorney General to commence an action or proceeding to foreclose that conduct, and specifies the relief, including equitable relief, that the Attorney General may seek").

In any event, even if compliance with the requirements of the *parens patriae* doctrine is necessary, which it is not, OAG has easily satisfied those requirements, as it is well-settled that "[i]n varying contexts, courts have held that a state has a quasi-sovereign interest in protecting the integrity of the marketplace." Grasso at 69 n 4; People v Coventry First LLC, 52 AD3d 345, 346 (1st Dept 2008) ("the claim pursuant to Executive Law § 63(12) constituted proper exercises

---

[1] Indeed, the Court made this crystal clear in its January 6, 2023 order when it found: "Here, the issues of capacity and standing, are pure issues of law and do not depend on a trial of disputed issues of fact. Simply put, who the instant parties are and what the law says, which determine capacity and standing, are not disputed issues of fact that need to be tried." NYSCEF Doc. No. 453 at 4.

**452564/2022  PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. TRUMP, DONALD J. ET AL Motion Nos. 026, 027, 028**

Page 4 of 35

4 of 35

of the State's regulation of businesses within its borders in the interest of securing an honest marketplace"); People v Amazon.com, Inc., 550 F Supp 3d 122, 130-131 (SD NY 2021) ("[T]he State's statutory interest under § 63(12) encompasses the prevention of either 'fraudulent or illegal' business activities. Misconduct that is illegal for reasons other than fraud still implicates the government's interests in guaranteeing a marketplace that adheres to standards of fairness…").

Defendants' rehashed argument that OAG's complaint must be dismissed because it is not designed to protect consumers is unavailing. New York v Feldman, 210 F Supp 2d 294, 299-300 (SD NY 2002) ("[D]efendants' claim that section 63(12) is limited to consumer protection actions is simply incorrect. The New York Attorney General has repeatedly used section 63(12) to secure relief for persons who are not consumers in cases that are not consumer protection actions").

Defendants cite to the trial court decision People v Domino's Pizza, Inc., NY Slip Op 30015(U) (Sup Ct, NY County 2021), which is not binding on this Court, as authority for the proposition that any relief sought here should come in the form of private contract litigation, not "a law enforcement action under a statute designed to address public harm." NYSCEF Doc. No. 835 at 39. However, Domino's is wholly distinguishable from the instant case. There, the Court found that "OAG did not establish that Domino's representations to franchisees… were false, deceptive, or misleading. Accordingly, the Court concludes that OAG has not established that Domino's engaged in conduct that 'tends to deceive or creates an atmosphere conducive to fraud.'" Domino's at 26[2]. Here, as discussed *infra*, OAG demonstrates that defendants repeatedly submitted fraudulent financial documents to obtain financial benefits which otherwise they would not have received.

Defendants glaringly misrepresent the requirements of an Executive Law § 63(12) cause of action. Citing to People v Northern Leasing Sys., Inc., 70 Misc 3d 256, 267 (Sup Ct, NY County 2021), defendants assert that OAG must show "the practice is one likely to mislead a reasonable consumer acting reasonably under the circumstances." NYSCEF Doc. No. 835 at 42. However, the word "consumer" does not appear anywhere in the referenced decision, and defendants' characterization of its holding is inaccurate[3]. Northern Leasing confirms that the "test for fraud under Executive Law § 63(12) is whether an act tends to deceive or creates an environment conducive to fraud." Northern Leasing at 267 (further holding "Executive Law § 63(12) expands fraud to encompass new liability, while including non-statutory fraud claims" and finding that "[a] claim under Executive Law § 63(12) is the exercise of 'the State's regulation of businesses within its borders in the interest of securing an honest marketplace'").

[2] As the failure to demonstrate false misrepresentations foreclosed the possibility of liability on that issue in Domino's, any commentary about the statute's requirements was pure *dicta*.

[3] Although "consumer" does appear in the First Department's affirmance of Northern Leasing, it does not advance defendants' proposition that Executive Law § 63(12) actions be consumer oriented; it simply reaffirms that "the test for fraud is whether the targeted act has the capacity or tendency to deceive, or creates an atmosphere conducive to fraud." 193 AD3d 67 (1st Dept 2021). The fact that Northern Leasing challenged actions targeted at consumers does not mean that Executive Law § 63(12) is restricted to such actions.

452564/2022  PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. TRUMP, DONALD J. ET AL  Motion Nos. 026, 027, 028

Page 5 of 35

5 of 84

Non-Party Disclaimers

Defendants, yet again, argue that OAG's complaint must be dismissed because the SFCs contain language, provided by non-party accountants Mazars, that indicate that they have not audited or reviewed the accompanying financial statements and therefore cannot express an opinion as to whether the financial statements comply with Generally Accepted Accounting Principles ("GAAP"). However, as this Court already ruled, these non-party disclaimers do not insulate defendants from liability, as they plainly state that "Donald J. Trump is responsible for the preparation and fair presentation of the financial statement in accordance with accounting principles generally accepted in the United States of America and for designing, implementing, and maintaining internal control relevant to the preparation and fair presentation of the financial statement." NYSCEF Doc. No. 183.

As this Court explained in its November 3, 2022 Decision and Order: "[t]he law is abundantly clear that" using a disclaimer as a defense to a justifiable reliance claim requires proof that: "(1) the disclaimer is made sufficiently specific to the particular type of fact misrepresented or undisclosed; and (2) the alleged misrepresentations or omissions did not concern facts peculiarly within the [defendant's] knowledge." Basis Yield Alpha Fund (Master) v Goldman Sachs Grp., Inc., 115 AD3d 128, 137 (1st Dept 2014) ("a [plaintiff] may not be precluded from claiming reliance on misrepresentation of facts peculiarly within the [defendant's] knowledge"); People v Bull Inv. Grp., Inc., 46 AD2d 25, 29 (3d Dept 1974) ("It has been stated that '[t]he rule is clear that where one party to a transaction has superior knowledge, or means of knowledge not open to both parties alike, he is under a legal obligation to speak and his silence constitutes fraud"). As the SFCs did not particularize the type of fact misrepresented or undisclosed and were unquestionably based on information peculiarly within defendants' knowledge, defendants may not rely on such purported disclaimers as a defense.

In sum, the Mazars disclaimers put the onus for accuracy squarely on defendants' shoulders.

Scienter and "Participation" Requirements

Defendants erroneously claim that Fletcher v Dakota, Inc, 99 AD3d 43, 49 (1st Dept 2012), stands for the proposition that the purported "participation element [of a cause of action under Executive Law § 63(12)] is satisfied where the defendant 'directed, controlled, or ratified the decision that led to plaintiff's injury.'" However, Fletcher is not an Executive Law § 63(12) action, it was brought as a corporate tort; accordingly, is not relevant here.[4] Executive Law § 63(12) is much more than a mere codification of common law fraud.

Defendants also incorrectly rely on Abrahami v UPC Const. Co., 224 AD2d 231, 233 (1st Dept 1996), for the proposition that "[m]erely providing copies of purportedly false financial statements is insufficient." NYSCEF Doc. No. 835 at 55. However, as Abrahami was not brought pursuant to Executive Law § 63(12), its analysis regarding "intent to deceive" is irrelevant. Unlike the situation in Abrahami, where an action is brought pursuant to Executive

---

[4] In fact, had defendants not cut off the beginning of the sentence they cited, it would be evident on its face that such case is legally irrelevant, as the full sentence reads: "A leading treatise on corporations states that a director may be held individually liable to third parties for a corporate tort if he either participated in the tort or else 'directed, controlled, approved or ratified the decision that led to the plaintiff's injury.'" Fletcher at 49.

452564/2022 PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. TRUMP, DONALD J. ET AL
Motion Nos. 026, 027, 028

Page 6 of 35

6 of 84

Law § 63(12), "good faith or lack of fraudulent intent is not in issue." People v Interstate Tractor Trailer Training, Inc., 66 Misc 2d 678, 682 (Sup Ct, NY County 1971) (holding liability under Executive Law § 63(12) does not require demonstrating an "intent to defraud"); Trump Entrepreneur Initiative at 417 ("fraud under section 63(12) may be established without proof of scienter or reliance"); Bull Inv. Grp. at 27 ("[i]t is well-settled that the definition of fraud under subdivision 12 of section 63 of the Executive Law is extremely broad and proof of scienter is not necessary").

### Disgorgement of Profits

In flagrant disregard of prior orders of this Court *and* the First Department, defendants repeat the untenable notion that "disgorgement is unavailable as a matter of law" in Executive Law § 63(12) actions. NYSCEF Doc. No. 835 at 70. This is patently false, as defendants are, or certainly should be, aware that the Appellate Division, First Department made it clear *in this very case* that "[w]e have already held that the failure to allege losses does not require dismissal of a claim for disgorgement under Executive Law § 63(12)." Trump, 217 AD3d at 610.

Defendants nonetheless rely on the trial court decision in People v Direct Revenue, LLC, 19 Misc 3d 1124(A) (Sup Ct, NY County 2008), for the proposition that Executive Law § 63(12) "do[es] no[t] authorize the general disgorgement of profits received from sources other than the public." NYSCEF Doc. No. 835 at 71-72. However, defendants' neglect to mention that Direct Revenue was superseded, and essentially overruled, in 2016 by the New York Court of Appeals in People v Greenberg, which unequivocally held that "disgorgement is an available remedy under the Martin Act and the Executive Law." People v Greenberg, 27 NY3d 490, 497 (2016).

Also fatally flawed is defendants' reliance on People v Frink Am., Inc., 2 AD3d 1379, 1380 (4th Dept 2003), as it relies on the outdated proposition that Executive Law § 63(12) "does not create any new causes of action" and thus, the remedy of disgorgement is unavailable. NYSCEF Doc. No. 835 at 73-74. However, in Trump Entrepreneur Initiative, in which at least three of the instant defendants were parties, the First Department unambiguously declared that "the Attorney General is, in fact, authorized to bring a cause of action for fraud under Executive Law § 63(12)." Trump Entrepreneur Initiative at 418; see also People v Pharmacia Corp., 27 Misc 3d 368, 373 (Sup Ct, NY County 2010) (holding "Executive Law § 63(12) applies to fraudulent conduct actionable at common law, as well as to conduct for which liability arises solely from the statute").

Defendants incorrectly posit that, under People v Ernst & Young, LLP, 114 AD3d 569 (1st Dept 2014), disgorgement is available under the Martin Act but not under Executive Law § 63(12). NYSCEF Doc. No. 836 at 73. This is simply untrue. In Ernst & Young, the First Department specifically held that disgorgement was an available and potentially "crucial" remedy in an Executive Law § 63(12) action. Ernst & Young at 570.

Defendants correctly assert that "the record is devoid of any evidence of default, breach, late payment, or any complaint of harm" and argue that as none of the recipients of the subject SFCs ever lodged a complaint with OAG or otherwise claimed damages, disgorgement of profits would be inappropriate. NYSCEF Doc. No. 835 at 40.

452564/2022 PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. TRUMP, DONALD J. ET AL
Motion Nos. 026, 027, 028

Page 7 of 35

7 of 35

However, that is completely irrelevant. As the Ernst & Young Court noted:

> [W]here, as here, there is a claim based on fraudulent activity,
> disgorgement may be available as an equitable remedy,
> notwithstanding the absence of loss to individuals or independent
> claims for restitution. Disgorgement is distinct from the remedy of
> restitution because it focuses on the gain to the wrongdoer as
> opposed to the loss to the victim. Thus, disgorgement aims to
> deter wrongdoing by preventing the wrongdoer from retaining ill-
> gotten gains from fraudulent conduct. Accordingly, the remedy of
> disgorgement does not require a showing or allegation of direct
> losses to consumers or the public; the source of the ill-gotten gains
> is "immaterial."

Id. (disgorgement is not impermissible penalty "since the wrongdoer who is deprived of an illicit
gain is ideally left in the position he would have been had there been no misconduct") (internal
citations omitted); see also Amazon.com at 130 ("Executive Law § 63(12) authorizes the
Attorney General to seek injunctive and other relief", and finding "the Attorney General can seek
disgorgement of profits on the State's behalf").

Sanctionable Conduct for Frivolous Motion Practice
In response to both OAG's request for a preliminary injunction and to defendants' motions to
dismiss, this Court rejected every one of the aforementioned arguments. In rejecting such
arguments for the second time, this Court cautioned that "sophisticated counsel should have
known better." [5] NYSCEF Doc. No. 453 at 5. However, the Court declined to impose sanctions,
believing it had "made its point." Id.

Apparently, the point was not received.

One would not know from reading defendants' papers that this Court has already *twice* ruled
against these arguments, called them frivolous, and *twice* been affirmed by the First Department.

"In its discretion, a court may award costs and financial sanctions against an attorney or party
resulting from frivolous conduct." Kamen v Diaz-Kamen, 40 AD3d 937, 937 (2d Dept 2007).
See Yan v Klein, 35 AD3d 729, 729–30 (2d Dept 2006) ("The plaintiff, following two prior
actions, has 'continued to press the same patently meritless claims,' most of which are now
barred by the doctrines of res judicata and collateral estoppel").

Defendants' conduct in reiterating these frivolous arguments is egregious. We are way beyond
the point of "sophisticated counsel should have known better"; we are at the point of intentional
and blatant disregard of controlling authority and law of the case. This Court emphatically
rejected these arguments, as did the First Department. Defendants' repetition of them here is
indefensible.

---

5 The Court even went so far as to caution that the "arguments were borderline frivolous even the first
time defendants made them." NYSCEF Doc. No. 453 at 3.

452564/2022  PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. TRUMP, DONALD J. ET AL
Motion Nos. 026, 027, 028

Page 8 of 35

Pursuant to New York Administrative Code § 130-1.1, "[t]he Court, as appropriate, may make such an award of costs or impose such financial sanctions against either an attorney or a party to the litigation or against both." The provision further states that:

> For purposes of this Part, conduct is frivolous if:
>
> (1) it is completely without merit in law and cannot be supported by a reasonable argument for an extension, modification or reversal of existing law;
>
> (2) it is undertaken primarily to delay or prolong the resolution of the litigation, or to harass or maliciously injure another; or
>
> (3) it asserts material factual statements that are false.

22 NYCRR 130-1.1(c). Defendants' inscrutable persistence in re-presenting these arguments clearly satisfies the first of these three possible criteria.

When considering imposing sanctions "[a]mong the factors [the court] is directed to consider is whether the conduct was continued when it became apparent, or should have become apparent, that the conduct was frivolous, or when such was brought to the attention of the parties or to counsel." Levy v Carol Mgmt. Corp., 260 AD2d 27, 34 (1st Dept 1999) (further finding that sanctions both "punish past conduct" and "they are goal oriented, in that they are useful in deterring future frivolous conduct").

In its January 6, 2023 Decision and Order, this Court warned defendants that their "reiteration of [these previously rejected arguments] scattered across five different motions to dismis[s] was frivolous." NYSCEF Doc. No. 453 at 3.

In a last-ditch attempt to stave off sanctions, defendants have submitted an affirmation by the Hon. Leonard B. Austin (ret.), who had a supremely distinguished judicial career, culminating in 12 years on the Appellate Division, Second Department. NYSCEF Doc. No. 1449. Justice Austin presents what is essentially a primer on the interplay between motions to dismiss and motions for summary judgment, and every point of law is valid.

However, it is wholly invalid as a reason for this Court to deny sanctions. First, legal arguments are for counsel to make, not for experts to submit. "The rule prohibiting experts from providing their legal opinions or conclusions is 'so well-established that it is often deemed a basic premise or assumption of evidence law—a kind of axiomatic principle.'" In re Initial Pub. Offering Sec. Litig., 174 F Supp 2d 61, 64 (SD NY 2001) (citing Thomas Baker, The Impropriety of Expert Witness Testimony on the Law, 40 U Kan LRev 325, 352 (1992) (precluding "expert affidavits" on the law); accord, Note, Expert Legal Testimony, 97 Harv LRev 797, 797 (1984) ("it remains black-letter law that expert legal testimony is not permissible"). Neither defendants nor Justice Austin has sought permission to file an amicus brief. In their own submissions, defendants have expounded on the law of capacity, standing, disclaimers, motions to dismiss, motions for summary judgment, and sanctions. The heft and prestige of a legal lion adds nothing.

452564/2022  PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. TRUMP, DONALD J. ET AL
Motion Nos. 026, 027, 028

Page 9 of 35

9 of 35

Case 1:23-cv-00131-GSK   Document 29   Filed 11/13/23   Page 58 of 84

More importantly, the subject affirmation utterly fails to fit the specific facts of this case into the general principles it enunciates. In many situations, discovery, and a complete record, and the reversal of the burden of proof, will turn the tide, requiring that a valid complaint be dismissed because there is no evidence to support it. But standing and capacity are legal questions, not factual issues. Crucially, while defendants have, by their own account, conducted extensive discovery and have created a complete record, they fail to point to a single fact that discovery has uncovered, let alone a single fact in the record, that changes the calculus of their denied and doomed capacity and standing arguments.

Capacity and standing are not esoteric concepts. Infants, legally declared incompetents, and persons under certain legal disabilities are not allowed to sue. The New York Attorney General is none of the above. If my sibling or neighbor is harmed, I do not have standing to sue for his or her injury. Citizens may not sue to prevent governmental actions unless they may suffer some personal harm. Executive Law § 63(12) was promulgated to give the Attorney General standing to sue on behalf of the people of New York to prevent or deter the precise type of fraud here at issue. Arguments to the contrary are risible.

Defendants' arguments that the factual record developed in discovery changed the landscape under which standing should be viewed is legally preposterous. The best that defendants could muster at oral argument was to contend (incorrectly) that plaintiff cannot sue because the subject transactions were between private entities, and nobody lost money. However, that is purely an argument on the merits, not an argument on standing. Taken to its logical extreme, absolutely any time a defendant denies liability, it could move to dismiss on the ground of lack of standing.

Exacerbating defendants' obstreperous conduct is their continued reliance on bogus arguments, in papers and oral argument. In defendants' world: rent regulated apartments are worth the same as unregulated apartments; restricted land is worth the same as unrestricted land; restrictions can evaporate into thin air; a disclaimer by one party casting responsibility on another party exonerates the other party's lies; the Attorney General of the State of New York does not have capacity to sue or standing to sue (never mind all those cases where the Attorney General has sued successfully) under a statute expressly designed to provide that right; all illegal acts are untimely if they stem from one untimely act; and square footage subjective.

That is a fantasy world, not the real world.

There is also a larger context to the sanctions issue. Several defendants are no strangers to sanctions and why courts are sometimes constrained to issue them. In the investigatory special proceeding this Court found Donald Trump in contempt of Court and sanctioned him $10,000 per day for failing to comply with his discovery obligations. This Court lifted the contempt after 11 days. The First Department affirmed the contempt and the fines. People v Trump, 213 AD3d 503, 504 (1st Dept 2023) ("[T]he financial sanction to compel compliance was a proper exercise of the court's discretionary power and was not excessive or otherwise improper, under the particular circumstances").

In Donald J. Trump v Hillary R. Clinton, 22-14102-CV-DMM, ("Order on Motion for Indicative Ruling") (filed September 15, 2023) (SD FL), Judge Donald M. Middlebrooks denied what in

New York legal parlance would be called "a motion to reargue," pursuant to which Donald Trump asked Judge Middlebrooks to vacate sanctions imposed on him and his legal team totaling close to one million dollars. Judge Middlebrooks wrote, on the first page thereof, that "Movants acted in bad faith in bringing this lawsuit and that this case exemplifies Mr. Trump's history of abusing the judicial process.[6]" Id.

Unfortunately, sanctions are the only way to impress upon defendants' attorneys the consequences of engaging in repetitive, frivolous motion practice after this Court, affirmed by the Appellate Division, expressly warned them against doing so. Boye v Rubin & Bailin, LLP, 152 AD3d 1, 11 (1st Dept 2017) ("sanctions serve to deter future frivolous conduct" and their "goals include preventing the waste of judicial resources, and deterring vexatious litigation and dilatory or malicious litigation tactics").

It is of no consequence whether the arguments were made at the direction of the clients or *sua sponte* by the attorneys; counsel are "ethically obligated to withdraw any baseless and false claims, if not upon [their] own review of the record, certainly by the time [the] Supreme Court advised [them] of this fact." Boye at 11 (upholding sanctions against attorneys because "counsel continued to… pursue claims which were completely without merit in law or fact."); see also Nachbaur v Am. Transit Ins. Co., 300 AD2d 74, 75 (1st Dept 2002) (motion court properly sanctioned attorneys for "repetitive and meritless motions"); Leventritt v Eckstein, 206 AD2d 313, 314 (1st Dept 1994) (affirming sanctions imposed on attorney for "repeated pattern of frivolous conduct"); William Stockler & Co. v Heller, 189 AD2d 601, 603 (1st Dept 1993) (affirming sanctions against attorney upon finding "there was no factual or legal basis for defendant's original cross motion, or for the reargument motion, that both motions were 'totally frivolous' and were submitted 'just really to delay'"). Counsel should be the first line of defense against frivolous litigation.

Accordingly, this Court grants OAG's motion for sanctions, in part, to the extent of sanctioning each of defendants' attorneys who signed their names to the instant legal briefs[7], in the amount of $7,500 each, to be paid to the Lawyer's Fund for Client Protection of the State of New York no later than 30 days from the date of this Order.

### Arguments Defendants Raise for the First Time

Summary Judgment Standard
To prevail on its motion for summary judgment on all causes of action, defendants must first "make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient

---

[6] One factor Judge Middlebrooks considered was Donald Trump's "disregard for legal principles and precedent." Id. at 14. In short, Donald Trump, and his lawyers, are not sanctions neophytes. This is not their first rodeo.

[7] The following attorneys signed their names to defendants' instant briefs and are, accordingly, sanctioned $7,500 each: Michael Madaio, Esq. (Habba Madaio & Associates, LLP); Clifford S. Robert, Esq. (Robert & Robert PLLC); Michael Farina Esq. (Robert & Robert PLLC); Christopher M. Kise, Esq., (admitted *pro hac vice*) (Continental PLLC); and Armen Morian (Morian Law PLLC).

**452564/2022 PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. TRUMP, DONALD J. ET AL Motion Nos. 026, 027, 028**    **Page 11 of 35**

11 of 35

evidence to eliminate any material issues of fact from the case." Winegrad v New York Univ.
Med. Ctr., 64 NY2d 851, 853 (1985). "Failure [of the movant] to make such showing requires
denial of the motion, regardless of the sufficiency of the opposing papers." Id. If the defendants
make out their prima facie showing, the burden then shifts to plaintiff to offer evidence sufficient
to rebut that showing by identifying disputed issues of fact that should go before a trier of fact.

Defendants strenuously argue throughout their briefs that OAG has not met her burden sufficient
to defeat defendants' motion for summary judgment. However, defendants misstate the black
letter law applicable to summary judgment, citing to City Dental Servs., P.C. v New York Cent.
Mut., 34 Misc 3d 127(A) (App Term 2d, 11th, 13th Jud Dists 2011) for the flatly wrong
proposition that "in order to defeat summary judgment on these claims of predicate illegality, the
NYAG must, with respect to each predicate illegality attached, 'establish[] each element of its
cause with respect to those causes of action.'" NYSCEF Doc. No. 835 at 62.

Not only does City Dental not stand for that proposition (it merely found that under the
circumstances of that case, plaintiff's evidence failed to meet her burden on summary judgment),
but the law is well-settled that "to defeat a motion for summary judgment the opposing party
must 'show facts sufficient to require a trial of any issue of fact," not make out its own case.
Zuckerman v City of New York, 49 NY2d 557, 562 (1980). While OAG must establish each and
every element of its cause(s) of action in order to *prevail* on its own motion for summary
judgment, in order to defeat defendants' motion for summary judgment (provided defendants are
able to demonstrate a prima facie case) "an opposing party must 'show facts sufficient to require
a trial of any issue of fact.'" Guzman v Strab Const. Corp., 228 AD2d 645, 646 (2d Dept 1996)
("evidentiary facts derived from the documents submitted [in opposition to summary judgment
motion] are sufficient to present a triable issue of fact").

The "Worthless Clause"
Defendants rely on what they call a "worthless clause" set forth in the SFCs under the section
entitled "Basis of Presentation" that reads, as here pertinent, as follows:

> Assets are stated at their estimated current values and liabilities at
> their estimated current amounts using various valuation methods.
> Such valuation methods include, but are not limited to, the use of
> appraisals, capitalization of anticipated earnings, recent sales and
> offers, and estimates of current values as determined by Mr. Trump
> in conjunction with his associates and, in some instances, outside
> professionals.  Considerable judgment is necessary to interpret
> market data and develop the related estimates of current value.
> Accordingly, the estimates presented herein are not necessarily
> indicative of the amount that could be realized upon the disposition
> of the assets or payment of the related liabilities.  The use of
> different market assumptions and/or estimation methodologies may
> have a material effect on the estimated current value amounts.

NYSCEF Doc. Nos. 769 at 7; 770 at 7; 771 at 7; 772 at 7; 773 at 7.

452564/2022  PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. TRUMP, DONALD J. ET AL
Motion Nos. 026, 027, 028                                                           Page 12 of 35

12 of 35

In his sworn deposition, Donald Trump spent a lot of time invoking this clause: "Well, they call it a 'disclaimer.' They call it 'worthless clause' too, because it makes the statement 'worthless.'" NYSCEF Doc. No. 859 at 67. Donald Trump goes on to say that "I have a clause in there that says, don't believe the statement, go out and do your own work. This statement is 'worthless.' It means nothing." Id. at 68. Furthermore, Donald Trump implies that he did not consider it important to review the SFCs for accuracy because of the existence of this purported "worthless clause":

OAG: Does this refresh your recollection of the process whereby you would get final review of the Statement of Financial Condition?

DJT: Yeah, I think generally. It's interesting. I would say as years went by, I got less and less and then once I became President, I would – if I saw it at all, I'd see it, you know, after it was already done.

OAG: So in the period –

DJT: Again, you know, I hate to be boring and tell you this. When you have the worthless clause on a piece of paper and the first – literally the first page you're reading about how this is a worthless statement from the standpoint of your using it as a bank or whatever –whoever may be using it, you tend not to get overly excited about it. I think it had very little impact, if any impact on the banks.

....

OAG: So am I understanding that you didn't particularly care about what was in the Statement of Financial Condition?

DJT: I didn't get involved in it very much. I felt it was a meaningless document, other than it was almost a list of my properties, with good faith effort of people trying to put some value down. It was a good faith effort.

Id. at 107-108. Defendants further submit the affidavit and deposition transcript of Robert Unell, who purports to be an expert in commercial real estate, for the proposition that because of "the worthless clause" in the SFC, "no lender relies on these for what it is." NYSCEF Doc. Nos. 1030 at 183-184; 1031.

However, defendants' reliance on these "worthless" disclaimers is worthless. The clause does not use the words "worthless" or "useless" or "ignore" or "disregard" or any similar words. It does not say, "the values herein are what I think the properties will be worth in ten or more years." Indeed, the quoted language uses the word "current" no less than five times, and the word "future" zero times.

452564/2022  PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. TRUMP, DONALD J. ET AL Motion Nos. 026, 027, 028

Page 13 of 35

13 of 35

INDEX NO. 452564/2022

Additionally, as discussed *supra*, a defendant may not rely on a disclaimer for misrepresentation of facts peculiarly within the defendant's knowledge. Basis Yield Alpha Fund at 136. Here, as the valuations of the subject properties are, obviously, peculiarly within defendants' knowledge, their reliance on them is to no avail.

Furthermore, "[t]his 'special facts doctrine' applies *regardless of the level of sophistication of the parties*." TIAA Glob. Invs. LLC v One Astoria Square LLC, 127 AD3d 75, 87 (1st Dept 2015) (emphasis added) (holding disclaimer does not bar liability for fraud where facts were peculiarly within disclaiming party's knowledge).

Thus, the "worthless clause" does not say what defendants say it says, does not rise to the level of an enforceable disclaimer, and cannot be used to insulate fraud as to facts peculiarly within defendants' knowledge, even vis-à-vis sophisticated recipients.

The Tolling Agreement

The First Department has declared that claims are timely against defendants subject to the tolling agreement if they accrued after July 13, 2014, and claims against defendants not subject to the tolling agreement are timely if they accrued after February 6, 2016. Trump, 217 AD3d at 611. Defendants concede that the tolling agreement binds each of the LLC-defendants and the Trump Organization. However, they argue that each of the individual defendants and the Donald J. Trump Revocable Trust (the "DJT Revocable Trust") are not bound by the agreement.

Alan Garten, the Trump Organization's Chief Legal Officer, originally entered into the tolling agreement on behalf of "the Trump Organization" on August 27, 2021; the agreement was extended one time by an amendment dated May 3, 2022. NYSCEF Doc. No. 1260. It tolls the statute of limitations for the period from November 5, 2020, through May 31, 2022. Id. at 2. The agreement contains a footnote to the entity "the Trump Organization" that reads as follows:

> As noted in the December 7, 2019 subpoena issued in this investigation to the Trump Organization, the "Trump Organization" as used herein includes The Trump Organization, Inc; DJT Holdings LLC; DJT Holdings Managing Member LLC; and any predecessors, successors, present or former parents, subsidiaries, and affiliates, whether direct or indirect; and all directors, officers, partners, employees, agents, contractors, consultants, representatives, and attorneys of the foregoing, and any other Persons associated with or acting on behalf of the foregoing, or acting on behalf of any predecessors, successors, or affiliates of the foregoing.

Id. at 4 n 1.

Thus, the tolling agreement at issue here binds "all directors [and] officers" and "present or former parents" of the Trump Organization and its affiliates and subsidiaries. Id. It is undisputed that at the time the tolling agreement was executed, each individual defendant, Donald J. Trump, Donald Trump Jr., Eric Trump, Allen Weisselberg, and Jeffrey McConney,

452564/2022 PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. TRUMP, DONALD J. ET AL
Motion Nos. 026, 027, 028

Page 14 of 35

14 of 35

were all directors and/or officers of the Trump Organization. NYSCEF Doc. No. 1293 at ¶¶ 673, 680, 696, 710, 736.

Defendants argue that the non-signatory defendants are not bound by the agreement, citing Highland Crusader Offshore Partners, L.P. v Targeted Delivery Techs. Holdings, Ltd., 184 AD3d 116, 121 (1st Dept 2020), for the "general principal that only the parties to a contract are bound by its terms." NYSCEF Doc. No. 835 at 27. However, defendants fail to quote the following sentence, which provides that "[a] non-signatory may be bound by a contract under certain limited circumstances." Highland at 122. See also Oberon Sec., LLC v Titanic Ent. Holdings LLC, 198 AD3d 602, 603 (1st Dept 2021) (non-signatory companies bound by agreement with language defining signatory to include "all subsidiaries, affiliates, [and] successors").

In People v JUUL Labs, Inc., 212 AD3d 414, 417 (1st Dept 2023), in a case involving nearly identical language in a corporate tolling agreement[8], the First Department recently held that non-signatory corporate affiliates, officers, and directors were bound by the agreement. Similarly, here all the individual defendants are bound by the instant tolling agreement's terms and may be held liable for any claims that accrued after July 13, 2014.

Defendants argue that OAG is judicially estopped from asserting that the agreement binds the individual defendants based on statements OAG's counsel made during oral argument in the investigatory special proceeding. NYSCEF Doc. No. 1292 at 26. Specifically, on April 25, 2022, while seeking to hold Donald Trump in contempt for failing to comply with court orders, OAG's counsel stated: "[t]here is hard prejudice because Donald Trump is not a party to the tolling agreement, that tolling agreement only applies to the Trump Organization." NYSCEF Doc. No. 1041 at 59.

For judicial estoppel to be applicable: "First, the party against whom the estoppel is asserted must have argued an inconsistent position in a prior proceeding; and second, the prior inconsistent position must have been adopted by the court in some manner." Bates v Long Island R. Co., 997 F2d 1028, 1038 (2d Cir 1993).

Defendants are correct that the first prong is satisfied, in that the statements OAG's counsel made during oral argument are inconsistent with the position OAG is now taking. However, defendants cannot demonstrate that this Court adopted the prior position. Indeed, this Court did not need to, and did not, consider the tolling agreement when it issued its April 26, 2022 Decision and Order finding Donald Trump in contempt. See Ghatani v AGH Realty, LLC, 181 AD3d 909, 911 (2d Dept 2020) ("For the doctrine [of judicial estoppel] to apply, there must be a final determination endorsing the party's inconsistent position in the prior proceeding").

This Court has not addressed the tolling agreement until now. Accordingly, defendants cannot demonstrate that this Court adopted OAG's prior inconsistent position.

---

[8] The substantially similar tolling agreement at issue in Juul can be found under Index No. 452168/2019, NYSCEF Doc. No. 176.

**452564/2022  PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. TRUMP, DONALD J. ET AL Motion Nos. 026, 027, 028**     **Page 15 of 35**

15 of 35

Moreover, "[t]he party asserting estoppel must show with respect to himself: '(1) lack of knowledge of the true facts; (2) reliance upon the conduct of the party estopped; and (3) a prejudicial change in his position.'" BWA Corp. v Alltrans Exp. U.S.A., Inc., 112 AD2d 850, 853 (1st Dept 1985). Here, none of the defendants claim that they changed their positions or courses of conduct in reliance upon the statement of OAG's counsel during oral argument.

Finally, while judicial estoppel may be applied to prohibit inconsistent changes in factual positions, courts have declined to extend the doctrine to changes in legal positions. Seneca Nation of Indians v New York, 26 F Supp 2d 555, 565 (WD NY 1998), affd, 178 F3d 95 (2d Cir 1999) (finding "[t]here is no legal authority" for "broadening of the doctrine" to "include seemingly inconsistent legal positions"). Who physically signed the agreement is a question of fact; whom it binds is a question of law.

Defendants' argument that the DJT Revocable Trust is not bound by the tolling agreement falls flat. In his deposition, Donald Trump affirmed under oath that the assets of the Trump Organization are held in the DJT Revocable Trust, for which he is the sole donor and beneficiary. NYSCEF Doc. No. 859 at 21. Donald Trump also affirmed that at the time the trust was formed, he was the sole trustee and remained the sole trustee until 2017, when defendants Allen Weisselberg and Donald Trump, Jr. became the sole trustees. Id. at 20-24.

As every beneficiary, donor, and trustee of the DJT Revocable Trust is a defendant bound by the tolling agreement, and as the trust is unquestionably a "parent" of the Trump Organization, so too does the tolling agreement bind the DJT Revocable Trust. See People v Leasing Expenses Co. LLC, 199 AD3d 521, 522 (1st Dept 2021) ("It may likewise be inferred that the trustees had knowledge of the activities of the businesses they controlled through the trust mechanism. Hence, under Executive Law § 63(12), the family trusts and trustees may likewise be held liable for the fraud"); see e.g., Kurzman v Graham, 12 Misc 3d 586, 590 (Sup Ct, NY County 2006) ("courts will not allow the owner of assets to evade creditors by placing the property in a trust while retaining a right to revoke the trust").

Defendants cite to New York Estates, Powers and Trust Law § 11-1.1(b)(17) for the proposition that only a trustee may bind a trust to an agreement. However, § 11-1.1(b)(17) does not state this; rather, it states:

> (b) In the absence of contrary or limiting provisions in the court order or decree appointing a fiduciary, or in a subsequent order or decree, or in the will, deed or other instrument, every fiduciary is authorized:
>
> …
>
> (17) To execute and deliver agreements, assignments, bills of sale, contracts, deeds, notes, receipts and any other instrument necessary or appropriate for the administration of the estate or trust.

This provision simply says what a fiduciary is permitted to do in the absence of a contrary provision. It does nothing to advance defendants' argument that *only* a trustee may bind a trust,

452564/2022 PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. TRUMP, DONALD J. ET AL
Motion Nos. 026, 027, 028                                                      Page 16 of 35

16 of 35

particularly since defendants fail to cite to any provision of the DJT Revocable Trust restricting who can bind it, as § 11-1.1(b)(17) anticipates.

Moreover, Korn v Korn, 206 AD3d 529, 530 (1st Dept 2022), upon which defendants inexplicably rely, is irrelevant to the instant analysis, as that case involved an examination by the court as to whether a fiduciary had a right or duty to negotiate on behalf of an estate pursuant to § 11-1.1(b)(13), not pursuant to § 11-1.1(b)(17), to which defendants cite.

Finally, "the Attorney General should not be limited, in [her] duty to protect the public interest, by an… agreement [s]he did not join." People v Coventry First LLC, 13 NY3d 108, 114 (2009) (holding Attorney General not bound by arbitration agreement when pursuing Executive Law § 63(12) claim and finding "[s]uch an arrangement between private parties cannot alter the Attorney General's statutory role or the remedies that [s]he is empowered to seek").

The tolling agreement was a mutually beneficial and common arrangement pursuant to which OAG agreed to hold off suing, and Alan Garten, on behalf of the Trump Organization, agreed to toll the statute of limitations. All defendants received the benefit of the bargain; OAG held off suing. OAG is entitled to its benefit of the bargain, the tolling of the statute of limitations, for the limited agreed-upon time, as against anyone it could have sued for the matters at issue at the time at which the agreement was executed. OAG clearly did not intend to permit defendants' principals to evade the tolling agreement based on a technicality contrary to the spirit of the agreement and controlling caselaw.

### Statute of Limitations

As a general rule, statutes of limitation start running when a claim accrues, that is, when it can be sued upon. In arguing that OAG's causes of action are untimely, defendants incorrectly assert that the statute of limitations starts running on the date the parties entered into the subject agreements, or when the loans closed. However, the First Department did not use the word "closed," it used the word "completed." Trump, 217 AD3d at 611. Obviously, the transactions were not "completed" while the defendants were still obligated to, and did, annually submit current SFCs to comply with the terms of the loan agreements.

Defendants further assert that any continuing documentation provided after the agreements were entered into, or when the loans closed, is of no consequence if the proceeds were distributed prior to July 2014. NYSCEF Doc. No. 835 at 18. This argument is unavailing. As OAG asserts, each submission of an SFC after July 13, 2014, constituted a separate fraudulent act. Indeed, each submission of a financial document to a third-party lender or insurer would "requir[e] a separate exercise of judgment and authority," triggering a new claim. Yin Shin Leung Charitable Found. v Seng, 177 AD3d 463, 464 (1st Dept 2019) (finding continuous series of wrongs each of which gave rise to its own claim).

Defendants mistakenly assert that if a loan agreement was entered into and its proceeds were dispersed prior to the applicable statute of limitations, then a claim arising out of submitting any subsequent contractually required financial documentation is also untimely, irrespective of when that documentation is submitted. Defendants would have this Court apply a bizarre, invented, inverted form of the "relation back" doctrine, pursuant to which if one aspect of fraudulent

452564/2022  PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. TRUMP, DONALD J. ET AL
Motion Nos. 026, 027, 028

Page 17 of 35

business conduct falls outside the statute of limitations, then all subsequent aspects of fraudulent conduct also fall outside the statute, no matter how inextricably intertwined.

Of course, this is contrary to controlling case law, which holds that a cause of action accrues at the time "when one misrepresents a material fact." Graubard Mollen Dannett & Horowitz v Moskovitz, 86 NY2d 112, 12 (1995). Moreover, even the plain language of Executive Law § 63(12) states: "[t]he term 'repeated' as used herein shall include repetition of any *separate and distinct fraudulent or illegal act*" (emphasis added). Clearly, the submission of each separate fraudulent SFC is a distinct fraudulent act.

OAG is not challenging the loans, the closings, or the disbursements; it is challenging defendants' submissions of financial documents containing false and misleading information. Thus, any SFC that was submitted after July 13, 2014, falls within the applicable statute of limitations. CW Capital Cobalt VR Ltd. v CW Capital Invs., LLC, 195 AD3d 12, 19-20 (1st Dept 2021) (each instance of wrongful conduct a "separate, actionable wrong" giving "rise to a new claim").

Materiality
It is settled that a standalone cause of action under Executive Law § 63(12) does not require a demonstration of materiality but merely that an "act has the capacity or tendency to deceive, or creates an atmosphere conducive to fraud." People v Gen. Elec. Co., 302 AD2d 314, 314-315 (1st Dept 2003) (holding that, unlike GBL § 349, plaintiff need not prove "the challenged act or practice 'was misleading in a material way'").

Although the Domino's court found that "evidence regarding falsity, materiality, reliance and causation plainly is *relevant* to determining whether the Attorney General has established that the challenged conduct has the capacity or tendency to deceive, or creates an atmosphere conducive to fraud" (Domino's at 11), every Appellate Division and the New York Court of Appeals now hold that materiality and scienter are not requirements for liability under § 63(12).

However, as discussed *infra*, although materiality is required under the second through seventh causes of action, it is not required under a standalone cause of action under Executive Law § 63(12), the OAG's first cause of action.

Defendants argue that the SFCs were not materially misleading, claiming, *inter alia* that: (1) "[t]here is no such thing as objective value"; (2) "a substantial difference between valuation in the SOFCs and appraisal, per se, is not evidence of inflated values"; (3) there is nothing improper about using "fixed assets" valuations as opposed to using the current market valuation approach; and (4) it was proper to include "internally developed intangibles, such as the brand premium used in the valuation of President Trump's golf clubs, in personal financial statements." NYSCEF Doc No. 1292 at 20-23.

Thus, defendants essentially argue that value is inherently subjective; that because internal brand valuations are in the eye of the beholder (here, Donald Trump), they cannot be overvalued. Defendants argue that "[n]o bank or underwriter would have reasonably been materially misled by the alleged misstatements or omissions in the SOFCs and other information the Defendants

made available to their counterparties because no sophisticated counterparty would have considered the SOFCs and other information provided by the Defendants alone as material to extend credit or set an interest rate, or issue an insurance policy or price a risk, without doing their own due diligence." NYSCEF Doc. No. 835 at 45.

Defendants also argue: "[i]t follows that if the user [of the SFCs] is in possession of the correct information, then the financial statements are not materially misstated." Id. at 39. Defendants' stance is, practically speaking, that they may submit false SFCs so long as the recipients know, from their own due diligence, that the information is false.

Accepting defendants' premise would require ignoring decades of controlling authority holding that financial statements and real property valuations are to be judged objectively, not subjectively. FMC Corp. v Unmack, 92 NY2d 179, 191 (1998) ("*objectively* reasonable conclusion, drawn by a competent and experience appraiser, was based on credible evidence" that demonstrated "property was overvalued") (emphasis added); Assured Guar. Mun. Corp. v DLJ Mortg. Cap. Inc., 44 Misc 3d 1206(A) (Sup Ct, NY County 2014) ("Credit Suisse is reading this as a subjective standard, dependent on Assured's expectations. Credit Suisse is wrong. It is well settled that this is an objective standard").

Moreover, courts have long found that "generally, it is the 'market value' which provides the most reliable valuation for assessment purposes." Great Atl. & Pac. Tea Co. v Kiernan, 42 NY2d 236, 239 (1977); Consol. Edison Co. of New York v City of New York, 33 AD3d 915, 916 (2d Dept 2007) ("the standard for assessment remains market value"), affd 8 NY3d 591. Beauty may be in the eye of the beholder, but value is in the eye of the marketplace.

Further, defendants' assertion that the discrepancies between their valuations and the OAG's are immaterial is nonsense. What OAG has established, in many cases by clear, indisputable, indisputable documentary evidence (as discussed *infra*), is not a matter of rounding errors or reasonable experts disagreeing. OAG has submitted conclusive evidence that between 2014 and 2021, defendants overvalued the assets reported in the SFCs between 17.27-38.51%; this amounts to a discrepancy of between $812 million and $2.2 billion dollars. NYSCEF Doc. No. 766 at 70. Even in the world of high finance, this Court cannot endorse a proposition that finds a misstatement of at least $812 million dollars to be "immaterial." Defendants have failed to identify any authority for the notion that discrepancies of the magnitude demonstrated here could be considered immaterial.

The Second through Seventh Causes of Action

The Second, Third, Fourth, Fifth, Sixth, and Seventh causes of action allege violations of Executive Law § 63(12) based on underlying violations of the New York Penal Law prohibiting falsification of business records, issuance of false financial statements, and insurance fraud.

Liability under New York Penal Law § 175.05 (falsifying business records in the second degree) requires that a person "[m]akes or causes a false entry in the business records of an enterprise."

Liability under New York Penal Law § 175.45 (issuing a false financial statement) requires that a person "represents in writing that a written instrument purporting to describe a person's financial

452564/2022  PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. TRUMP, DONALD J. ET AL
Motion Nos. 026, 027, 028

Page 19 of 35

19 of 35

condition or ability to pay as of a prior date is accurate with respect to such person's current financial condition or ability to pay, whereas [that person] knows it is materially inaccurate in that respect."

Liability under New York Penal Law § 176.05 (insurance fraud) requires that a person submitted an application for insurance either: (1) knowing that it "contain[ed] materially false information concerning any fact material thereto"; or (2) "conceal[ed], for the purpose of misleading, information concerning any fact material thereto."

Accordingly, unlike a standalone cause of action under Executive Law § 63(12). the second through seventh causes of action require demonstrating some component of intent and materiality. People v Alamo Rent A Car, Inc., 174 Misc 2d 501, 505 (Sup Ct, NY County 1997) ("As in all other situations requiring *mens rea*, however, petitioners may prove, by reference to facts and circumstances surrounding the case, that respondents knew that their conduct was unlawful. Moreover, petitioners need not prove respondents acted with an 'evil motive, bad purpose or corrupt design'") (internal citations omitted).

OAG has demonstrated that there remain, at the very least, disputed issues of fact as to whether defendants violated these statutes, intentionally and materially. Thus, there are issues of fact as to causes of action two through seven that require a trial.

The Court has considered defendants' remaining arguments and finds them to be unavailing and/or non-dispositive.

Accordingly, defendants' motion for summary judgment dismissing every cause of action is denied in its entirety.

## OAG'S MOTION FOR PARTIAL SUMMARY JUDGMENT
## ON ITS FIRST CAUSE OF ACTION

Summary Judgment Burden on Standalone Executive Law § 63(12) Cause of Action
OAG moves for partial summary judgment, seeking to hold defendants liable under OAG's first cause of action, for fraud under Executive Law § 63(12).

As this Court has noted *ad nauseum*, Executive Law § 63(12) "authorizes the Attorney General to bring a special proceeding against any person or business that engages in repeated or persistent fraudulent or illegal conduct, while broadly construing the definition of fraud so as to include acts characterized as dishonest or misleading and eliminating the necessity for proof of an intent to defraud." People v Apple Health & Sports Club, Ltd., Inc., 206 AD2d 266-267 (1st Dept 1994).

As OAG's first cause of action, the only one upon which it moves for summary judgment, alleges a standalone violation of Executive Law § 63(12), OAG need only prove: (1) the SFCs were false and misleading; and (2) the defendants repeatedly or persistently used the SFCs to transact business.

**452564/2022  PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. TRUMP, DONALD J. ET AL
Motion Nos. 026, 027, 028**                                    **Page 20 of 35**

20 of 35

This instant action is essentially a "documents case." As detailed *infra,* the documents here clearly contain fraudulent valuations that defendants used in business, satisfying OAG's burden to establish liability as a matter of law against defendants. Defendants' respond that: the documents do not say what they say; that there is no such thing as "objective" value; and that, essentially, the Court should not believe its own eyes.[9]

The defenses Donald Trump attempts to articulate in his sworn deposition are wholly without basis in law or fact. He claims that if the values of the property have gone up in the years since the SFCs were submitted, then the numbers were not inflated at that time (i.e.; "But you take the 2014 statement, if something is much more valuable now – or, I guess, we'll have to pick a date which was a little short of now. But if something is much more valuable now, then the number that I have down here is a low number"). NYSCEF Doc. No. 1363 at 69-75). He also seems to imply that the numbers cannot be inflated because he could find a "buyer from Saudi Arabia" to pay any price he suggests.[10] Id. at 30-33, 60-62, 79-80.

The Trump Tower Triplex
This Court takes judicial notice that the Trump Tower apartment in which Donald Trump resided for decades (the "Triplex") is 10,996 square feet. NYSCEF Doc. No. 816 at 2. Between 2012-2016, Donald Trump submitted SFCs falsely claiming that the Triplex was 30,000 square feet, resulting in an overvaluation of between $114-207 million dollars. NYSCEF Doc. Nos. 782 at Rows 833-834, 1028, 783 at Rows 799-800, 1199, 784 at Rows 843-844, 785 at Rows 882-883, 789 at Row 913, 817. The misrepresentation continued even after defendants received written notification from *Forbes* that Donald Trump had been overestimating the square footage of the Triplex by a factor of three.[11]

In opposition, defendants absurdly suggest that "the calculation of square footage is a subjective process that could lead to differing results or opinions based on the method employed to conduct the calculation.[12]" NYSCEF Doc. No. 1293 at 20. Well yes, perhaps, if the area is rounded or oddly shaped, it is possible measurements of square footage could come to slightly differing results due to user error. Good-faith measurements could vary by as much as 10-20%, not 200%.

---

[9] As Chico Marx, playing Chicolini, says to Margaret Dumont, playing Mrs. Gloria Teasdale, in "Duck Soup," "well, who ya gonna believe, me or your own eyes?"

[10] This statement may suggest influence buying more than savvy investing.

[11] Three days after receiving a written inquiry from *Forbes*, Trump Organization Vice President, Amanda Miller, sent an email to Trump Organization Executive Vice President and Chief Legal Officer, Alan Garten, indicating that she "spoke to Allen W[eisselberg] re: [Trump World Tower and Trump Tower] – we are going to leave those alone." NYSCEF Doc. No. 821. Although OAG need not show intent to deceive under a standalone § 63(12) cause of action, this directive to continue to use a grossly inflated number despite clear knowledge it is false demonstrates the repetitive and ongoing nature of defendants' propensity to engage in fraud.

[12] Despite this assertion in their motion papers, counsel for defendants, Christopher Kise, Esq, conceded during oral argument held on September 22, 2023, that square footage is, in fact, an objective number.

452564/2022   PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. TRUMP, DONALD J. ET AL
Motion Nos. 026, 027, 028                                                    Page 21 of 35

21 of 35

Case 1:23-cv-00131-GSK Document 29 Filed 11/13/23 Page 70 of 84

A discrepancy of this order of magnitude, by a real estate developer sizing up his own living space of decades, can only be considered fraud.[13]

OAG unquestionably satisfies its two-prong burden of demonstrating the SFCs from 2012-2016 calculated the value of the Triplex based on a false and misleading square footage, and that some of the defendants repeatedly and persistently used the SFCs to transact business.

Seven Springs Estate
Defendant Seven Springs LLC owns over 200 acres of contiguous land in the towns of Bedford, New Castle and North Castle in Westchester County, New York.

In 2000, non-party the Royal Bank of Pennsylvania appraised the "as is" market value of Seven Springs to be $25 million if converted to residential development. NYSCEF Doc. No. 825. In 2006, the same bank performed a new appraisal, which showed Seven Springs had an "as is" market value of $30 million. NYSCEF Doc. No. 826.

In 2012, Seven Springs LLC received another appraisal that estimated a six-lot subdivision on the New Castle portion of the property to have a fair market value of approximately $700,000 per-lot. NYSCEF Doc. No. 829 at 203-206.

In July 2014, because the Trump Organization was considering donating a conservation easement, it retained Cushman & Wakefield to provide a "range of value" of the Seven Springs property. NYSCEF Doc. Nos. 830, 831. Cushman & Wakefield's appraiser, David McArdle, analyzed the sale of eight lots in Bedford, six lots in New Castle, and ten lots in North Castle and determined the fair market value for all 24 lots was approximately $30 million. NYSCEF Doc. No. 831, 832.

Notwithstanding receiving market values from professional appraisals in 2000, 2006, 2012, and 2014 valuing Seven Springs at or below $30 million, Donald Trump's 2011 SFC reported the value to be $261 million, and his 2012, 2013 and 2014 SFCs reported the value to be $291 million.[14] NYSCEF Doc. Nos. 769, 770, 771, 772.

---

[13] In fact, OAG demonstrates that as of 2012, no apartment sold in New York City had ever approached the price at which defendants valued the Triplex, noting that the highest overall sale at that time was $88 million for a Central Park West penthouse. The SFCs valued the Triplex at a staggering $180,000,000-$327,000,000 for the years 2012-2016. NYSCEF Doc. No. 1 at ¶276.

[14] The statutes of limitations have run for all claims that accrued before July 13, 2014. However, although not actionable by themselves, evidence of fraud that predates July 13, 2014, may still be used as evidence in evaluating OAG's request for permanent injunctive relief, wherein the Court must determine whether there has been "a showing of a reasonable likelihood of a continuing violation based upon the totality of the circumstances." People v Greenberg, 27 NY3d 490, 496-97 (2016) (detailing standard for permanent injunctive relief under Executive Law 63(12) and "reject[ing] defendants' arguments that the Attorney General must show irreparable harm in order to obtain a permanent injunction").

452564/2022 PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. TRUMP, DONALD J. ET AL
Motion Nos. 026, 027, 028

Page 22 of 35

In early 2016, Cushman & Wakefield performed another appraisal of Seven Springs, which included the planned development, and determined that as of December 1, 2015, the entire parcel was worth $56.6 million. NYSCEF Doc. Nos. 824 at 9; 875; 876.

Even giving defendants the benefit of the $56.6 million figure as of December 1, 2015, the value submitted on Donald Trump's 2014 SFC was inflated by over 400%. Accordingly, OAG has demonstrated liability for the false 2014 SFC for fraudulently inflating the value of Seven Springs.

Trump Park Avenue
Trump Park Avenue is a residential building included as an asset on Donald Trump's SFCs for the years 2011-2021. NYSCEF Doc. Nos. 769-779. In 2011, 12 of the unsold residential condominium units were subject to New York City's rent regulation laws. NYSCEF Doc. No. 948 at 3. By 2014, nine units remained subject to rent restrictions. NYSCEF Doc. No. 966. By 2020, six units remained subject to rent restrictions. NYSCEF Doc. No. 971.

A 2010 appraisal performed by the Oxford Group valued the 12 rent-stabilized units at $750,000 total, or $62,500 per unit. NYSCEF Doc. No. 952. A 2020 appraisal performed by Newmark Knight Frank valued the six units that remained subject to stabilization at $22,800,090 total, or $3,800,315 per unit. NYSCEF Doc. No. 972.

Notwithstanding, for the years 2014-2021, the Trump Organization submitted SFCs that valued these rent-restricted units as if they were unencumbered, inflating the value of each unit between as much 700% (in 2014) and 64% (in 2021). NYSCEF Doc. Nos. 772-779.

In an unsuccessful attempt to rebut OAG's prima facie demonstration, defendants proffer that the units are not overvalued because "the rent-stabilized units have the potential at some point in the future to be converted into unencumbered (by rent stabilization) units."[15] NYSCEF Doc. No. 1292 at 57. They further concede that "[t]his is the assumption the owner made when assessing potential asset pricing or value." Id.

---

[15] As every New Yorker knows, rent regulated units may be passed on from one generation to the next in perpetuity.

However, the SFCs are required to state "current" values, not "someday, maybe" values. At the time defendants provided the subject SFCs to third parties they unquestionably falsely inflated the value of the units based on a false premise that they were unrestricted.[16]

40 Wall Street
The Trump Organization, through defendant 40 Wall Street LLC, owns a ground lease at 40 Wall Street and pays ground rent to the landowner.

In 2010, Cushman & Wakefield appraised the Trump Organization's interest in 40 Wall Street at $200 million. NYSCEF Doc. Nos. 878-79. Cushman & Wakefield appraised again in 2011 and 2012, reaching valuations of between $200 and $220 million. NYSCEF Doc. Nos. 881-82. The Trump Organization possessed and was familiar with these appraisals. NYSCEF Doc. Nos. 817 at 135-138; 883.

Despite these appraisals, the 2011 and 2012 SFCs valued the Trump Organization's interest in the property at $524.7 million and $527.2 million, respectively, an overvaluation of more than $300 million each year.[17] NYSCEF Doc. Nos. 769, 770.

In 2015, Cushman & Wakefield once again appraised the property, and valued it at $540 million.[18] NYSCEF Doc. No. 887. Notwithstanding this appraised value, the 2015 SFC listed the value of 40 Wall Street at $735.4 million.[19] NYSCEF Doc. No. 773.

---

[16] Mazars accountant Donald Bender testified that when he asked Jeffrey McConney, "Do you have any other appraisals?", Jeffrey McConney stated "I have nothing else," demonstrating an intent to conceal or mislead the accountants. NYSCEF Doc. No. 1262 at 243.

Further, Patrick Birney, a Trump Organization employee working directly under Jeffrey McConney, conceded that the Trump Organization maintained a spreadsheet for day-to-day operations on the Trump Park Avenue offering plan that included both the offering plan prices *and* the current market values, but that the Trump Organization concealed its own actual market estimates from Mazars by omitting the market value column in its spreadsheet and providing Mazars with only the offering plan prices. NYSCEF Doc. No. 946.

[17] Although any liability arising out of the submission of the 2011 and 2012 SFCs is time barred; as previously discussed, these submissions may be considered as evidence in support of OAG's request for injunctive relief.

[18] OAG plausibly asserts that this $540 million is also inflated; however, for purposes of this motion, OAG does not dispute the number, and argues that, even if the Court were to accept defendants' number as accurate, the 2015 SFC was still materially false, as it stated the value as nearly $200 million more than the $540 million appraisal. NYSCEF Doc. No. 766 at n 7.

[19] An email exchange dated August 4, 2014, between Allen Weisselberg and his son, Jack Weisselberg, a Ladder Capital employee, discusses the 2015 $540 million Cushman & Wakefield appraisal. NYSCEF Doc. No. 888. Notwithstanding direct knowledge of it, the 2015 SFC valued 40 Wall Street at nearly $200 million more. NYSCEF Doc. No. 773.

452564/2022  PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. TRUMP, DONALD J. ET AL
Motion Nos. 026, 027, 028                                                          Page 24 of 35

24 of 35

Defendants assert that overvaluations of two hundred million dollars are immaterial, as the "NYAG has produced no evidence to suggest… that Ladder Capital would have been uncomfortable allowing President Trump to guarantee the 40 Wall Street Loan if his net worth was only $1.9 billion, as the NYAG contends." NYSCEF Doc. No. 835 at 48. They further emphasize that "Ladder Capital has received in excess of $40 million in interest and 40 Wall Street LLC has never defaulted under the Loan."[20] Id.

Defendants' argument misses the mark. As has been explained to defendants many times, in many legal proceedings, and in painstaking detail, "where, as here, there is a claim based on fraudulent activity [under Executive Law 63(12)], disgorgement may be available as an equitable remedy, *notwithstanding the absence of loss to individuals or independent claims for restitution.*" Ernst & Young at 569 (emphasis added). Accordingly, it is not significant that the banks made money (or did not lose money)[21], or that they would have done business with the Trump Organization notwithstanding. The law is clear that the only requirements for liability to attach under a standalone Executive Law § 63(12) cause of action are (1) a finding that the SFCs were false and misleading; and (2) that defendants repeatedly or persistently used the SFCs to conduct business.

Accordingly, OAG has demonstrated liability for the false valuation of 40 Wall Street in the 2015 SFC.

Mar-a-Lago

Donald Trump purchased Mar-a-Lago in 1985. In 1993, he sought, and obtained, permission from the Town of Palm Beach to turn the property into a social club (NYSCEF Doc. No. 900), and on August 10, 1993, he entered into a "Declaration of Use Agreement" by which he agreed "the use of Land shall be for a private social club" and that "[a]ny additional uses of the Land shall be subject to approval by the applicable governmental authority including but not limited to the Town Council of the Town, the Landmarks Preservation Commission of the Town, the Architectural Review Commission of the Town, Palm Beach County, the State of Florida, the United States Government, and/or any agencies under the foregoing governmental authorities." NYSCEF Doc. No. 915.

In 1995, Donald Trump signed a "Deed of Conservation and Preservation Easement" in which he gave up his right to use Mar-a-Lago for any purpose other than as a social club (the "1995 Deed"). NYSCEF Doc. No. 901. In 2002, Donald Trump signed a "Deed of Development Rights." NYSCEF Doc. No. 902. As part of granting a conversation easement to the National

---

[20] The defendant borrowers did not default on any loans; but we only know that with hindsight. Markets are volatile, and borrowers come in all shapes and sizes. The next borrower, or the one after that, might default, and if its SFCs are false, the lender might unfairly be left holding the bag. This will distort the lending marketplace and deprive other potential borrowers of the opportunity to obtain loans and create wealth.

[21] The subject loans made the banks lots of money; but the fraudulent SFCs cost the banks lots of money. The less collateral for a loan, the riskier it is, and a first principal of loan accounting is that as risk rises, so do interest rates. Thus, accurate SFCs would have allowed the lenders to make even more money than they did.

**452564/2022  PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. TRUMP, DONALD J. ET AL
Motion Nos. 026, 027, 028**                                                      **Page 25 of 35**

25 of 35

Trust for Historic Preservation, Donald Trump agreed that "Trump intend[s] to forever extinguish [his] right to develop or use the Property for any purpose other than club use" (the "2002 Deed"). The 2002 Deed also specifically "limits changes to the Property including, without limitation, the division or subdivision of the Property for any purpose, including use as single family homes, the interior renovation of the mansion, which may be necessary and desirable for the sale of the Property as a single family residential estate, the construction of new buildings and the obstruction of open vistas." Id. In exchange for granting the easement, Mar-a-Lago was taxed at a significantly lower rate (the club rate) than it otherwise would have been (the private home rate). NYSCEF Doc. No. 903.

From 2011-2021, the Palm Beach County Assessor appraised the market value of Mar-a-Lago at between $18 million and $27.6 million. NYSCEF Doc. No. 905.

Notwithstanding, the SFCs' values do not reflect these land use restrictions. Donald Trump's SFCs for 2011-2021 value Mar-a-Lago at between $426,529,614 million and $612,110,496, an overvaluation of *at least 2,300%*, compared to the assessor's appraisal. NYSCEF Doc. Nos. 769-779.

In an attempt to rebut the OAG's demonstration, defendants rely on the opinion affidavit of Lawrence Moens, who they purport is "the most accomplished and knowledgeable ultra-high net worth real estate broker in Palm Beach, Florida." [22] Moens claims that "the SOFC were and are appropriate and indeed *conservative*." NYSCEF Doc. No. 1292 at 35-36 (emphasis added). The Moens' affidavit states in a conclusory fashion that because he believes "this unique property offers to an elite purchaser the unparalleled opportunity to own an exclusive and extensive family compound in the most desirable sections of Palm Beach… the valuations in the SOFC were reasonable and below my estimate for the market value of the property each year." NYSCEF Doc. No. 1435. Moreover, Moens opines that "[i]f Mar-A-Lago was available for sale, I am confident that in short order, I would be in a position to produce a ready, willing and able buyer who would have interest in securing the property for their personal use as a residence, or even, their own club." Id. at 29. Critically, Moens does not opine *at what price* he is "confident" he could find a buyer (although he opines separately, without relying on any objective evidence, that he believes that as of 2023 the property is worth $1.51 *billion[23]*).

It is well-settled that: "[w]here the expert's ultimate assertions are speculative or unsupported by any evidentiary foundation, however, the opinion should be given no probative force and is insufficient to withstand summary judgment." Diaz v New York Downtown Hosp., 99 NY2d 542, 544 (2002); see also Gardner v Ethier, 173 AD2d 1002, 1003-4 (3d Dept 1991) ("the expert

---

[22] At oral argument, his domain of expertise was enlarged to nationwide status.

[23] In his sworn deposition, when asked "[w]ho were the dozen or so [qualified] buyers that you were referencing in your report, Lawrence Moens replied: "I could dream up anyone from Elon Musk to Bill Gates and everyone in between. Kings, emperors, heads of state. But with net worths in the multiple billions. I don't know how many people in the world have a net worth of more than $10 billion, but I think it's quite a number. There are a lot." NYSCEF Doc. No. 1428 at 184-185. Obviously, this Court cannot consider an "expert affidavit" that is based on unexplained and unsubstantiated "dream[s]."

**452564/2022 PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY**
**GENERAL OF THE STATE OF NEW YORK vs. TRUMP, DONALD J. ET AL**
**Motion Nos. 026, 027, 028**

Page 26 of 35

26 of 35

affidavit is also inadmissible because it is conclusory and the views are apparently based to a great extent on hearsay statements from unspecified witnesses as well as upon speculations on the part of the expert"). Accordingly, defendants' reliance on the Moens affidavit is unpersuasive and certainly insufficient to rebut OAG's prima face case.

Defendants further imply that they may ignore the plain language of the 2002 Deed restrictions because they would likely be able to use the Florida judicial system to get out of their contractual requirements; they further assert that because they may successfully breach their contract in the future, they were not required to consider the restrictions of the 2002 Deed when valuing the property. NYSCEF Doc. 1292 at 48-51. This argument is wholly without merit. At the time in which the defendants submitted the SFCs, the restrictions were in effect, and any valuations represented to third-parties must have incorporated those restrictions; failure to do so is fraud. Assets values that disregard applicable legal restrictions are by definition materially false and misleading.

Accordingly, OAG has demonstrated liability for the false valuation of Mar-a-Lago as appears in the SFCs from 2014-2021.

### Aberdeen
The Trump Organization owns a golf course located in Aberdeen, Scotland ("Aberdeen"). The value assigned to Aberdeen was comprised of two parts: a value for the golf course and a value for the development of the non-golf course property, the latter of which is the focus here. Developing any of the non-golf course property required that the local Scottish authorities approve any proposed plans.

From 2011-2014, Donald Trump's SFC reported that he had "received outline planning permission [from local Scottish authorities] in December 2008 for… a residential village consisting of 950 holiday homes and 500 single family residences and 36 golf villas." NYSCEF Doc. Nos. 769-776.

The Trump Organization had "outline planning permission" to build a total of 1,486 homes. Notwithstanding, the 2014-2018 SFCs valuations of Aberdeen assumed the Trump Organization had received approval to build 2,500 homes, despite never having received such approval. NYSCEF Doc. Nos. 772-776, 907.

Additionally, the approval of the 950 holiday homes and 36 golf villas came with severe restrictions on their use: they could be used solely as rental properties and could be rented for no more than 12 weeks in any calendar year. NYSCEF Doc. No. 908 at 13. The Trump Organization submitted financial documentation to the local Scottish authorities representing that these short-term rentals would not be profitable and therefore would not add any value to Aberdeen. NYSCEF Doc. Nos. 909 at 36, 910 at 7. Consequently, the only profitable development of Aberdeen would have been the 500 single family residences. In July 2017, nonparty Ryden LLP, acting on behalf of the Trump Organization, prepared a development appraisal for Aberdeen wherein it assessed the profit from developing 557 homes and estimated profits in the range of £16,525,000-£18,546,000. NYSCEF Doc. No. 1231 at 10.

452564/2022 PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. TRUMP, DONALD J. ET AL
Motion Nos. 026, 027, 028

Page 27 of 35

27 of 35

In May 2018, the Trump Organization applied to the Aberdeen City Council to reduce the scope of the development project to 550 dwellings, consisting of 500 private residences, 50 leisure/resorts units, and zero holiday homes (having determined they were not profitable). NYSCEF Doc. No. 911. In September 2019, the Aberdeen City Council approved the proposal for a reduction in the proposed development, but restricted the 50 leisure/resort units, as they had the holiday homes, to be "occupied on a holiday letting or fractional ownership basis only and for no other purposes whatsoever including use as a permanent residential unit… ." NYSCEF Doc. No. 907 at 7.

Notwithstanding, the 2019 SFC, finalized a month after the latest approval, derived a value based on the assumption that 2,035 private residential homes could be developed. Adjusting the values to reflect the permissible 500 private residences reduces the value of the Aberdeen undeveloped property as reflected in the 2019 SFC by £164,196.704. NYSCEF Doc. No. 777 at 16, 789 at Cells G561-619, 912.

Although defendants wholly fail to address Aberdeen in any of their three memos of law, in their response to OAG's statement of material facts, they state that "Defendants dispute the veracity of the appraisal because President Trump, as a land developer, took optimistic views of potential future value which is not contemplated in the appraisal, thereby undervaluing Trump Aberdeen." NYSCEF Doc. No. 1293 at 82-83. For all the reasons discussed *supra*, this defense fails.

Accordingly, OAG has demonstrated liability for the false valuation of Aberdeen as appears in the SFCs from 2014-2019.

### US Golf Clubs
Donald Trump owns or leases a number of golf clubs across the United States and abroad that are included as assets on his SFCs. NYSCEF Doc. Nos. 769-779. The value for these golf clubs is provided in the aggregate in the SFCs, although supporting accounting spreadsheets evidence the breakdown of the values assigned to each club. NYSCEF Doc. Nos. 781-791.

### *The "Trump Brand Premium"*
The evidence indicates that for the years 2013-2020, the SFCs relied on values that included a 15% or 30% "premium" based on the "Trump brand" for the following seven golf clubs: Trump National Golf Course ("TNGC") Jupiter, TNGC LA, TNGC Colts Neck, TNGC Philadelphia, TNGC DC, TNGC Charlotte, and TNGC Hudson Valley. NYSCEF Doc. Nos. 783-790. However, the SFCs for those years (and, indeed, all the years before this Court), also contained express language stating: "The goodwill attached to the Trump name has significant value that has *not* been reflected in the preparation of this financial statement." NYSCEF Doc. Nos. 769-779 (emphasis added). Accordingly, the SFCs "double dip," both purporting not to include a brand premium while simultaneously including one of 15% or 30%.

In opposition, defendants submit the affidavit of Eli Bartov, an accounting professor at New York University, who distinguishes between overall brand value and brand value ascribed to individual golf courses. His point, ensconced in numerous lines of academic jargon, seems to be that defendants said that they were eschewing the former and opting only for the latter. NYSCEF Doc. No. 1378 at 14-15. This is a red herring and factually incorrect. The SFCs

452564/2022  PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. TRUMP, DONALD J. ET AL
Motion Nos. 026, 027, 028

Page 28 of 35

28 of 35

clearly state that they do not include a brand value for *any* of the properties included in the SFCs; indeed, the SFCs emphatically declare that "[t]he goodwill attached to the Trump name has significant financial value *that has not been reflected in the preparation of this financial statement*." NYSCEF Doc. Nos. 769-779 (emphasis added). Perhaps Donald Trump could have ascribed a brand value to golf courses that he viewed as "special," but he was obligated to disclose those exceptions when he represented that the SFCs did not reflect his brand value.

*TNGC Briarcliff and TNGC LA*

The valuations of TNGC Briarcliff and TNGC LA were each comprised of a value for the golf course and a value for the undeveloped land. As the Trump Organization was considering donating a conservation easement over both properties, they had both properties appraised.

An April 2014 appraisal valued the golf club portion of TNGC Briarcliff at $16,500,000; later that same year, Donald Trump valued the golf club portion of TNGC Briarcliff at $73,430,217, *an inflation of more than 300%*, in his SFC. NYSCEF Doc. Nos. 923 at 147; 785 at Row 257. A 2015 appraisal valued the golf club portion of TNGC LA at $16,000,000 as of December 26, 2014; the 2015 SFC valued the golf club portion of TNGC LA at $56,615,895, *an inflation of more than 200%*. NYSCEF Doc. Nos. 924 at 151; 785 at Row 386.

In an attempt to rebut this strong showing of fraud, defendants argue that they were not obligated to use market value, but, instead, were permitted to use the "fixed assets" approach to valuation, pursuant to which defendants may "value" a property by aggregating the money spent to acquire and maintain a property. NYSCEF Doc. No. 1292. They further rely on the Bartov affidavit, which states, in wholly conclusory fashion that: "[t]he assertion that 'Using fixed assets approach does not present the golf clubs at their estimated current value because the approach ignores market conditions and the behavior of informed buyers and sellers' is unsubstantiated and false." NYSCEF Doc. No. 1378 at 29.

Bartov is incorrect. Each of the corresponding SFCs include representations that "[a]ssets are stated at their estimated current values…" NYSCEF Doc. Nos. 769-779.[24] Accordingly, it is false and misleading to use a fixed-assets evaluation, which is completely different. The price for which you purchase property is not necessarily the price for which you can sell it. The latter, not the former, matters to lenders who want adequate collateral.

*The Membership Liabilities*

As part of the purchase of several of the golf club properties, Donald Trump agreed to assume the obligation to pay back refundable non-interest-bearing long-term membership deposits. However, notwithstanding that these liabilities must be satisfied in the future, the SFCs from 2012-2021 value them at $0. NYSCEF Doc. Nos. 769-779. This is false; they are a liability in the millions of dollars.

---

[24] In their response to OAG's statement of material facts, defendants concede that "GAAP defines Estimated Current Value as 'the amount at which the item could be exchanged between a buyer and seller, each of whom is well informed and willing, and neither of whom is compelled to buy or sell." NYSCEF Doc No. 1293 at 17.

452564/2022  PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. TRUMP, DONALD J. ET AL
Motion Nos. 026, 027, 028                                                Page 29 of 35

29 of 35

However, the SFCs all state: "The fact that Mr. Trump will have the use of these funds for that period without cost and that the source of repayment will most likely be a replacement membership has led him to value this liability at zero." See e.g., NYCSCEF Doc. No. 772.

Although it was false to report the membership liabilities as $0, it was not, under the circumstances, *misleading*, as the SFCs state that the reason for so doing. Accordingly, OAG cannot prevail on liability as a result of the failure to report the membership liabilities.

Yet, as discussed *supra*, OAG has demonstrated liability for submitting fraudulent SFCs in 2014-2020 that falsely value the aforementioned US Golf Clubs based on undisclosed brand premiums and failure to report "current" values.

Vornado Partnership Properties
Donald Trump has a 30% limited partnership interest with non-party Vornado Realty Trust in entities that own office buildings in New York City (at 1290 Avenue of the Americas, hereinafter "1290 AOA") and San Francisco at 555 California Street.

*Cash/Liquid Classification*
Donald Trump's 30% limited partnership stake does not permit him to use or withdraw funds held by the partnerships. NYSCEF Doc. Nos. 916, 917. Notwithstanding, Donald Trump and his trustees classified his 30% interest in the Vornado partnership as a liquid/cash asset on his SFCs for the years 2013-2021. NYSCEF Doc. No. 771-779. This was even though it is "undisputed" by defendants that Donald Trump does not have "the right to use or withdraw [these] funds." NYSCEF Doc. No. 1293 at ¶387-388.

Defendants assert that "[e]ven if the cash held in the partnership was misclassified and should have been reported elsewhere on the SOFCs as an asset (e.g., in the value of the partnership interest), it would not have inflated the total value of cash or President Trump's net worth reported on the SOFCs." NYSCEF Doc No. 1292 at 39.

This argument does not hold any water. Put simply, it was false and misleading for defendants to indicate that it had access to between $14,221,800 and $93,126,589 in liquid assets, sometimes nearly a third of the total cash it claimed, when in fact those assets were completely illiquid. NYSCEF Doc. No. 1293 ¶ 403.

*The Appraisals*
Cushman & Wakefield appraised the value of 1290 AOA at $2 billion as of November 1, 2012, and $2.3 billion as of November 1, 2016. NYSCEF Doc. No. 919 at 5-6.

However, Donald Trump's 2014 SFC calculated his 30% share based on a purported value of $3,078,338,462; his 2015 SFC was based on a purported value of $2,985,819,936; and his 2016 SFC was based on a purported value of $3,055,000,000. NYSCEF Doc. Nos. 784 at Rows 709-715, 785 at Rows 748-755, 785 at Rows 779-784. This resulted in overvaluations of Donald Trump's 30% interest in 1290 AOA of between $205-$233 million dollars for those years.

452564/2022  PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. TRUMP, DONALD J. ET AL
Motion Nos. 026, 027, 028                                                    Page 30 of 35

30 of 35

CBRE appraised 1290 AOA and determined its value at $2 billion as of October 7, 2021. NYSCEF Doc. No. 947. Nonetheless, the 2021 SFC was calculated based upon a purported value of $2,574,813,800, an overvaluation of Donald Trump's 30% share by $172 million dollars. NYSCEF Doc. No. 791 at Row 918.

The instant motions do not task this Court with determining which appraisals are the most accurate, which would present issues of fact.[25] Rather, time and time again, the Court is not comparing one appraisal to another; it is comparing an independent professional appraisal to a pie-in-the-sky dream of concocted potential.

Accordingly, OAG has demonstrated liability for submitting fraudulent SFCs overvaluing Donald Trump's interest in the Vornado partnership in 2014-2016 and 2021.

Licensing Deals

Each of Donald Trump's SFCs from 2011-2021 has an asset category entitled "Real Estate Licensing Deals," which the SFC represents is value derived from "associations with others for the purpose of developing and managing properties" and the "cash flow that is expected to be derived… from these associations as their potential is realized." NYSCEF Doc. Nos. 769-779. The SFCs further state that "[i]n preparing [these] assessment[s], Mr. Trump and his management considered only situations which have evolved to the point where signed arrangements with the other parties exist and fees and other compensation which he will earn are reasonably quantifiable." Id.

Despite this express language, the SFCs from 2014-2018 and 2020-2021 include valuations of intra-organization deals, all between entities under the Trump Organization umbrella, in this category of assets. NYSCEF Doc. Nos. 1014, 1018, 1019, 1021, 1023, 1024, 1062, 1063, 1064. It was flatly false and misleading to include values of deals between Trump Organization entities while expressly representing in the SFCs that such assets included only valuations derived from "association with others." Improperly including these intra-organization deals resulted in an overvaluation of up to $224 million in 2014, $110 million in 2015, $120 million in 2016, $113 million in 2017, $115 million in 2018, $97 million in 2020, and $106 million in 2021. Id.

OAG has demonstrated liability for the false and misleading valuation of intra-company licensing deals on the SFCs from 2014-2018 and 2020-2021.

The Other Loans

OAG has established that defendants submitted false SFCs after July 13, 2014, pursuant to their other loan commitments. Defendants submitted SFCs to Deutsche Bank as part of their contractual obligations arising out of three different loans: (1) a Chicago Loan, undertaken by 401 North Wabash Venture LLC; (2) a Doral Loan, undertaken by Trump Endeavor LLC; and (3) an Old Post Office Loan, undertaken by Trump Old Post Office LLC. Defendants certified the accuracy of these SFCs to Deutsche Bank for the years 2014-2019 and 2021[26] as part of their

---

[25] Nor is this Court asked to determine Donald Trump's total wealth.

[26] The gap for 2020 may have been due to the COVID-19 pandemic.

contractual obligations.  NYSCEF Doc. Nos. 1097, 1098, 1099, 1100, 1102, 1104, 1106, 1124, 1126, 1155, 1156, 1157.

The Individual Defendants

OAG has demonstrated liability on behalf of all the named individual defendants: (1) **Donald Trump**, as each and every SFC was issued on behalf of "Donald J. Trump"; (2) **Donald Trump, Jr.**, who, along with Allen Weisselberg, certified the accuracy of the SFCs for 2016-2020, and who singlehandedly certified the accuracy of the 2021 SFC (NYSCEF Docs. No. 808-813); (3) **Eric Trump**, who is the listed source for the Seven Springs valuation in 2014,[27] and who signed several guarantor compliance certificates in 2020 and 2021 for Donald J. Trump (NYSCEF Doc. No. 802); (4) **Allen Weisselberg**, who certified the accuracy of the SFCs from 2014-2021 (NYSCEF Doc. Nos. 806-812); (5) and **Jeffrey McConney**, who led the process of preparing all the SFCs since the 1990s[28] (NYSCEF Doc. No. 822 at 52-68).

The Entity Defendants

It is settled law that "[a] parent corporation will not be held liable for the torts or obligations of a subsidiary *unless it can be shown that the parent exercised complete dominion and control over the subsidiary*."  Potash v Port Auth. of New York & New Jersey, 279 AD2d 562, 562 (2d Dept 2001) (emphasis added).  Here, it is undisputed that Donald Trump, through one corporate form or another, exercised complete control over the umbrella of entities operating in furtherance of, or on behalf of, "the Trump Organization."

Defendants do not dispute that DJT Holdings LLC and DJT Holdings Managing Member LLC are entities that sit at the top of the Trump Organization's organizational chart and together own many of the Trump-affiliated entities that comprise the Trump Organization.  DJT Holdings Managing Member LLC owns 100% of the Trump Organization and DJT Holdings LLC owns 100% of the Trump Organization LLC.  NYSCEF Doc. Nos. 4, 819 at ¶1.

Accordingly, OAG has established liability on behalf of all the named entity defendants: (1) **The Trump Organization Inc.**, **the Trump Organization LLC**, **DJT Holdings LLC**, and **DJT Holdings Member LLC**, as each participated in the preparation, submission and certification of the SFCs after July 13, 2014 through the acts of the individual defendants as described *supra*; (2) the **DJT Revocable Trust**, as both Donald Trump Jr. and Allen Weisselberg certified the accuracy of the 2016-2019 SFCs in their capacities as "Trustee, the Donald J. Trump Revocable Trust dated April 7, 2014, as amended" (NYSCEF Doc. No. 808); (3) **Trump Endeavor LLC**, which was the borrower on the Doral Loan, for which SFCs were submitted after July 13, 2014; (4) **401 North Wabash Venture LLC**, which was the borrower on a loan for "Trump Chicago," under which SFCs were required to be (and were) submitted

---

[27] Eric Trump also reaffirmed the SFCs accuracy on July 9, 2019.  NYSCEF Doc. Nos. 782 at Row 679, 783 at Rows 638-40, 784 at Row 660, 1183.

[28] Jeffrey McConney acknowledged his personal role in preparing supporting data for Donald Trump's SFCs beginning in 2011, testifying that: "I assemble the documentation" and that he would send both supporting data spreadsheets and backup documentation to the accountants.  He further conceded that the supporting data spreadsheets were referred to as "Jeff's supporting data" or "Jeff's supporting schedule."  NYSCEF Doc. No. 822 at 40, 67-68, 212, 294.

**452564/2022  PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. TRUMP, DONALD J. ET AL Motion Nos. 026, 027, 028**                                                                 **Page 32 of 35**

32 of 35

after July 13, 2014; (5) **Trump Old Post Office LLC**, as it was the borrower on the "Old Post Office" loan, under which SFCs were required to be (and were) submitted after July 13, 2014; and **Seven Springs LLC**, the borrowing entity (as described *supra*) under which SFCs were required to be (and were) submitted after July 13, 2014.

Injunctive Relief

OAG has prevailed on liability on its first cause of action pursuant to Executive Law § 63(12) as against all defendants: Donald J. Trump; Donald Trump, Jr.; Eric Trump; Allen Weisselberg; Jeffrey McConney; the DJT Revocable Trust; the Trump Organization Inc; the Trump Organization LLC; DJT Holdings LLC; DJT Holdings Managing Member LLC; Trump Endeavor 12 LLC; 401 North Wabash Venture LLC; Trump Old Post Office LLC; 40 Wall Street LLC; and Seven Springs LLC.

If liability is established under Executive Law § 63(12), the statute itself provides that the attorney general may obtain "an order enjoining the continuance of such business activity or of any fraudulent or illegal acts… and, in an appropriate case, cancelling any certificate filed under and by virtue of the provisions of … section one hundred thirty of the general business law.…"

"[T]he Attorney General may obtain permanent injunctive relief under… Executive Law § 63(12) upon a showing of a reasonable likelihood of a continuing violation based upon the totality of the circumstances." People v Greenberg, 27 NY3d at 496-97 (further stating "[t]his is not a 'run of the mill' action for an injunction, but rather one authorized by remedial legislation, brought by the Attorney-General on behalf of the People of the State and for the purposes of preventing fraud and defeating exploitation") (internal citations omitted).

Having found, at the commencement of the action, that OAG had preliminarily demonstrated defendants' "propensity to engage in persistent fraud," this Court appointed the Hon. Barbara S. Jones (ret.) as an independent monitor "to ensure there is no further fraud or illegality that violates § 63(12) pending the final disposition of this action." NYSCEF Doc. No. 194. On August 3, 2023, Judge Jones reported as follows:

> [S]ince my appointment I have reviewed material financial and
> accounting information submitted by the Trump Organization. As
> part of my review, I have made preliminary observations regarding
> certain current financial disclosures with respect to the Trump
> Organization's reporting of financial information. Specifically, I
> have observed that information regarding certain material
> liabilities provided to lenders – such as intercompany loans
> between or among Trust entities and Donald J. Trump, certain of
> the Trust's contingent liabilities, as well as refundable golf club
> membership deposits—has been incomplete. The Trust also has
> not consistently provided all required annual and quarterly
> certifications attesting to the accuracy of certain financial
> statements.

**452564/2022 PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. TRUMP, DONALD J. ET AL Motion Nos. 026, 027, 028**

**Page 33 of 35**

33 of 35

> In addition, annual audited financial statements for certain entities,
> prepared by an external accounting firm, list depreciation
> expenses. However, interim internally prepared financial
> statements provided to third parties for these same entities
> inconsistently report depreciation expenses.

NYSCEF Doc. No. 647. Even with a preliminary injunction in place, and with an independent monitor overseeing their compliance, defendants have continued to disseminate false and misleading information while conducting business. This ongoing flouting of this Court's prior order, combined with the persistent nature of the false SFCs year after year, have demonstrated the necessity of canceling the certificates filed under GBL § 130, as the statute provides. People v Northern Leasing, 70 Misc 3d 256, 279-80 (Sup Ct, NY County 2020) (denying a trial on the petition and ordering the LLC respondents to dissolve upon a finding of persistent fraud under Executive Law § 63(12)).

Having prevailed on liability on a standalone Executive Law § 63(12) cause of action, the Attorney General is entitled to the first two prayers for relief sought in her complaint: (1) canceling any certificate filed under and by virtue of the provisions of New York General Business Law § 130 for all the entity defendants found liable, as well as any other entity controlled or beneficially owned by the individual defendants found liable herein, which and who participated in or benefitted from the foregoing fraudulent schemes; and (2) appointing an independent monitor to oversee compliance, financial reporting, valuations, and disclosures to lenders, insurers, and tax authorities at the Trump Organization. NYSCEF Doc. No. 1 at 213.

### Remaining Issues to be Determined at Trial
Anything presented in the parties' moving papers that this Court has not ruled upon in this Decision and Order, including determinations on liability for the second through seventh causes of action, the amount of disgorgement of profits to which OAG is entitled, and determinations on the third through ninth prayers for relief sought by OAG in its complaint, presents disputed issues of fact that shall proceed to trial.

452564/2022  PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. TRUMP, DONALD J. ET AL
Motion Nos. 026, 027, 028

Page 34 of 35

34 of 35

Conclusion
For the reasons stated herein, it is hereby

**ORDERED** that defendants' motion for summary judgment is denied; and it is further

**ORDERED** that plaintiff's motion for sanctions is granted in part, to the extent of sanctioning Michael Madaio, Esq. (Habba Madaio & Associates, LLP), Clifford S. Robert, Esq. (Robert & Robert PLLC), Michael Farina Esq. (Robert & Robert PLLC), Christopher M. Kise, Esq., (admitted *pro hac vice*) (Continental PLLC), and Armen Morian (Morian Law PLLC) in the amount of $7,500 each, to be paid to the Lawyer's Fund for Client Protection of the State of New York no later than 30 days from the date of this Decision and Order; and it is further

**ORDERED** that plaintiff's motion for partial summary judgment on its first cause of action is granted in part, to the extent of finding defendants Donald J. Trump, Donald Trump, Jr., Eric Trump, Allen Weisselberg, Jeffrey McConney, the DJT Revocable Trust, the Trump Organization Inc, the Trump Organization LLC, DJT Holdings LLC, DJT Holdings Managing Member LLC, Trump Endeavor 12 LLC, 401 North Wabash Venture LLC, Trump Old Post Office LLC, 40 Wall Street LLC, and Seven Springs LLC to be liable as a matter of law for persistent violations of Executive Law § 63(12); and it is further

**ORDERED** that any certificates filed under and by virtue of GBL § 130 by any of the entity defendants or by any other entity controlled or beneficially owned by Donald J. Trump, Donald Trump, Jr., Eric Trump, Allen Weisselberg, and Jeffrey McConney are canceled; and it is further

**ORDERED** that within 10 days of the date of this order, the parties are directed to recommend the names of no more than three potential independent receivers to manage the dissolution of the canceled LLCs; and it is further

**ORDERED** that the Hon. Barbara S. Jones (ret.) shall continue to serve as an independent monitor of the Trump Organization until further Court order; and it is further

**ORDERED** that the Clerk shall enter judgment accordingly.

| 9/26/2023 | | | | |
|-----------|---|---|---|---|
| **DATE** | | | **ARTHUR F. ENGORON, J.S.C.** | |
| CHECK ONE: | CASE DISPOSED | X | NON-FINAL DISPOSITION | |
| | GRANTED | DENIED | GRANTED IN PART | X OTHER |
| APPLICATION: | SETTLE ORDER | | SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | INCLUDES TRANSFER/REASSIGN | | FIDUCIARY APPOINTMENT | REFERENCE |

452564/2022   PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. TRUMP, DONALD J. ET AL
Motion Nos. 026, 027, 028

Page 35 of 35

35 of 35

## **<u>CERTIFICATE OF COMPLIANCE</u>**

1. This brief complies with the guidelines set forth in the Standard Chambers Procedures. The confidential version of this brief contains **11,850** words on numbered pages (that is, excluding only the Cover Page, the Table of Contents, and the Table of Authorities).

2. This brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 12-point font.

<u>/s/ Mark B. Lehnardt</u>
Mark B. Lehnardt

Date: November 13, 2023

*Counsel to Kaptan Demir Çelik Endüstrisi ve Ticaret A.Ş.*