NON-CONFIDENTIAL VERSION

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

**KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S.,**

Plaintiff,

and

**ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI, A.S.,**

v.

**UNITED STATES,**

Defendant,

and

**REBAR TRADE ACTION COALTION,**

Defendant-Intervenor.

Before: Hon. Gary S. Katzmann, Judge

Court No. 23-00131

<u>NON-CONFIDENTIAL VERSION</u>

Business Proprietary Information Removed from Pages 13, 18-22, 24-25

<u>DEFENDANT-INTERVENORS' RESPONSE BRIEF</u>

Alan H. Price, Esq.
John R. Shane, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC  20036
(202) 719-7000

*Counsel to the Rebar Trade Action Coalition*

Dated: January 29, 2024

Ct. No. 23-00131                                    NON-CONFIDENTIAL VERSION

# <u>TABLE OF CONTENTS</u>

Page

I.      INTRODUCTION ................................................................................................ 1

II.     RULE 56.2 STATEMENT .................................................................................. 1

    A.    Administrative Determination Presented for Review ...............................1

    B.    Issues Presented .......................................................................................1

    C.    Request for Court Order and Decision Sought .........................................2

III.    LEGAL AND FACTUAL BACKGROUND ...................................................... 2

    A.    Exemptions from the BITT .......................................................................3

    B.    Selection of the Benchmark Used to Value Certain GOT-Provided
        Land ..........................................................................................................4

    C.    Determination of Icdas's Margin .............................................................7

IV.     STANDARD OF REVIEW ................................................................................ 7

V.      SUMMARY OF ARGUMENT .......................................................................... 9

VI.     ARGUMENT ...................................................................................................... 9

    A.    Commerce's Specificity Finding Regarding the BITT Should Be
        Affirmed..................................................................................................10

    B.    Commerce's Selection of the Benchmark for Assessing the Benefit of
        GOT-Provided Land Should Be Affirmed.............................................12

        1.    Kaptan Does Not Persuade That Its Study and the Colliers
            International Report Are Equally Public...........................................14

        2.    Kaptan Does Not Persuade That Commerce Erred in Assessing the
            Reliability of the Two Data Sources ................................................16

        3.    Kaptan's Challenge to Commerce's Rejection of GOT Prices to
            Measure the Benefits of GOT-Provided Land Fails .........................21

        4.    Kaptan Does Not Persuade that Commerce Was Required to
            Further Engage with its Arguments Regarding Comparability .........23

    C.    There is No Reason for Icdas's Net Subsidy Margin to be
        Redetermined .........................................................................................25

VII.    CONCLUSION ................................................................................................ 26

Ct. No. 23-00131                                        NON-CONFIDENTIAL VERSION

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AMS Assocs. Inc. v. United States,*
 737 F.3d 1338 (Fed. Cir. 2013).................................................................8

*Ceramica Regiomontana, S.A. v. United States,*
 810 F.2d 1137 (Fed. Cir. 1987)............................................................8, 22

*Chemours Co. FC, LLC v. United States,*
 443 F. Supp. 3d 1315 (Ct. Int'l Trade 2020) .........................................18

*Consol. Edison Co. of New York v. NLRB,*
 305 U.S. 197 (1938)..................................................................................18

*Consolo v. Fed. Mar. Comm'n,*
 383 U.S. 607 (1966)....................................................................................8

*CP Kelco US, Inc. v. United States,*
 24 F. Supp. 3d 1337 (Ct. Int'l Trade 2014) .............................................8

*Dongtai Peak Honey Indus. Co. v. United States,*
 777 F.3d 1343 (Fed. Cir. 2015)..................................................................8

*Downhole Pipe & Equip., L.P. v. United States,*
 776 F.3d 1369 (Fed. Cir. 2015)................................................................18

*Gov't of Québec v. United States,*
 567 F. Supp. 3d 1273 (Ct. Int'l Trade 2022) .......................................3, 12

*INS v. Elias-Zacarias,*
 502 U.S. 478 (1992)....................................................................................8

*Jilin Henghe Pharm. Co. v. United States,*
 28 CIT 969, 342 F. Supp. 2d 1301 (2004), *vacated on other grounds,*
 123 F. App'x 402 (Fed. Cir. 2005) .........................................................8, 9

*Matsushita Elec. Indus. Co. v. United States,*
 750 F.2d 927 (Fed. Cir. 1984)....................................................................8

*Mosaic Co. v. United States,*
 589 F. Supp. 3d 1298 (Ct. Int'l Trade 2022) .......................................20, 22

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
 463 U.S. 29 (1983)................................................................................8, 22

*Ozdemir Boru San. ve Tic. Ltd. Sti. v. United States*,
   273 F. Supp. 3d 1225 (Ct. Int'l Trade 2017) ...........................................24

*Universal Camera Corp. v. NLRB*,
   340 U.S. 474 (1951) .......................................................................7

*Usinor Sacilor v. United States*,
   19 CIT 711, 893 F. Supp. 1112 (1995) ................................................20

*Zhaoquing New Zhongya Aluminum Co. v. United States*,
   37 CIT 1003, 929 F. Supp. 2d 1324 (2013) ...........................................25

**Statutes**

19 C.F.R. § 351.102(b)(21)(iii) ..........................................................15

19 C.F.R. § 351.511(2) ....................................................................4, 5

19 C.F.R. § 351.511(a) .....................................................................12

19 C.F.R. § 351.511(a)(2) .............................................................21, 22

19 U.S.C. § 1516a(b)(1)(B)(i) ...........................................................7

19 U.S.C. § 1671d(c)(5)(A)(i) ........................................................7, 26

19 U.S.C. § 1677(5)(A) ...................................................................3, 4

19 U.S.C. § 1677(5)(B) ...................................................................3, 4

19 U.S.C. § 1677(5)(D)(iii) ..........................................................4, 12

19 U.S.C. § 1677(5A)(D)(i) ..............................................................12

19 U.S.C. § 1677(5A)(D)(ii) .............................................................12

19 U.S.C. § 1677(5A)(D)(iii) ............................................................12

**Other Authorities**

*Certain Aluminum Foil from the Republic of Turkey*,
   86 Fed. Reg. 52,884 (Dep't Commerce Sept. 23, 2021) ...........................11

*Circular Welded Carbon-Quality Steel Pipe from the Sultanate of Oman*,
   77 Fed. Reg. 64,473 (Dep't Commerce Oct. 22, 2012) ............................11

*Common Alloy Aluminum Sheet from the Republic of Turkey*,
   85 Fed. Reg. 49,629 (Dep't Commerce Aug. 14, 2020) ............................11

NON-CONFIDENTIAL VERSION

## I.    INTRODUCTION

On behalf of the Rebar Trade Action Coalition ("RTAC"), defendant-intervenor in this action, we respectfully submit the following response to the November 13, 2023 opening briefs filed by plaintiff Kaptan Demir Çelik Endüstrisi ve Ticaret A.Ş. ("Kaptan") and plaintiff-intervenor Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. ("Icdas"). *See* Rule 56.2 Mot. for J. on the Agency R. of Kaptan (Nov. 13, 2023), ECF No. 29 ("Kaptan's Brief"); Pl.-Int. Icdas's Mem. of Law in Supp. of Mot. for J. on the Agency R. Pursuant to Rule 56.2 (Nov. 13, 2023), ECF No. 30 ("Icdas's Brief").

## II.   RULE 56.2 STATEMENT

This action arises from the 2020 administrative review of a countervailing duty order covering steel concrete reinforcing bars ("rebar") from the Republic of Turkey ("Turkey").

### A.    Administrative Determination Presented for Review

The U.S. Department of Commerce ("Commerce") published the final results of the challenged administrative review as *Steel Concrete Reinforcing Bar From the Republic of Turkey*, 88 Fed. Reg. 34,129 (Dep't of Commerce May 26, 2023) (final results of countervailing duty administrative review and rescission, in part; 2020), P.R. 156 ("Final Results"). Commerce laid out the bases for its determination in an accompanying issues and decision memorandum, P.R. 152 ("IDM").

### B.    Issues Presented

Kaptan and Icdas have brought the following challenges to the agency's final results:

(1) Kaptan argues that Commerce inappropriately determined that exemptions to Turkey's Bank and Insurance Transactions Tax ("BITT") were specific under the Tariff Act of 1930 ("the Act"), despite record evidence indicating that the exemptions were available only to companies meeting certain conditions, and a lack of record evidence to suggest

that all companies meeting even the broadest interpretation of those conditions availed themselves of the exemptions.

(2) Kaptan argues that the agency inappropriately benchmarked the value of certain government-provided land based on public data regarding industrial rental prices during 2020, rather than a privately commissioned, proprietary report regarding 2022 rental prices for parcels zoned for a variety of uses, including rental prices being charged by the Government of Turkey ("GOT"); and

(3) Icdas argues that, to the extent that Kaptan's net subsidy margin changes as a result of this litigation, Icdas's margin as a non-selected respondent should be redetermined.

## C.    **Request for Court Order and Decision Sought**

RTAC respectfully requests that this court uphold Commerce's determination in all respects.

## III.   **LEGAL AND FACTUAL BACKGROUND**

Commerce initiated the contested review on December 28, 2021. Preliminary Decision Memorandum accompanying *Steel Concrete Reinforcing Bar from the Republic of Turkey*, 87 Fed. Reg. 73,750 (Dep't Commerce Dec. 1, 2022) (prelim. results of countervailing duty administrative review and intent to rescind in part; 2020), P.R. 134 at 2 ("PDM"). Commerce selected Kaptan for individual examination in the review. *Id.* Commerce preliminarily determined that Kaptan benefited from countervailable subsidies in the form of (1) exemptions to Turkey's BITT and (2) land provided by the GOT for less than adequate remuneration. *Id.* at 11-14. Commerce continued to find that Kaptan benefited from these subsidies in the final results. *See* IDM at 5. Ultimately, Commerce calculated a 2.15% net subsidy margin for Kaptan, which it then applied to Icdas as a company subject to the review but not selected for individual examination. Final Results, 88 Fed. Reg. at 34,130.

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　NON-CONFIDENTIAL VERSION

### A.　　Exemptions from the BITT

A subsidy exists where a government authority provides a financial contribution that confers a benefit. 19 U.S.C. §§ 1677(5)(A)-(B). A subsidy is countervailable where it is "specific." *Id.* § 1677(5A). A subsidy may be specific as a matter of law or a matter of fact. *Id.* § 1677(5A)(D); *see also Gov't of Québec v. United States*, 567 F. Supp. 3d 1273, 1278-79 (Ct. Int'l Trade 2022) ("A subsidy that escapes de jure specificity may nevertheless be designated de facto specific.")

The GOT normally requires companies to pay a tax, the BITT, on foreign currency transactions. PDM at 11. The GOT exempts certain transactions from the tax, including foreign exchange sales to companies that possess an industrial registry certificate or that are members of exporters' associations. *Id.*; *see also* Letter from Directorate General for Imports, Ministry of Trade, Republic of Turkiye, to Sec'y Commerce, re: *Response of the Government of Türkiye in 2020 Countervailing Duty Administrative Review on Imports of Steel Concrete Reinforcing Bar from Turkey* (May 16, 2022), C.R. 51-80, 86-95, 101-103, P.R. 48-89 at 77 ("GOT IQR"). Kaptan reported that it availed itself of the BITT exemption during the review period by providing its banking institution with a copy of its exporters' association membership documents. Letter from Law Offices of David L. Simon, PLLC to Sec'y Commerce, re: *Steel Concrete Reinforcing Bar from Turkey; Kaptan Initial Questionnaire Response* (May 16, 2022), C.R. 26-48, P.R. 48 at 52 ("Kaptan IQR"). In addition to being a member of an exporters' association, Kaptan reported that it possessed an industrial registry certificate. *Id.*; *see also* PDM at 11.

Commerce preliminarily found that the BITT exemption constituted a financial contribution provided by a governmental authority. It also found that the BITT exemption was de jure specific, because Turkish law limited such exemptions to "firms that conduct certain types of foreign exchange transactions." PDM at 11. Kaptan argued in its case brief that the program was

not de jure specific, because "all manufacturers in Turkiye are required to have an industrial registry certificate." Letter from Law Offices of David L. Simon, PLLC to Sec'y Commerce, re: *Steel Concrete Reinforcing Bar from Turkey; Case Brief* (Jan. 10, 2023), C.R. 126, P.R. 139 at 7 ("Kaptan Case Brief"). As such, Kaptan argued that the BITT exemption was too broadly and generally available to be considered specific within the meaning of 19 U.S.C. § 1677(5A)(D)(i). *Id.* at 20.

Commerce continued to find the program specific in the final results. IDM at 11-12. Commerce noted that the GOT had reported that any industrial establishment can obtain an industrial registry certificate. *Id.* However, Commerce reasoned that even if this were so (and even if the criteria for qualifying as an "industrial establishment" were broad), the record did not indicate "that all enterprises eligible actually apply and obtain industrial registry certificates." *Id.* at 12. Commerce concluded that the record lacked evidence to show that "all companies that make foreign exchange transactions received the benefit under the law." *Id.*

### B.     Selection of the Benchmark Used to Value Certain GOT-Provided Land

As noted above, a subsidy exists where a government authority provides a financial contribution that confers a benefit. 19 U.S.C. §§ 1677(5)(A)-(B). A "financial contribution" may take the form of the government's provision of an item or service. *Id.* § 1677(5)(D)(iii). Such a contribution provides a benefit to the extent that the government's price for the item/service is inconsistent with prevailing market conditions. *Id.* § 1677(5)(E)(iv). Accordingly, to determine the benefit (if any) that results from the government's provision of the item/service, Commerce compares the government price to a market-based benchmark price. *See, e.g.*, 19 C.F.R. § 351.511(2).

Here, Kaptan reported that its cross-owned affiliate, Nur Gemicilik ve Tic. A.S. ("Nur"), obtained rent-free land from the GOT. PDM at 13.[1] Commerce found that the provision of land was a financial contribution. *Id.* To measure the resulting benefit, Commerce "multiplied the area of land provided to Nur (in square meters) by" a "monthly cost per square meter benchmark rate." *Id.* Commerce derived this rate from a report issued by global real estate firm Colliers International, regarding Turkish real estate values in the second half of 2020. *Id.*; *see also* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Steel Concrete Reinforcing Bar from the Republic of Turkey: Submission of Benchmark Information* (Oct. 31, 2022), P.R. 122 at 2 and Exhibit 1 ("RTAC Benchmark Information"). Commerce based the specific benchmark rate on rental prices for industrial properties in a region of Turkey with similar population density to the region in which Nur's land was located. PDM at 13-14.

Kaptan argued that Commerce should have instead benchmarked the rent-free provision of land using a "Rent Estimation Study" produced by real estate firm Cushman & Wakefield, regarding 2022 rental rates for (1) land zoned for various purposes in the region in which Nur's land was located and (2) GOT-owned land. *Id.* at 11-16; *see also* Letter from Law Offices of David L. Simon, PLLC to Sec'y Commerce, re: *Steel Concrete Reinforcing Bar from Turkey; Kaptan Benchmark Submission* (Oct. 31, 2022), C.R. 114-117, P.R. 121 at 1 and Exhibit 1 ("Kaptan Benchmark Submission"); Letter from Law Offices of David L. Simon, PLLC to Sec'y Commerce, re: *Steel Concrete Reinforcing Bar from Turkey; Comments* (Nov. 15, 2022), C.R. 120, P.R. 127 at 2-3 ("Kaptan Pre-Preliminary Comments") (explaining that the study provided information on 2022 rental rates for parcels zoned for various purposes in the same general area as Nur's land, as

---

[1]     In two prior administrative reviews, Kaptan reported that Nur obtained this land from the GOT, but argued that the benefit should not be cross-attributed to Kaptan. Kaptan did not make this argument in the 2020 review, and has not appealed the cross-attribution.

well as rates for land leased by the GOT). Kaptan argued that the study, which it had commissioned, provided a superior source of benchmarking data, while characterizing the Colliers International report as unreliable and distortive. Kaptan Case Brief at 3-11.

Commerce continued to rely on the benchmark derived from the Colliers International's report in the final results. IDM at 8-10. Commerce noted that the "Rent Estimation Study" was entirely business proprietary, whereas the agency's preference was to use public data to derive its benchmark price. *Id.* at 9. Commerce also reasoned that the study indicated that Kaptan had commissioned it specifically for purposes of the review and/or related litigation. *Id.* The agency noted that it had declined in the past to rely on such later-developed information to derive benchmarks due to concerns that it would not reasonably reflect market conditions during the review period, and would otherwise be skewed to support a party's litigation position. *Id.* at 9-10. Commerce also noted that the study contained information suggesting that its pricing data were at least partially related to land being rented out by non-private parties, *i.e.*, the GOT. *See id* at 10; *see also* Kaptan Pre-Preliminary Comments at 2-3.

Commerce also found unpersuasive Kaptan's arguments that the Colliers International report provided unreliable, distortive data. IDM at 8-9. Commerce first found that, contrary to Kaptan's claim that the Colliers International report did not identify the source of its information, the Colliers International report identified Colliers International itself as the source of the data. *Id.* at 9. The agency also found the report's incorporation of a liability disclaimer irrelevant to its reliability for benchmarking purposes. *Id.* Commerce noted that, in developing its preliminary benchmark, it relied only on data relating to an area of Turkey with a population density like that of the area in which Nur's land was located. *Id.* Finally, addressing Kaptan's claim that the Colliers International data were for parcels too dissimilar to Nur's to provide a reasonable benchmark,

Commerce noted that this review did not present a situation in which Commerce had multiple potential benchmark sources available. *Id.* With the Colliers International data and the "Rent Estimation Study" forming the only record sources of potential benchmark data, Commerce found the former more reliable and appropriate. *Id.*

### C.   Determination of Icdas's Margin

Kaptan was selected for individual examination in the 2020 review, along with a second company, Colakoglu Dis Ticaret A.S. and Colakoglu Metalurji A.S. (collectively, "Colakoglu"). PDM at 1. Icdas was also subject to the review, but was not individually examined. *See id.* at 1-2. Commerce ultimately calculated a *de minimis* net subsidy margin for Colakoglu, and a 2.15% net subsidy margin for Kaptan. Final Results, 87 Fed. Reg. at 34,130.

The Act states that, in investigations in which there are more respondents than can be individually examined, Commerce will determine the rate for the respondents that are not individually examined by averaging the net subsidy margins for the individually examined companies, excluding margins that are zero, *de minimis* or based entirely on facts available. PDM at 5; *see also* 19 U.S.C. § 1671d(c)(5)(A)(i). Consistent with this approach, Commerce here assigned Icdas the rate determined for Kaptan, as that was the only rate determined for an individually examined company that was not zero, *de minimis*, or based entirely on facts available. PDM at 5; Final Results, 88 Fed. Reg. at 34,130.

## IV.   STANDARD OF REVIEW

The U.S. Court of International Trade reviews Commerce's decisions in antidumping duty proceedings to determine whether those decisions are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).

It is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966); *see Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d 1343, 1349 (Fed. Cir. 2015). The courts have framed the substantial evidence standard as a review for "reasonableness," in which "th{e} court's function is merely to ascertain 'whether there was evidence which could reasonably lead to the {agency's} conclusion.'" *CP Kelco US, Inc. v. United States*, 24 F. Supp. 3d 1337, 1344 (Ct. Int'l Trade 2014) (quoting *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984)).

A dissatisfied plaintiff cannot ask the Court to re-weigh the evidence on the record and decide the case for Commerce anew. *See Matsushita Elec.*, 750 F.2d at 933. Rather, factual findings by Commerce are afforded considerable deference. *See INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992) (stating that in fact-intensive situations, agency conclusions should be reversed only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion). And the Court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987). As such, Commerce need only "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs.*, 463 U.S. at 43.

A decision is not "in accordance with law" if it violates the plain language of a relevant statute or regulation. *AMS Assocs. Inc. v. United States*, 737 F.3d 1338, 1344 (Fed. Cir. 2013); *Jilin Henghe Pharm. Co. v. United States*, 28 CIT 969, 977, 342 F. Supp. 2d 1301, 1309 (2004),

*vacated on other grounds*, 123 F. App'x 402 (Fed. Cir. 2005). Likewise, to the extent that the

agency's determination is inconsistent with binding judicial precedent, the determination is not in

accordance with law. *Jilin Henghe*, 28 CIT at 977, 342 F. Supp. 2d at 1309, *vacated on other*

*grounds*, 123 F. App'x 402.

## V.      SUMMARY OF ARGUMENT

Commerce made no error in determining that Turkey's BITT exemption program is de jure

specific. The law authorizing the exemption specifies that the exemption is available only to certain

foreign exchange transactions. While plaintiff has argued that the exemptions are too broadly

available to be specific as a matter of law, the agency reasonably found that this had not been

established on the record.

Commerce also made no error in deriving the benchmark by which it determined the

benefit to Kaptan of its affiliate's rent-free use of GOT-owned land. Commerce reasonably chose

to rely on information prepared and issued in the normal course of business by a disinterested third

party over a proprietary study that Kaptan commissioned well after the review period had

concluded. Contrary to Kaptan's claims, its preferred source of benchmarking data was not equally

publicly available as the information on which Commerce relied. Commerce also reasonably

declined to rely on information that was developed well after the review period for litigation

purposes, rather than more contemporaneous data prepared in the course of ordinary business.

Finally, Commerce reasonably declined to rely on government rental prices to benchmark the

GOT's rent-free provision of land to Nur.

## VI.     ARGUMENT

Commerce's final results should be affirmed. As described below, there is no error in either

the agency's specificity finding regarding the BITT program, or in its selection of the benchmark

for determining the benefit that Kaptan obtained through the GOT's provision of land to a Kaptan affiliate. As such, there is no need for Icdas's margin to be redetermined.

**A.  <u>Commerce's Specificity Finding Regarding the BITT Should Be Affirmed</u>**

Turkey normally charges the BITT, a tax on foreign currency transactions, with the goal of restricting currency speculation. GOT IQR at 76-77. Certain transactions are exempt from the tax, including foreign exchange sales to companies that are members of exporters' associations, and foreign exchange sales to companies that have an industrial registry certificate. *Id.* at 77. Kaptan reported that it availed itself of the exemption during the review period by providing its banking institution with a copy of its exporters' association membership documents. Kaptan IQR at 52. In addition to being a member of an exporter's association, Kaptan reported that it possessed an industrial registry certificate. *Id.*; *see also* PDM at 11.

Kaptan argued in its case brief that the BITT exemption was too broadly available to reasonably be deemed "specific" within the meaning of 19 U.S.C. § 1677(5A)(D)(i). Kaptan Case Brief at 16-20. Commerce rejected this argument. Commerce noted that the GOT had reported that any industrial establishment can obtain an industrial registry certificate. IDM at 11-12.  However, Commerce reasoned that even if this were so (and even if the criteria for qualifying as an "industrial establishment" were broad), the record did not indicate "that all enterprises eligible actually apply and obtain industrial registry certificates." *Id.* at 12. Further, the tax exemption was necessarily limited to those companies that both met one of the five exemption criteria and that had relevant foreign exchange transactions. *Id.* As such, Commerce continued to find the BITT exemption countervailable. *Id.*

Kaptan challenges the agency's specificity finding. Kaptan's Brief at 18-23. Kaptan argues that Turkish law both defines an "industrial establishment" for purposes of industrial registry certificates and requires all companies meeting this definition to obtain such certificates. *Id.* at 19-

22. Kaptan further argues that the record indicates that there are 140,071 Turkish enterprises with industrial registry certificates. *Id.* at 21-22. Kaptan also claims that the BITT exemption applies automatically to such industrial establishments' foreign exchange purchases, making it non-specific as a matter of law under 19 U.S.C. § 1677(5A)(D)(ii). *Id.* at 22. In light of these assertions, Kaptan claims that Commerce's de jure specificity finding is inadequately explained and supported. *Id.* at 22-24. Kaptan urges the Court to "remand with instructions stating that the Record only admits a finding that BITT exemptions are not specific and not countervailable." *Id.* at 23.

The Court should decline this invitation. The thrust of Kaptan's argument is that all manufacturing companies in Turkey are required to have an industrial registry certificate, making the BITT exemption too widely available to be specific as a matter of law. But Commerce has previously found subsidies de jure specific where they apply to seemingly large, yet statutorily defined, classes of companies, such as "industrial enterprises." *See* Issues and Decision Memorandum accompanying *Circular Welded Carbon-Quality Steel Pipe from the Sultanate of Oman*, 77 Fed. Reg. 64,473 (Dep't Commerce Oct. 22, 2012) (final affirm. countervailing duty deter.) at 5-6. Commerce has also repeatedly found the BITT exemption program itself specific. *See, e.g.*, Issues and Decision Memorandum accompanying *Certain Aluminum Foil from the Republic of Turkey*, 86 Fed. Reg. 52,884 (Dep't Commerce Sept. 23, 2021) (final affirm. countervailing duty deter. and final affirm deter. of critical circumstances, in part) at 15; Preliminary Decision Memorandum accompanying *Common Alloy Aluminum Sheet from the Republic of Turkey*, 85 Fed. Reg. 49,629 (Dep't Commerce Aug. 14, 2020) (prelim. affirm. countervailing duty deter., prelim. affirm. deter. of critical circumstances in part, and alignment of final deter. with final antidumping duty deter.) at 22-23 (unchanged in final).

In any event, Kaptan did not claim to have qualified for the BITT exemption by reason of possessing an industrial registry certificate. Kaptan IQR at 52 and Exhibit 27. Rather, it claimed to have accessed the BITT exemption by demonstrating to its banking institution that it was a member of an exporters' association. *Id.* Thus, Kaptan's challenge to Commerce's de jure specificity finding is not in keeping with its own assertions regarding how it qualified for the BITT exemption program.

Finally, even if the BITT exemption program was manifestly not de jure specific, this would not end the specificity inquiry. Under the Act, where a program is not de jure specific, it may nonetheless be de facto specific. 19 U.S.C. § 1677(5A)(D)(i)-(iii). The proper course of events where a subsidy is not de jure specific is for Commerce to proceed to the de facto inquiry. *See, e.g., Gov't of Québec*, 567 F. Supp. 3d at 1278-79 ("A subsidy that escapes de jure specificity may nevertheless be designated de facto specific."). Thus, even if this Court were to remand Commerce's de jure specificity finding, that remand should be for further consideration of that finding and for the agency to conduct a de facto analysis if necessary. Kaptan's request that the Court remand with instructions for Commerce to find the program non-specific is therefore inappropriate.

### B.     Commerce's Selection of the Benchmark for Assessing the Benefit of GOT-Provided Land Should Be Affirmed

Pursuant to 19 U.S.C. § 1677(5)(D)(iii), Commerce treats a government's provision of goods or services, including the provision of land, as a financial contribution. *See* 19 U.S.C. § 1677(5)(D)(iii). To measure the benefit provided, Commerce benchmarks the government price against a market-determined value. *See* 19 C.F.R. § 351.511(a). During the 2020 review period, Kaptan's affiliate Nur used GOT-owned land for free. PDM at 13. Both RTAC and Kaptan submitted data for Commerce's consideration in identifying a market-determined rental value for

**BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED**

the land. RTAC Benchmark Information at 2 and Exhibit 1; Kaptan Benchmark Submission at Exhibit 1.

RTAC submitted public data in the form of a Colliers International's report titled "Turkey: Turkey: Real Estate Market Review – Second Half 2020.". RTAC Benchmark Information at 2 and Exhibit 1. Among other information, the report provided rental rates for the second and fourth quarters of 2020 for industrial properties in Istanbul and several surrounding regions. *See id.* at Exhibit 1, pp. 9-11. Kaptan confidentially submitted a study that it had commissioned regarding Turkish real estate rates in 2022. Kaptan Benchmark Submission at Exhibit 1; *see also* IDM at 9. The study, which was prepared [                    ], provided 2022 rental rates for thirteen commercial, industrial, private use, tourism, land, and field-type properties located in the region in which Nur's land was located. *See* Kaptan Benchmark Submission at 1 and Exhibit 1; Kaptan Pre-Preliminary Comments at 2-3. The study also provided 2022 rental rates for three government-leased properties, including two properties in or near Istanbul. *See* Kaptan Benchmark Submission at 1 and Exhibit 1; Kaptan Pre-Preliminary Comments at 2-3.

Commerce ultimately relied on the Colliers International data for 2020 industrial rents in an area of Turkey with a population density like that of the region in which Nur's land was located. IDM at 8-10; *see also* PDM at 5. Explaining its decision, Commerce noted its preference for public benchmarking data such as the Colliers International report, in contrast with Kaptan's confidential study. IDM at 9. Commerce found that the Colliers International report adequately identified its sources and that the report's generalized disclaimer of liability did not undermine its reliability for benchmarking purposes. *Id.* Commerce further noted that Kaptan's study contained information indicating that Kaptan had commissioned the study after the review period for purposes of the review and/or related litigation, and that the data it provided was at least partially based on

government rental prices. *Id.* at 9-10. While Kaptan argued that the properties covered by its study were more similar to Nur's than those covered by the Colliers International data, Commerce found these alleged similarities were insufficient to overcome the issues affecting Kaptan's study, *i.e.*, its non-public nature, its inclusion of government prices, and the fact that it was developed after the review period for use in litigation. *Id.*

Kaptan now challenges the agency's reliance on the Colliers International data over Kaptan's study to derive the benchmark. Kaptan's Brief at 24-41. Kaptan first argues that while Commerce found that Kaptan's study was not publicly available, the study and the Colliers International report provide comparably public benchmarking data. *Id.* at 24-28. Kaptan then argues that the data provided in its study were more credible than the Colliers International data. *Id.* at 28-33. Third, Kaptan argues that the agency did not explain why it found it relevant, in determining not to rely on Kaptan's study, that the study included prices at which the GOT offered land for rent. *Id.* at 33-34. Fourth and finally, Kaptan argues that Commerce failed to adequately engage with Kaptan's arguments regarding the comparability of Nur's land with the land for which the Colliers International data provided information. *Id.* at 34-41. As detailed below, Kaptan's arguments are unpersuasive. As such, this Court should affirm Commerce's benchmark selection.

### 1.    *Kaptan Does Not Persuade That Its Study and the Colliers International Report Are Equally Public*

For the agency's consideration in benchmarking the value of Nur's land, RTAC publicly submitted the entirety of Colliers International's *Turkey Real Estate Market Review* for the second half of 2020). RTAC Benchmark Information at Exhibit 1. Kaptan provided a brief public description of the "Rent Estimation Study" that it had commissioned, and publicly identified two benchmark prices derived from the study. Kaptan Benchmark Submission at 1; Kaptan Pre-Preliminary Comments at 2-3; *see also* Kaptan Case Brief at 15-16. However, Kaptan submitted

the study itself as a fully confidential document, notwithstanding agency regulations indicating that such data must be submitted publicly. Kaptan Benchmark Submission Exhibit 1; 19 C.F.R. § 351.102(b)(21)(iii). In declining to rely on the "Rent Estimation Study," Commerce explained that, as Kaptan had acknowledged, the agency prefers to rely on public data for benchmarking purposes. IDM at 9; *see also* Kaptan Case Brief at 15.

Kaptan now argues that the agency's acknowledged preference for public data does not support reliance on the public Colliers International report over the confidential "Rent Estimation Study." Kaptan's Brief at 24-28. Kaptan first claims that the record contains "identical amounts of relevant public information about the {study's} and Collier's benchmark rents." *Id.* at 25. Kaptan further argues that, even if Commerce's general preference is for public benchmarking data, Commerce has previously relied on proprietary benchmarking data. *Id.* at 26-28. Kaptan accordingly argues that Commerce's decision not to rely on Kaptan's study cannot be justified through a "false assertion that the information underlying a proposed benchmark must be publicly available." *Id.* at 28.

These arguments are unavailing. In claiming that there was no greater amount of public data offered by the Colliers International report than was available regarding the "Rent Estimation Study," Kaptan notes that it publicly identified two benchmark prices that it calculated from the proprietary study data, and publicly described those benchmarks as relating to "average rents" for "undeveloped industrial property in rural provinces similar to Trabzon." *Id.* at 25-26; Kaptan Pre-Preliminary Comments at 2-3; Kaptan Benchmark Submission at Exhibit 1. But it remains that the data underlying Kaptan's calculations and descriptions are entirely proprietary. Kaptan Benchmark Submission at Exhibit 1. Moreover, while Kaptan assumes that Commerce could – and should – have relied on one of the two publicly-identified average rents derived from the study data, one of

those averages incorporates data for non-industrial properties, while the other is based entirely on GOT rental rates. *See* Kaptan Pre-Preliminary Comments at 2-3; Kaptan Benchmark Submission at Exhibit 1. Commerce could not have attempted to disentangle these issues – or adjusted the averaged figures that Kaptan publicly presented – without relying on proprietary data. By contrast, the fully public nature of the Colliers' International report allowed the agency to select among and adjust that report's data without resort to non-public information. As such, Kaptan's claim that the study and the Colliers International report provided comparably public information is misleading in important respects.

Further, while Kaptan argues that Commerce's decision not to rely on Kaptan's survey cannot be justified through a "false assertion that the information underlying a proposed benchmark must be publicly available," Kaptan's Brief at 28, this is not an assertion that Commerce made. Rather, it noted that when faced with proprietary and public data sources for use in benchmarking government prices, "Commerce prefers to use public benchmark information." IDM at 9. Kaptan acknowledged that preference in its case briefing. Kaptan Case Brief at 15 ("Commerce has stated a preference for public benchmarks, but uses non-public benchmarks as situations demand."). While Kaptan enlarges here on its claim that Commerce relies on non-public benchmarks "as situations demand," Kaptan does not contest Commerce's preference is for public data. *Id.*; Kaptan's Brief at 26-28. And as further detailed below, Commerce reasonably found here that the "situation" presented by the record here did not "demand" that the agency rely on non-public information to derive a benchmark.

> **2.      *Kaptan Does Not Persuade That Commerce Erred in Assessing the Reliability of the Two Data Sources***

In explaining its decision to rely on the Colliers International data, Commerce addressed arguments that Kaptan raised in its case brief regarding the reliability of those data, as well as the

data in Kaptan's survey. IDM at 8-10. In response to Kaptan's argument that the Colliers International report was unreliable because it identified Colliers International as the source of its industrial rental prices, Kaptan Case Brief at 5, Commerce reasoned that the report's reliance on Colliers's own market research "strengthens the case to use the Colliers report as it is not using secondary sources or compiling sets of data from other sources." IDM at 9. Noting Kaptan's argument that the report should be considered unreliable because it contained a liability disclaimer, Commerce found the presence of such a disclaimer irrelevant to the data's reliability for benchmarking purposes. *Id.*; *see also* Kaptan Case Brief at 5-6. Commerce also reasoned that, by contrast with the Colliers International report, Kaptan's "Rent Estimation Study" was privately commissioned well after the review period for the specific purpose of litigation, bringing its reliability as to Turkish real estate prices in 2020 into doubt. IDM at 9-10.

On appeal, Kaptan renews its claim that the data provided by the Colliers International report is less reliable than the information provided by the "Rent Estimation Study." Kaptan's Brief at 28-33. Kaptan argues that the Colliers International report "disavow{s}" its own accuracy and provides no indication of Colliers International's data-gathering methodology. *Id.* at 28-29. By contrast, Kaptan argues that its "Rent Estimation Study" was developed by property valuation experts that fully explained their methodologies and accepted liability in relation to the valuation performed. *Id.* at 29-30; *see also* Kaptan Case Brief at 15 n.54; Kaptan Benchmark Submission at Exhibit 1, p. 9. Finally, Kaptan argues that Commerce erroneously applied a *per se* rule that rejected the "Rent Estimation Study" as unreliable simply because it was commissioned for use in litigation, without meaningfully addressing the study's substance with respect to property valuation, an area outside of Commerce's expertise. Kaptan's Brief at 30-33.

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED   **NON-CONFIDENTIAL VERSION**

Kaptan's arguments are again unpersuasive. At bottom, Kaptan asks this Court to reweigh the evidence and make a *de novo* finding regarding the most appropriate source of benchmarking data. This the Court cannot do. *See Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1376-77 (Fed. Cir. 2015) (quoting *Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807, 815 (Fed. Cir. 1992)) ("It is not for this court on appeal to reweigh the evidence or to reconsider questions of fact anew.").

Further, to the extent that Kaptan argues that Commerce's benchmarking selection was unsupported by the record (rather than asking the Court to reweigh the evidence itself), Kaptan must show that no reasonable mind could rely on a Colliers International-based benchmark over the study-derived benchmarks that Kaptan proposed. *See Chemours Co. FC, LLC v. United States*, 443 F. Supp. 3d 1315, 1321 (Ct. Int'l Trade 2020); *see also Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938) (stating that substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."). Kaptan does not show that the record compelled reliance on a benchmark derived from the "Rent Estimation Study" over the one that Commerce derived from the Colliers International report.

Kaptan attacks the Colliers International Report as "disavow{ing}" its own accuracy, citing a liability disclaimer at the end of the report. Kaptan's Brief at 28. But there is no obvious reason why a generic liability disclaimer at the end of a regularly published report prepared by an international real estate firm should render that report unreliable for benchmarking purposes. IDM at 9; *see also* RTAC Benchmark Information at Exhibit 1, Back Cover. And while Kaptan contrasts the report's disclaimer with the purported acceptance of liability in the "Rent Estimation Study," Kaptan's Brief at 28-30, the study [

BUSINESS PROPRIETARY INFORMATION
                                            HAS BEEN DELETED                    **NON-CONFIDENTIAL VERSION**

]. Kaptan Benchmark Submission at Exhibit 1, pp. 5 & 9.

Kaptan next argues that the Colliers International report provides less information on its sources and data-gathering methodologies than the "Rent Estimation Study." *Id.* at 29-30. But as Commerce noted, the Colliers International report indicates that the source of the data reported therein is Colliers International's own research into 2020 rental rates for industrial properties in Turkey. IDM at 9; *see also* RTAC Benchmark Information at Exhibit 1. And while Kaptan argues that the "Rent Estimation Study" is transparent regarding its data sources and methodologies, the [

]. Pertinently, [

]. Kaptan Benchmark Submission at Exhibit 1, pp. 3, 24-25. [

]. *Id.* at 24. For that matter, [

] *Id.*

Kaptan also fails to persuade that the agency acted unreasonably in finding that the study's having been commissioned after the review period for purposes of litigation brought its reliability into question. Kaptan's Brief at 30-33. Commerce explained that it found "contemporaneous documentary evidence" that is "prepared in the ordinary course of business" to be more credible than "later-developed evidence" generated specifically for litigation. IDM at 9-10. While Kaptan characterizes this as an unlawful *per se* rule, it is instead a common-sense observation – and one

**BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED**    **NON-CONFIDENTIAL VERSION**

that holds particular weight here, where it is [



]. *See*

discussion *supra* at 16; *see also* IDM at 9 & n.47 (citing cases in which Commerce declined to

rely on reports prepared for purposes of litigation, reasoning that such reports are "not normally

{} considered reliable," [


]).

Indeed, this Court has previously upheld Commerce's rejection of benchmarks derived

from studies privately commissioned for purposes of litigation, particularly where the "original

documentation" underlying the report is not included. *See, e.g.*, *Mosaic Co. v. United States*, 589

F. Supp. 3d 1298, 1312-13 (Ct. Int'l Trade 2022). In this regard, it should be recalled that, at best,

the "Rent Estimation Study" contains a non-contemporaneous rental value, [



]. Kaptan Benchmark

Submission at Exhibit 1, pp. 3, 24-25; Kaptan Pre-Preliminary Comments at 2-3.

Finally, while Kaptan argues that Commerce is not an expert in property valuation,

Kaptan's Brief at 32-33, Commerce is the expert agency in selecting among potential benchmarks

for purposes of measuring subsidy benefits. Here, Commerce's determination that the Colliers

International report provided a reliable source of benchmarking data is supported by substantial

record evidence, and even if one accepted for the sake of argument that the "Rent Estimation

Study" was similarly reliable (which it was not), "the decision as to the credibility of the evidence

and the inference to be drawn therefrom lies with the fact finder" – Commerce. *See Usinor Sacilor

v. United States*, 19 CIT 711, 725, 893 F. Supp. 1112, 1127 (1995).

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED          NON-CONFIDENTIAL VERSION

> ### 3.  *Kaptan's Challenge to Commerce's Rejection of GOT Prices to Measure the Benefits of GOT-Provided Land Fails*

Kaptan's "Rent Estimation Study" provided 2022 rental prices for thirteen [

] properties in Turkey's Trabzon province, as well as 2022 rental prices for three government-owned properties. *See* Kaptan Benchmark Submission at Exhibit 1, pp. 24-25; Kaptan Pre-Preliminary Comments at 2-3. In explaining its decision to rely on the Colliers International report to derive its benchmark, Commerce noted that the prices in the "Rent Estimation Study" appeared to have "been partially based on prices provided by non-private entities." IDM at 10. Kaptan argues that this is "speculation" and that Commerce failed to explain why it should matter whether certain prices were provided by non-private entities. Kaptan's Brief at 33-34. Once again, Kaptan's arguments are unconvincing.

As an initial matter, Commerce's conclusion that the study incorporated prices provided by non-private entities is hardly "speculation," given that Kaptan described the study as providing "rental rates for coastal and filled areas rented by the Government in 2022." Kaptan Pre-Preliminary Comments at 3; *see also* Kaptan Benchmark Submission at Exhibit 1, p. 25.

Moreover, while the agency has a duty to explain its decisions, that duty cannot be considered in isolation from what is being decided. The use of a government price to benchmark a government price presents an obvious concern, given that the overarching point of the benchmarking exercise is to find an appropriate "market-determined" value for measuring a government's financial contribution. *See* 19 C.F.R. § 351.511(a)(2); *see also id.* § 351.505(a)(1) (stating that the benefits of government-provided loans exist in relation to "the amount the firm would pay on a comparable commercial loan{} that the firm could actually obtain on the market").

Simply put, a fundamental assumption of the countervailing duty laws is that government prices are not market-determined until shown otherwise; as such, benchmarking one government

**BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED**      **NON-CONFIDENTIAL VERSION**

price with another presents obvious concerns. Indeed, this Court has routinely approved Commerce's rejection of even private prices as benchmarks, where those prices were derived from markets in which a government has such an influence as to be able to distort private prices. *See, e.g.*, *Mosaic Co.*, 589 F. Supp. 3d at 1311-13 (discussing Commerce's practice of rejecting private prices as benchmarks where there is distortive government influence over the private market). Kaptan's complaint that the agency did not adequately explain why it would be inappropriate to benchmark a government price with a government price (or a price at least partially reflective of such prices) is therefore unconvincing.

Further, Kaptan does not argue that the government rental prices reflected in the study were market-determined within the meaning of 19 C.F.R. § 351.511(a)(2) or that they resulted from "competitively run government auctions" (the sole type of government pricing that Commerce's benchmarking regulation identifies as potentially "market-determined."). 19 C.F.R. § 351.511(a)(2). Indeed, the [


]. Kaptan Benchmark Submission at Exhibit 1, p. 25. Given the above, it is disingenuous for Kaptan to argue that the path of the agency's reasoning here was undiscernible. *Motor Vehicle Mfrs.*, 463 U.S. at 43 (stating that even where an agency decision reflects "less than ideal clarity," it must be upheld so long as the path of the agency's reasoning can be discerned); *Ceramica Regiomontana*, 810 F.2d at 1139 (same). Rather, the basis for Commerce's citation of the inclusion of non-private prices in the study as supporting its decision not to rely on the study is readily apparent.

### 4.  *Kaptan Does Not Persuade that Commerce Was Required to Further Engage with its Arguments Regarding Comparability*

To derive its benchmark, Commerce relied on industrial rental prices from the Colliers International report, in conjunction with record information regarding the population density of the regions covered by that report and the region in which Nur's land was located. IDM at 9. Kaptan argued that Commerce's adjustment of the Colliers International data was insufficient, and that Commerce should have considered other factors that, in Kaptan's estimation, supported use of a benchmark derived from the "Rent Estimation Survey" over the Colliers International data. *Id.*; *see also* Kaptan Case Brief at 6-11.

In its final determination, Commerce explained that Kaptan's arguments put the cart before the horse. While Kaptan argued that the benchmarks provided in the "Rent Estimation Survey" reflected properties either in the same region of Turkey as Nur's land or properties that, like Nur's land, were government-owned, Commerce had determined that the "Rent Estimation Survey" was not reliable for benchmarking purposes, due to its confidentiality, its having been prepared specifically for the litigation, and its incorporation of non-private prices. Kaptan Case Brief at 6-11; IDM at 8-10. Thus, the agency was in the position of having only one usable benchmark source: the Colliers International data, which it adjusted to the extent possible based on the record to approximate population density. IDM at 9-10.

Kaptan now argues that Commerce improperly failed to consider factors affecting comparability in selecting a source of benchmark data. Kaptan's Brief at 34-41. In making this argument, Kaptan reiterates its claim that the "Rent Estimation Study" provides superior, more transparent data than the Colliers International report. *Id.* at 35-41. Kaptan also argues that this Court has previously found it inappropriate to value land located outside of developed areas using benchmarks derived from prices of land in more-developed areas. *Id.* at 37-38.

**BUSINESS PROPRIETARY INFORMATION**
**HAS BEEN DELETED**

At best, Kaptan argues for the Court to reweigh the evidence, giving primacy to Kaptan's assessment that its "Rent Estimation Study" provided values for the properties most comparable to Nur's over Commerce's judgment that the study data were unreliable or otherwise unsuitable for benchmarking purposes because, for example, they reflected non-private prices. Further, even a casual review of the study bears out Commerce's concerns. The study provides 2022 prices, rather than prices contemporaneous with the 2020 review period, reflecting the fact that the study was generated well afterwards for purposes of litigation. Kaptan Benchmark Submission at Exhibit 1; Kaptan Pre-Preliminary Comments at 2-3. The data include government prices, as Kaptan has admitted. Kaptan Benchmark Submission at at Exhibit 1, p. 25; Kaptan Pre-Preliminary Comments at 3. The remaining, [            ] values are for, [                    ] and [

] parcels designated for commercial, tourism, and other irrelevant purposes; these parcels were described in the study as [                                        ]. Kaptan Benchmark Submission at Exhibit 1, p. 24; Kaptan Pre-Preliminary Comments at 2-3.

Beyond this, the legal precedents that Kaptan relies on are not apposite. Kaptan's Brief at 37-38. In the *Ozdemir* cases, the Court was not asked to review the agency's determination as to which of two potential sources of benchmark data was more reliable. *See Ozdemir Boru San. ve Tic. Ltd. Sti. v. United States*, 273 F. Supp. 3d 1225, 1251 (Ct. Int'l Trade 2017). Rather, the agency relied on a single data source that presented prices for fourteen industrial-usage parcels in seven Turkish regions, and it averaged all fourteen prices together to create its benchmark. *Id.* On remand, Commerce removed two values before averaging the rest, to better tailor the benchmark to the region in which the relevant land was located. *Id.* at 1252. Here, Commerce had two potential sources for benchmark data. It reasonably determined that one was not suitable for its purposes,

and then, consistent with *Ozdemir*, tailored its use of the suitable source to the region in which the relevant land was located. IDM at 8-10; PDM at 13.

In *Zhaoquing New Zhongya Aluminum Co.*, the Court remanded Commerce's finding, based on a 2010 screenshot of a promotional website, that certain land purchased in 2006 was "comparable to a fully developed industrial park." *Zhaoquing New Zhongya Aluminum Co. v. United States*, 37 CIT 1003, 1008 929 F. Supp. 2d 1324, 1329 (2013). Commerce has not made a similar finding here. Rather, it has reasonably selected between two different data sources for benchmarking the benefit to Nur in 2020 of its 49-year lease of Government-owned land. IDM at 8-10; PDM at 13. For that matter, to the extent that Kaptan argues that its "Rent Estimation Study" is superior based on the degree of development (or non-development) of the properties surveyed in that study, the record is unsupportive of its claims. Indeed, of the thirteen [          ] properties for which the study presents prices, [

                                                         ]. Kaptan Benchmark Submission at Exhibit 1, pp. 3 and 24; Kaptan's Pre-Preliminary Comments at 2-3. The other three prices in the study relate to [                                                         ]. Kaptan Benchmark Submission at Exhibit 1, p. 25; Kaptan's Pre-Preliminary Comments at 3.

In sum, Kaptan does not persuade that there is any error in Commerce's decision to rely on the Colliers International report to derive its benchmark, rather than Kaptan's "Rent Estimation Study." While Kaptan would prefer that Commerce have reached a different result, the agency's selection of the source of benchmarking data was reasonable, and this is all that the law requires.

**C.    There is No Reason for Icdas's Net Subsidy Margin to be Redetermined**

Consistently with the Act, Commerce assigned Icdas the rate determined for Kaptan, as that was the only rate determined for an individually examined company that was not zero, *de*

*minimis*, or based entirely on facts available. PDM at 5; Final Results, 88 Fed. Reg. at 34,130; *see also* 19 U.S.C. § 1671d(c)(5)(A)(i). Icdas argues that, to the extent that Commerce recalculates Kaptan's rate pursuant to this litigation, the agency must also redetermine Icdas's rate. Icdas's Brief at 2. As described above, however, there is no error in Commerce's determination of Kaptan's rate. Accordingly, there is no basis for a redetermination of Icdas's net subsidy margin. That said, RTAC does not contest that if the margin for Icdas changes as a result of this litigation, there may be a basis for altering Icdas's rate. The nature and degree of any such change, however, cannot be determined at this time.

## VII.   <u>CONCLUSION</u>

For the reasons described above, RTAC urges this Court to affirm the final results of the 2020 administrative review of the countervailing duty order on Turkish rebar.

Respectfully submitted:

*/s/ John R. Shane*
Alan H. Price, Esq.
John R. Shane, Esq.
Maureen E Thorson, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036

*Counsel to the Rebar Trade Action Coalition*

Dated: January 29, 2024

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chambers Procedure 2(B)(1), the undersigned certifies that these comments comply with the word limitation requirement. The word count for Defendant-Intervenor Rebar Trade Action Coalition's Rebuttal Brief, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 7,928 words.

<u>*/s/ John R. Shane*</u>
(Signature of Attorney)

<u>John R. Shane</u>
(Name of Attorney)

<u>Rebar Trade Action Coalition</u>
(Representative Of)

<u>January 29, 2024</u>
(Date)