NON-CONFIDENTIAL VERSION

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| KAPTAN DEMIR ÇELIK ENDÜSTRISI VE TICARET A.Ş., | |
| Plaintiff, | **Court No. 23-cv-00131** |
| and | |
| ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI, A.S., | **NON-CONFIDENTIAL VERSION** |
| Plaintiff-Intervenor, | CONFIDENTIAL INFORMATION REDACTED AT PAGE 9 AND ATTACHMENT 3 |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| and | |
| REBAR TRADE ACTION COALITION, | |
| Defendant-Intervenor. | |

### RESPONSE OF PLAINTIFF

### KAPTAN DEMIR ÇELIK END. VE TIC. A.Ş.

### TO THE COURT'S QUESTIONS, ECF #43

David L. Simon, Esq.
LAW OFFICES OF DAVID L. SIMON, PLLC
1025 Connecticut Avenue, NW, Suite 1000
Washington, DC 20036 USA
Tel. (202)481-9000
Fax (202)481-9010
e-mail: DLSimon@DLSimon.com

*Counsel to Kaptan Demir Çelik Endüstrisi ve Ticaret A.Ş.*

May 29, 2024

Plaintiff Kaptan responds below to the Court's questions for oral argument, ECF #43.

**I.    Questions to Plaintiff Kaptan Demir Çelik Endüstrisi ve Ticaret A.S. ("Kaptan")**

    1.    What is an "enterprise or industry?"  19 U.S.C. § 1677(5A)(D)(i).

**Answer:**

"Enterprise" is not defined in the statute.

Likewise, the SAA[1] does not define "enterprise," but gives some guidance:

> Section 771(5A)(D) uses the term "enterprise or industry" as it is used in Article 2 of the {SCM[2]} Agreement for purposes of determining whether a subsidy is specific.

The SCM Agreement suggests that "enterprise" means "company" [3]:

> Objective criteria … mean criteria … which are neutral, which do not favour certain enterprises over others, and which are economic in nature and horizontal in application, such as number of employees or size of enterprise.

By linking "enterprise" and "number of employees," the Agreement suggests that "enterprise" means "company." [4]

---

[1] *Statement of Administrative Action accompanying the Uruguay Round Agreements Act*, H.R. Rep. No. 103-316, vol. I at 884, *reprinted in* 1994 U.S.C.C.A.N. 4040, at 925.

[2] *Agreement Establishing the World Trade Organization,* Apr. 15, 1994, 1869 U.N.T.S. 14, Annex 1A, Agreement on Subsidies and Countervailing Measures.

[3] SCM Art. 2 n. 2.

[4] *Cf. Black's Law Dictionary* defining "enterprise" as, "A corporation, business, firm, company, or registered group with a designated purpose."
https://www.google.com/url?sa=t&source=web&rct=j&opi=89978449&url=https://thelawdictio nary.org/enterprise/%23:~:text%3DENTERPRISE%2520Definition%2520%2526%2520Legal% 2520Meaning%26text%3D1.,organized%2520to%2520conduct%2520entrepreneurial%2520acti vity.&ved=2ahUKEwj6iIGE-JSGAxWBEFkFHZyjBqkQFnoECA4QAw&usg=AOvVaw2LFwiYkqE8j65lhFsqJiex, accessed May 17, 2024.

In *Gov't of Québec v. United States,* 567 F. Supp. 3d 1273, 1290 (Ct. Int'l Trade 2022), this Court approved Commerce's treatment of "enterprise" as equivalent to "company." *See also*, *Risen Energy Co. v. United States*, 658 F. Supp. 3d 1364, 1375 (Ct. Int'l Trade 2023), quoting *BGH Edelstahl Siegen GmbH v. United States,* 600 F. Supp. 3d 1241, 1256 (Ct. Int'l Trade 2022); *see also*, *AK Steel Corp. v. United States*, 192 F. 3d 1367, 1384-5 (Fed. Cir. 1999) (Korean steelmaker Posco is an "enterprise").

"Industry" is not defined in the statutory CVD provisions, but the statutory definition of "industry" as "the producers as a whole of a domestic like product," 19 U.S.C. § 1677(4), suggests that, in a CVD context, "industry" means "producers as a whole of a given product." *Cf.* the *Preamble* to Commerce's CVD regulations[5]:

> In situations where a previous finding may be pertinent to one industry, *e.g.,* that the paper clip industry did not receive dominant or disproportionate benefits under a particular program, petitioners seeking investigation of benefits under that program to the staple industry should allege that … the situation of the staple industry differs….

The *Preamble* also refers to the "Korean steel industry" (*id*. at 65,359) and the "aircraft industry" (65,388). Thus, "industry" may encompass producers as a whole of a given product (paper clips, aircraft) or, sometimes, group of products (steel industry).

Not included in the concept "enterprise or industry" are sectors of economies whose output is not products – *e.g.*, the services sector. Thus, the analysis of *de jure* specificity does not contemplate the economy as a whole, but only producers of products within an economy.

---

[5] *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,358 (Commerce Dep't Nov. 25, 1998) ("*Preamble*").

*2024-05-29 qys for oral arg PUB.docx*

NON-CONFIDENTIAL VERSION
CONFIDENTIAL INFORMATION REDACTED IN BRACKETS, [ … ]

    a.   Please respond to Defendant-Intervenors' assertions that "Commerce has previously found subsidies de jure specific where they apply to seemingly large, yet statutorily defined, classes of companies, such as 'industrial enterprises'" and that "Commerce has also repeatedly found the [Bank and Insurance Transactions Tax ("BITT")] exemption program itself specific." Resp. of Def.-Inters. in Opp'n to Pl.'s Mot. for J. on the Agency R. at 11, Jan. 29, 2024, ECF No. 31 ("Def.-Inters.' Br.").

**<u>Answer:</u>**

Defendant-Intervenors rely on a single case to claim that "Commerce has previously found subsidies de jure specific where they apply to seemingly large, yet statutorily defined, classes of companies, such as 'industrial enterprises,'" namely, *Circular Welded Carbon-Quality Steel Pipe From Oman*, 77 Fed. Reg. 64,473 (Dep't Commerce Oct. 22, 2012), ID Memo at 5-6. The issue concerned tariff exemptions granted to "industrial enterprises." *Id*. at 5.

Commerce found that the Omani program was *de jure* specific because the tariff exemption explicitly excluded "enterprises that mined or extracted raw materials but did not convert them into semi-finished or finished products." *Id*. at 6.

Here, the BITT exemption covers all enterprises with Industrial Registry certificates. Attachment 1 at 3 hereto. The enterprises for which industrial registration is required have no explicit exclusions; they are:

> The places that produce or obtain a material continuously and in series by changing the characteristics, shape, precision or composition of a substance or by processing these substances with the help of machinery, equipment, looms, tools or other means and forces or only by manual labor and the places where the mines are extracted and processed by are considered industrial enterprise, the work done here are considered industrial works and those who run these are considered industrialist.
>
> …
>
> Establishments that carry out continuous and serial repairs and plants that produce electricity or other energy, large construction

*2024-05-29 qys for oral arg PUB.docx*

NON-CONFIDENTIAL VERSION
CONFIDENTIAL INFORMATION REDACTED IN BRACKETS, [ … ]

sites such as shipbuilding and enterprises that produce information technology and software are also included in this article.

*Id*. at 5.

No party has identified any enterprise or industry to which the BITT exemption or the Industrial Registry requirement explicitly does not apply – unlike the situation in *Oman Pipe*.

As for Commerce's earlier BITT decisions, each administrative review stands on its own record; *see*, *Hyundai Steel Co. v. United States*, 319 F. Supp. 3d 1327, 1342 n.13 (Ct. Int'l Trade 2012). This Court is certainly not bound by Commerce's decisions. Moreover, the BITT exemption was only enacted in 2019; Attachment 1 at 3. Therefore, while it has been addressed in several Turkish cases, they are all recent, and none have yet resulted in a judicial decision.

2.    Does Kaptan here concede (without prejudice to any arguments raised in other actions before this or any other court) that Nur Gemicilik ve Ticaret A.S. is Kaptan's cross-owned input supplier as defined by Commerce in 19 C.F.R.§ 351.525(b)(6)(iv)?

**<u>Answer:</u>**

Yes.

3.    Suppose, hypothetically, that a foreign country enacts legislation that uncontestedly "expressly limits access to [a] subsidy to an enterprise or industry." 19 U.S.C.§ 1677(5A)(D)(i). Is there any conceivable scenario in which the country's failure to implement that legislation would support a finding that the relevant subsidy is not specific as a matter of law?

**<u>Answer:</u>**

Kaptan believes that Commerce would find *de jure* specificity in any subsidy expressly limited to a specific enterprise or industry, even if never implemented.

Suppose the U.S. Congress granted a cash subsidy to the widget industry but never allocated funds for it. This subsidy would be *de jure* specific, but would fall among programs determined not to have been utilized in a given period.

NON-CONFIDENTIAL VERSION
CONFIDENTIAL INFORMATION REDACTED IN BRACKETS, [ … ]

4.    Please further explain the relevance to your argument of your citation to <u>Toscelik Profil ve Sac Endustrisi A.S. v. United States</u>, 38 CIT 1534, 1541 (2014).  <u>See</u> Pl.'s Mot. for J. on the Agency R. at 35, Nov. 13, 2023, ECF No. 29 ("Kaptan's Br.").

**<u>Answer:</u>**

*Tosçelik c. United States*, 38 CIT 1534 (2014), involved land-valuation benchmarks under Law 5084.  The Court remanded, at 1541, and directed Commerce to address comparability as to –

- whether the benchmark properties were in the same condition as the LTAR plot when respondent acquired it;

- whether the benchmark properties should be in a less-developed region, since the LTAR property was in a less-developed region;

- whether the type of the land in the benchmark (*e.g.*, agricultural) should match the type of the LTAR land;

- whether the benchmark should prefer "relatively nearby and manifestly similar properties" over more-distant, less-similar properties.

If the Court remands with an instruction that Commerce consider the substance of Kaptan's proffered C&W benchmark report, Kaptan asks that the instruction include reference to the *Tosçelik* principles.

5.    Why should the propositions that "contemporaneous documentary evidence provides greater corroborative value" and that "[b]ecause documentary or physical evidence is created at the time of conception or reduction to practice, the risk of litigation-inspired fabrication or exaggeration is eliminated," <u>Sandt Tech., Ltd. v.</u> <u>Resco Metal & Plastics Corp.</u>, 264 F.3d 1344, 1350-51 (Fed. Cir. 2001), not survive application to the trade context?

**Answer:**

In *Sandt,* the Federal Circuit considered the validity of a patent under a complex evidentiary hierarchy unique to patent-validity litigation. *Id*.; *see also*, *Mahurkar v. C.R.Bard, Inc.*, 79 F. 3d 1572, 1576-7 (Fed. Cir. 1996).

Here, Commerce plucked one notion from *Sandt* analysis, and then actually failed to apply it as prescribed by *Sandt*. In its Decision Memo, Attachment 2 at 10, Commerce quotes *Sandt* for the proposition that "contemporaneous documentary evidence provides greater corroborative value" in determining whether a party's litigation "story is credible." This proposition applies in patent-validity litigation, where there is a specific event (creation of an invention) and there may be contemporaneous documentation (*e.g.*, lab notes) concerning the inventive act. This entire context, *viz.*, a discrete event with possible contemporaneous documentation, is absent in trade litigation.

In any event, Commerce plucks one piece of the *Sandt* hierarchy out of its context, then declares:

> We continue to find that the Federal Circuit's concerns are equally applicable to evidence created for the purpose of an adjudicatory administrative proceeding, such as this one. Although we consider all evidence on the record of a proceeding, in determining the weight to be accorded to a particular piece of evidence, we consider whether the evidence in question was prepared in the ordinary course of business, or for the express purpose of submission in the ongoing administrative proceeding.

IDM at 10.

This analysis is consistent with Commerce's statement in *Softwood Lumber Products from Canada: Final Affirmative Countervailing Duty Determination*,… 82 Fed. Reg. 51,814 (Dep't Commerce Nov. 8, 2017), IDM at 59 (relying on *Sandt,* cited *id*. at 60), that –

NON-CONFIDENTIAL VERSION
CONFIDENTIAL INFORMATION REDACTED IN BRACKETS, [ … ]

> where parties have presented a self-commissioned study conducted specifically in anticipation of an investigation for the Department's consideration, the Department must carefully examine the study to ensure that it is based on sound methodologies that guard against any study bias {and} is free of data and conclusions that were tailored to generate a desired result.

Key here is Commerce's acknowledgement in *Softwood Lumber* that it "must evaluate" whether the report was "tailored to generate a desired result." This is consistent with the *Sandt* requirement that –

> In applying the "rule of reason" test, "all pertinent evidence" is examined in order to determine whether the "inventor's story" is credible. *Id*. "Each corroboration case must be decided on its own facts with a view to deciding whether the evidence as a whole is persuasive."

264 F.3d at 1350.

In the present case, however, Commerce went further than a *Sandt* rule of reason, creating a *per se* exclusionary rule (IDM at 10):

> When evidence has been generated expressly for the purpose of an administrative proceeding, we find that said evidence is at "risk of litigation-inspired fabrication or exaggeration," which diminishes its weight and results in the evidence being unreliable.

In the last sentence, Commerce moves directly from "diminishes its weight" to "results in the evidence being <u>unreliable</u>." Thus, Commerce creates a rule that all reports prepared by third parties for purposes of a CVD case are *automatically* unreliable. This approach is inconsistent with the substantial evidence standard, because it avoids evaluation of evidence on its merits; it is arbitrary and capricious, because Commerce gives no rationale for creating such a rule of blanket rejection; and it is inconsistent with the "rule of reason" articulated in *Sandt*.

The situation here resembles that in *Rautaruukki Oy v. United States*, 23 CIT 257 (Ct. Int'l Trade 1999), where the Court found (at 7):

> Commerce claims it did not disregard the expert testimony. The agency, however, apparently observed the evidence only to the extent necessary to conclude that it was "subjective" and did not need to be considered. This was not a fair treatment of the material submitted. Accordingly, the court finds that Commerce abused its discretion in failing to consider the only material evidence before it.

Here, as in *Rautaruukki Oy,* Commerce's automatic exclusion was not a "fair treatment of the material submitted."

In sum, Kaptan has reservations about importing into trade law the entire evidentiary framework of patent law. However, if Commerce does rely on *Sandt,* it must apply it as a "rule of reason," not a rule of exclusion.

> a. Kaptan's reply brief states that "Commerce cited only the BPI nature of the report, the fact that it was prepared for the review, and states that some information appears to be from non-private entities." Pl.'s Reply at 10, Feb. 19, 2024, ECF No. 35. Why do these citations not provide a basis from which the court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned"? <u>Bowman Transp., Inc. v.</u> <u>Ark.-Best Freight Sys., Inc.</u>, 419 U.S. 281, 286 (1974).

**<u>Answer:</u>**

Commerce has, with clarity, applied an unlawful evidentiary standard when it found Kaptan's C&W report to be literally "unusable"  (IDM at 10).

Regarding the rejection of the C&W report as BPI, Commerce states that it "prefers to use public benchmark information where available." ID Memo at 9. The government argues, in its brief, that "using public information allows Commerce to be more transparent in its decision-making, and more thorough in its public documentation." Gov't brf at 14. The government's brief is, of course, *post hoc* rationalization that should be ignored.  More importantly, a *preference* for public information cannot be grounds for blanket *exclusion* of an entire class of evidence.

Regarding the rejection of the C&W report because it was prepared for the review, see the discussion of *Sandt*, above.  Departing from its own *Softwood Lumber* precedent, *supra*, Commerce failed to "carefully examine the study to ensure that it is based on sound methodologies that guard against any study bias."

Regarding Commerce's assertion that "prices in the {C&W} study may have been partially based on prices provided by nonprivate entities," Commerce errs. Actually, the C&W Report breaks down the benchmarks into four categories:

1.  ["                    "]

2.  ["                    "]

3.  ["                    "]

4.  ["                     "]

C&W Report, Attachment 3 hereto, at 4.  Each of these categories is tabulated separately; the private-lease benchmarks (#1) are tabulated separately from the public-lease benchmarks (#2), etc.  Commerce's claim that the presence of nonprivate leases corrupts the report is unsupported; the private and public leases are clearly separated.

So, the issue is not the clarity of Commerce's reasoning; the issue is the lawfulness and application Commerce's evidentiary rules. Rejecting the C&W report as commissioned for litigation purposes, and, therefore, *per se* excluded, is inconsistent with *Sandt, Rautaruukki Oy,* and *Softwood Lumber;* the *per se* exclusion is arbitrary and capricious.  Rejecting the C&W report as proprietary converts a mere "preference" into an arbitrary and capricious exclusionary rule.  Finally, rejecting the C&W Report because it may contain nonprivate leases is unsupported by substantial evidence, since the Report segregates private and nonprivate leases.

NON-CONFIDENTIAL VERSION
CONFIDENTIAL INFORMATION REDACTED IN BRACKETS, [ … ]

6.    Please respond to Defendant-Intervenors' argument that the <u>Ozdemir</u> cases are distinguishable.  Def.-Inters.' Br. at 24–25.

**<u>Answer:</u>**

Defendant-Intervenors argue that the *Ozdemir* cases concern <u>comparability</u> between benchmark candidates and the parcel under review, while the present case concerns the <u>reliability</u> of competing valuation reports.

Kaptan agrees that the *Ozdemir* cases do not address reliability. However, the *Ozdemir* cases establish the critical propositions that population density alone does not establish comparability and that land valuations in the Istanbul region are not comparable to those in less-developed regions of Turkey. See Kaptan brief at 33, 37. If this Court remands, Kaptan asks the Court to reference these propositions in its instructions.

7.    What authorities best support your overall argument?

**<u>Answer:</u>**

Regarding *de jure* specificity, in *Hyundai Steel Co. v. United States*, Slip Op. 22-55 (CIT, May 2, 2024), the Court remanded on *de jure* specificity, stated,

> In order to find that the K-ETS program is *de jure* specific,
> Commerce must identify "{w}here the authority providing the
> subsidy, or the legislation pursuant to which the authority operates,
> *expressly limits access to the subsidy to an enterprise or industry*.

*Id*. at 27 (emphasis in original).  *See also, BGH Edelstahl Siegen GmbH v. United States,* 663 F. Supp. 3d 1378 (Ct. Int'l Trade 2023), and *BGH Edelstahl Siegen GmbH v. United States*, Slip Op. 24-60 (CIT May 22, 2024). Kaptan asks the Court to direct Commerce, on remand, to identify where the Turkish statute expressly limits access to an enterprise or industry, and, if there is no such limitation, to find that the statute lacks *de jure* specificity.

Regarding Commerce's rejection of the C&W Report on a blanket exclusionary rule, see

*2024-05-29 qys for oral arg PUB.docx*

*Sandt, Rautaruukki Oy,* and *Softwood Lumber.*  Kaptan asks the Court to direct Commerce, on

remand, to determine, on the merits, whether the C&W Report provides a more reliable and

more comparable benchmark than Petitioners' report, and to reconsider its benchmark valuation

accordingly.

8.    Are there any recent or pending Federal Circuit or CIT cases that may affect the court's analysis?

**<u>Answer:</u>**

Kaptan is not aware of any such cases beyond those cited above.

Respectfully submitted,

*/s/ David L. Simon*

David L. Simon
LAW OFFICES OF DAVID L. SIMON, PLLC
1025 Connecticut Ave, NW, Ste. 1000
Washington, DC 20036
Tel: +1(202)481-9000
Email: DLSimon@DLSimon.com

May 29, 2024                                    *Counsel to Kaptan*

<u>CERTIFICATION</u>

I hereby certify that the foregoing contains 2,390 words, exclusive of the cover page, signature

block, and this certification.

<u>*/s/ David L. Simon*</u>

**ATTACHMENTS**

| 1 | EXCERPTS FROM BITT LAW AND INDUSTRY REGISTRY LAW, ECF 37, PUBLIC APPENDIX, TAB 6 | PUBLIC |
|---|---|---|
| 2 | EXCERPTS FROM COMMERCE FINAL DECISION MEMO, ECF 37, PUBLIC APPENDIX, TAB 17 | PUBLIC |
| 3 | EXCERPTS FROM CUSHMAN & WAKEFIELD REPORT, ECF 36, CONFIDENTIAL APPENDIX, TAB 7 | CONFIDENTIAL |

# ATTACHMENT 1

## EXCERPTS FROM BITT LAW AND INDUSTRY REGISTRY LAW

### ECF 37 TAB 6

### PUBLIC DOCUMENT

**TAB 6**

**Government Of The Republic Of Turkey Sec II Questionnaire Response (May 16, 2022)**

**P.R. 49-89 / C.R. 51-80, 86-95**

**Pages:  76-87, Exs.31-33**

Barcode:4241562-36 C-489-819 REV - Admin Review 1/1/20 - 12/31/20

# EXHIBIT 31

BITT REGULATIONS

Non-Confidential
Barcode:4241562-36 C-489-819 REV - Admin Review 1/1/20 - 12/31/20

## Decision by Council of Ministers No 98/11591

No:
98/11591
Date of Official Gazette:
01/09/1998
Official Gazette No:
23450

Determination of the rate of banking and insurance transactions tax as mentioned in the enclosed Decree was decided on 28/8/1998 by the Council of Ministers upon 28/8/1998 dated and 31129 numbered letter of the Ministry of Finance in accordance with the amended Article 33 of the Law No. 6802 on Expenditure Taxes.

**Annex to 28/8/1998 Dated**

**Decree No 98/11591**

**DECISION**

Article 1 - The rate of banking and insurance transactions tax shall be applied as;

a)   1% over the amounts received as a result of interbank deposit transactions,

b)   1% over the amounts received as a result of stock exchange money market transactions between banks and intermediary institutions established according to the Capital Markets Law No. 2499,

c)   **(Paragraph amended by B.K.K. no. 2009/15398 Enforcement; 01.10.2009)** 1% over the amounts received in return for the purchase and sale of the government bonds, revenue indexed securities and treasury bills as well as the securities issued by the Public Housing Administration, State Partnership Administration and Privatization Administration with the re-purchase and re-sale commitment (*)

d)   **(Paragraph amended by B.K.K. no. 2009/15398 Enforcement; 01.10.2009)** 1% over the amounts received due to the sales of the government bonds, revenue indexed securities and treasury bills as well as the securities issued by the Public Housing Administration, State Partnership Administration and Privatization Administration without waiting their due dates (**)

e)   **(Paragraph amended by President's Decree no. 1106 (Enforcement; 15.05.2019) and 1149 (Enforcement; 18.06.2019))** 1 per thousand over the sales amount in foreign exchange transactions, and zero over the sales amount in foreign exchange transactions listed below;

1)   Foreign exchange sales among banks and authorized institutions or to each other,

2)   Foreign exchange sales to the Ministry of Treasury and Finance,

3)   For the payment of foreign currency loans, foreign exchange sales to the debtor by the bank using or intermediating in the use of foreign currency loans,

4)   Foreign exchange sales to enterprises with industry registry certificate,

5)   Foreign exchange sales to exporters who are members of Exporters' Unions, **(***)**

f)   **(Paragraph added by B.K.K. no. 2010/1182 (Enforcement:29.12.2010) and amended by B.K.K. no. 2011/1854 (Enforcement; 29.06.2011))** 1% over the amounts received in return for purchase and sale of bonds issued in TL at home and leasing certificates issued by property leasing companies with re-purchase and re-sale commitment, (****)

Barcode:4241562-37 C-489-819 REV - Admin Review 1/1/20 - 12/31/20

# EXHIBIT 32

RELATED ARTICLES OF LAW NO.6948

Barcode:4241562-37 C-489-819 REV - Admin Review 1/1/20 - 12/31/20

3115

# INDUSTRIAL REGISTRY LAW[(1)]

| | |
|---|---|
| **Law Number** | : 6948 |
| **Date of Acceptance** | : 17/4/1957 |
| **Official Gazette** | : Date  : 24/4/1957          Number: 9593 |
| **Principle of Publication** | : Composition: 3     Volume : 38     Page: 1147 |

**Article 1 – (Amended first paragraph: 18/6/2017-7033/3 art.)** The places that produce or obtain a material continuously and in series by changing the characteristics, shape, precision or composition of a substance or by processing these substances with the help of machinery, equipment, looms, tools or other means and forces or only by manual labor and the places where the mines are extracted and processed by are considered industrial enterprise, the work done here are considered industrial works and those who run these are considered industrialist.

**(Amended second paragraph: 18/6/2017-7033/3 art.)** Establishments that carry out continuous and serial repairs and plants that produce electricity or other energy, large construction sites such as shipbuilding and enterprises that produce information technology and software are also included in this article.

Handicrafts and domestic crafts and small repair shops are not subject to this law. However, the Ministry of Economy and Trade, may appoint and announce the organization among them, which will be subject to this law in terms of the type and amount of material it produces and obtains.

**Article 2 – (Amendment: 18/6/2017-7033/4 art.)**

It is obligatory for industrial enterprises to be registered in the industrial registry to be kept at the Ministry of Science, Industry and Technology and to submit the corresponding industrial registry certificate to authorized officials.

Industrial enterprises must pre-register with the industrial registry before starting production activities. For industrial enterprises to be issued business and working licences, the letter stating that they are registered in the industrial registry is sought by the administrations that issue business and working licenses.

Newly opened industrial enterprises are obliged to fill out the declarations to be issued by the Ministry of Science, Industry and Technology in accordance with Article 3 and send them electronically to the Ministry of Science, Industry and technology, within two months from the date of their start of operation.

**ATTACHMENT 2**

**EXCERPTS FROM COMMERCE DEPT.
FINAL DECISION MEMO**

**ECF 37 TAB 17**

**PUBLIC DOCUMENT**

**TAB 17**

**Final Issues & Decision Memo (May 23, 2023)**

**P.R. 152**

**Pages:  5-12**

**Commerce's Position:** Kaptan asks us to find that the Colliers report provided by the petitioner is distortive and unusable as a benchmark under 19 CFR 351.511. Further, Kaptan requests that we use Kaptan's benchmark, which we did not use in our *Preliminary Results*. We disagree with both propositions and find that the Colliers report constitutes the best benchmark on the record, consistent with 19 CFR 351.511.

---

[35] *See* Petitioner's Rebuttal Brief at 2-6.

[36] *Id.* at 2 (citing *Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results of Countervailing Duty Administrative Review and Rescission, in Part; 2019*, 87 FR 21640 (April 12, 2022), (*Rebar from Turkey 2019*), and accompanying IDM at 16; *see also Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results of Countervailing Duty Administrative Review and Rescission, in Part; 2018*, 86 FR 53279 (September 27, 2021) (*Rebar from Turkey 2018 Final*), and accompanying IDM at comment 6).

[37] *Id.* at 3 (citing 19 CFR 351.511).

[38] *Id.* (citing *Preliminary Results* PDM at 13).

[39] *Id.* (citing 19 CFR 351.102(b)(21)(iii)).

[40] *Id.* at 4 (citing Kaptan Case Brief at 12).

[41] *Id.*

8

Regarding Kaptan's argument that the Colliers report is unusable as a benchmark, Kaptan first claims that the Colliers report is not a reliable data source because it disclaims liability for its accuracy and cites to itself as the data source.[42]  We find that this argument is unpersuasive because disclaimer of liability is not at issue, and the fact that the Colliers report is based on numbers compiled by Colliers does not disqualify the data, but rather strengthens the case to use the Colliers report as it is not using secondary sources or compiling sets of data from other sources.

Kaptan also argues that the Colliers report provides data that are distortive and not comparable to the land area used by Nur, Kaptan's affiliate.[43]  We disagree.  Kaptan points to the fact that Commerce has limited the data in the Colliers report to only include one province which has the most similar population density to the land where Nur is located and claims that Commerce has not considered any other factors such as the geographical location of the land within the country of Turkey in terms of its proximity to a commercial hub, or any other factors which would affect comparability.[44]  This argument is predicated on Kaptan's assumption that there are multiple data sources Commerce could choose from.  However, the only usable data source on the record is the Colliers report, and is thus the only source Commerce may consider..  We made the adjustment to the data in this report to use a comparable benchmark for industrial land based on population density information, but we did not opine as to the remaining factors because the record did not contain multiple data sources to choose from.  We therefore chose Colliers as the best benchmark on the record and limited our comparability analysis based on the most relevant and quantifiable metric available on the record, which is population density.  As we will discuss below, the only other benchmark to assess the rental value of land on the record is Kaptan's submission, which, as discussed below, is not a usable benchmark.

Kaptan argues that Commerce should use Kaptan's benchmark submission, a Rent Estimation Study by Cushman & Wakefield, as it is the best information on the record.[45]  First, the information provided by Kaptan is business proprietary information in its entirety.  Kaptan acknowledges that Commerce prefers to use public benchmark information where available.  Further, there is evidence contained in the Cushman & Wakefield report which indicates that the report was commissioned by Kaptan for the purposes of this review or litigation related to the review.[46]  We have declined to use benchmarks commissioned for the purposes of countervailing duty proceedings due to "the risk of litigation-inspired fabrication or exaggeration that may come from later-developed evidence, intended to corroborate the party's story."[47]  As we explained in *Softwood Lumber from Canada*, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit), in evaluating whether a party's claim had been sufficiently corroborated with evidence

---

[42] *See* Kaptan's Case Brief at 3.

[43] *Id.* at 4.

[44] *Id.* at 7.

[45] *Id.* at 15.

[46] *See* Kaptan's Letter, "Kaptan Benchmark Submission," dated October 31, 2022 (Kaptan Benchmark Submission) at 1, 5, and 9.

[47] *See Certain Softwood Lumber Products from Canada:  Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 FR 51814 (November 8, 2017) (*Softwood Lumber from Canada*), and accompanying IDM at 82  (citing *Sandt Tech. v. Resco Metal & Plastics Cor.*, 264 F.3d 1344, 1350-51 (Fed. Cir. 2001) (quotations omitted); *see also Coated Free Sheet Paper from Indonesia:  Final Affirmative Countervailing Duty Determination*, 72 FR 60642 (October 25, 2007), and accompanying IDM at Comment 12.

in a patent case, opined that "contemporaneous documentary evidence provides greater corroborative value" in determining whether a party's litigation "story is credible."[48]  We continue to find that the Federal Circuit's concerns are equally applicable to evidence created for the purpose of an adjudicatory administrative proceeding, such as this one.  Although we consider all evidence on the record of a proceeding, in determining the weight to be accorded to a particular piece of evidence, we consider whether the evidence in question was prepared in the ordinary course of business, or for the express purpose of submission in the ongoing administrative proceeding.  When evidence has been generated expressly for the purpose of an administrative proceeding, we find that said evidence is at "risk of litigation-inspired fabrication or exaggeration," which diminishes its weight and results in the evidence being unreliable.[49]  Lastly, it appears from information contained in the benchmark methodology of Kaptan's benchmark that prices in the study may have been partially based on prices provided by non-private entities.[50]  Therefore, for the final results of review, Commerce will rely on information provided in the Colliers report for the purposes of measuring the adequacy of remuneration consistent with 19 CFR 351.511.

---

[48] *Id.*
[49] *See, e.g., Coated Free Sheet Paper from Indonesia:  Final Affirmative Countervailing Duty Determination*, 72 FR 60642 (October 25, 2007), and accompanying IDM at Comment 12 (finding a study commissioned specifically for the purposes of an investigation to be unreliable).
[50] *See* Kaptan Benchmark Submission at 25.

Filed By: Richard Roberts, Filed Date: 5/23/23 9:05 AM, Submission Status: Approved

**ATTACHMENT 3**


**EXCERPT FROM CUSHMAN &
WAKEFIELD REPORT**


**ECF 37 TAB 7**

**PUBLIC VERSION**

**Exhibit 1**
**Cushman & Wakefield Rent Estimation Study**

**BPI – Not Susceptible To Public Summary**