Slip Op. 24 -116

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S.,** | |
| **Plaintiff,** | |
| **and** | |
| **ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI, A.S.,** | |
| **Plaintiff-Intervenor,** | **Before: Gary S. Katzmann, Judge** |
| **v.** | **Court No. 23-00131** |
| **UNITED STATES,** | |
| **Defendant,** | |
| **and** | |
| **REBAR TRADE ACTION COALITION,** | |
| **Defendant-Intervenor.** | |

## <u>OPINION AND ORDER</u>

[The court remands the Final 2020 Review for Commerce's further explanation or reconsideration of both of the determinations that Kaptan challenges]

Dated: <u>October 21, 2024</u>

<u>David L. Simon</u>, Law Office of David L. Simon, PLLC, of Washington, D.C., argued for Plaintiff Kaptan Demir Celik Endustrisi ve Ticaret A.S. With him on the brief was <u>Mark B. Lehnardt</u>.

<u>Jessica R. DiPietro</u>, <u>Leah N. Scarpelli</u>, and <u>Matthew M. Nolan</u>, ArentFox Schiff LLP, of Washington, D.C., for Plaintiff-Intervenor Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S.

<u>Kelley M. Geddes</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant the United States. With her on the briefs were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, <u>L. Misha Preheim</u>, Assistant Director. Of counsel on the briefs was <u>W. Mitch</u>

Purdy, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Maureen E. Thorston, Wiley Rein LLP, of Washington, D.C., argued for Defendant-Intervenor Rebar Trade Action Coalition. With her on the brief were Alan H. Price, John R. Shane, and Stephanie M. Bell.

Katzmann, Judge: In 2020, the government of Turkey exempted Plaintiff Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan")—a Turkish producer of steel concrete reinforcing bar ("rebar")[1]—from a tax it normally imposes on certain transactions involving the exchange of foreign currency. Meanwhile, Nur Gemicilik ve Ticaret A.S. ("Nur"), a shipbuilding company affiliated with Kaptan, enjoyed rent-free industrial use of state-owned land. The U.S. Department of Commerce ("Commerce"), in the 2020 administrative review of its countervailing duty order on rebar from Turkey, determined both of these boons to be countervailable subsidies benefitting Kaptan. See Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Countervailing Duty Administrative Review and Rescission, in Part; 2020, 88 Fed. Reg. 34129 (Dep't Com. May 26, 2023), P.R. 156 ("Final 2020 Review") and accompanying memorandum, Mem. from J. Maeder to L. Wang, re: Issues and Decision Memorandum for the Final Results of the Countervailing Duty Administrative Review of Steel Concrete Reinforcing Bar from the Republic of Turkey; 2020 (Dep't Com. May 22, 2023), P.R. 152 ("IDM"). Commerce calculated the value of these putative subsidies and issued equivalent ad valorem countervailing duties on Kaptan's imports of rebar into the United States. See Final 2020 Review at 34130.

---

[1] "'Rebar,' which is a portmanteau of 'reinforcing' and 'bar,' refers to rods of steel that are embedded into concrete as a means of strengthening the resulting structure." Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States ("Kaptan I Remand"), 47 CIT __, __ n.1, 666 F. Supp. 3d 1334, 1336 n.1 (2023) (citations omitted).

Kaptan, in a Motion for Judgment on the Agency Record,[2] now challenges two aspects of the Final 2020 Review.  See Pl.'s Mot. for J. on the Agency R., Nov. 13, 2023, ECF No. 29 ("Pl.'s Br.").  First, Kaptan challenges Commerce's determination that the foreign currency exchange tax exemption is "specific"—which, as explained below, is a statutory requirement for countervailability.  Second, Kaptan challenges Commerce's estimation of the value of the government-owned land that Nur used for free.  Defendant the United States ("the Government") and Defendant-Intervenor Rebar Trade Action Coalition ("RTAC"), a group of U.S.-based rebar producers, oppose Kaptan's motion.  See Gov't Br.; Def.-Inter.'s Br.

The court remands both challenged aspects of the Final 2020 Review for Commerce's further explanation or reconsideration.

## BACKGROUND

The court assumes familiarity with Kaptan's challenges to prior Commerce determinations in relation to the countervailing duty order on Turkish rebar and subsequent administrative reviews thereof, including the background recounted in Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States ("Kaptan I"), 47 CIT __, 633 F. Supp. 3d 1276 (2023), and in Kaptan I Remand, 47 CIT __, 666 F. Supp. 3d 1334.  A summary of the background most relevant to this particular

---

[2] Plaintiff-Intervenor Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. ("Icdas") is also a Turkish producer-importer of rebar that is subject to countervailing duties pursuant to the Final 2020 Review.  Icdas has filed a Motion for Judgment on the Agency Record of its own, requesting that "[t]o the extent that Commerce recalculates Kaptan's rate as a result of this litigation, it must redetermine the "all-others" rate applied to Icdas in accordance with the statute."  Pl.-Inter.'s Mot. for J. on the Agency R. at 3, Nov. 13, 2023, ECF No. 30 ("Pl.-Inter.'s Br.").  This request is effectively unopposed, see Def.'s Resp. to Pl.'s Mot. for J. on the Agency R. at 19, Jan. 29, 2024, ECF No. 33 ("Gov't Br."); Def.-Inter.'s Resp. to Pl.'s Mot. for J. on the Agency R. at 25–26, Jan. 29, 2024, ECF No. 31 ("Def.-Inter.'s Br."), and the court accordingly instructs Commerce to recalculate Icdas's rate as necessary to reflect any potential changes made to Kaptan's on remand.

case is below.

### I.    *Legal and Regulatory Framework*

The Tariff Act of 1930, as amended, provides for the imposition of countervailing duties on imported merchandise where Commerce finds that "the government of a country or any public entity within the territory of a country is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of" that merchandise.   19 U.S.C. § 1671(a)(1); see also id. §§ 1671e, 1675(1) (providing for Commerce's issuance of a countervailing duty order and conduct of annual administrative reviews thereof).   Countervailable subsidies must be "specific," and may include financial contributions in the form of a foreign government's "foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income."   Id. § 1677(5)(D)(ii).   This, in turn, includes cases where "goods or services are provided for less than adequate remuneration," which "shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review."   Id. § 1677(5)(E)(iv).

Commerce's regulations provide a more detailed framework for the measurement of "adequate remuneration":

> The Secretary will normally seek to measure the adequacy of remuneration by comparing the government price to a market-determined price for the good or service resulting from actual transactions in the country in question.   Such a price could include prices stemming from actual transactions between private parties, actual imports, or, in certain circumstances, actual sales from competitively run government auctions.   In choosing such transactions or sales, the Secretary will consider product similarity; quantities sold, imported, or auctioned; and other factors affecting comparability.

19 C.F.R. § 351.511(a)(2)(i).

## II.     History of Relevant Administrative Proceedings

Commerce issued a countervailing duty order on rebar from Turkey in 2014.  See Steel Concrete Reinforcing Bar From the Republic of Turkey: Countervailing Duty Order, 79 Fed. Reg. 65926 (Dep't Com. Nov. 6, 2014) ("Original Order").  The original Turkish producers individually examined for the Original Order were Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. and Icdas.  Commerce added Kaptan as a mandatory respondent[3] in the 2014 administrative review of the Original Order, see Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2014, 82 Fed. Reg. 26907, 26908 (Dep't Com. June 12, 2017), and ordered the assessment of countervailing duties on

---

[3] In CVD investigations or administrative reviews, Commerce may select mandatory respondents pursuant to 19 U.S.C. § 1677f-1(e)(2), which provides:

> If the administering authority determines that it is not practicable to determine individual countervailable subsidy rates under paragraph (1) because of the large number of exporters or producers involved in the investigation or review, the administering authority may —
>
> > (A) determine individual countervailable subsidy rates for a reasonable number of exporters or producers by limiting its examination to —
> >
> > > (i) a sample of exporters or producers that the administering authority determines is statistically valid based on the information available to the administering authority at the time of selection, or
> > >
> > > (ii) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that the administering authority determines can be reasonably examined; or
> >
> > (B) determine a single country-wide subsidy rate to be applied to all exporters and producers.
>
> The individual countervailable subsidy rates determined under subparagraph (A) shall be used to determine the all-others rate under section 1671d(c)(5) of this title.

19 U.S.C. § 1677f-1(e)(2).

Kaptan's U.S. imports of rebar following the 2018 administrative review.  See Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results of Countervailing Duty Administrative Review and Rescission, in Part; 2018, 86 Fed. Reg. 53279 (Dep't Com. Sept. 27, 2021) ("Final 2018 Review").

Kaptan challenged the Final 2018 Review in Commerce's proceeding below and in litigation before the U.S. Court of International Trade ("USCIT"), specifically contesting "Commerce's determination that subsidies received by Nur . . . were properly attributed to Kaptan on the basis of a cross-owned input supplier relationship as defined by 19 C.F.R. § 351.525(b)(6)(iv)."  Kaptan I Remand, 666 F. Supp. 3d at 1338.  Last year, the court entered judgment sustaining Commerce's determination on remand that certain subsidies conveyed by the Turkish government to Nur were not properly classified as indirect subsidies to Kaptan.  See id. at 1351.  RTAC and other defendant-intervenors appealed from that judgment, and that matter is pending before the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit").  See Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States ("Kaptan I Appeal"), No. 24-1431 (Fed. Cir. docketed Feb. 2, 2024).

In the 2020 administrative review, which is the subject of this case, Commerce again calculated non-zero countervailing duties to be assessed on Kaptan's imports of subject rebar into the United States.  See Final 2020 Review at 34130.  Commerce published the preliminary results of its review on December 1, 2022.  See Steel Concrete Reinforcing Bar From the Republic of Turkey: Preliminary Results of Countervailing Duty Administrative Review; 2020, 87 Fed. Reg. 73750 (Dep't Com. Dec. 1, 2022), P.R. 134 ("Preliminary 2020 Review") and accompanying memorandum, Mem. from J. Maeder to A. Elouaradia, re: Decision Memorandum for the

Preliminary Results of Countervailing Duty Administrative Review of Steel Concrete Reinforcing

Bar from the Republic of Turkey; 2020 (Dep't Com. Nov. 22, 2022), P.R. 131 ("PDM").

As relevant here, Commerce found that Kaptan received subsidies of two types from

government entities in Turkey between January 1 and December 31, 2020 (the "period of review").

See PDM at 11.  One was an Kaptan's total exemption from Turkey's then-current 0.2% Banking

and Insurance Transactions Tax ("BITT") on foreign exchange transactions (the "BITT

Exemption").  See id. (referencing Article 33 of Law Number 6802 ("Turkish Law 6802"),[4] a

provision of Turkish law that is referenced in the record, and which in turn refers to an "industrial

registration certificates," the possession of which by certain entities is seemingly required under

Law Number 6948 ("Turkish Law 6948")).[5]  The other was a subsidy conferred by a Turkish state

entity to Kaptan through Kaptan's affiliate Nur, a shipbuilding company, in the form of an ongoing

"lease and investment agreement with the local government in the Surmene district to use a state-

controlled area of land free of rent."  Id. at 13.  Commerce explained as follows:

> A benefit exists under section 771(5)(E)(iv) of the Act to the extent that the
> [Turkish government] provides land for [less than adequate remuneration]. To

---

[4] During the agency proceeding below, the Turkish government submitted a series of provisions
of Turkish law that are relevant to the BITT Exemption and eligibility therefor.  See Letter from
Gov't of Turkey to G. Raimondo, Sec'y of Com., re: Sec II Questionnaire Response at Exs. 31–
32 (May 16, 2022), P.R. 49–89, C.R. 51–80, 86–95.

A complete amended text of Article 33 of Turkish Law 6802 does not appear in the Turkish
government's submission and is therefore absent from the record.  But the relevant text of that
provision is reproduced in a discernible form in a separate document that the Turkish government
did submit in Exhibit 31 of its questionnaire response, which is a "President's Decree" numbered
1149 and dated June 17, 2019 ("Turkish Presidential Decree 1149").  The terms of that decree
amend Turkish Law 6802 to exempt from the BITT, among a total of five exemption categories,
"[f]oreign exchange sales to enterprises holding industrial registration certificates."  Id.

[5] The terms "industrial registry certificate" and "industrial registration certificate" appear to be
interchangeable.

compute the benefit, we computed the amount Nur should have paid for its rent-free land during the [period of review]. Specifically, we multiplied the area of land provided to Nur (in square meters) by the monthly cost per square meter benchmark rate to derive a benefit for each month of the [period of review].   The land benchmark is based on Colliers International's <u>Real Estate Market Turkey Review</u>. The petitioner placed population density information on the record showing that the area in Surmene, Trabzon, where the land in question is located, is most similar in population density to Cerkezkoy, Tekirdag.   Consistent with the final results of prior administrative reviews, we adjusted the land benchmark by limiting the rental rates contained in Colliers International's Real Estate Market Turkey Review to only include rental prices from Cerkezkoy, Tekirdag.   Next, we summed the monthly benefits to find the total benefit in accordance with section 771(6)(A) of the Act, and then divided the benefit amount by Kaptan's and Nur's total sales (less any intercompany sales) during the [period of review].   On this basis, we preliminarily calculate a net countervailable subsidy rate of 0.86 percent <u>ad valorem</u> for Kaptan.

<u>Id.</u> at 13–14 (footnotes omitted) (citing Letter from Wiley Rein, LLP to G. Raimondo, Sec'y of Com., re: RTAC Benchmark Submission at Ex. 1 (Oct. 31, 2022), P.R. 122 (the "Colliers report")).

Kaptan submitted a case brief challenging both of these determinations, <u>see</u> Letter from David L. Simon, PLLC to G. Raimondo, Sec'y of Com., re: Respondent's Case Brief at 4–11 (Jan. 10, 2023), P.R. 139, C.R. 126 ("Kaptan's Case Br."), to which Commerce responded point-by-point in the IDM.  <u>See</u> <u>IDM</u> at 6–12.   Commerce made no changes to the <u>Final 2020 Review</u> in response to the points Kaptan raised in its case brief, finding that "the Colliers report constitutes the best benchmark on the record" and that "the BITT exemptions are specific and countervailable." <u>Id.</u> at 8, 12.

### III.    Procedural History

Kaptan timely challenged the <u>Final 2020 Review</u>, filing a complaint against the United States with the USCIT.   <u>See</u> Compl., June 21, 2023, ECF No. 4.   The following month, Icdas and RTAC were entered as Plaintiff- and Defendant-Intervenors, respectively.   <u>See</u> Order, July 25, 2023, ECF No. 22; Order, July 25, 2023, ECF No. 23.   Kaptan and Icdas filed their respective

motions for judgment on the agency record pursuant to USCIT Rule 56.2 on November 13, 2023.

See Pl.'s Br.; Pl.-Inter.'s Br.  The Government and RTAC responded on January 29, 2024, see

Gov't Br.; Def.-Inter.'s Br., and Kaptan and Icdas each replied in turn.  See Pl.'s Reply, Feb 19,

2024, ECF No. 35 ("Pl.'s Reply"); Pl.-Inter.'s Reply, Feb. 19, 2024, ECF No. 34.

Kaptan, the Government, and RTAC participated in oral argument on June 12, 2024.  In

advance of that argument, the court issued written substantive questions to the participating parties

and ordered written responses.  See Letter, May 8, 2024, ECF No. 43.  All participating parties

timely complied with this order.  See Def.-Inter.'s Resp. to Qs. for Oral Arg., May 29, 2024, ECF

No. 44 ("Def.-Inter.'s OAQ Resp."); Pl.'s Resp. to Qs. for Oral Arg., May 29, 2024, ECF No. 46

("Pl.'s OAQ Resp."); Def.'s Resp. to Qs. for Oral Arg., May 29, 2024, ECF No. 48 ("Gov't OAQ

Resp.").  At oral argument the court invited the participating parties to submit supplemental briefs;

only Kaptan responded with a substantive submission.  See Pl.'s Post-Arg. Subm., June 20, 2024,

ECF No. 51.

## JURISDICTION AND STANDARD OF REVIEW

Jurisdiction lies under 28 U.S.C. § 1581(c).  19 U.S.C. § 1516a(b)(1)(B)(i) supplies the

standard of review, which is that "[t]he court shall hold unlawful any determination, finding, or

conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in

accordance with law . . . ."  Substantial evidence is "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion."  Broadcom Corp. v. Int'l Trade Comm'n, 28

F.4th 240, 249 (Fed. Cir. 2022) (internal quotation marks and citation omitted).  To be supported

by substantial evidence, a determination must account for "whatever in the record fairly detracts

from its weight," including "contradictory evidence or evidence from which conflicting inferences

could be drawn." Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 487–88 (1951)).

Separately, Commerce is required to provide "an explanation of the basis for its determination that addresses relevant arguments, made by interested parties who are parties to the investigation or review." 19 U.S.C. § 1677f(i)(3)(A); see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); Timken U.S. Corp. v. United States, 421 F.3d 1350, 1357 (Fed. Cir. 2005) (holding that section 1677f(i) codifies the State Farm standard).

## DISCUSSION

Kaptan argues that Commerce (1) erroneously determined that the BITT Exemption is a domestic subsidy that is specific as a matter of law under 19 U.S.C. § 1677(5A)(D)(i), and that Commerce (2) erroneously chose the Colliers report over the C&W report as a benchmark for the government land that Nur used rent-free. For the reasons explained below, the court remands for Commerce's reconsideration or further explanation of both determinations.

### I. Commerce's Determination That the BITT Exemption Is Specific as a Matter of Law, as Currently Explained, Is Unsupported by Substantial Evidence.

Kaptan first argues that Commerce improperly determined that the BITT Exemption is a subsidy that is specific as a matter of law, and thus countervailable, under 19 U.S.C. § 1677(5A)(D)(i). This determination, Kaptan states at the outset, is "unsupported by substantial evidence on the administrative record and otherwise not in accordance with law." Pl.'s Br. at 18.[6]

---

[6] This statement does not isolate a precise statutory standard of review—as between "unsupported by substantial evidence on the record" and "otherwise not in accordance with law," 19 U.S.C. § 1516a(b)(1)(B)(i)—against which Kaptan requests that the court assess Commerce's determination that the BITT Exemption is specific as a matter of law. See Pl.'s Br. at 18. Greater

Kaptan is correct that Commerce's determination of the BITT Exemption's de facto specificity, as currently explained in the IDM, lacks support in the record.  The record contains a series of provisions of Turkish law that, read together, do not support the specificity as a matter of law of the subsidy that Kaptan received in the form of the BITT Exemption.

To summarize the (U.S.) law governing the countervailing duties at issue in this case will require disassembling a nesting doll of recursive statutory definitions.  First, the outer shell: If a foreign government provides "a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States," and the U.S. International Trade Commission determines that imports of that merchandise materially injure or threaten to materially injure an industry in the United States, then Commerce may "impose[] upon such merchandise a countervailing duty, in addition to any other duty imposed, equal to the amount of the net countervailable subsidy." 19 U.S.C. § 1671(a).  Read in isolation, this provision is tautological:  Commerce may countervail countervailable subsidies with countervailing duties.  But what is a countervailable subsidy? 19 U.S.C. § 1677(5)(A) provides the answer: "A countervailable subsidy is a subsidy described in

---

precision on this matter would have been desirable, as these are distinct standards of review.  See Tension Steel Indus. Co. v. United States, 40 CIT 661, 668, 179 F. Supp. 3d 1185, 1193 (2016); Dorbest Ltd. v. United States, 30 CIT 1671, 1676, 462 F. Supp. 2d 1262, 1268 (2006).

But Kaptan does seem to acknowledge in passing that it seeks substantial-evidence review on this particular challenge.  See Pl.'s Br. at 18 ("Commerce's conclusion that the BITT exemptions are de jure specific is unsupported by record evidence"); id. at 23 ("Commerce's determination that BITT exemptions are de jure specific is wholly contradicted by record evidence and is otherwise based on irrelevant and unproved speculation.").  And the court concludes that this is indeed the relevant standard.  Commerce's task in the proceeding below was to make a finding of fact, limited to record evidence, about certain features of Turkish law.  See Rebar Trade Action Coal. v. United States, 40 CIT 1304, 1308 (2016).  This was not the kind of direct ruling on a question of U.S. law that might be subject to otherwise-not-in-accordance-with-law review.

this paragraph which is specific as described in paragraph (5A)." Id. Paragraph (5A), in turn,

provides (as relevant here) that "[a] subsidy is specific . . . if it is determined to be specific pursuant

to subparagraph (D)." Id. § 1677(5A)(A). And subparagraph (D), in turn, provides that "[i]n

determining whether a subsidy . . . is a specific subsidy, in law or in fact, to an enterprise or industry

within the jurisdiction of the authority providing the subsidy, the following guidelines shall

apply:". Id. § 1677(5A)(D).

      For the purposes of this case, the referenced guidelines are the innermost statutory figurine.

They delineate two categories of specific subsidies: those that are specific as a matter of law ("de

jure"), and those that are specific as a matter of fact ("de facto"). See id. § 1677(5A)(D)(i), (iii).

A subsidy is specific as a matter of law "[w]here the authority providing the subsidy, or the

legislation pursuant to which the authority operates, expressly limits access to the subsidy to an

enterprise or industry . . . ." Id. § 1677(5A)(D)(i). And a subsidy is specific as a matter of fact if

at least one of four enumerated factors pertains:

> (I) The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.
>
> (II) An enterprise or industry is a predominant user of the subsidy.
>
> (III) An enterprise or industry receives a disproportionately large amount of the subsidy.
>
> (IV) The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

Id. § 1677(5A)(D)(iii). As the Federal Circuit recently explained, "[t]he statutory language is clear

that specificity can be either de jure or de facto. The de jure specificity inquiry is separate from

the de facto inquiry and the two are based on different factors." Gov't of Quebec v. United States,

105 F.4th 1359, 1374 (Fed. Cir. 2024) (emphasis and citation omitted).

Putting it all back together: Commerce may impose a countervailing duty in an amount equal to the calculated value of a countervailable subsidy provided by a foreign government. A subsidy is not countervailable unless it is specific. And a subsidy is specific when either (1) the law of the subsidy-providing government limits the subsidy to a specific "enterprise or industry," or (2) such a limitation is apparent from observable facts about the subsidy's distribution.

Here, Commerce found that the BITT Exemption is a subsidy that is specific as a matter of law. IDM at 12. For this finding to be supported by substantial evidence, then, the record must demonstrate that Turkish law "expressly limits" the BITT Exemption "to an enterprise or industry." 19 U.S.C. § 1677(5A)(D)(i).

The record lacks substantial evidence to support this conclusion. The provisions of Turkish law in the record, on which Commerce relied, do not appear to expressly limit the BITT Exemption to an "enterprise or industry." Id. Their express terms instead appear to support a conclusion of broad, economy-wide eligibility for the subsidy.

The terms of the Turkish law implementing the BITT Exemption provide that companies that possess an industrial registry certificate are subject to a 0% BITT tax rate for foreign exchange transactions. See Turkish Presidential Decree 1149 (amending Turkish Law 6802).[7] And Turkish law further requires a broad range of Turkish companies to obtain an industrial registry certificate.

---

[7] As Commerce pointed out, see IDM at 12, Turkish Law 6802 (as amended by Turkish Presidential Decree 1149) supplements the industrial registry certificate criterion with four additional independently sufficient criteria for eligibility for the BITT Exemption. But because (as explained below) so many enterprises in the Turkish economy appear to be required to possess an industrial registry certificate, the certificate criterion alone nixes a determination of de jure specificity (as currently explained). If anything, the existence of the remaining four criteria would seem to marginally broaden, not "further limit[]," the universe of BITT-exempt enterprises. IDM at 12.

The law subjects to this requirement "places that produce or obtain a material continuously and in series by changing the characteristics, shape, precision or composition of a substance or by processing these substances with the help of machinery, equipment, looms, tools or other means and forces or only by manual labor . . ."  Turkish Law 6948 at Art. 1.  It also enumerates "[e]stablishments that carry out continuous and serial repairs and plants that produce electricity or other energy, large construction sites such as shipbuilding and enterprises that produce information technology and software . . ." as entities that must obtain a certificate.  Id.  The sole exceptions the provision explicitly carves out are "[h]andicrafts and domestic crafts and small repair shops."  Id.

This is not a narrow or industry-specific list of companies.  It instead appears that under the provisions of Turkish law in the record, virtually every company of a certain size must possess an industrial registry certificate.  And because every company that complies with the legal requirement to possess an industrial registry certificate is eligible for the BITT Exemption, see Turkish Law 6802,[8] legal eligibility for the BITT Exemption appears to be broad and non-enterprise- or industry-specific.

The Government argues that the relevant "enterprise or industry" here for the purpose of satisfying 19 U.S.C. § 1677(5A)(D)(i) is the category of "enterprises or industries that both conducted foreign business transactions and satisfied one of the additional conditions established

---

[8] The Government argues that "the universe of companies that may benefit from the program is necessarily limited to companies that make foreign exchange transactions, further limiting the group of enterprises that may benefit from it."  Gov't Br. at 9.  Commerce similarly stated that "the universe of companies that may benefit from the program is necessarily limited to companies that make foreign exchange transactions, which inevitably limits the universe of companies that may benefit from it."  IDM at 12.  But this purported additional criterion appears to be trivially satisfied for present purposes, as a company that does not transact foreign currency is not subject to the tax that the BITT Exemption exempts.

by law." Gov't OAQ Resp. at 6. RTAC, meanwhile, suggests the category of "industrial

enterprises." Def.-Inter.'s Br. at 11. But these categories are implausibly far-reaching. It is hard

to discern what, if anything, they would exclude. If "an enterprise or industry" could be taken to

refer to the set of all "industrial enterprises," then section 1677(5A)(D)(i) would allow <u>any</u> legal

condition on eligibility for a subsidy to establish that subsidy's specificity as a matter of law. But

the mere fact that eligibility for a subsidy is limited does not automatically mean that the limitation

delineates an enterprise or industry. If it did, "enterprise or industry" would be an empty term. As

the court recently observed in a case involving a distinction between de facto and de jure

specificity, "converting the language of the criteria into subsector descriptors is insufficient to

demonstrate that a subsidy may not operate throughout the economy." <u>Hyundai Steel Co. v. United</u>

<u>States</u>, 48 CIT __, __, 701 F. Supp. 3d 1398, 1412 (2024); <u>see also</u> <u>PPG Indus., Inc. v. United</u>

<u>States</u>, 928 F.2d 1568, 1577 (Fed. Cir. 1991) ("The statute does not mandate that 'specific' means

no more than 'identifiable.'").

It is accordingly unapparent from the record that this is a scenario "[w]here the authority

providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits

access to the subsidy to an enterprise or industry." 19 U.S.C. § 1677(5)(A)(D)(i). Indeed, the

BITT Exemption by its terms appears to provide "government assistance that is both generally

available and widely and evenly distributed throughout the jurisdiction of the subsidizing

authority," which "is not an actionable subsidy." <u>Statement of Administrative Action</u>

<u>accompanying the Uruguay Round Agreements Act</u>, H.R. Doc. No. 103-316, vol. 1 (1994),

reprinted in 1994 U.S.C.C.A.N. 4040, 4230 ("SAA").[9]   Unlike the Government or RTAC,

Commerce did not venture to explain what the applicable "enterprise or industry" would even be

in this case, alluding only vaguely to a "limit[ed] universe" of companies eligible for the BITT

Exemption.  IDM at 12.  Nor did Commerce explain why the industrial registry certificate criterion

would "inherently favor a given enterprise or industry or address whether the criteri[on is]

economic in nature."  Hyundai Steel Co. v. United States, 47 CIT __, __, 659 F. Supp. 3d 1327,

1342 (2023).

Commerce instead premised its specificity determination on the notion that that even if

Turkish law establishes broad eligibility for the BITT exemption, "[t]his does not demonstrate that

all enterprises eligible actually apply and obtain industrial registry certificates."  IDM at 12.

"Evidence on the record," Commerce explained, "does not address whether all companies that

make foreign exchange transactions receive the benefit under the law, which would show that the

BITT exemptions are generally available."  Id.

This type of analysis, however, is out of place in a determination of whether a subsidy is

specific as a matter of law.  The relevant question here is whether the provisions of Turkish law in

the record "expressly limit[] access to the subsidy to an enterprise or industry," 19 U.S.C.

§ 1677(5A)(D)(i), not whether the implementation of that law results in the subsidy's distribution

to a limited number of recipients.  This latter question belongs in a de facto analysis under

section 1677(5A)(D)(iii).  See BGH Edelstahl Siegen GmbH v. United States, 47 CIT __, __,

---

[9] The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application."   19 U.S.C. § 3512(d).

663 F. Supp. 3d 1378, 1383 n.9 (2023) ("That a limited number of enterprises or industries may

ultimately benefit from the program may support a finding of de facto specificity, but it does not

support a finding of express or de jure specificity.").  In other words, a determination of specificity

as a matter of law pursuant to section 1677(5A)(D)(i) is not supported by substantial evidence if it

rests only on factors that are unrelated to the construal of the law of the foreign jurisdiction.  It

may be that such extrinsic factors could establish a subsidy's specificity, but only de facto

specificity.  See Gov't of Quebec, 105 F.4th at 1374.

       Here, Commerce did not analyze the BITT Exemption's possible specificity as a matter of

fact.  It invoked only section 1677(5A)(D)(i) as a basis for its specificity determination.  See IDM

at 11.  Accordingly, because the provisions of Turkish law that Commerce cites do not constitute

"substantial evidence on the record" for de jure specificity, the court remands for a redetermination

of whether the BITT Exemption is countervailable.  In conducting this redetermination, Commerce

may consider (as RTAC suggests) whether evidence in the record supports a determination of de

facto specificity under section 1677(5A)(D)(iii).  See Def.-Inter.'s Br. at 12.  Alternatively,

Commerce may attempt on remand to further explain why the BITT Exemption is specific as a

matter of law.

## II.      *Commerce Did Not Properly Explain its Rejection of the C&W Report*

       As explained above, Commerce used a report prepared by Colliers International

("Colliers") as a benchmark to value state-owned land in the Turkish city of Trabzon, Surmene,

that Kaptan's shipbuilder affiliate Nur[10] used for free during the period of review.  See PDM at

---

[10] Unlike in prior litigation related to the 2018 administrative review, Kaptan does not here
challenge an underlying determination by Commerce that subsidies received by Nur are

11–14.  Kaptan had submitted a competing report, prepared by Cushman & Wakefield ("C&W").

<u>See</u> Letter from David L. Simon, PLLC to G. Raimondo, Sec'y of Com., re: Kaptan Benchmark

Submission at Ex. 1 (Oct 31, 2022), P.R. 121, CR 114–17 (the "C&W report").  But Commerce

declined to consider the C&W report on the stated basis that it "is not a usable

benchmark." IDM at 9.

Kaptan challenges both the selection of the Colliers report and the rejection of the C&W

report.  Pl.'s Br. at 24.  Kaptan argues that "[t]he C&W benchmark . . . has the same or superior

quality information in terms of its public nature, credibility, and underlying data," and that

"Commerce improperly ignored relevant factors affecting comparability when finding the

[Colliers] benchmark to be usable."  <u>Id.</u>

For the reasons explained below, Commerce's explanation of its selection of the Colliers

report is not in accordance with law.  Remand is accordingly required on this issue as well:

Commerce must either further explain or reconsider its choice of a benchmark to value the land

that Nur used free of charge.

In the administrative proceeding below, Kaptan raised two main objections to Commerce's

use of the Colliers report.  <u>See</u> Kaptan's Case Br. at 4–11.  Kaptan first challenged the underlying

reliability of the Colliers report's data.  <u>See</u> <u>id.</u> at 4.  According to Kaptan, Commerce relied on

those data despite a lack of external confirmation of their reliability.  Kaptan noted that the report

references "Colliers International" as its source, and that it does not indicate "whether the reported

rates [therein] are based upon public listings, private offers, actual leases, or guesses based upon

_____

attributable to Kaptan.  <u>See generally</u> <u>Kaptan I Remand</u>, 47 CIT __, 666 F. Supp. 3d 1334; <u>see also</u>
Pl.'s OAQ Resp. at 4.

leases entered in prior years and adjusted upwards for inflation." Id. at 5. Kaptan further asserted

that "there is no statement" in the report "regarding the experience and qualifications of the

individuals compiling the data," and that the report presents, "in miniature font," a disclaimer that

"no warranty is given as to the accuracy of . . . the forecasts, figures, or conclusions contained in

this report . . . ." Id.

Kaptan next challenged the Colliers report's alleged usage of land near the populous and

economically productive Istanbul metropolitan area[11] as a benchmark for assessing the value of

the land used by Nur in distant Trabzon—which, Kaptan asserted (and continues to assert), is a

less populous and productive area than the area surrounding Istanbul. See id. at 6–11. In Kaptan's

framing, "[t]he benchmark used in the Preliminary Results to value the Nur property is like using

a turnkey industrial site in Bayonne, New Jersey . . . to value unimproved land on the shore of

Lake Superior an hour outside Duluth, Minnesota." Id. at 10.

Commerce responded to the substance of the first objection but not the second. In the IDM,

Commerce addressed first objection as follows:

> Regarding Kaptan's argument that the Colliers report is unusable as a benchmark,
> Kaptan first claims that the Colliers report is not a reliable data source because it
> disclaims liability for its accuracy and cites to itself as the data source. We find
> that this argument is unpersuasive because disclaimer of liability is not at issue, and
> the fact that the Colliers report is based on numbers compiled by Colliers does not
> disqualify the data, but rather strengthens the case to use the Colliers report as it is
> not using secondary sources or compiling sets of data from other sources.

---

[11] Commerce "adjusted the land benchmark by limiting the rental rates contained in Colliers International's Real Estate Market Turkey Review to only include rental prices from Cerkezkoy, Tekirdag." PDM at 13–14. Kaptan asserts that Cerkezkoy "is an industrial/transportation hub just outside Istanbul" and that "it is part of the greater Istanbul area." Pl.'s Br. at 37, 39 (internal quotation marks and citations omitted); see also Kaptan's Case Br. at 10. Commerce did not raise any issue of Cerkezkoy's geographic proximity to Istanbul below, and neither the Government nor RTAC does so now.

IDM at 9 (footnote omitted).  Without evaluating the merits of this response, the court observes

that it at least directly addresses Kaptan's concerns regarding the Colliers report's disclaimer of

liability and reference to internally collected data.

The same cannot be said about Commerce's treatment of the Kaptan's second,

methodological objection.  Commerce did not directly address Kaptan's argument regarding the

Colliers report's use of land value comparables within Turkey.  Instead of confronting possible

issue about the Colliers report's "distortive" nature, Commerce insisted that the Colliers report

was the only viable choice—notwithstanding any possible problems with its own viability:

> Kaptan also argues that the Colliers report provides data that are distortive and not
> comparable to the land area used by Nur, Kaptan's affiliate.  We disagree.  Kaptan
> points to the fact that Commerce has limited the data in the Colliers report to only
> include one province which has the most similar population density to the land
> where Nur is located and claims that Commerce has not considered any other
> factors such as the geographical location of the land within the country of Turkey
> in terms of its proximity to a commercial hub, or any other factors which would
> affect comparability.  This argument is predicated on Kaptan's assumption that
> there are multiple data sources Commerce could choose from.  However, the only
> usable data source on the record is the Colliers report, and is thus the only source
> Commerce may consider.[]  We made the adjustment to the data in this report to
> use a comparable benchmark for industrial land based on population density
> information, but we did not opine as to the remaining factors because the record did
> not contain multiple data sources to choose from.  We therefore chose Colliers as
> the best benchmark on the record and limited our comparability analysis based on
> the most relevant and quantifiable metric available on the record, which is
> population density.  As we will discuss below, the only other benchmark to assess
> the rental value of land on the record is Kaptan's submission, which, as discussed
> below, is not a usable benchmark.

Id. (footnotes omitted).

Commerce thus declined to respond to Kaptan's objection to the use of the Colliers report

as a benchmark.  This was error.  "When confronted with a colorable claim that the data that

Commerce is considering is aberrational, Commerce must examine the data and provide a reasoned

explanation as to why the data it chooses is reliable and non-distortive."  Mittal Steel Galati S.A.

v. United States, 31 CIT 1121, 1135, 52 F. Supp. 1295, 1308 (2007).  Commerce was aware that

Kaptan had raised a concern with the possibly distortive nature of the Colliers report's geographic

focus.  See IDM at 7.  And this concern was a colorable one: in theory, at least, the estimated value

of foregone rent for Nur's use of the Trabzon land could be inaccurately high if based on a non-

representative sample of higher-priced land rentals in a different area of Turkey.  But rather than

"provide an explanation of the basis for its determination that addresses relevant arguments, made

by interested parties who are parties to the investigation or review," 19 U.S.C. § 1677f(i)(3)(A),

Commerce resorted to a process of elimination in which it struck the C&W report and then selected

the Colliers report by default.  Under the Government's framing, which is that Commerce "found

the [C&W] report unusable only after considering various factors detracting from its credibility,"

Gov't Br. at 15, Commerce was also required to address the "usability" of the Colliers report by

considering the "detracting" factors that Kaptan raised in its case brief.

Commerce, of course, "is entitled to broad discretion regarding the manner in which it

develops the record . . . ."  Stupp Corp. v. United States, 5 F.4th 1341, 1350 (Fed. Cir. 2021).  It is

furthermore "not necessary that there could be only one conclusion; even if two inconsistent

conclusions could have been drawn, the determination could still be supported by substantial

evidence."  Dupont Teijin Films USA, LP v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005).

And as RTAC points out, see Def.-Inter.'s Br. at 18, the court may not "reweigh the evidence or

to reconsider questions of fact anew."  Trent Tube Div., Crucible Materials Corp. v. Avesta

Sandvik Tube AB, 975 F.2d 807, 815 (Fed. Cir. 1992); see also Downhole Pipe & Equip., L.P. v.

United States, 776 F.3d 1369, 1376–77 (Fed. Cir. 2015).  But here, Commerce did not "weigh"

the relative merits of the Colliers and C&W reports with regard to the comparability established

by their respective geographical sampling methods.  See 19 C.F.R. § 351.511(a)(2)(i); see also

Ozdemir Boru San. ve Tic. Ltd. Sti. v. United States, 41 CIT __, __, 273 F. Supp. 3d 1225, 1252

(2017) (explaining that "Commerce must consider relevant record evidence in determining the

comparability of land parcels it uses in creating a reasonable benchmark that lacks distortive

pricing").  Commerce simply stated that the C&W report was "unusable," and that the Colliers

report was therefore the only acceptable choice.

      This might have passed muster if Commerce had based its determination of the C&W

report's per se unusability on a sound legal basis.  It is within Commerce's discretion, for example,

to flatly decline to consider submissions by parties that carry certain fundamental defects.  These

defects include untimely filing, see QVD Food Co. v. United States, 658 F.3d 1318, 1324 (Fed.

Cir. 2011), or else a submission's failure to meet any of the other criteria enumerated in 19 U.S.C.

§ 1677m(e).[12]

      But neither Commerce, the Government, nor RTAC has shown that the aspects of the C&W

---

[12] This subsection provides as follows:

> In reaching a determination under section 1671b, 1671d, 1673b, 1673d, 1675, or 1675b of this title the administering authority and the Commission shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements . . . , if—
>
> > (1) the information is submitted by the deadline established for its submission,
> > (2) the information can be verified,
> > (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,
> > (4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by the administering authority or the Commission with respect to the information, and
> > (5) the information can be used without undue difficulties.

Id.

report that Commerce identified as disqualifying falls into any of these defined categories.  See Gov't Br. at 15 (stating generally that Commerce "found the report unusable only after considering various factors detracting from its credibility"); Def.-Inter.'s Br. at 23 (arguing only that "the agency was in the position of having only one usable benchmark source: the Colliers International data . . . .").  Commerce noted that the C&W report "is business proprietary information in its entirety," that it was commissioned by Kaptan for the purpose of litigation, and that "prices in the study may have been partially based on prices provided by nonprivate entities."  IDM at 9–10.  These assertions, if valid, might indeed weigh against Commerce's use of the C&W report on reliability grounds.  Cf., e.g., Sandt Tech., Ltd. v. Resco Metal & Plastics Corp., 264 F.3d 1344, 1350–51 (Fed. Cir. 2001) ("Documentary or physical evidence that is made contemporaneously with the inventive process provides the most reliable proof that the inventor's testimony has been corroborated." (emphasis added)).  But even if they did, they would not lift Commerce's statutory burden under 19 U.S.C. § 1677f(i)(3)(A) to respond to Kaptan's objections to the use of the Colliers report.[13]  Commerce must consider the parties' submissions as part of an evenhanded assessment of "factors affecting comparability."  19 C.F.R. § 351.511(a)(2)(i).  Commerce may not use the substantive flaws it identifies in one submission as a basis for declining to address

---

[13] The court raised an analogous concern twenty-five years ago in Rautaruukki Oy v. United States, 23 CIT 257 (1999), which Kaptan cites for the proposition that Commerce's "automatic exclusion" of the C&W report was unlawful.  Pl.'s OAQ Resp. at 7–8.  Kaptan quotes the following passage from that case:

> Commerce claims it did not disregard the expert testimony.  The agency, however, apparently observed the evidence only to the extent necessary to conclude that it was "subjective" and did not need to be considered.  This was not a fair treatment of the material submitted.

Rautaruukki, 23 CIT at 260.

Court No. 23-00131                                                               Page 24

possible flaws in the other.

The court accordingly remands this aspect of the <u>Final 2020 Review</u> for Commerce to fully

address the arguments presented by Kaptan regarding possible deficiencies in the Colliers report,

and, if appropriate, to reconsider its selection of the Colliers report over the C&W report as a

benchmark.

**CONCLUSION**

For the reasons explained above, the court remands the <u>Final 2020 Review</u> for Commerce's

reconsideration or further explanation of the two issues that Kaptan raises in its Motion for

Judgment on the Agency Record.  The court does not compel a result for either issue on remand.

It is hereby

**ORDERED** that upon consideration of Plaintiff-Intervenor's Motion for Judgment on the

Agency Record, Nov. 13, 2023, ECF No. 30, the U.S. Department of Commerce is instructed to

reconsider the rate applied to Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. based on any

changes to the margin calculated for mandatory respondents, and it is further

**ORDERED** that Commerce shall file its remand redetermination with the court within

ninety days of the date of this opinion.  The timeline for filings and comments regarding the second

remand redetermination shall proceed according to USCIT Rule 56.2(h).

**SO ORDERED**.

/s/        *Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated:  October 21, 2024
        New York, New York