C-489-819
Remand
Slip Op. 24-116
POR:  01/01/2020 – 12/31/2020
**Public Document**
E&C/OI:  TP

**Kaptan Demir Celik Endustrisi ve Ticaret A.S., et al. v. United States,**
**Court No. 23-00131; Slip Op. 24-116 (CIT October 21, 2024)**
**Steel Concrete Reinforcing Bar from the Republic of Türkiye**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.   SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand opinion of the U.S. Court of International Trade (the

Court) in *Kaptan Demir Celik Endustrisi ve Ticaret A.S., et. al. v. United States*, Consol. Court

No. 23-00131, Slip Op. 24-116 (October 21, 2024) (*Remand Order*).[1]  These final results of

redetermination concern the *Steel Concrete Reinforcing Bar from the Republic of Turkey:  Final*

*Results of Countervailing Duty Administrative Review and Rescission, in Part; 2020*, 88 FR

34129 (May 26, 2023) (*2020 AR Final Results*), and accompanying Issues and Decision

Memorandum (IDM).  Specifically, these final results of redetermination concern the *2020 AR*

*Final Results*, wherein Commerce determined that the benefits received by Kaptan Demir Celik

Endustrisi ve Ticaret A.S. (Kaptan Demir) from the Banking Insurance and Transaction Tax

(BITT) exemptions were countervailable and that the appropriate benchmark for land for less

than adequate remuneration (LTAR) under Law 5084 is Colliers International's Real Estate

Market Turkey Review (Colliers report) instead of the Rent Estimation Study by Cushman &

---

[1] *See Kaptan Demir Celik Endustrisi Ve Ticaret A.S. v. United States*, Court No. 23-00131, Slip Op. 24-116 (CIT
October 21, 2024) (*Remand Order*).

Wakefield (C&W report). The domestic interested party in the underlying administrative review is the Rebar Trade Action Coalition (RTAC).[2]

Pursuant to the *Remand* Order, Commerce has addressed the parties' comments regarding whether the BITT program is specific, and thus countervailable. We have also evaluated the parties' comments on the benchmarks used to value Turkish land. As explained below, in these final results of redetermination, we continue to find that the BITT program is not countervailable for the purposes of this remand redetermination and that the Colliers report is a more suitable benchmark than the C&W report.

## II. BACKGROUND

On December 28, 2021, Commerce initiated an administrative review of steel concrete reinforcing bar (rebar) from the Republic of Türkiye (Türkiye) for 24 producers and exporters of the subject merchandise for period of review (POR) of January 1, 2020, through December 31, 2020.[3] On March 21, 2022, Commerce selected Colakoglu Metalurji A.S. and Kaptan Demir as the mandatory respondents in the administrative review.[4] On March 25, 2022, Commerce released the initial countervailing duty (CVD) questionnaire to the Government of Türkiye (GOT) and informed the GOT that it was responsible for forwarding it to the mandatory respondents.[5] On May 16, 2022, the GOT timely filed its response to section II of the initial questionnaire.[6]

---

[2] The members of RTAC are Byer Steel Group, Inc., Schnitzer Steel Industries d/b/a Cascade Steel Rolling Mills, Inc., Commercial Metals Company, Gerdau Ameristeel U.S. Inc., and Nucor Steel Corporation (the petitioner).
[3] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 FR 73734 (December 28, 2021).
[4] *See* Memorandum, "Respondent Selection," dated March 21, 2022.
[5] *See* Commerce's Letter, "Initial Questionnaire in Countervailing Duty Administrative Review for 2020," dated March 25, 2022.
[6] *See* GOT's Letter, "Response of the government of Türkiye in 2020 Countervailing Duty Administrative Review on Imports of Steel Concrete Reinforcing Bar from Turkey," dated May 16, 2022 (GOT's IQR).

With respect to the BITT program, in its initial questionnaire response, the GOT explained that during the POR BITT rates fluctuated between 0.2 percent and 1 percent.[7] Further, regarding *de jure* specificity, the GOT explained that five types of transactions are subject to a zero percent BITT rate. These transactions included: (1) foreign exchange sales between banks and authorized institutions or among each other; (2) foreign currency sales that are made to the Ministry of Treasury and Finance; (3) foreign currency sales made to corporate borrowers having foreign currency loan payables; (4) foreign exchange sales to enterprises having an industrial registry certificate; and, (5) foreign exchange sales to exporters which are members of Exporters' Associations.[8] In reviewing the administrative record for this remand, we discovered that during the end of the POR, there was a sixth criteria under which enterprises could be exempt from BITT. Specifically, Exhibit 31 of the GOT's initial questionnaire response indicates that on August 7, 2020, the GOT amended the BITT regulations to include a sixth type of transaction subject to a zero percent BITT rate (*i.e.*, "foreign exchange sales to institutions which make at least one of the activities that are deemed as financial institution activities pursuant to Banking Law").[9] The GOT did not refer to this sixth type of transaction in its narrative response, and we did not address it in any decision documents prior to these *Draft Results of Redetermination*.

The GOT did not directly respond to Commerce's *de facto* specificity questions in its initial questionnaire response. Instead, it explained, broadly, that a wide variety of enterprises (*i.e.,* 140,071 total) in Türkiye possessed industrial registry certificates during the POR.[10] As

---

[7] *See, e.g.*, GOT's IQR at 76-77.
[8] *Id*. at 77 and Exhibit 31.
[9] *Id*. at Exhibit 31.
[10] *Id*. at 81-85 and Exhibit 33.

such, it claimed BITT exemptions were widely available and used throughout the Turkish economy.

We issued the *Preliminary Results* of the administrative review on November 22, 2022, and preliminarily found the BITT program to be *de jure* specific.[11]  In the *Preliminary Results*, we explained that the program is *de jure* specific because it is limited to firms that conduct certain types of foreign exchange transactions that were exempted by Law 6802 (Article 33) (the Expenditure Expenses Law).[12]

In its case brief, Kaptan Demir argued that Commerce should not countervail the BITT program because exemptions are generally available to companies that meet one of five criteria.[13]  Further, Kaptan Demir specified that the general reach of BITT exemptions was vast since nearly every company in Türkiye qualifies as an industrial establishment and acquires an industrial register certificate.[14]  In its rebuttal brief, the petitioner contended that the BITT is specific because it is limited to the five criteria enumerated above.[15]  In addition, the petitioner explained that the GOT failed to define the parameters under which it defines "industrial establishment" and did not explain the criteria under which it grants or denies industrial registry certificates to applicants.[16]

Commerce published the *2020 AR Final Results* on May 26, 2023, wherein we continued to find the BITT program *de jure* specific under 771(5A)(D)(i) of the Tariff Act of 1930, as amended (the Act), because (1) the GOT did not define parameters under which an enterprise

---

[11] *See Steel Concrete Reinforcing Bar from the Republic of Turkey:  Preliminary Results of Countervailing Duty Administrative Review and Intent to Rescind in Part; 2020*, 87 FR 73750 (December 1, 2022) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM) at 11-12.
[12] *Id.* at 11.
[13] *See* Kaptan Demir's Letter, "Case Brief," dated January 10, 2023 (Kaptan Demir's Case Brief), at 16-19.
[14] *Id.*
[15] *See* Petitioner's Letter, "Rebuttal Brief," dated January 24, 2023 (Petitioner's Rebuttal Brief), at 6-9.
[16] *Id.*

qualifies as an "industrial establishment;" (2) the GOT did not explain the criteria under which it grants or denies industrial registry certificates; and, (3) the law demonstrated the program is limited to companies making foreign exchange transactions, which necessarily narrows the number of companies eligible for exemptions.[17]  On this basis, for this program, we calculated a net subsidy rate of 0.91 percent *ad valorem* for Kaptan Demir.

Regarding the appropriate benchmark for the land for LTAR, under Law 5084, on October 31, 2022, the petitioner and Kaptan Demir timely filed factual information to measure the adequacy of remuneration under 19 CFR 351.511(a)(2).[18]  The petitioner provided the Colliers report, which covered the second half of the POR and contained lease rates for industrial land in Türkiye.[19]  Kaptan Demir provided the C&W report, which contained rental rates for land located in areas similar to where Nur Gemicilik A.S. (Nur), Kaptan Demir's cross-owned affiliate, acquired rent free land for 49 years under this LTAR program.[20]

The petitioner and Kaptan Demir submitted timely rebuttal benchmark comments on November 10, 2022.  In its comments, the petitioner provided information (*e.g.*, population growth figures and economic data) to justify the selection of the Colliers report.[21]  In comparison, Kaptan Demir provided information to substantiate that the C&W report contained data more economically comparable to the land Nur acquired.[22]

In the *Preliminary Results*, we explained that in 2014 Nur entered into a lease and investment agreement with the local government in the Surmene district to use a state-controlled

---

[17] *See Final Results* IDM at Comment 2.
[18] *See* 19 CFR 351.301(c)(3); *see also* Petitioner's Letter, "Submission of Benchmark Information," dated October 31, 2022 (Petitioner's Benchmark Submission); and Kaptan Demir's Letter, "Benchmark Submission," dated October 31, 2022 (Kaptan Demir's Benchmark Submission).
[19] *See* Petitioner's Benchmark Submission.
[20] *See* Kaptan Demir's Benchmark Submission; *see also Preliminary Results* PDM at 13.
[21] *See* Petitioner's Letter, "Rebuttal Comments and Benchmark Information," dated November 10, 2022.
[22] *See* Kaptan Demir's Letter, "Benchmark Rebuttal," dated November 10, 2022 (Kaptan Demir's Benchmark Rebuttal).

area of land free of rent.[23]  We used the Colliers report as the benchmark because the petitioner

placed population density information on the record showing that the area in Surmene, Trabzon,

where the land in question is located, is most similar in population density to Cerkezkoy,

Tekirdag.[24]  As such, we adjusted the Colliers report to only include rental prices from

Cerkezkoy, Tekirdag.[25]

In its case brief, Kaptan Demir argued that Commerce erred in relying on the Colliers

report for several reasons.  These included:  (1) the Colliers report disclaimed liability and did

not identify the underlying data; and, (2) Commerce ignored the benchmark provided by Kaptan

Demir, which contained rates for industrial leases in the same province where Nur acquired

land.[26]  In its rebuttal brief, the petitioner claimed that Commerce should continue to use the

Colliers report because (1) Commerce found the Colliers report reliable in the two previous

reviews; (2) the Colliers report is based on actual transactions between private parties; (3)

Commerce reviewed the data to make sure Cerkezkoy, Tekirdag, and Trabzon had similar

population densities; and, (4) the C&W report was commissioned for the purposes of the

administrative review and contained certain government set prices.[27]

Commerce determined in the *Final Results* that the Colliers report constituted the best

benchmark on the record, pursuant to 19 CFR 351.511.  Specifically, Commerce did not find

Kaptan Demir's arguments that the Collier report was unusable as a benchmark and that the

C&W report was a suitable replacement, to be compelling.  Specifically, Commerce noted that

disclaimer of liability does not disqualify the usage of the report outright and Colliers

---

[23] *See Preliminary Results* PDM at 13.
[24] *Id*.
[25] *Id*.
[26] *See* Kaptan Demir's Case Brief at 3-16.
[27] *See* Petitioner's Rebuttal Brief at 2-6.

International is the source of its own data, which bolsters the case for selecting it as the benchmark for determining the rate for the land for LTAR program as Commerce does not need to assess the veracity of secondary sources.[28]  Further, Commerce found that its evaluation of population density demonstrated that the land in the Colliers report was comparable to the land Nur acquired in Trabzon.

With regard to the C&W report, Commerce determined in the *Final Results* that the data provided did not constitute a suitable replacement to the existing benchmark.  First, the information provided was considered business proprietary in its entirety.[29]  Further, Commerce explained that it previously avoided utilizing reports which were commissioned explicitly for the purpose of a review and its associated litigation due to the "risk of litigation-inspired fabrication or exaggeration" as determined in *Softwood Lumber from Canada*.[30]  Considering the above factors, Commerce upheld its decision in the preliminary results to continue utilizing the Collier report.[31]  On this basis, for this program, we calculated a net subsidy rate of 0.86 percent *ad valorem* for Kaptan Demir.

On November 19, 2024, Kaptan Demir submitted a letter on the record of this remand offering to submit the C&W report as a public document.[32]  On November 20, 2024, we accepted Kaptan Demir's request.[33]  As such, on November 24, 2024, Kaptan Demir filed the C&W report as a public document on the record of this proceeding.  However, on January 14, 2025, we determined that Kaptan Demir's filing of the C&W report as a public document contained

---

[28] *See Final Results* IDM at Comment 1.
[29] *Id*.
[30] *Id*.
[31] *Id*.
[32] *See* Kaptan Demir's Letter, "Kaptan Comment on GOT SQR and Kaptan Proffer of Public Benchmark Report," dated November 18, 2024.
[33] *See* Commerce's Letter, "Provision of Cushman & Wakefield Benchmark," dated November 20, 2024.

untimely new factual information (NFI),[34] and, consequently, we rejected Kaptan Demir's public submission while allowing Kaptan Demir a second opportunity to resubmit the C&W report as a public document in the format from underlying administrative review.  On January 14, 2025, Kaptan Demir resubmitted the public C&W report with the NFI omitted.[35]

## III.    REMAND ORDER

In the *Remand Order*, the Court ordered Commerce to (1) reconsider whether the BITT program is *de jure* specific or to consider whether evidence on the record supports a *de facto* specificity determination; (2) to fully address Kaptan Demir's arguments concerning possible deficiencies in the Colliers report, and, if appropriate, reconsider the selection of the Colliers report over the C&W report as a benchmark; and, (3) reconsider the rate applied to Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. (Icdas), a non-selected company subject to this review, should the margin calculated for either of the mandatory respondents change.  As ordered, we have addressed each of the specific circumstances outlined by the Court for each of these issues.  Regarding the BITT program, our analysis below supports finding that the program is not specific, and thus not countervailable.  For the land benchmark, Commerce has considered Kaptan Demir's arguments and continues to find it appropriate to use the Colliers report as the benchmark for land for LTAR.

## IV.    ANALYSIS

### A.    *Specificity of the BITT program*

In the *2020 AR Final Results*, we determined that the BITT program was *de jure* specific pursuant to section 771(5A)(D)(i) of the Act because the GOT, via legislation, limits access to

---

[34] *See* Commerce's Letter, "Rejection of New Factual Information in Proffered Benchmark Resubmission As a Public Filing," dated January 14, 2025.
[35] *See* Kaptan Demir's Letter, "Public Benchmark Report," dated January 14, 2025 (Kaptan Demir's Public Submission).

the program to a cross-section of companies that fulfill one of the five requirements and make foreign exchange transactions.[36]  In the *Remand Order*, the Court explained that Commerce's *de jure* specificity analysis is not supported by substantial evidence if it rests only on factors that are unrelated to the construal of law of the foreign jurisdiction.[37]  On this basis, the Court remanded Commerce to consider whether the record supported a *de facto* specificity determination under section 771(5A)(D)(iii) of the Act or, alternatively, to further explain why the BITT program is *de jure* specific.[38]  We revisited our specificity analysis of the BITT program, and, given the new record information and the Court's order regarding *de jure* specificity, we find, under respectful protest,[39] that the BITT program is not *de jure* specific.  Further, we have evaluated whether the program is *de facto* specific, and, as facts available, pursuant to section 776(a) of the Act, determine it is not.  Thus, we find that the program is not countervailable.

Pursuant to section 771(5A)(D)(iii) of the Act, where there are reasons to believe that a subsidy may be specific as a matter of fact, the subsidy is specific if one or more of the following factors exist:

(I)    The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number;

(II)   An enterprise or industry is a predominant user of the subsidy;

(III)  An enterprise or industry receives a disproportionately large amount of the subsidy; and

(IV)   The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

---

[36] *See 2020 AR Final Results* IDM at Comment 2.
[37] *See Remand Order* at 17.
[38] *Id*.
[39] *See Viraj Group v. U.S.*, 476 F.3d 1349 (Fed. Cir. 2007).

As part of this remand, Commerce issued a supplemental questionnaire regarding *de facto* specificity to the GOT and received a timely questionnaire response.[40]  While the GOT was not able to answer many of Commerce's *de facto* specificity questions, it was able to provide information concerning the operation of the program, the total amount of foreign exchange transactions, the total amount of BITT program exchange taxes collected, and the percentage of transactions exempt from BITT.[41]  Therefore, while Commerce is not able to complete a full *de facto* analysis based on the information provided by the GOT, we are issuing a determination based on the information we have on the record using partial facts available.  In reviewing the record, we find no evidentiary basis to determine that the BITT program meets any of the criteria listed above in section 771(5A)(D)(iii) of the Act.

Specifically, in the *de facto* supplemental questionnaire response, the GOT explained that the taxpayers of BITT are individual financial institutions and these institutions also receive any BITT exemptions.[42]  As such, the GOT explained it did not possess certain information regarding this program (*e.g.*, the total amount of approved assistance, the total number of companies approved for assistance, *etc.*) because this information is possessed by individual financial institutions.[43]  The GOT was able to provide figures concerning the total amount of foreign exchange transactions in Türkiye during the POR and the total amount of taxes collected under BITT.[44]  While the figures provided by the GOT are proprietary in nature, this information indicated that during the POR, exemptions from BITT were widely available.  We emphasize, however, that this information does not categorize or provide any details on the distribution of

---

[40] *See* Commerce's Letter, "Supplemental Questionnaire for the Government of Türkiye," dated November 1, 2024; *see also* GOT's Letter, "Response of the Government of Türkiye to the Supplemental Questionnaire," dated November 15, 2024 (GOT's *De Facto* Response).
[41] *See* GOT's *De Facto* Response at 1-2 and 5.
[42] *Id*. at 1-2.
[43] *Id*. at 2-4.
[44] *Id*. at 5.

BITT exemptions on an enterprise or industry basis, nor does the information provide the number of enterprises or industries which actually received the exemptions.  Therefore, we cannot determine, based on record evidence, whether any subset of recipients is a predominant user or receives a disproportionally large amount of the subsidy pursuant to sections 771(5A)(D)(iii)(II) and (III) of the Act.

Nevertheless, as explained above, the GOT stated that it was unable to provide actual usage information under the BITT program because it does not maintain or collect the information and is unable to do so given the nature of how the program operates.  Therefore, the record is devoid of information (*e.g.*, evidence that enterprises or industries that received the BITT exemptions were limited in number) evincing whether the program is *de facto* specific pursuant to section 771(5A)(D)(iii)(I) of the Act.  Further, because of how the BITT program operates, the GOT explained that it could not provide evidence demonstrating whether it exercised discretion by favoring an enterprise or industry over others in the decision to grant the subsidy pursuant to section 771(5A)(D)(iii)(IV) of the Act.  As such, we find that necessary information is not available on the record, consistent with section 776(a)(1) of the Act.  The gap in the record, however, did not result from the actions of an "interested party or any other person" as envisioned by section 776(a)(2) of the Act, which therefore does not apply in this case.  While information to conduct a full *de facto* analysis is missing from the record, given the nature of the operation of the BITT program, we find no reasonable basis to conclude that the GOT withheld information that has been requested by Commerce.  Instead, based on an analysis of the record, Commerce determines that it is appropriate to rely on facts otherwise available under section 776(a)(1) of the Act.  Therefore, for the reasons detailed above, we find based on

facts otherwise available, in accordance with 771(a)(1) of the Act, that the BITT program is not *de facto* specific and thus does not constitute a countervailable subsidy.

We note that given the nature of the BITT program, which exempts certain entities from taxes on *foreign exchange transactions*, there may be additional bases to analyze whether the BITT program is *de facto* specific, for example whether the traded goods sector is a predominant or disproportionate user of the program pursuant to 19 CFR 351.502(c). As explained below, however, there is insufficient time to conduct a full analysis of this approach in this remand determination.

Given our finding that the BITT program does not constitute a countervailable subsidy, we are revising the subsidy calculations in these final results of redetermination. The revised CVD rate for Kaptan Demir and its cross-owned affiliates and the non-selected companies under review (*i.e.*, Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. and its cross-owned companies under review) from the *2020 AR Final Results* for the period January 1, 2020, through December 31, 2020, is now 1.26 percent *ad valorem*.

Going forward, Commerce intends to further examine whether this program is specific in subsequent proceedings, when Commerce has additional time to issue questionnaires and review subsequent responses on a more extensive record. For example, under 19 CFR 351.502(c), Commerce may consider whether the traded goods sector is a predominant or disproportionate user of the program. However, as explained above, for purposes of this remand, Commerce does not have the time to gather such information and do a thorough analysis in that regard, so instead is making its specificity determination based on facts otherwise available.

    *B.*      *Benchmark for the Provision of Land for LTAR*

Pursuant to the Court's order, we reconsidered the record of this review to evaluate the Colliers report and the benchmarks at issue, incorporating Kaptan Demir's furnishing of the C&W report as a public document.  However, we made no changes to our determination from the *Final Results*, as discussed below.

As noted above, the Court directed Commerce to "fully address the arguments presented by Kaptan Demir regarding possible deficiencies in the Colliers report."[45]  Kaptan Demir has indicated:  (1) that the Colliers report is unreliable because Colliers does not provide or describe its sources and includes a disclaimer and (2) that the Colliers report is distortive because it is not based upon similar property but the most improved and richest land in Türkiye, which the Court previously found inappropriate for benchmarking elsewhere in the country and which Commerce has only modified for population density while ignoring other information on the record relating to various comparability issues.[46]  In addition, Commerce has re-evaluated the C&W report and found that the data are not as contemporaneous as the Coller's report data.

Regarding the reliability of the Colliers report, we continue to find that Kaptan Demir's arguments that the Colliers report is unreliable are unavailing.  As acknowledged by the Court, Commerce directly addressed these issues in the *Final Results*:

> Regarding {Kaptan Demir's} argument that the Colliers report is unusable as a benchmark, Kaptan first claims that the Colliers report is not a reliable data source because it disclaims liability for its accuracy and cites to itself as the data source. We find that this argument is unpersuasive because disclaimer of liability is not at issue, and the fact that the Colliers report is based on numbers compiled by Colliers does not disqualify the data, but rather strengthens the case to use the Colliers report as it is not using secondary sources or compiling sets of data from other sources.[47]

---

[45] *See Remand Order* at 24.
[46] *See* Kaptan Demir's Case Brief at 4-11.
[47] *See Final Results* IDM at 9 (citations omitted).

Commerce continues to note that contemporaneous original research from an independent, third-party source is a strict preference in comparing benchmarks. Further, Commerce previously stated its support for Colliers International as a source in other, non-Turkish proceedings. In *OTR Tires from India*, Commerce used land valuation reports by Colliers International, noting that the reports were generated by an "independent third {party}."[48]

In addition, in *Softwood Lumber from Canada*, Commerce rejected arguments that a benchmark, Washington Department of Natural Resources (WDNR) prices, should be excluded because it, amongst other issues, included a disclaimer.[49] Rather, Commerce continued to use the WDNR prices over another benchmark, Forest2Market (F2M) price tables, because the F2M price tables were "strongly disfavored as a source because they were created for the purposes of {*Softwood Lumber from Canada*} proceeding."[50]

Regarding the second concern raised by Kaptan Demir regarding comparability, we further reviewed the benchmark. As an initial matter, pursuant to 19 CFR 351.511(a)(2)(i), Commerce selects a "market-determined price for the good or service resulting from actual transactions in the country in question." Ideally, assuming the market is not distorted and there are no other issues, Commerce would seek to use a respondent's own private purchases of the same good in question. For example, in *Softwood Lumber from Canada*, Commerce used a

---

[48] *See Certain New Pneumatic Off-the-Road Tires from India: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, in Part, and Alignment of Final Determination with Final Antidumping Determination*, 81 FR 39903 (June 20, 2016) (*OTR Tires from India*), and accompanying PDM at 32. In *Countervailing Duty Investigation of Certain New Pneumatic Off- the-Road Tires from India: Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part*, 82 FR 2946 (January 10, 2017), Commerce found the program not countervailable for reasons of specificity but did not reevaluate the benchmarks selected.
[49] *See Certain Softwood Lumber Products from Canada: Final Results and Final Rescission, in Part, of the Countervailing Duty Administrative Review; 2021*, 88 FR 50103 (August 1, 2023) (*Softwood Lumber from Canada*), and accompanying IDM at Comment 17.
[50] *Id*. at 99. Commerce further noted that the F2M price tables did not incorporate the underlying data used to construct the tables.

respondent's own purchases of stumpage from private sources over survey data that it otherwise used for other respondents.[51]  Even within this context, we may select, average, or otherwise adapt data within a respondent's own purchases if we deem the comparison preferable.[52]  Thus, in this instance, Commerce would ideally use the purchases of land by Kaptan Demir and its affiliates and, even within that context, Commerce might use only a specific portion of the purchased land transactions if record evidence indicated that the comparison with a limited subset of transactions would be more applicable.

With regards to the Colliers report, our review indicates that it contains:  (1) a general discussion and forecast of Türkiye's economic outlook;[53] broad economic indicators for Türkiye;[54] narrative descriptions and analysis of the office, industrial, retail, residential, and hotel real estate markets within the greater Istanbul area;[55] rent, vacancy, and related statistics sourced by either Collier International's own work or other identified entities for the greater Istanbul area in the various types of markets;[56] a title page;[57] and a closing page with a legal disclaimer.[58]  The relevant portion for the benchmark is the "Greater Istanbul Industrial Market," which provides

---

[51] *See Softwood Lumber from Canada* IDM at Comments 8 (using the 2017-2018 Private Market Survey for other respondents) and 15 (using a respondent's own purchases over the 2017-2018 Private Market Survey); *see also Citric Acid and Certain Citrate Salts:  Final Results of Countervailing Duty Administrative Review; 2012*, 79 FR 78799 (December 31, 2014), and accompanying IDM at Comment 11.  "Under 19 CFR 351.511(a)(2)(iv), when measuring the adequacy of remuneration under tier two, {Commerce}will adjust the benchmark price to reflect the price that a firm actually paid or would pay if it imported the product, including delivery charges and import duties.  This means that, whenever possible, it is {Commerce's}preference to use a respondent's own purchase information."

[52] *See Truck and Bus Tires from the People's Republic of China:  Preliminary Results of Countervailing Duty Administrative Review and Rescission of Review in Part, 2022*, 89 FR 10034 (February 13, 2024), and accompanying PDM at 34-35 (dividing a respondent's private purchases of synthetic rubber into various different grades for comparison to similar grades purchased from government sources), unchanged in *Truck and Bus Tires from the People's Republic of China:  Final Results of Countervailing Duty Administrative Review; 2022*, 89 FR 42450 (May 15, 2024).

[53] *See* Petitioner's Benchmark Submission at Exhibit 1, at 2.

[54] *Id*. at 3-4.

[55] *Id*. at 5-6, 9-10, 12-13, 15, and 17-20.

[56] *Id*. at 6-9, 11, 13-17, and 19-20.

[57] *Id*. at 1.

[58] *Id*. at 21.

rental data in the second and fourth quarters of 2020 for three provinces of Türkiye (Istanbul, Tekirdağ, and Kocaeli) divided into eight areas (Dudullu, Tuzla, Silivri, Esenyurt, Gebze, Dilovasi, Çerkezköy, and Çorlu).[59]  The Colliers report does not contain an explanation of how other provinces are affected by the Istanbul market, or, relatedly, a quantification of how various factors, such as gross domestic product (GDP), distance from the center of Istanbul, or level of development of the property, affect rental rates.[60]

As stated above, we prefer to use a benchmark based upon Kaptan Demir's own private purchases, and would rely on such purchases, or a subset of those purchases, if they were on the record.  However, such information is not available.  Such information would also be preferable to the C&W report, as the C&W report also does not contain Kaptan Demir's purchases as described above.[61]  However, unlike the Colliers Report, Commerce has a preference against selecting benchmarks like the C&W report, which was prepared for the purposes of the proceeding, as Commerce strongly disfavors benchmarks that are created solely for the purpose of the proceeding.[62]  As we stated in the *2020 AR Final Results*:

> We have declined to use benchmarks commissioned for the purposes of countervailing duty proceedings due to 'the risk of litigation-inspired fabrication or exaggeration that may come from later-developed evidence, intended to corroborate the party's story.'  As we explained in Softwood Lumber from Canada, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit), in evaluating whether a party's claim had been sufficiently corroborated with evidence in a patent case, opined that "contemporaneous documentary evidence provides greater corroborative value" in determining whether a party's litigation "story is credible."  We continue to find that the Federal Circuit's concerns are equally applicable to evidence created for the purpose of an adjudicatory administrative proceeding, such as this one.  Although we consider all evidence on the record of a proceeding, in determining the weight to be accorded to a particular piece of evidence, we consider whether the evidence in question was prepared in the ordinary course of business,

---

[59] *Id*. at 11.
[60] *Id*. at 1-21.
[61] Commerce further notes that the C&W report appears to contain benchmark information in part based upon non-private purchases.  *See 2020 AR Final Results* IDM at 10.
[62] *See Softwood Lumber from Canada* IDM at 99.

or for the express purpose of submission in the ongoing administrative proceeding. When evidence has been generated expressly for the purpose of an administrative proceeding, we find that said evidence is at "risk of litigation-inspired fabrication or exaggeration," which diminishes its weight and results in the evidence being unreliable.[63]

Consequently, we are disinclined to use the C&W report for the purposes of measuring Kaptan Demir's land grants because we continue to find it incorporates a "risk of litigation-inspired fabrication or exaggeration"[64] that otherwise does not exist in the Colliers report.

Moreover, there is no information on the record that indicates that the Colliers report is not comparable to Kaptan Demir's Trabzon land purchases. While Kaptan Demir argued in the underlying administrative proceeding that "rent amounts in Turkey {are} strictly in line with the per capita GDP of cities,"[65] there is no record evidence for this claim (*e.g.*, a comparison of rent across all provinces with their corresponding GDPs). Rather, there is only information regarding each province's respective GDPs.[66] Thus, while we agree that GDP is a factor that affects comparability, this is not evidence of a strict, quantifiable link between a province's GDP and its industrial rent.

Similarly, Kaptan Demir raises concerns over the level of development of the land, the levels of competition and market size, and the physical distance between Trabzon and Istanbul,[67] but Kaptan Demir provides no record information to quantify the proportional effect of these concerns. For example, there is no evidence that Istanbul being located some 1,000 kilometers

---

[63] *See 2020 AR Final Results* IDM at 9-10 (citing *Certain Softwood Lumber Products from Canada: Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 FR 51814 (November 8, 2017), and accompanying IDM at 82; *Sandt Tech. v. Resco Metal & Plastics Cor.*, 264 F.3d 1344, 1350- 51 (Fed. Cir. 2001); and *Coated Free Sheet Paper from Indonesia: Final Affirmative Countervailing Duty Determination*, 72 FR 60642 (October 25, 2007) (*Coated Free Sheet Paper from Indonesia*), and accompanying IDM at Comment 12) (citations omitted).
[64] *See Coated Free Sheet Paper from Indonesia* IDM at Comment 12.
[65] *See* Kaptan Demir's Benchmark Rebuttal Exhibit 1 at 1.
[66] *Id*. at 3-4.
[67] *See* Kaptan Demir's Case Brief at 6-11.

(km) from Trabzon means that it is proportionally any less representative than land 500 km or 100 km from Trabzon.  Furthermore, the Colliers report meets the standard of 19 CFR 351.511(a)(2)(i) because it does contain actual prices from the private market in Türkiye based upon Colliers International's market research.

With regard to the C&W report land valuation data, we find that while the report was carried out for 2020 (*i.e.*, the POR) and 2021, a substantial portion of the data relied on is from 2022.[68]  Under section 771(5)(E)(iv) of the Act, when considering benchmarks for goods or services provided for LTAR, Commerce is instructed to consider the prevailing market conditions for the goods being purchased or services being provided in the country subject to the investigation or review.  As such, Commerce views contemporaneity as a key factor in evaluating the prevailing market conditions.[69]

Regarding land benchmarks, Commerce has explained to the Court that when considering contemporaneity, the relevant time period to consider is the year or years in which the respondent purchased land use rights, rather than the POR.[70]  In this review, Nur acquired its land use rights in 2014, while the C&W report contains land pricing mostly from 2022 and the Colliers report from 2020.[71]  As such, neither land benchmark contains prices from the year in which Nur acquired land use rights.  Thus, consistent with case precedent, Commerce will consider which data source is more contemporaneous.[72]

---

[68] *See* Kaptan Demir's Benchmark Submission Exhibit 1 at Section E. Valuation.
[69] *See, e.g.*, *Brass Rod from Israel:  Final Affirmative Countervailing Duty Determination*, 89 FR 63410 (August 5, 2024), and accompanying IDM at Comment 1.
[70] *See Jiangsu Zhongji Lamination Materials Co., Ltd.; Jiangsu Zhongji Lamination Materials Co., (HK) Ltd.; Shantou Wanshun Package Material Stock Co., Ltd.; Jiangsu Huafeng Aluminum Industry Co., Ltd.; Anhui Maximum Aluminum Industries Company Limited v. United States*, Court No. 21-00133, Slip Op. 24-128 (CIT November 22, 2024) (*Zhongji*) at 13.
[71] *See Preliminary Results* PDM at 13.
[72] *See, e.g.*, *Zhongji* at 11 (citing *Aluminum Extrusions from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 76 FR 18521 (April 4, 2021), and accompanying IDM at Comment 24).

Regarding Kaptan Demir's land benchmark, in "Section E. Valuation" of the C&W report, the comparable list of rental land includes transactions from 2022. The data are then adjusted (*i.e.*, "{i}n order to find the equivalent price for 2020 and 2021, we made a calculation using annual inflation rate of 2020 and 2021") to calculate an "estimated average unit price."[73] In comparison, the Colliers report data are from the second half of the POR, and thus more contemporaneous with Nur's 2014 land use rights acquisition. In this proceeding, Commerce finds the Colliers data to be more contemporaneous, and Commerce has analyzed the economic comparability of these data, as explained above. Therefore, we find that the Colliers report also constitutes a stronger benchmark than the C&W report because it more accurately reflects prevailing market conditions at the time of the provision of the land at issue.

In the presence of other benchmarks, Commerce might consider a variety of factors in either selecting a different benchmark or choosing to average benchmarks,[74] including GDP, level of development, levels of competition, market size, or physical distance. In the instant remand, however, there is no evidence on the record indicating how these factors impact industrial rent prices. Thus, given the information available on the record, the Colliers report represents the best available benchmark. Because the Colliers report is at least produced by an independent source and contemporaneous, we consider it strictly preferable to the C&W report.

Further, in the underlying review, Commerce selected the most similar of the possible benchmarks in the Colliers report to account for the issue of comparability.[75] Commerce selected Çerkezköy based off the population density,[76] and, given that Commerce only had three

---

[73] *See* Kaptan Demir's Benchmark Submission Exhibit 1 at Section E. Valuation.
[74] *See Özdemir Boru San. ve Tic. Ltd. Sti v. United States,* Court No. 16-00206, Slip Op. 18-6 (CIT February 1, 2018) (*Özdemir*). Commerce notes that, in *Özdemir*, benchmark information was otherwise provided that allowed for the removal of Istanbul prices.
[75] *See Final Results* IDM at 9.
[76] *Id.*

provinces from which we could select a benchmark, the benchmark province we selected of

Tekirdağ, which contains Çerkezköy, also has the most similar GDP to Trabzon (where the land

in question is located) of the limited options presented.[77]  Thus, Commerce opted to use the most

comparable benchmark on the record, and, consequently, we made no changes for this issue for

the draft results of redetermination.

## V.     INTERESTED PARTY COMMENTS

On December 16, 2024, we released our draft remand redetermination to interested

parties.[78]  On December 27, 2024, we received comments from the petitioner, Kaptan Demir, and

Icdas.[79]

### Comment 1:  Commerce's Determinations Regarding the Countervailability of the BITT Program

*Kaptan Demir's Comments:*

The following is a verbatim summary of arguments submitted by Kaptan Demir.  For further
details, *see* Kaptan Demir's Draft Remand Comments at 3-7.

> Kaptan {Demir} agrees that the exemption from the {BITT} is not countervailable.
> However, Kaptan {Demir} disagrees that the record was insufficient to make this
> decision on the merits, rather than as a matter of "facts available."  First, the tax is
> incident upon banks, and not upon the customers of the banks.  Therefore, there is
> no benefit to the respondents, and the exemption is therefore not countervailable.
> Second, nearly 95 percent of all foreign exchange transactions within the banking
> system were exempt from the BITT.  Thus, the BITT exemption lacks *de facto*
> specificity; it is utilized in virtually every transaction to which it could be applied,
> throughout the entire banking sector.  Even if, *arguendo*, the beneficiaries of the

---

[77] *See* Kaptan Demir's Benchmark Rebuttal at Exhibit 1.
[78] *See* "Draft Results Of Redetermination Pursuant To Court Remand," issued December 16, 2024 (Draft Remand Redetermination).
[79] *See* Petitioner's Letter, "Steel Concrete Reinforcing Bar from Turkey Remand Slip Op. 24-116:  Comments on Draft Results of Redetermination Pursuant to Court Record," dated December 27, 2024 (Petitioner's Draft Remand Comments); *see also* Kaptan Demir's Letter, "Steel Concrete Reinforcing Bar from Turkey:  Kaptan Comments on Draft Results of Redetermination," dated December 27, 2024 (Kaptan Demir's Draft Remand Comments); and Icdas's Letter, "Steel Concrete Reinforcing Bar from the Republic of Türkiye:  Icdas's Letter in Lieu of Comments on Draft Remand Redetermination Pursuant to Court Order," dated December 27, 2024 (Icdas's Letter in Lieu of Draft Remand Comments).  Icdas explained that it "continues to support and incorporate by reference the arguments filed by {Kaptan}" and that "{t}o the extent that {Commerce} recalculates the rates assigned to Kaptan, it must also redetermine the countervailable subsidy rate for Icdas in accordance with the relevant statute.  *See* Icdas's Letter in Lieu of Draft Remand Comments at 2.

exemption were the banks' customers with {i}ndustrial {r}egistry certificates, those customers are so broadly distributed across the productive economy as to exclude the possibility of *de facto* specificity.

*Petitioner's Comments:*

The following is a verbatim summary of arguments submitted by the petitioner. For further details, *see* the Petitioner's Draft Remand Comments at 3-12.

> In the final remand determination, {Commerce} should find that the BITT program is countervailable. The BITT program is both *de jure* and *de facto* specific. The {GOT} failed to provide {Commerce} with the information required to conduct a complete specificity analysis with respect to the BITT program. Accordingly, {Commerce} should use facts available and adverse facts available, respectively, in making its determination as to the *de jure* and *de facto* specificity of this program.

**Commerce's Position:**

We continue to find, under respectful protest, that the BITT program is not *de jure* specific, and determined, based on facts available, that it is not *de facto* specific, and thus not countervailable based on the record evidence. We address below the points argued by Kaptan Demir and the petitioner in their comments regarding the specificity of the BITT program.

In its comments, Kaptan Demir agrees with Commerce that the BITT program is not countervailable; however, it claims (1) the record is sufficient to find the program provides no countervailable benefit to the respondent (*i.e.*, itself) and (2) Commerce should find that the program is not *de facto* specific based solely on the record evidence, rather than using facts available to make such a finding. We disagree with Kaptan Demir.

Regarding Kaptan Demir's claim that the BITT program does not provide a countervailable benefit, as an initial matter, the Court ordered Commerce to reconsider the specificity of this program, not benefit. Moreover, Kaptan Demir has not previously raised arguments concerning benefit as part of the administrative review covered by this remand and has thus failed to exhaust administrative remedies. Congress mandated that this Court "shall,

21

where appropriate, require the exhaustion of administrative remedies" in civil actions arising

from Commerce's antidumping duty (AD) determinations.[80]  The failure to make a specific

argument in a case brief, even if the general issue is addressed, constitutes a failure to exhaust

administrative remedies.[81]  The failure specifically to raise an issue is considered failure to

exhaust remedies because it "deprives {Commerce} of an opportunity to consider the matter,

make its ruling, and state the reasons for its action."[82]  This exhaustion requirement applies to

remand proceedings.[83]

    Furthermore, Kaptan Demir's challenge to Commerce's benefit finding goes beyond the

scope of its complaint in the associated litigation proceeding and thus is beyond the scope of the

remand proceeding currently before Commerce.  In the interests of finality, Commerce's final

determination in any administrative proceeding is generally subject to change only when a party

commences a timely challenge of that final determination before the Court – and, even then, only

to the extent those specific issues that are raised in the complaint.  In other words, finality

attaches to all aspects of a final determination except those that are challenged in a timely-filed

complaint.[84]  Issues that are not the subject of a timely-filed complaint cannot, as a general rule,

be entertained by the court.[85]  As such, the complaint defines and delimits the scope of litigation

and the jurisdiction of the court.[86]  Second, this issue is moot because we are continuing to find

---

[80] *See* 28 U.S.C. § 2637(d); *see Boomerang Tube, LLC v. United States*, 856 F.3d 908, 910 (Fed. Cir. 2017).
[81] *See Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) (holding that plaintiff's failure to raise a particular argument before Commerce precluded judicial review even though plaintiff characterized that argument as "simply another angle to an issue").
[82] *See Ad Hoc Shrimp Trade Action Comm. v. United States*, 33 C.I.T. 533, 545–46 (2009), *aff'd in part*, 596 F.3d 1365 (Fed. Cir. 2010).
[83] *See Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1383–84 (Fed. Cir. 2008).
[84] *See Zhaoqing Tifo New Fibre Co., Ltd. v. United States*, 256 F.Supp.3d 1314, 1327 (CIT 2017) (*Zhaoqing Tifo*).
[85] *See generally Zhaoqing Tifo*, 256 F.Supp.3d at 1327-28; *see also, e.g., Georgetown Steel Corp. v. United States*, 801 F.2d 1308, 1309-10, 1311-13 (Fed. Cir. 1986) (holding that Court of International Trade lacked jurisdiction over action where party failed to file timely appeal).
[86] *See generally Zhaoqing Tifo*, 256 F.Supp.3d at 1327-28; *see generally, e.g., Civil Aeronautics Board v. Delta Air Lines, Inc.*, 367 U.S. 316, 321-22 & n.5 (1961) (explaining that "{w}henever a question concerning administrative,

the program not specific, and thus not countervailable.  As such, we are not addressing the merits of Kaptan Demir's argument regarding program benefit in this remand.

Next, Kaptan Demir claims that there is sufficient evidence on the record to find that this program is not *de facto* specific without relying on facts available.  As explained above, the GOT was unable in its initial questionnaire response and *de facto* supplemental questionnaire response to answer some of our *de facto* specificity questions because non-interested third parties (*i.e.*, private financial institutions) administer the program.[87]  Specifically, the GOT could not provide: (1) the amount of assistance approved for each mandatory respondent company; (2) the total amount of assistance approved for all companies under the program; (3) the total amount of assistance approved for each of the largest 50 recipients under the program and the industry designation of each of these recipients; (4) the total number of companies approved for assistance; (5) the total number of companies operating or established in the jurisdiction of the granting authority; (6) the total number of corporate/business income tax filers within the jurisdiction of the granting authority of the program; (7) a complete listing of the industries that operate in the jurisdiction of the granting authority; (8) the total amount of assistance approved for the industry in which the mandatory respondent companies operate, as well as the totals for every other industry in which companies were approved for assistance under this program; and (9) the total number of companies that applied for, but were denied, assistance under this

---

or judicial, reconsideration arises, two opposing policies demand recognition: the desirability of finality, on the one hand, and the public interest in reaching what, ultimately, appears to be the right result on the other," and noting that "{s}ince these policies are in tension, it is necessary to reach a compromise"); *Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 401 (1981) (stating that, in the interests of finality, "{p}ublic policy dictates that there be an end of litigation; that those who have contested an issue shall be bound by the result of that contest, and that matters once tried shall be considered forever settled as between the parties"); *Alloy Piping Prods., Inc. v. Kanzen Tetsu Sdn Bhd.*, 334 F.3d 1284, 1292 (Fed. Cir. 2003) (recognizing the "strong interest in the finality of Commerce's decisions").

[87] *See* GOT's IQR at 81-85; and GOT's *De Facto* Response at 1-4.

program.[88]  As such, Commerce could not conduct a complete *de facto* specificity analysis of this program.

We agree with Kaptan that the information the GOT was able to provide (*i.e.*, figures concerning the total amount of foreign exchange transactions in Türkiye during the POR and the total amount of taxes collected under BITT) indicated that BITT exemptions were widely available across the Turkish economy.  However, several questions remain outstanding regarding the full context of the program, including details concerning the actual distribution of the program's benefits.  Therefore, we must rely on facts available to find the program not *de facto* specific in the absence of a complete response to our standard *de facto specific* questions.  As explained in the draft remand redetermination,[89] we intend to further examine whether this program is specific in subsequent proceedings, including, for example, whether the traded goods sector is a predominant or disproportionate user of the program pursuant to 19 CFR 351.502(c), when Commerce has additional time to issue questionnaires and review subsequent responses on a more extensive record.

Kaptan Demir also argues that the total number of companies receiving BITT exemptions under its industrial registry code are small and thus not disproportionate users of the program.  However, without additional *de facto* specificity information on the record, we cannot fully evaluate this claim.  Further, as indicated above, there are other ways in which the program may be *de facto* specific (*e.g.*, traded goods sector).  As such, we continue to find that the BITT program is not *de facto* specific based on facts available.

In its comments, the petitioner argues that Commerce should determine that the BITT program is either *de jure* or *de facto* specific.  For *de jure* specificity, the petitioner argues that

---

[88] *See* GOT's *De Facto* Response at 1-4.
[89] *See* Draft Remand Redetermination at 15.

the law limits eligibility to one of the five criteria listed above. The petitioner also explains that Commerce should apply adverse facts available (AFA) in finding *de jure* specificity, because the GOT failed to provide complete information regarding the universe of companies that may apply for and receive industrial registry certificates. We find these arguments unpersuasive.

As discussed, five types of transactions are subject to a zero percent BITT rate. These transactions included: (1) foreign exchange sales between banks and authorized institutions or among each other; (2) foreign currency sales that are made to the Ministry of Treasury and Finance; (3) foreign currency sales made to corporate borrowers having foreign currency loan payables; (4) foreign exchange sales to enterprises having an industrial registry certificate; and, (5) foreign exchange sales to exporters which are members of Exporters' Associations.[90] Further, as the petitioner explained, a company need only meet one of these five criteria to be eligible for BITT exemptions.[91] The Court has already evaluated this evidence and explained that "{t}his is not a narrow list of companies."[92] In doing so, the Court found the same reasoning advocated for by the petitioner in its comments as insufficient to establish *de jure* specificity. This is the same reasoning Commerce relied on in the underlying *Final Results*, and the petitioner has not presented any new arguments for finding the program to be *de jure* specific that was not already reviewed and addressed in the Court's Remand Order. Furthermore, on remand, Commerce discovered that a sixth criteria was in effect during the POR that qualifies a company for a BITT exemption. That criterion covers "{f}oreign exchange sales to institutions which make at least one of the activities that are deemed as financial institution activities

---

[90] *See* GOT's IQR at 77 and Exhibit 31.
[91] *See* Petitioner's Draft Remand Comments at 3-4.
[92] *See Remand Order* at 13-14.

pursuant to Banking Law,"[93] which further broadens the potential scope of qualifying entities. As such, we continue to find, under protest, that this program is not *de jure* specific.

Similarly, regarding the petitioner's discussion of the criterion for obtaining industrial registry certificates, the Court explained that such an analysis is more appropriate in a *de facto* specificity finding, rather than a *de jure* specificity analysis.[94]  We agree with the Court's opinion on this point, and therefore are not able to use such information for a *de jure* specificity analysis.

Turning to the petitioner's arguments regarding *de facto* specificity, we find the record information is not sufficient to make an affirmative *de facto* specificity finding.  Specifically, the petitioner claims that record information demonstrates that only a limited number of industries may apply for industrial registry certificates.[95]  As support, the petitioner references record information from the GOT indicating that most of the industries with industrial registry certificates are involved in several specific industries.[96]  This argument is misplaced.  A review of this information indicates a wide variety of industries possess industrial registry certificates.[97] Furthermore, in order to determine whether the subsidy is limited to or otherwise favors specific industries, Commerce would need to request the GOT provide a breakdown of *all* industries with such certificates, rather than solely the top ones.[98]  We thus continue to find that this information does not support a *de jure* or *de facto* specificity finding.

Next, the petitioner argues that the record supports a finding that the BITT program is *de facto* specific, as AFA, because the GOT did not respond to many of Commerce's *de facto*

---

[93] *See* GOT's IQR Exhibit 31 at 15.
[94] *See Remand Order* at 16-17.
[95] *See* Petitioner's Draft Remand Comments at 4-6.
[96] *Id*.
[97] *See* GOT's *De Facto* Response at Exhibit 3.
[98] *See* GOT's *De Facto* Response at 4.

specificity questions.[99]  As indicated above, the GOT explained that it was unable to collect this information because non-interested third parties (*i.e.*, private financial institutions) oversee the program.  Commerce generally may not apply AFA to a cooperating party (*i.e.*, the GOT) for failing to compel non-interested and otherwise unaffiliated parties (*i.e.*, private financial institutions) from providing information.[100]  As such, the facts on the record of this proceeding do not support applying AFA to the GOT to find *de facto* specificity.  In future administrative proceedings, Commerce will also consider ways in which it can gather additional *de facto* information regarding this program now that we better understand how it is administered.  However, based on the information on the record, we continue to find this program is not *de facto* specific based on facts available.

**Comment 2:  Commerce's Determinations Regarding the Benchmark for the Provision of Land for LTAR**

*Kaptan Demir's Comments:*

The following is a verbatim summary of arguments submitted by Kaptan Demir.  For further details, *see* Kaptan Demir's Draft Remand Comments at 8-25.

> Kaptan disagrees with the Draft Results' continued reliance on the Colliers benchmark.

> First, Commerce finds that {Kaptan Demir's} {C&W} report is unusable because of Commerce's "strict preference" for sources other than commissioned studies. This novel formulation is inconsistent with the obligation that Commerce "must consider the parties' submissions as part of an evenhanded assessment" and may not reject out of hand benchmark submissions that are filed consistently with the regulations.

---

[99] *See* Petitioner's Draft Remand Comments at 6-12.
[100] *See GPX International Tire Corp. v. United States*, 942 F. Supp. 2d 1343, 1359 (CIT 2013) ("{Commerce} cannot rely on an unaffiliated party's failure to cooperate to justify the application of an AFA rate unless the exporter under investigation also is found responsible for the behavior in some way.")); *SKF USA Inc. v. United States*, 675 F.Supp.2d 1264, 1275–77 (CIT 2009) (finding unlawful the application of an AFA rate to a cooperative respondent in order to encourage the compliance of an unaffiliated supplier); *see also Phosphate Fertilizers from the Kingdom of Morocco:  Final Affirmative Countervailing Duty Determination*, 86 FR 9482 (February 6, 2021), and accompanying IDM at Comment 14.

Second, Colliers' rent figure for Çerkezköy/Tekirdağ province, which Commerce selected as the sole benchmark, is precluded from use as a benchmark because the Çerkezköy properties are in an Organized Industrial Zone ("OIZ"). Colliers "examined the industrial zones within … Tekirdağ." Colliers is clearly referring to Organized Industrial Zones. OIZs are governmental bodies under CVD law, and leases from OIZs therefore cannot be used as benchmarks in a land LTAR analysis.

Third, even if the Colliers report figure for Çerkezköy were usable, Commerce's approach in the Draft Results fails in two key respects: first, Commerce does not analyze whether the C&W report bears the hallmarks of reliability, namely, objectivity and expertise; and second, Commerce fails to make a substantive analysis of whether the C&W benchmarks have a higher degree of comparability to the Nur leasehold property than does the Çerkezköy benchmark. As to the first, the C&W report was undertaken according to objective standards of independent expert analysis, and is therefore reliable. As to the second, the C&W benchmarks are individual properties within Trabzon province, where Nur is located. There are tremendous disparities in per capita income and overall economic activity between Trabzon and the Greater Istanbul Industrial Area rendering the Colliers properties {} less comparable to the Nur property than are the C&W properties, all of which are close to Nur. Commerce's use of the Çerkezköy benchmark bears out the Court's concern that "the estimated value of foregone rent for Nur's use of the Trabzon land could be inaccurately high if based on a nonrepresentative sample of higher-priced land rentals in a different area of Turkey."

*Petitioner's Comments:*

The following is a verbatim summary of arguments submitted by the petitioner. For further details, *see* the Petitioner's Draft Remand Comments at 12-16.

{Commerce} should not change the benchmark for measuring the subsidy for the provision of land for LTAR in its final remand determination. The data provided in the Colliers International Report is reliable and its use is consistent with {Commerce's} practice. {Commerce} has now fully addressed {Kaptan Demir's} arguments with respect to {Commerce's} use of the Colliers International Report in accordance with the {C}ourt's remand order. In the draft remand redetermination, {Commerce} again correctly recognizes that there are serious problems with Kaptan {Demir's} proffered benchmark. For example, the benchmark information provided by Kaptan is less contemporaneous than the Colliers International Report and is thus improper to use as a benchmark. This is hardly the only issue with the report, and, as further described below, {Commerce} final remand redetermination should note several additional factors that strongly undermine the reliability and utility of Kaptan {Demir's} information for benchmarking purposes.

**Commerce's Position:**

*A.   Introduction*

At the outset, we disagree with Kaptan Demir's opinion that the draft remand redetermination did not properly comport with the Court's order to fully address the arguments it presented concerning deficiencies in the Colliers report.  Specifically, the Court noted Commerce had not sufficiently addressed Kaptan Demir's concerns regarding the reliability and economic comparability of the land in the Colliers report to the land Nur had acquired in another province in Türkiye.[101]  In light of the Court's concerns, we reevaluated Kaptan Demir's arguments and reviewed the reliability of both benchmarks.  In the draft remand redetermination, we explained our preference to use independent third-party benchmarks, rather than those commissioned specifically for an administrative proceeding.[102]  We further discussed how we analyzed the economic indicators listed in the Colliers report and found that there is no record evidence to support Kaptan Demir's claims that the land Nur acquired in Trabzon is not economically comparable to the land in Cerkezkoy, Tekirdag from the Colliers report, which we used as the benchmark.[103]  In fact, we previously explained that we selected the land in Cerkezkoy as a benchmark based on population density and the fact that it has a GDP similar to Trabzon.[104] Kaptan Demir argues in comments on the draft remand redetermination that (1) Commerce has not adequately explained our rejection of the C&W report; (2) the Colliers report data is unreliable because it relies on government land in organized industrial zones (OIZs); and (3) the C&W report is still the most comparable benchmark on the record.  However, Commerce

---

[101] *See Remand Order* at 18-21.
[102] *See* Draft Remand Redetermination at 12-14.
[103] *Id*. at 15-17.
[104] *Id*. at

complied with the Court's instructions, and, for the following reasons, we continue to find that the Colliers report is the preferable benchmark of the options available on the record.

### B.     Rejection of the C&W Report

Kaptan Demir first claims that Commerce may not reject the C&W report solely because it was commissioned specifically for purposes of the administrative review.  As an initial matter, the Court acknowledged that Commerce is entitled to broad discretion when selecting from alternative options available on the record.[105]  Commerce has a stated preference not to use benchmarks commissioned for a proceeding because such information incorporates a "risk of litigation-inspired fabrication or exaggeration."[106]  This preference has been articulated in the *2020 AR Final Results*, other administrative proceedings, and before the Federal Circuit.[107] However, although Commerce is concerned that documents prepared for the purposes of an AD or CVD proceeding may be tailored to reach specific results, Commerce does not dismiss such documents outright on that basis alone.  Rather, Commerce considers additional factors in determining the weight to accord such documents prepared for the purposes of a proceeding. Such factors may include whether the methodology underlying a particular study or report is clearly articulated, and whether the assertions in reports and studies are supported by citations to data, other third-party studies, or otherwise corroborated by additional record evidence.[108]

---

[105] *See Preliminary Results* PDM at 13; and Draft Remand Redetermination at 14-17; *see also Timken Co. v. United States,* 788 F. Supp. 1216, 1220 (1992) ("When Commerce is faced with the decision to choose between two alternatives and one alternative is favored over the other in {its} eyes, then {it has} the discretion to choose accordingly if {its} selection is reasonable.").

[106] *See Coated Free Sheet Paper from Indonesia* IDM at Comment 12.

[107] *See 2020 AR Final Results* IDM at 9-10 (citing *Certain Softwood Lumber Products from Canada:  Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 FR 51814 (November 8, 2017), and accompanying IDM at 82; *Sandt Tech. v. Resco Metal & Plastics Cor*., 264 F.3d 1344, 1350- 51 (Fed. Cir. 2001); and *Coated Free Sheet Paper from Indonesia* IDM at Comment 12) (citations omitted).

[108] *See Certain Softwood Lumber Products from Canada:  Final Results of the Countervailing Duty Administrative Review, 2017-2018,* 85 FR 77163 (December 1, 2020), and accompanying IDM at Comment 2.

In this remand proceeding, Commerce has not dismissed any benchmark submissions outright but has fully examined and weighed all available information in making its determinations in these final results.  While Commerce has noted concerns of potential bias in the C&W report, it has also identified other concerns with the report, as described below.  Thus, Commerce has fully examined all the benchmark submissions on the record of this proceeding.  As such, while Commerce did not disqualify or outright "reject" the C&W report as a benchmark simply because it was prepared for the underlying proceeding, this factor weighs against using the C&W report.  The Colliers report, in comparison, is an independent third-party report and is, in this regard, strongly preferable.

With respect to the C&W report, we received only a single, self-selected sample of Kaptan Demir's communication with C&W (*i.e.*, the Engagement Agreement).[109]  Both of the "Market Research Sources" for "Rent Analysis" were based upon data "received from client" (*i.e.*, Kaptan Demir),[110] and, while the underlying appendices are business proprietary,[111] they do not contain the underlying information used by C&W for the "Comparison Method (Based on the Land for Rent Currently Market)" or "Comparison Method (Based on Leasehold Lands by Government).[112]  Despite Kaptan Demir's claims that C&W was an objective entity with no stake in the outcome,[113] Kaptan Demir paid for the creation of the C&W report, which calls into question the objective and independent nature of the report.[114]  Notably, while the stated purpose

---

[109] *See* Kaptan Demir's Public Submission at 30-93
[110] *Id*. at 3.
[111] *See* Kaptan Demir's Benchmark Submission Exhibit 1 at 7 indicating that the "Sources of Information" are "obtained from you and others listed in Appendices."  Commerce is unable to find the underlying information from "www.milliemlak.gov.tr" or the "most commonly used website for commercial real estate transactions," or any other sources referenced.  *Id*. at 29-143.  Rather, the entirety of pages 29-143 appears to consist of Kaptan Demir's internal documents, (*e.g*., occupancy permits) that Kaptan Demir partially omitted in its public submission.  *See also* Kaptan Demir's Public Submission.
[112] *See* Kaptan Demir's Public Submission at 3.
[113] *See* Kaptan Demir's Draft Remand Comments at 12-13.
[114] *See* Kaptan Demir's Public Submission 34-35

of the C&W report is "internal purposes,"[115] record information suggests that the intended purpose is to provide ongoing benchmark information for this proceeding. This raises concerns for Commerce about the nature of Kaptan Demir's agreements with C&W and the nature and purpose of the benchmark commission itself. Thus, we do not have visibility into the process of the C&W report creation, and we continue to be concerned about the potential lack of objectivity and neutrality concerning this benchmark information due to the benchmark being commissioned by Kaptan Demir specifically for the purposes of this proceeding.

Kaptan Demir also argues that other factors make the C&W report more reliable than the Colliers report. These include that: (1) the C&W report was prepared pursuant to clear valuation standards in contrast to the Colliers report; (2) the C&W report details Nur's leasehold, while the Colliers report does not reflect a fair market value for any specific property; and (3) the compilation standards and qualifications of the person(s) compiling the Colliers report are unknown.[116]

As an initial matter, these factors, even if supported by the facts on the record, do not fully address or resolve the above concern (*i.e.*, that the C&W report was commissioned for the purpose of this proceeding).[117] Further, we disagree with Kaptan Demir's claims concerning the Colliers report. The Colliers report was prepared by a well-known independent party (*i.e.*, Colliers International) using Colliers data and there is no indication that this data does not represent fair market prices. Commerce has also explained that the general disclaimer of liability on the Colliers report "does not disqualify the data but rather strengthens the case to use the Colliers report as it is not using secondary sources or compiling sets of data from other sources."

---

[115] *Id.* at 32.
[116] *See* Kaptan Demir's Draft Remand Comments at 9-13.
[117] We further discuss other issues of comparability below.

The Court acknowledged that this explanation at least directly addresses Kaptan Demir's concern regarding the disclaimer of liability and reference to internally collected data.[118]

C.     OIZs

Kaptan Demir also argues that the Colliers report's industrial zones are specific government-granted industrial properties, OIZs, but the report provides no basis for reaching this conclusion as suggested by Kaptan Demir.  As an initial matter, if the Colliers report intended to refer to OIZs specifically, Colliers International could have referred to them as Organized Industrial Zones, OIZs, government-granted industrial zones, or noted that it referred to those established under Law 4563 or Law 5084.  The Colliers report makes no such reference.[119] Moreover, the Colliers report states that "the data in the table specifies all leasable, sellable and owner-used industrial property stock," omitting the alleged evidentiary use of the article "the" for which Kaptan Demir expressed extensive concern.[120]  Lastly, Kaptan Demir provides no evidence to demonstrate that "the industrial zones" indicates the government, in contrast to simply "industrial zones," which would indicate no government involvement.  Rather, "the industrial zones" could signify an alternative to non-industrial commercial or retail real estate as covered elsewhere in the Colliers report.[121]  That the Colliers report only examined industrial zones in Kocaeli and Tekirdag while examining the industrial market more broadly in Istanbul could indicate that Colliers International's review of Istanbul was simply more extensive (*e.g.*, Colliers International examined industrial properties in a variety of neighborhoods – industrial, commercial, retail – in Istanbul and solely focused on industrial zones in Kocaeli and Tekirdag).

---

[118] *See Remand Order* at 19-20.
[119] *See* Petitioner's Benchmark Submission Exhibit 1 at 9-11.
[120] *Id*. at 9.
[121] *Id*. at 5-7 and 12-14.

There is simply no evidence for Kaptan Demir's claims that the report only examines OIZs, and, thus, this claim consists of nothing more than mere speculation.

        D.     *Comparability*

With regards to comparability, Kaptan Demir makes a collection of arguments that it claims favor relying on the C&W report over the Colliers report as a benchmark.  First, Kaptan Demir raises five concerns regarding contemporaneity as a factor for comparability between the C&W report and the Colliers report : (1) Nur leased rather than purchased the land; (2) that the benefit for an LTAR is received at the time of payment; (3) that Commerce has not previously treated the benefit as received at the time the lease was approved; (4) that this change is beyond the scope of Kaptan's complaint; and (5) that this new approach exceeds the Court's instructions. Regarding the issue of lease versus purchase, we agree that Kaptan Demir leased the land, and the Colliers report benchmarks used by Commerce are for rental/leasing value as opposed to a lump-sum purchase.[122]  However, to the extent that the Court directed Commerce to consider the comparability of the C&W report and the Colliers report, we continue to find that our practice with regards to land-use rights is instructive:

> {I}n identifying a land for LTAR benchmark, Commerce's practice is to look to the year in which the land-use rights were acquired from the government, and the terms of the acquisition (reflecting land values and prices for the year) were set, to determine the appropriate time period for calculating the land benchmark.  The Court has acknowledged this practice.  Thus, for purposes of identifying a land value for LTAR benchmark in China, under Commerce's regulations and practice, we must determine when the producer/exporter acquired the land-use rights from the GOC and seek benchmark information that is contemporaneous with the year(s) of acquisition.  In other words, the appropriate methodology for calculating land benchmark is to index a land price to the date of the purchase of the land-use right (*e.g.,* 2018) rather than to the period of review (*e.g.,* 2019).[123]

---

[122] *Id*. at 11.

[123] *See Risen Energy Co., Ltd., et al. v. United States,* 658 F. Supp. 3d 1364 (CIT 2023); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Results Of Redetermination Pursuant To Court Remand* (citations omitted) at 8.  This approach is comparable to Commerce's

Thus, Kaptan Demir conflates two issues:  the allocation of benefit to a time and the selection of an appropriate benchmark.  We agree with Kaptan Demir that the appropriate time of receipt of the benefit is during the POR.  However, the appropriate benchmark is the one that is the more contemporaneous to the time Kaptan Demir acquired the land-use rights because that benchmark reflects what Kaptan Demir would have paid on its long-term lease had it signed a comparable commercial lease instead of having received the subsidized land.

Second, Kaptan Demir raises various concerns about a multitude of factors that it argues in favor of the C&W report.  However, consistent with our explanation in the draft results, we continue to find that Kaptan Demir has not provided any evidence for a quantifiable difference in these factors (*e.g.*, GDP or land development) that would indicate that the Colliers report is not comparable to Kaptan Demir's land purchases.  Further, while Kaptan Demir raises concerns regarding a variety of such factors, including distance from Sürmene, GDP, value of foreign trade, and the stage of development of the land, there is no record evidence demonstrating that these differences between the C&W report and the Colliers report have a specific effect, such as data showing a consistent increase in land values in more distant provinces, provinces with higher GDPs, provinces with high trade levels, or in areas with more developed land.[124]  Unless such factors are adequately substantiated, Commerce cannot determine their relevance, and

---

practice regarding long-term interest rate loans in which the recurring interest payment is compared to a benchmark that would have been available at the time of the agreement.  *See also* 19 CFR 351.505(a)(2)(iii), which states Commerce "normally will use a loan the terms of which were established during, or immediately before, the year in which the terms of the government-provided loan were established."  In the program at issue, rent-free land is provided on a 49-year basis, equivalent to an interest-free loan.  *See also Preliminary Results* PDM at 13, unchanged in *Final Results*.

[124] *See* Kaptan Demir's Draft Remand Comments at 21-25.  We note that Kaptan Demir claims "The number of cars per person in Trabzon was 150, versus 200 in Istanbul."  *Id*. at 22.  Kaptan Demir provides no citation for this claim, but this emphasizes the issue with much of Kaptan Demir's argument:  the difference in any given statistic is not necessarily proof of its relevance.  While we do agree that issues such as GDP and locality are relevant, we continue to note that the C&W report data is less contemporaneous for benchmark selection, and there is no record evidence to demonstrate that one factor has a dispositive impact on comparability relative to another.  However, while we did not disqualify the C&W report *prima facie* and considered its merits relative to the Colliers report, Commerce strongly prefers benchmarks that were not commissioned for the purposes of a proceeding, as discussed above.

Kaptan Demir has not demonstrated their proportional effect; it just supplied data indicating that there are internal differences in the Turkish economy.[125]  Thus, while each of these factors, if substantiated, are ones we would consider  in determining whether to select the C&W report or the Colliers report, neither the report nor Kaptan Demir itself has provided any supporting evidence that these factors result in a measurable difference in comparability such that Commerce should favor the C&W report data.

Finally, Kaptan Demir argues that the Colliers report is a less suitable benchmark because it does not disclose its methodologies.  However, as explained above, the C&W report does not clarify its sources either in the text of the report or the appendices, referring to a "most commonly used website" without identifying the website and a "well recognized real estate advisory in the region" without identifying the advisory.[126]  Moreover, as noted above, Kaptan Demir does not provide the underlying data in its appendices for the C&W report.[127]  Instead, what is clear from the C&W report is that the information is derived from secondary sources without attribution.

By contrast, as discussed in the *Final Results*,[128] Colliers International is the source of its own work in the Colliers report, and the Colliers report thus represents original research that is more contemporaneous to Kaptan Demir's acquisition of the land than the C&W report. Moreover, as the Colliers report is independently produced, there is not the concern that the report was biased and tailored to generate certain results for this proceeding.  Consequently, we made no changes for this issue for these final results of redetermination and continue to select the Colliers report as the benchmark for valuing the provision of land for LTAR.

---

[125] *See, e.g.*, Kaptan Demir's Benchmark Submission at Exhibit 2.
[126] *See* Kaptan Demir's Public Submission Exhibit 1 at 3.
[127] *See* Kaptan Demir's Benchmark Submission at 29-143.
[128] *See Final Results* IDM at 9.

## VI.    FINAL RESULTS OF REDETERMINATION

In accordance with the Court's *Remand Order*, Commerce reexamined whether the BITT program is countervailable and provided additional explanation regarding why we consider the Colliers report to be a more appropriate benchmark than the C&W report.  For the purposes of these final results of remand redetermination, we find, under protest, that the BITT program is not *de jure* specific, and is also not *de facto* specific, and is thus not countervailable. Accordingly, we are revising the subsidy rates in the final results of redetermination, to remove benefits that we previously calculated for the BIT program in the final results of the 2020 CVD administrative review.  Regarding, the provision of land for LTAR, under Law 5084, because we are continuing to use the Colliers report to measure the adequacy of remuneration, we are making no revisions to the subsidy rate calculated for this program.  The revised CVD rate (*i.e.*, the total rate absent the calculation of benefit for the BITT program) for Kaptan Demir and its cross-owned affiliates and the non-selected companies under review (*i.e.*, Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. and its cross-owned companies under review) is now 1.26 percent *ad valorem*.

1/21/2025

X _Elouaradia_

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia,
Deputy Assistant Secretary
  for Enforcement and Compliance.