**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| KAPTAN DEMIR ÇELIK ENDÜSTRISI VE TICARET A.Ş., | |
| Plaintiff, | |
| and | |
| ICDAS ÇELIK ENERJI TERSANE VE ULASIM SANAYI, A.Ş., | |
| Plaintiff-Intervenor, | **Court No. 23-cv-00131** |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| and | |
| REBAR TRADE ACTION COALITION, | |
| Defendant-Intervenor. | |

**KAPTAN'S COMMENTS ON COMMERCE'S FINAL
REDETERMINATION ON REMAND**

David L. Simon, Esq.

LAW OFFICES OF DAVID L. SIMON, PLLC
1025 Connecticut Ave., N.W., Ste. 1000
Washington, D.C. 20036
Tel.:  (202) 481-9000
Email:  DLSimon@DLSimon.com

Date: February 20, 2025

*Counsel to Kaptan Demir Çelik Endüstrisi ve
Ticaret A.Ş.*

**Table of Contents**

INTRODUCTION ...................................................................................................2

ARGUMENT.........................................................................................................3

   I.   The Court Should Sustain Commerce's Redetermination As To The BITT
      Exemption.................................................................................................3

   II.  The Court Should Remand Commerce's Redetermination As To The Land
      LTAR Benefit............................................................................................3

     A.  Background................................................................................................3

     B.  Commerce's Rejection Of The C&W Report Remains Unlawful ...............6

     C.  Commerce's Selection Of The Çerkezköy Benchmark Was
        Unsupported By Substantial Evidence And Unlawful...........................13

        1.  Commerce's stated basis for selecting the Çerkezköy benchmark
           is a total fabrication without evidentiary support................................13

        2.  Commerce's refusal to acknowledge the likelihood that the
           Çerkezköy properties are in an OIZ, and are therefore precluded
           from serving as benchmarks, is the result of Commerce's
           application of an erroneous evidentiary standard ..............................15

        3.  Commerce errs in claiming that the Colliers report contains actual
           prices from the private market ............................................................19

        4.  Commerce's novel rule that the respondent must demonstrate that
           different rent rates between provinces are proportional to
           differences in economic indicators sets an unlawful standard and
           exceeds the scope of the remand instructions ...................................20

        5.  The magnitude of the difference between C&W's Trabzon rental
           rates and Colliers' Çerkezköy rates constitutes a substantial
           deviation that invalidates the Çerkezköy benchmark .........................23

        6.  Commerce's novel "contemporaneity" test is an unsupported
           change in practice and exceeds the scope of the remand order...........24

     CONCLUSION ...................................................................................................27

i

## TABLE OF AUTHORITIES

**Cases**

*Arcelormittal Stainless Belg. N.V. v. United States*, 35 C.I.T. 796 (2011)...................................26

*Arcelormittal Stainless Belg. N.V. v. United States*, 694 F.3d 82 (Fed. Cir. 2012).......................26

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 83 S. Ct. 239, 9 L. Ed. 2d 207 (1962) ........................................................................................................22

*Estate of Mitchell v. Commissioner*, No. 17351-09, 2011 Tax Ct. Memo LEXIS 93  (T.C. Apr. 28, 2011) ..............................................................................................23

*Foshan Shunde Yongjian Housewares & Hardwares Co. v. United States*, 896 F. Supp. 2d 1313 (Ct. Int'l Trade 2013)..........................................................................19

*Gerald Metals, Inc. v. United States*, 132 F.3d 716  (Fed. Cir. 1997)...........................................19

*Huvis Corp. v. United States*, 525 F. Supp. 2d 1370 (Ct. Int'l Trade 2007).................................26

*Kaptan Demir Çelik Endüstrisi ve Ticaret A.S. v. United States*, Slip Op. 24-116 (Ct. Int'l Trade October 21, 2024) .....................................................................passim

*Mittal Steel Galati S.A. v. United States*, 31 C.I.T. 1121, 502 F. Supp. 2d 1295 (2007) .......................................................................................................................6, 23

*Nan Ya Plastics Corp. v. United States*, 906 F. Supp. 2d 1348  (Ct. Int'l Trade 2013)...........................................................................................................................22

*NEC Home Elecs. v. United States*, 54 F.3d 736 (Fed. Cir. 1995)................................................22

*NTN Bearing Corp. of Am. v. United States*, 104 F. Supp. 2d 110 (Ct. Int'l Trade 2000)............................................................................................................................22

*Özdemir Boru San. ve Tic. Ltd. Sti. v. United States*, 273 F. Supp. 3d 1225 (Ct. Int'l Trade 2017)...........................................................................................21, 23

*Özdemir Boru San. ve Tic. Ltd. Sti. v. United States*, 282 F. Supp. 3d 1352 (Ct. Int'l Trade 2018)........................................................................................................21

*Pakfood Pub. Co. Ltd. v. United States*, 753 F. Supp. 2d 1334 (Ct. Int'l Trade 2011)............................................................................................................................26

*POSCO v. United Sta*tes, 296 F. Supp. 3d 1320 (Ct. Int'l Trade 2018) ........................................22

*Ranchers-Cattlemen Action Legal Found. v. United States*, 74 F. Supp. 2d 1353 (Ct. Int'l Trade 1999) ..............................................................................................26

*Sandt Tech. v. Resco Metal and Plastics Corp.*, 264 F. 3d 1344  (Fed. Cir. 2001).......................8

*Shandong Huarong Mach. Co. v. United States*, 29 C.I.T. 484  (2005).......................................14

*Toscelik Profil ve Sac Endustrisi A.S. v. United States*, 38 C.I.T. 1534 (2014) ...........................17

*Transactive Corp. v. United States*, 91 F. 3d 232, 319 U.S. App. D.C. 428 (D.C. Cir. 1996)..............................................................................................................19

*Vicentin S.A.I.C. v. United States,* 466 F. Supp. 3d 1227 (Ct. Int'l Trade 2020)..........................26

*Yama Ribbons & Bows Co. v. United States*, 865 F. Supp. 2d 1294 (Ct. Int'l Trade 2012)..........................................................................................................................14

**Statutes**

19 U.S.C. § 1677f(i)(3)(A) ...........................................................................................6

**Rules**

19 C.F.R. § 351.511(a)(2)(i) .......................................................................................19

**Administrative Determinations**

*Brass Rod From Israel: Final Affirmative Countervailing Duty Determination,* 89 Fed. Reg. 63,410 (Dep't Commerce Aug. 5, 2024) ...............................................17

*Circular Welded Carbon Steel Pipes and Tubes From Turkey: Final Results of Countervailing Duty Administrative Review; Calendar Year 2011,* 78 Fed. Reg. 64,916 (Dep't Commerce Oct. 30, 2013) .......................................................17

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the Socialist Republic of Vietnam: Preliminary Affirmative Countervailing Duty Determination,…,* 89 Fed. Reg. 80,866 (Dep't Commerce Oct. 4, 2024)..........7

*New Pneumatic Off-the-Road Tires from India: Preliminary Affirmative Countervailing Duty Determination, …,* 81 Fed. Reg. 39,903 (Dep't Commerce June 20, 2016) ...........................................................................................................7

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Preliminary Results of Countervailing Duty Administrative Review and Intent To Rescind in Part; 2018,* 56 Fed. Reg. 15,921 (Dep't Commerce March 25, 2021)..........................25

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Preliminary Results of Countervailing Duty Administrative Review and Intent To Rescind in Part; 2019,* 86 Fed. Reg.  69,009 (Dep't Commerce Dec. 6, 2021)..............................25

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| KAPTAN DEMIR ÇELIK ENDÜSTRISI VE TICARET A.Ş.,<br><br>                           Plaintiff,<br>and<br><br>ICDAS ÇELIK ENERJI TERSANE VE ULASIM SANAYI, A.Ş.,<br><br>                           Plaintiff-Intervenor,<br><br>                           v.<br><br>UNITED STATES,<br><br>                           Defendant,<br>and<br><br>REBAR TRADE ACTION COALITION,<br><br>Defendant-Intervenor. | Court No. 23-cv-00131 |

**<u>KAPTAN COMMENTS ON COMMERCE'S FINAL<br>REDETERMINATION ON REMAND</u>**

Plaintiff Kaptan Demir Çelik Endüstrisi ve Ticaret A.Ş. ("Kaptan") files these comments on the Commerce Department's Final Results Of Redetermination Pursuant To Court Remand, ECF-53 (the "Redetermination"). For the reasons set forth below, Kaptan respectfully requests that this Court (1) sustain Commerce's redetermination as to the non-countervailability of the exemption from the Banking Insurance and Transaction Tax ("BITT") and (2) declare unsupported by substantial evidence and unlawful Commerce's redetermination as to the appropriate benchmark for land for less than adequate remuneration ("LTAR") under Law 5084.

**INTRODUCTION**

In *Kaptan Demir Çelik Endüstrisi ve Ticaret A.S. v. United States,* Slip Op. 24-116 (Ct. Int'l Trade October 21, 2024), this Court remanded the proceeding to the Commerce Department ("Commerce") for reconsideration of (1) Commerce's original finding that the exemption from Turkey's BITT was *de jure* specific (*id*. at 11,14), with a further suggestion that Commerce consider also the issue of *de facto* specificity (*id*. at 17); and (2) Commerce's original decision to (a) reject the benchmark analysis submitted by Kaptan based on the C&W report and to (b) calculate the LTAR benefit as to the Nur land based on a report submitted by petitioners and prepared by international realtors Colliers International (the "Colliers report"). *Id*. at 18.

During the remand proceeding, Kaptan offered to resubmit the C&W report as a public document, RPR9,[1] and Commerce accepted Kaptan's proffer.  RPR10.  Kaptan thereupon submitted the C&W report as a public document. RPR21-24 .[2]

In its Draft Results of Redetermination ("Draft Results"), RPR15, Commerce preliminarily found (1) that the BITT exemption was not countervailable since it lacked *de jure* and *de facto* specificity (Draft Results at 11-12) and (2) that it was appropriate to reject the C&W report as a source for benchmark information since "it incorporates a 'risk of litigation-inspired fabrication or exaggeration'" (*id*. at 16), while "there is no information on the record that indicates that the Colliers report is not comparable to Kaptan Demir's Trabzon land purchases." *Id.* at 17.

---

[1] We refer to public documents in the remand proceeding as "RPR *n*" to distinguish them from the public record of the underlying proceeding.

[2] Kaptan originally resubmitted the C&W report as a public document on November 24, 2024, RPR11, but inadvertently submitted the C&W report from a different review. On January 14, 2025, Kaptan resubmitted the C&W report from the present (2020) review as a public document, RPR21-24 .

Kaptan filed comments in support of Commerce's position as to the BITT and in opposition to Commerce's position as to the land LTAR benefit. RPR16.

In its Final Remand Redetermination, RPR25, Commerce found (1) that the BITT exemption was not countervailable, because it was neither *de jure* nor *de facto* specific (*id*. at 12); and (2) that it had properly declined to consider the benchmark provided in the C&W report because the C&W report "incorporates a 'risk of litigation-inspired fabrication or exaggeration'" (*id*. at 17), while "there is no information on the record that indicates that the Colliers report is not comparable to Kaptan Demir's Trabzon land purchases." *Id*.

## ARGUMENT

### I.  The Court Should Sustain Commerce's Redetermination As To The BITT Exemption

In the Redetermination, Commerce found that "the BITT program does not constitute a countervailable subsidy." Redetermination at 12.

Kaptan does not disagree with this conclusion, and asks the Court to sustain it.

### II.  The Court Should Remand Commerce's Redetermination As To The Land LTAR Benefit

#### A.  Background

By way of background, the LTAR benefit under Law 5084 relates to certain land in the town of Sürmene, in Trabzon province, that Kaptan's affiliate Nur Gemicilik leased *gratis* for fifty years from a governmental authority in return for making certain improvements and employing a certain number of workers.  PR48/CR26-50, Kaptan IQR, at 25-26. Petitioners submitted the Colliers report as a proposed benchmark, PR122, and Kaptan submitted the C&W report as a proposed benchmark, RPR21-24.

The Colliers report contains a three-page section on rents in the "Greater Istanbul Area Industrial Market." PR122. Within the Istanbul industrial market, the report states, "we have examined *the industrial zones* within the province of Kocaeli (which includes the districts of Gebze and Dilovası), and the province of Tekirdağ (which includes the districts of Çerkezköy and Çorlu)." The Colliers report makes clear that it is not analyzing all industrial properties in Kocaeli and Tekirdağ but only those in "the industrial zones." *Id.*

Commerce took its benchmark from the following table in the Colliers report:

| | Districts | Rent (TL/m²/month) | | |
|---|---|---|---|---|
| | | Q2 2020 | Q4 2020 | Change |
| Istanbul Asia | 1 Dudullu | 26 | 30 | ↑ |
| | 2 Tuzla | 28 | 28 | ↔ |
| Istanbul Europe | 3 Silivri | 11 | 14 | ↑ |
| | 4 Esenyurt- | 28 | 36 | ↑ |
| Kocaeli | 5 Gebze | 22 | 28 | ↑ |
| | 6 Dilovası | 17 | 17 | ↑ |
| Tekirdağ | 7 Çerkezköy | 15 | 19 | ↑ |
| | 8 Çorlu | 13 | 15 | ↑ |

The C&W report, on the other hand, contains the following table of properties going into the rent estimation calculation, RPR21 Exh. 1 PDF-24:

| # | Type | Market Status | Zoning Statu | Province/ District | Neighborhood | Gross Rental Areas (sq.m) | Asking Monthly Rental Price (TL) | Asking Monthly Rental Price (USD) | Monthly Unite Rental Price (TL/sq.m) |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Land | Rental | Commercial | Trabzon/ Yorma | Namıkkemal | 2,545 | ₺20,000 | $1,360 | ₺7.86 |
| 2 | Land | Rental | Commercial | Trabzon/ Arsin | Fatih | 1,566 | ₺10,000 | $680 | ₺6.39 |
| 3 | Land | Rental | Land | Trabzon/ Araklı | Yiğitozu | 1,500 | ₺7,000 | $476 | ₺4.67 |
| 4 | Land | Rental | Private Use | Trabzon/ Ortahisar | Konaklar | 1,000 | ₺6,000 | $408 | ₺6.00 |
| 5 | Land | Rental | Industry | Trabzon/ Ortahisar | 2 Nolu Bostancı | 1,176 | ₺12,500 | $850 | ₺10.63 |
| 6 | Land | Rental | Private Use | Trabzon/ Akcaabat | Orta | 12,000 | ₺100,000 | $6,800 | ₺8.33 |
| 7 | Land | Rental | Land | Trabzon/ Akcaabat | Yaylacık | 1,919 | ₺6,000 | $408 | ₺3.13 |
| 8 | Land | Rental | Private Use | Trabzon/ Akcaabat | Yaylacık | 780 | ₺3,000 | $204 | ₺3.85 |
| 9 | Land | Rental | Tourism | Trabzon/ Akcaabat | Yıldızlı | 13,000 | ₺29,000 | $1,972 | ₺2.23 |
| 10 | Land | Rental | Land | Trabzon/ Akcaabat | Derecik | 2,147 | ₺5,500 | $374 | ₺2.56 |
| 11 | Land | Rental | Commercial | Trabzon/ Ortahisar | Gurbulak | 900 | ₺1,500 | $102 | ₺1.67 |
| 12 | Land | Rental | Land | Trabzon/ Ortahisar | Yalıncık | 610 | ₺5,833 | $397 | ₺9.56 |
| 13 | Land | Rental | Field | Trabzon/ Yorma | Kasustu | 1,250 | ₺4,167 | $283 | ₺3.33 |
| | | | | | | | | Average | ₺5.40 |

Comparable List of Rental Land in Trabzon (2022)

The C&W report was prepared in 2022, so C&W applied an inflation adjustment to give the average for 2020, *id*. PDF-25:

The average monthly unit rental value of land in Trabzon is 5.40 TL. In order to find the equivalent price for 2020, we made a calculation using annual inflation rate (connected with consumer price index) of 2020 and 2021. The inflation rate for 2020 is %14.60 and for 2021 is %36.08. Estimated average unite price for land rent in Trabzon 3.46 TL. This is equal to 0.49 USD based on 2020 exchange rate average.

| Land Rent Comparable in Trabzon | TL | USD |
|---|---|---|
| 2022 Average Unit Price for Land Rent in Trabzon | ₺5.40 | $0.37 |
| 2020 Estimated Average Unit Price for Land Rent in Trabzon | ₺3.46 | $0.49 |

In its Redetermination, Commerce reaffirmed its original decision that the appropriate benchmark was the Colliers report rent rates for Çerkezköy, averaged for the period of review. PR14, IDM at comment 1. The calculation is in Commerce's calculations Excel file, CR123, which contains the following public information:

| Source: Petitioner's October 31, 2022 Benchmark Submission at Ex. 1: Colliers International, *Turkey Real Estate Market Review* (Turkish Lira per Square Meter Per Month) Benchmark:Turkish Lira Per Square Meter Rental Price | | |
|---|---|---|
| Quarter of 2020 | Q2 | Q4 |
| Çerkezköy | ₺15.00 | ₺19.00 |
| Overall Averages | ₺15.00 | ₺19.00 |
| Average Q2 and Q4 | ₺17.00 | |

In Slip Op. 24-116, this Court articulated two issues on which it found that Commerce's approach was legally inadequate:

*First*, the Court found that "Commerce's explanation of its selection of the Colliers report is not in accordance with law." *Id*. at 18. This issue relates to Commerce's rationale for rejecting the C&W report *ab initio*, without considering the merits of its benchmark vis-à-vis the Colliers benchmark.

*Second*, the Court found that Commerce had failed to address Kaptan's argument that the Çerkezköy benchmark, from the Greater Istanbul Industrial Area, was aberrational as a benchmark for unimproved land in Trabzon province, far distant from, and far poorer than, the Istanbul area. The Court explained,

> When confronted with a colorable claim that the data that
> Commerce is considering is aberrational, Commerce must
> examine the data and provide a reasoned explanation as to why
> the data it chooses is reliable and non-distortive.

*Id.* at 21, quoting *Mittal Steel Galati S.A. v. United States*, 31 C.I.T. 1121, 1135, 502 F. Supp. 2d
1295, 1308 (2007). The Court went on to explain, Slip Op. 24-116 at 21:

> {I}n theory, at least, the estimated value of foregone rent for Nur's
> use of the Trabzon land could be inaccurately high if based on a
> nonrepresentative sample of higher-priced land rentals in a
> different area of Turkey. But rather than "provide an explanation
> of the basis for its determination that addresses relevant arguments,
> made by interested parties who are parties to the investigation or
> review," 19 U.S.C. § 1677f(i)(3)(A), Commerce resorted to a
> process of elimination in which it struck the C&W report and then
> selected the Colliers report by default.

Thus the Court faulted Commerce for its failure to address Kaptan's argument that the vast

differences between Trabzon province and the Greater Istanbul Industrial Area in terms of GDP,

annual export volume, and other economic measures render the benchmark from the Colliers

report "inaccurately high."

As we explain below, in the Redetermination, Commerce has "doubled down" on its

original errors and has failed to address the flaws pointed out by the Court.

## B. Commerce's Rejection Of The C&W Report Remains Unlawful

In the Redetermination, Commerce explained why it rejected the C&W report *ab initio*

(*id.* at 14): "contemporaneous original research from an independent, third-party source is a

*strict preference* in comparing benchmarks." Redetermination at 14 (emphasis added). A Lexis

search of Administrative Decisions by the International Trade Administration reveals that

Commerce has never before used the phrase "strict preference" in a CVD or antidumping

proceeding, and the precise contours of this novel formulation are uncertain. In any event,

nothing in this formulation precludes the use of the C&W report, which is clearly original

research, which is contemporaneous,[3] and which is from an independent, third-party source.[4]  By

Commerce's own formulation, the C&W report is therefore a viable candidate for benchmark

information.

Commerce goes on to tout its use of a Colliers report in a 2016 administrative review, as

support for continuing to use the Colliers report in the present case. Redetermination at 14.[5]  This

is irrelevant to the issue at hand, namely, whether Commerce may lawfully reject the C&W

report *ab initio*.[6]  Kaptan has never questioned Colliers' expertise; rather, Kaptan has focused on

the superiority of the C&W report to the Colliers report on substantive grounds – principally, the

fact that the Colliers properties are all in the Istanbul area, the economic profile of which is

thoroughly different from Trabzon's, coupled with the fact that the Çerkezköy properties, in

particular, appear to be in a Turkish Organized Industrial Zone ("OIZ") and that their rents are

therefore inadmissible as benchmarks since OIZs are government entities, as addressed below.

Commerce goes on to emphasize that "unlike the Colliers Report, Commerce has a

preference against selecting benchmarks like the C&W report, which was prepared for the

---

[3] While the report was written in 2022, when the review was underway, C&W deflated the 2022 benchmark to a 2020 level.

[4] No one suggests that Kaptan has any affiliation with Cushman & Wakefield.

[5] Commerce cites *New Pneumatic Off-the-Road Tires from India: Preliminary Affirmative Countervailing Duty Determination, ...,* 81 Fed. Reg. 39,903 (Dep't Commerce June 20, 2016) (*OTR Tires from India*), and accompanying PDM at 32.

[6] Commerce also ignores the argument in Kaptan's comments on the draft redetermination that there is a much more recent reliance *by petitioners* on a Cushman and Wakefield valuation report, which counterbalances any reliance Commerce may claim on the outdated *OTR* precedent. RPR16  at 12, citing *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the Socialist Republic of Vietnam: Preliminary Affirmative Countervailing Duty Determination,...,* 89 Fed. Reg. 80,866 (Dep't Commerce Oct. 4, 2024).

purposes of the proceeding, as Commerce strongly disfavors benchmarks that are created solely for the purpose of the proceeding," claiming that use of the C&W report "incorporates a 'risk of litigation-inspired fabrication or exaggeration.'" Redetermination at 16-17.  However, Commerce cites no record evidence that the C&W report was prepared *for purposes of this proceeding* or even that C&W had any knowledge of the CVD administrative review or what a CVD review might entail.  Nor does Commerce cite any evidence to support the speculation that the C&W report contains "litigation-inspired fabrication or exaggeration."[7]  In fact, the C&W report opens, in Section 1.1, with the statement that, "We, 'Cushman & Wakefield Gayrimenkul Danismanlan Mumessillik ve Turizm Hizmetleri A.S.' are pleased to submit our valuation report, *which has been prepared for internal purpose*."[8]  RPR21, Exh. 1 PDF-4 (emphasis added). C&W thus explicitly controverts Commerce's speculation that the report was prepared "solely for the purpose of the proceeding."

In the section of the Redetermination addressing Kaptan's comments on the draft redetermination, Commerce explains (Redetermination at 30):

> {A}lthough Commerce is concerned that documents prepared for
> the purposes of an AD or CVD proceeding may be tailored to
> reach specific results, Commerce does not dismiss such documents
> outright on that basis alone. Rather, Commerce considers
> additional factors in determining the weight to accord such

---

[7] These terms, "litigation-inspired fabrication or exaggeration," are taken from *Sandt Tech. v. Resco Metal and Plastics Corp.*, 264 F. 3d 1344, 1350-51 (Fed. Cir. 2001), in which the Court addressed the reliability of *oral testimony* from a person with a potential interest in the patentability of the supposed invention in question. In essence, the Court did not want to give credence to the testimony of, say, the engineer at the workbench neighboring on the inventor's bench who might have a personal or pecuniary interest in the patentability of the invention. Of course, there are no such issues present here, where a well-respected international real estate firm was asked to provide a written valuation a lease of a particular piece of property. Fundamental differences between patent litigation and CVD or dumping cases should dissuade Commerce and the Court from presuming that characterizations of evidence in patent cases carry over to trade cases.  They do not.

[8] The Turkish words mean "Real Estate Consultant Representation and Tourism Services."

> documents prepared for the purposes of a proceeding. Such factors
> may include whether the methodology underlying a particular
> study or report is clearly articulated, and whether the assertions in
> reports and studies are supported by citations to data, other third-
> party studies, or otherwise corroborated by additional record
> evidence.

Remarkably, Commerce does not apply any of these criteria to the Colliers report, whose methodology is *not* "clearly articulated"; whose assertions are *not* "supported by citations to data or other third-party studies," and whose assertions are *not* "otherwise corroborated by additional record evidence." Apparently, Commerce's searching analytic framework is only applicable to the respondent's benchmark, not to petitioners'.

Commerce asserts that (*id*. at 31):

> Despite Kaptan Demir's claims that C&W was an objective entity
> with no stake in the outcome, Kaptan Demir paid for the creation
> of the C&W report, which calls into question the objective and
> independent nature of the report.

Commerce's assertion is gross innuendo, and it overlooks the manifold indicia of independence and objectivity than run throughout the C&W report. In fact –

- The C&W Rent Estimation Study was prepared "in accordance with the RICS {Royal Institute of Chartered Surveyors} Valuation Standards, … ('the Red Book') by a valuer acting as an External Valuer, as defined within the RICS Red Book. We {*i.e.*, C&W} confirm that the valuer, in respect of his/her vocational training and professional activity, possesses special knowledge and many years of experience in the field of property valuation and possesses the knowledge that is needed specifically to prepare an 'as is' value assessment." RPR21, Exh. 1 at 5.

- The RICS Valuation Standards provide, *inter alia,* that a valuer "must meet and observe very high standards of *impartiality and objectivity*."  PR124, Exh. 3 at 15 (emphasis added).

- The International Valuation Standards ("IVS"), incorporated in the RICS standard,[9] define an external valuer as "an individual, group of individuals or a firm who possesses the necessary qualifications, ability and experience to execute a valuation in an *objective, unbiased and competent manner*." *Id.*, PDF-130 (emphasis added). The C&W report was prepared by persons with these qualifications.  RPR21, Exh. 1 at 5.

- The C&W report includes a detailed description of the Nur leasehold, including its location, its use as a shipyard, the specific improvements on the property, its access to transportation, and the term of the lease, as well as the economic characteristics of Trabzon province, where the property is located (per capita GDP, labor force participation rate, number of cars per 1000 people, etc.). *Id.*, Exh. 3 at 11-18.  All of these considerations informed the C&W experts' selection of properties "comparable" to the Nur property, from which the estimated fair-market rental value of the Nur property was determined by using internationally-recognized objective standards. *Id.* at 28.  In other words, the properties listed in the C&W report as "comparable" were selected with reference to the specific characteristics that they had in common with the Nur property by valuers who had the expertise and experience necessary to make such a selection objectively.

- The C&W report expressly states that, "The purpose of the valuation does not alter the approach to the valuation." *Id.*, Exh. 1 at 8.

---

[9] The IVS are adopted by reference into the RICS Valuation Standards. *See*, *id*. at PDF-122.

Commerce makes no mention of any of these assurances of objectivity in the C&W report, dismissing it merely as paid-for.

Commerce goes on with a scurrilous, unsupported allegation (Redetermination at 31-32):

> {W}hile the stated purpose of the C&W report is "internal purposes," record information suggests that the intended purpose is to provide ongoing benchmark information for this proceeding. This raises concerns for Commerce about the nature of Kaptan Demir's agreements with C&W and the nature and purpose of the benchmark commission itself.

Commerce fails to back up its assertion of "record evidence" that the report was prepared for purposes of this litigation with a single cite to any such evidence, and from this utterly unsupported calumny goes on to fabricate from whole cloth the agency's "concerns … about the nature of Kaptan Demir's agreements with C&W and the nature and purpose of the benchmark commission itself." Indeed, Commerce attempts to cast the C&W report in a nefarious light by labeling it the "benchmark commission," when it was really no more than a valuation report. Commerce is so thoroughly committed to debunking the C&W report that it resorts to citation of facts that do not exist in support of its goal. Commerce goes on (*id*.):

> {W}e do not have visibility into the process of the C&W report creation, and we continue to be concerned about the potential lack of objectivity and neutrality concerning this benchmark information due to the benchmark being commissioned by Kaptan Demir specifically for the purposes of this proceeding.

Here, again, Commerce fabricates from whole cloth its narrative that Kaptan and C&W somehow colluded in preparation of a false study. There is absolutely no evidence supporting Commerce's insinuation.

The actual fact is that Commerce *does* have "visibility" into the "process of creation" of the C&W report.  C&W's valuation experts, with full knowledge of the characteristics of the Nur

parcel, ascertained what lands available for lease in Trabzon were most nearly comparable to the Nur property, as explained above, and listed them individually, one-by-one.

Commerce pays lip service to Kaptan's claims that the C&W report was "prepared pursuant to clear valuation standards" (*id*.) but asserts that "these factors, even if supported by the facts on the record, do not fully address or resolve the above concern (*i.e.*, that the C&W report was commissioned for the purpose of this proceeding)." *Id*. Thus, no amount of objectivity or expertise can overcome Commerce's supposition – entirely unsupported by any facts of record – that the C&W report is tainted by the mere fact that it was commissioned by Kaptan, even if for "internal purposes." In short, Commerce's is irretrievably wedded to the higher benchmark of the petitioners' benchmark over the lower benchmark of Kaptan's benchmark.

The pretextual nature of Commerce's decision-making is also evident in the agency's comparison of the two reports. While complaining that it has no "visibility" into C&W's "process of creation," Commerce praises the Colliers report, stating (*id*. at 32):

> The Colliers report was prepared by a well-known independent party (*i.e.,* Colliers International) using Colliers data and there is no indication that this data does not represent fair market prices.

So, if Colliers is a well-known independent party, what is Cushman and Wakefield? And if there is "no indication" that the Colliers data "does not represent fair market prices," what evidence is there that the C&W report does not represent fair market prices? And if the C&W report is faulted for its alleged failure to provide "visibility" into the "process of creation," what are we to say of the Colliers report, which simply provides a single figure for the Çerkezköy rentals, with no showing of the underlying data and not even a statement of the number of individual leases examined. Thus, Commerce accepts the Colliers report simply because Colliers is "well-

known," while applying an entirely different standard to the report of Cushman and Wakefield, an equally well-known real estate company.

In short, while Commerce claims that it "has not dismissed any benchmark submissions outright but has fully examined and weighed all available information in making its determinations in these final results," *id*., the facts do not match the rhetoric.

### C. Commerce's Selection Of The Çerkezköy Benchmark Was Unsupported By Substantial Evidence And Unlawful

#### 1. Commerce's stated basis for selecting the Çerkezköy benchmark is a total fabrication without evidentiary support

In the Redetermination, Commerce explains that it selected the Colliers figure for Çerkezköy –

> because the petitioner placed population density information on the record showing that the area in Surmene, Trabzon, where the land in question is located, is most similar in population density to Cerkezkoy, Tekirdag.

Redetermination at 6, citing Preliminary Results PDM at 13 (PR131). In the PDM, Commerce says:

> The petitioner placed population density information on the record showing that the area in Surmene, Trabzon, where the land in question is located, is most similar in population density to Cerkezkoy, Tekirdağ.

*Id*. at 13, citing Petitioner's Benchmark Rebuttal at Exhibit 3. However, when we examine Petitioner's Benchmark Rebuttal at Exhibit 3, PR123, we find that *there is no information whatsoever concerning the population density* of Sürmene, Trabzon, Çerkezköy, or anywhere else. The referenced exhibit has a table showing the population of the five largest and five smallest provinces in Turkey, none of which are either Çerkezköy or Trabzon; the population

13

"pyramid" by age cohort; the median age of the population; the proportion of population in the working-age group; a descriptive paragraph stating the population density of Turkey overall, and of Istanbul, Konya, and Izmir – none of which are Çerkezköy or Trabzon; and the population and population growth rate of all provinces and district centers, which has nothing to do with population density. There is not a single table showing population densities for Trabzon, Çerkezköy, Istanbul, or anywhere else.

In short, Commerce cites to a putative statistic which *nowhere appears on the record of this review* as the source for its selection of the Çerkezköy benchmark. Maybe Commerce copied-and-pasted this reference from some other Kaptan review in some other period, or from some other proceeding; maybe they simply made it up. In any event, the *sole datum supposedly supporting the selection of the benchmark is absolutely missing from the record in this review*.

Even if Commerce took its predicate from a prior review, population density is an issue of fact which much be proven on the record of each review. *Yama Ribbons & Bows Co. v. United States*, 865 F. Supp. 2d 1294, 1298 (Ct. Int'l Trade 2012) ("Commerce must base its decisions on the record before it in each individual investigation."); *Shandong Huarong Mach. Co. v. United States*, 29 C.I.T. 484, 491 (2005) ("{E}ach administrative review is a separate segment of proceedings with its own unique facts."). Here, petitioners failed to put this important statistic on the record, and its absence cannot be made up by copying the text of some earlier review.

The use of a *nonexistent statistic* as the basis for the most critical benchmarking decision casts strong doubt on the reliability of Commerce's approach to this entire benchmarking exercise. The agency complains about the lack of "visibility" into C&W's "process of creation," but has the temerity to predicate its entire benchmark selection on a nonexistent statistic.

14

2. **Commerce's refusal to acknowledge the likelihood that the Çerkezköy properties are in an OIZ, and are therefore precluded from serving as benchmarks, is the result of Commerce's application of an erroneous evidentiary standard**

Furthermore, as Kaptan has argued, there is strong evidence that the Çerkezköy datum in the Colliers report represents the rental rate for property in an Organized Industrial Zone (OIZ). OIZs are government entities and, as such, cannot be used as CVD LTAR benchmarks.

The Colliers report provides rent values for eight different sub-regions within four regions constituting the Greater Istanbul Industrial Area. PR122. The report explains, *id*. at 9 (emphasis added):

> Our industrial market research is conducted on the basis of 8 subregions in Istanbul and its vicinity. The regions under examination are Dudullu and Tuzla on the Asian side of the city, and Esenyurt-Kiraç and Silivri on the European side. In addition, we have examined *the industrial zones* within the province of Kocaeli (which includes the districts of Gebze and Dilovası), and the province of Tekirdağ (which includes the districts of Çerkezköy and Çorlu).

The four regions in the Colliers report are Istanbul-Asia, Istanbul-Europe, Kocaeli, and Tekirdağ. *Id*. at 10. The Istanbul-Asia region (*i.e.,* Dudullu and Tuzla) and the Istanbul-Europe region (*i.e.,* Esenyurt-Kıraç and Silivri) are all within or immediately adjacent to Istanbul. *Id*. at 9 (map). The Colliers report tabulates rents for these regions without regard to their typology, and considering only their proximity to Istanbul. Colliers considers the properties in Kocaeli (*i.e.,* Gebze and Dilovası) and in Tekirdağ (*i.e.,* Çerkezköy and Çorlu) in a more nuanced way; the properties in these subregions are all "analyzed as *industrial zones*." *Id*. at 9.

Here is the table from the Colliers report, *id*. at 11:

| | | Q2 2020 | Q4 2020 |
|---|---|---|---|
| ISTANBUL ASIA | DUDULLU | 26 | 30 |
| | TUZLA | 28 | 28 |
| ISTANBUL EUROPE | SILIVRI | 11 | 14 |
| | ESENYURT-KIRAÇ | 28 | 36 |
| KOCAELI | GEBZE | 22 | 28 |
| | DILOVASI | 17 | 17 |
| TEKIRDAĞ | ÇERKEZKÖY | 19 | 19 |
| | ÇORLU | 13 | 15 |

When Colliers uses a term of art specific to the Turkish real estate sector, it must be presumed to do so knowingly. "Organized Industrial Zone" is this type of well-known term of art.  In fact, Petitioners, themselves, provided comprehensive documentation showing the pervasiveness of OIZs across the Turkish economy, dating back to the Turkish government's drafting of the OIZ statute in the 1960s, and emphasizing that OIZs have become "investor-friendly venues for foreign investors and local actors whereby can benefit from a pre-installed infrastructure and public structures, *i.e.* water source, power plants, IT network and natural gas." PR123,  Petitioners' Benchmark Rebuttal, Exh. 4.  Furthermore, the Çerkezköy OIZ, in particular, is "one of the largest and most established industrial zone{s} in Turkey with its approximately 1,273 hectares of land within two municipal boundaries."  *Id*. Exh. 2, PDF-4. The Çerkezköy OIZ hosts "a total of 355 industrial parcels within the region and 306 industrial establishments are in production, construction and project stages," with an employment of 77,000 persons and "full and ready" infrastructure. *Id*. Moreover, the Çerkezköy OIZ is an "industrial/transportation hub just outside Istanbul and is the staging area for imports from the rest of Europe into Turkey." *Id*.  It is clearly this OIZ that Colliers has in mind when it limits its analysis to properties in "industrial zones" in Çerkezköy.

OIZs are governmental bodies under CVD law[10]; *see, Tosçelik Profil ve Sac Endüstrisi A.S. v. United States*, 38 C.I.T. 1534 (2014). They are created by Turkish statute,[11] and companies operating in OIZs benefit from numerous subsidies,[12] which affect lease values. Leases from OIZs cannot be used as benchmarks in a land LTAR analysis, because a government lease cannot be a benchmark for another government lease. *Circular Welded Carbon Steel Pipes and Tubes From Turkey: Final Results of Countervailing Duty Administrative Review; Calendar Year 2011,* 78 Fed. Reg. 64,916 (Dep't Commerce Oct. 30, 2013)*; see also*, *Brass Rod From Israel: Final Affirmative Countervailing Duty Determination,* 89 Fed. Reg. 63,410 (Dep't Commerce Aug. 5, 2024), ID memo at comment 3.

Kaptan argued this point in its comments on the draft redetermination, RPR16 at 14-23.

In the Redetermination, Commerce rejected the notion that there was reason to believe that the Çerkezköy property was in an OIZ, PR25 at 33-34. Commerce explains (*id*. at 33):

> {I}f the Colliers report intended to refer to OIZs specifically, Colliers International could have referred to them as Organized Industrial Zones, OIZs, government-granted industrial zones, or noted that it referred to those established under Law 4563 or Law 5084. The Colliers report makes no such reference.

Commerce goes on to explain (*id*. at 33-4, footnote omitted):

> Kaptan Demir provides no evidence to demonstrate that "the industrial zones" indicates the government, in contrast to simply "industrial zones," which would indicate no government involvement. Rather, "the industrial zones" could signify an alternative to non-industrial commercial or retail real estate as covered elsewhere in the Colliers report. That the Colliers report only examined industrial zones in Kocaeli and Tekirdağ while examining the industrial market more broadly in Istanbul could

---

[10] *CWP 2011, supra.*

[11] Petitioners' Benchmark Rebuttal, Exh. 4, citing Law No. 4,563.

[12] *See*, *Özdemir I, supra; Tosçelik Profil ve Sac Endüstrisi A.S. v. United States*, 38 C.I.T. 1534 (2014).

> indicate that Colliers International's review of Istanbul was simply
> more extensive (e.g., Colliers International examined industrial
> properties in a variety of neighborhoods – industrial, commercial,
> retail – in Istanbul and solely focused on industrial zones in
> Kocaeli and Tekirdağ).  There is simply no evidence for Kaptan
> Demir's claims that the report only examines OIZs, and, thus, this
> claim consists of nothing more than mere speculation.

The agency's basic argument is that, absent an explicit reference to "Organized Industrial Zones," there is no reason to believe that reporting of leases for "industrial zones" in Kocaeli and Tekirdağ provinces (which include Çerkezköy) might reasonably be construed to cover OIZs. Thus, in spite of the overwhelming evidence concerning the size and importance of the Çerkezköy OIZ, with its 355 industrial parcels and over 77,000 workers, Commerce closes its eyes to the likelihood that "industrial zones" in the Colliers report is simply a shorthand for "Organized Industrial Zones."

Commerce's inconsistency is revealing.  With no evidence, Commerce infers that the C&W report lacks objectivity and independence, while with the indisputable evidence that the Çerkezköy properties are in "industrial zones," Commerce refuses to infer that these industrial zones might be the selfsame OIZs that are the backbone of Çerkezköy's economy. Commerce engages in rank speculation regarding the reliability of the C&W report, then requires strict proof of any argument that impugns the reliability of the Colliers report.

In the final IDM in the underlying review, PR152  at 10, Commerce gave, as a reason to reject the C&W report, that –

> {I}t appears from information contained in the benchmark
> methodology of Kaptan's benchmark that prices in the study may
> have been partially based on prices provided by non-private
> entities.

Commerce no longer takes this position, as it does not appear anywhere in the remand

proceeding.  But what is important is Commerce's articulation of its evidentiary standard – that the C&W report "*may have been* partially based" on public leases.

If Commerce applied this same standard of proof to the OIZ issue, it would have to consider whether the Çerkezköy properties "*may have been partially*" comprised of OIZ properties.  Given the "industrial zone" terminology of the Colliers report, Kaptan does not believe it can reasonably be denied that the Çerkezköy properties "may have been partially" OIZ properties.  If Commerce applies one evidentiary standard to the respondent's benchmark, it must apply the same standard to the petitioners' benchmark.  "An 'agency action is arbitrary when the agency offers{s} insufficient reasons for treating  similar situations differently.'" *Foshan Shunde Yongjian Housewares & Hardwares Co. v. United States*, 896 F. Supp. 2d 1313, 1325 (Ct. Int'l Trade 2013) (*quoting  Transactive Corp. v. United States*, 91 F. 3d 232, 237, 319 U.S. App. D.C. 428 (D.C. Cir. 1996). The substantial evidence standard requires more than mere assertion of 'evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (citation omitted).

In sum, Commerce's rejection of the likelihood that the Çerkezköy properties were in OIZs, in whole or in part, is unsupported by substantial evidence and contrary to law.

### 3.  Commerce errs in claiming that the Colliers report contains actual prices from the private market

Commerce asserts that the Colliers report –

> meets the standard of 19 CFR 351.511(a)(2)(i) because it does contain actual prices from the private market in Türkiye based upon Colliers International's market research."

Redetermination at 18.

This is palpably untrue.  The Colliers report does not contain or disclose a single "actual price"; rather, it provides a table that purports to reflect *average* unit rental rates in the geographic areas under its consideration. The Colliers report does not show a single actual transaction, nor does it even claim to provide specific transaction values.  We have provided, at page 4 of this brief, the actual table of rental rates from the Colliers report; these have no reference to actual parcels.

The C&W report, by contrast, lists each of the properties that enter into the C&W rent estimation; see the C&W table reproduced at page 4 of this brief.

Kaptan does not disagree that a report containing actual listings is superior to a report that contains summary figures without any underlying data.  Clearly, though, it is the C&W report, not the Colliers report, that satisfies this criterion.

4. **Commerce's novel rule that the respondent must demonstrate that different rent rates between provinces are proportional to differences in economic indicators sets an unlawful standard and exceeds the scope of the remand instructions**

Commerce also advances the argument that the 1200-km distance between Trabzon and Çerkezköy and the economic differences between Trabzon and Çerkezköy have no demonstrable impact on the comparability of the C&W Trabzon properties versus the Çerkezköy properties:

> {W}hile Kaptan Demir raises concerns regarding a variety of such factors, including distance from Sürmene, GDP, value of foreign trade, and the stage of development of the land, there is no record evidence demonstrating that these differences between the C&W report and the Colliers report have a specific effect, such as data showing a consistent increase in land values in more distant provinces, provinces with higher GDPs, provinces with high trade levels, or in areas with more developed land.  Unless such factors are adequately substantiated, Commerce cannot determine their relevance, and Kaptan Demir has not demonstrated their

> proportional effect; it just supplied data indicating that there are
> internal differences in the Turkish economy.

Redetermination at 35-36 (footnotes omitted).

     In a similar vein, Commerce applies the same approach to the Colliers report

(Redetermination at 16):

> The Colliers report does not contain an explanation of how other
> provinces are affected by the Istanbul market, or, relatedly, a
> quantification of how various factors, such as gross domestic
> product (GDP), distance from the center of Istanbul, or level of
> development of the property, affect rental rates.

     In short, Commerce now asserts that, not only must the respondent show that there are

economic and geographic differences between the proposed benchmark and the property in

question, but it must also show that the value of real estate changes proportionally to such

differences. This is an entirely new test, and one that has never been applied in the precedents;

*see*, *Özdemir Boru San. ve Tic. Ltd. Sti. v. United States*, 273 F. Supp. 3d 1225, 1250-53 (Ct.

Int'l Trade 2017) ("*Ozdemir I*"), where the Court ruled, and Commerce agreed, that land

benchmarks in Istanbul and the Istanbul area are inappropriate as benchmarks for land located in

less-developed areas in Turkey because Istanbul-area benchmarks "deviate substantially from the

other prices"; *see also*, *Özdemir Boru San. ve Tic. Ltd. Sti. v. United States*, 282 F. Supp. 3d

1352 (Ct. Int'l Trade 2018) ("*Özdemir II*"), noting Commerce's agreement that prices in Istanbul

and Istanbul area "deviate substantially from the other prices in the dataset," skewed the

benchmark, and should be removed from the benchmark calculation.  Indeed, this Court, in Slip

Op. 24-116, at 21, noted, "{I}n theory, at least, the estimated value of foregone rent for Nur's

use of the Trabzon land could be inaccurately high if based on a nonrepresentative sample of

higher-priced land rentals in a different area of Turkey."  Clearly, Commerce's novel test runs

against the most basic common sense, and has never before been suggested, much less adopted, in LTAR valuation practice.

Commerce's new requirement that the respondent prove the proportional linkage between macroeconomic differences and real estate rental rates is impermissible *post hoc* reasoning. "The court may not accept 'post hoc rationalizations for agency action' and may only sustain the agency's *decision 'on the same basis articulated in the order by the agency itself.'" POSCO* v. *United Sta*tes, 296 F. Supp. 3d 1320, 1360 n.58 (Ct. Int'l Trade 2018), citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69, 83 S. Ct. 239, 9 L. Ed. 2d 207 (1962); *Nan Ya Plastics Corp. v. United States*, 906 F. Supp. 2d 1348, 1354 (Ct. Int'l Trade 2013). Moreover, this requirement places an unreasonable, and therefore unlawful, burden on respondents. *See*, *NEC Home Elecs. v. United States*, 54 F.3d 736, 745 (Fed. Cir. 1995) (holding that burden imposed to prove a LOT adjustment was unreasonable because claimant could, under no practical circumstances, meet the burden); *see also*, *NTN Bearing Corp. of Am. v. United States*, 104 F. Supp. 2d 110, 120 (Ct. Int'l Trade 2000) (Commerce may not "impose impossible burdens of proof on claimants"). The difficulty of finding location-specific rent valuations in the present case shows how impossible it would be to prove that rent valuations throughout Turkey follow local differences in per-capita GDP or any other economic statistic. The data are simply not available, and the test thus imposes an impossible burden of proof on both respondents and petitioners.

Furthermore, if this new requirement is applied retroactively to the present review, then the selection of benchmark must be made without consideration of the economic differences between Trabzon and Çerkezköy. In this case, the fundamental difference between the competing benchmarks is simply proximity. The fundamental truism of real estate valuation is that location

is everything: "Location, location, location is paramount in real estate valuation."  *Estate of*

*Mitchell v. Commissioner*, No. 17351-09, 2011 Tax Ct. Memo LEXIS 93, at 31 (T.C. Apr. 28,

2011). Against this standard, it is indisputable that the Trabzon properties in the C&W report are

closer to the Nur property (which is also in Trabzon province) than the Çerkezköy properties

1200 km away. Therefore, if Commerce declines to consider economic comparability, it has no

choice but to choose the C&W report, whose benchmarks are all in the same province as Nur's

property.

5.    **The magnitude of the difference between C&W's
Trabzon rental rates and Colliers' Çerkezköy rates
constitutes a substantial deviation that invalidates the
Çerkezköy benchmark**

Furthermore, the sheer magnitude of the difference between Colliers' Çerkezköy

benchmark, 17 TL/square meter, and the C&W's Trabzon benchmark, 3.46 TL/m$^2$ – a fivefold

difference, nearly 500 percent – is so great as to invalidate the Çerkezköy benchmark. As

Commerce agreed in *Özdemir I*, *supra*, a "substantial deviation" between prospective

benchmarks compels the removal of the deviant datum from the benchmark. Here, the fivefold

deviation is sufficient, in and of itself, to invalidate the Çerkezköy benchmark vis-à-vis the

Trabzon benchmarks in the C&W report. As this Court explained in Slip Op. 24-116, "'When

confronted with a colorable claim that the data that Commerce is considering is aberrational,

Commerce must examine the data and provide a reasoned explanation as to why the data it

chooses is reliable and non-distortive.' " *Id.* at 21, quoting *Mittal Steel Galati S.A. v. United

States*, 52 F. Supp. at 1308. Here, the sheer magnitude of the 500 percent difference between the

Çerkezköy benchmark and the Trabzon benchmark renders one or the other of these

"aberrational."  The C&W report transparently shows each of the individual Trabzon properties

that go into the 3.46 TL/m$^2$; these rates run from 1.67 to 10.63 TL/m$^2$ – a broad range, but with

not a single property anywhere close to the Colliers/Çerkezköy figure of 17 TL/m$^2$.  On the other hand, unlike the C&W report, the Colliers report does not disclose the individual properties within the Çerkezköy figure, providing no "visibility" into the "process of creation" of the underlying dataset.

Given this disparity, one or the other of these competing benchmarks is clearly aberrational.  Given the clustering of individual lease rates within the Trabzon properties in the C&W report, it is clearly the Çerkezköy figure that is aberrational.  Commerce therefore had an obligation to explain why the aberrational Çerkezköy figure was both reliable and non-distortive. It is impossible to determine the reliability of the Çerkezköy figure, since Colliers does not provide the underlying statistics, and Commerce has advanced no argument that the Çerkezköy figure is non-distortive.

### 6. Commerce's novel "contemporaneity" test is an unsupported change in practice and exceeds the scope of the remand order

Finally, Commerce makes a new argument concerning contemporaneity, asserting, for the first time in these *Rebar* reviews, that –

> We agree with Kaptan Demir that the appropriate time of receipt of the benefit is during the POR. However, the appropriate benchmark is the one that is the more contemporaneous to the time Kaptan Demir acquired the land-use rights because that benchmark reflects what Kaptan Demir would have paid on its long-term lease had it signed a comparable commercial lease instead of having received the subsidized land.

Redetermination at 35. Commerce raised this contemporaneity test for the first time in the

remand proceeding.[13]  Commerce notes that the original Nur lease began in 2014, while the

C&W report was prepared in 2022 and the Colliers report was done in 2020.  *Id*. at 18. Thus,

neither of the competing benchmarks is anywhere near contemporaneous with the original lease.

The Colliers benchmark is superficially nearer, but the C&W benchmark, which is indexed to

2020, employs the same inflation-indexing methodology that Commerce proposes to apply to a

literally contemporaneous benchmark.  Once again, Commerce's rejection of the C&W report,

based on this unlawful *post hoc* rationalization, is pretextual and cannot be sustained.

Commerce's novel argument may be the result of fundamentally imprecise thinking on

the agency's part, as the agency confuses Kaptan/Nur's *lease* with a purchase, stating

(Redetermination at 15),

> {I}n this instance, Commerce would ideally use the purchases of
> land by Kaptan Demir and its affiliates and, even within that
> context, Commerce might use only a specific portion of the
> purchased land transactions if record evidence indicated that the
> comparison with a limited subset of transactions would be more
> applicable.

Of course, the LTAR issue here relates to a lease rather than a purchase, so Commerce's

comments concerning "purchased land transactions" are irrelevant.

Throughout the rebar reviews, both petitioners and respondents, and, indeed, Commerce

itself, worked on the basis that the benefit of the *gratis* lease is calculated on the difference

between zero (the lease value) and the value of a benchmark contemporaneous with the period of

---

[13] *See,* the PDM in the instant case at 13 ("To compute the benefit, we computed the amount Nur should have paid for its rent-free land during the POR"). *See also*, *Steel Concrete Reinforcing Bar From the Republic of Turkey: Preliminary Results of Countervailing Duty Administrative Review and Intent To Rescind in Part; 2018*, 56 Fed. Reg. 15,921 (Dep't Commerce March 25, 2021), PDM at 13 (identical language); *Steel Concrete Reinforcing Bar From the Republic of Turkey: Preliminary Results of Countervailing Duty Administrative Review and Intent To Rescind in Part; 2019*, 86 Fed. Reg.  69,009 (Dep't Commerce Dec. 6, 2021), PDM at 13 (identical language).

review. The parties thus have a substantial reliance interest in this methodology, since both sides, petitioners and respondents, have provided LTAR benchmarks specifically for benefits received on a POR basis.  Now, Commerce is suggesting that the proper measure of the benefit is to find a benchmark lease in 2014 and then index that value each year to give a figure contemporaneous with the given period of review.  Redetermination at 34. This is the first time Commerce has suggested such an approach, after years of administrative reviews and appeals of this CVD order. Commerce has given no notice to the parties to adjust their benchmarking in accordance with this novel approach, nor has the agency given a reason for such a clear change in practice. "Where . . . Commerce adopts a practice that substantially deviates from precedent, it must at least acknowledge the change and show that there are good reasons for the new policy." *ArcelorMittal Stainless Belg. N.V. v. United States*, 35 C.I.T. 796, 811 (2011) (*citing Pakfood Pub. Co. Ltd. v. United States*, 753 F. Supp. 2d 1334, 1341-2 (Ct. Int'l Trade 2011)), *reversed on other grounds*, *ArcelorMittal Stainless Belg. N.V. v. United States*, 694 F.3d 82 (Fed. Cir. 2012); *Vicentin S.A.I.C. v. United States*,  466 F. Supp. 3d 1227, 1238 (Ct. Int'l Trade 2020); *Ranchers-Cattlemen Action Legal Found. v. United States*, 74 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 1999) ("An action . . . becomes an 'agency practice' when a uniform and established procedure exists that would lead a party, in the absence of notification of change, reasonably to expect adherence to the established practice or procedure.") (citations omitted); *Huvis Corp. v. United States,* 525 F. Supp. 2d 1370, 1378 (Ct. Int'l Trade 2007) (same) (citations omitted).

Moreover, Commerce's new approach exceeds the instructions of Slip Op. 24-116, stating[14]:

> The court accordingly remands this aspect of the Final
> 2020 Review for Commerce to fully address the arguments

---

[14] Slip Op. 24-116 at 24.

> presented by Kaptan regarding possible deficiencies in the Colliers
> report, and, if appropriate, to reconsider its selection of the Colliers
> report over the C&W report as a benchmark.

Nowhere did any party argue, nor did the Court suggest, that Commerce should alter its POR-based approach to the Nur land LTAR analysis.

## CONCLUSION

For the reasons stated above, Kaptan urges this Court to affirm Commerce's Redetermination with respect to the BITT exemption and to find unlawful Commerce's Redetermination with respect to the LTAR program relating to the Nur lease under Law 5084. Kaptan therefore asks the Court to remand the land LTAR issue to Commerce. In light of Commerce's manifest intransigence with regard to the selection of a benchmark – shown, *inter alia*, in Commerce's persistent application of inconsistent outcome-determinative evidentiary standards when considering the two competing benchmarks as well as Commerce's total fabrication of the rationale for selecting the Çerkezköy benchmark in particular – Kaptan asks that the Court remand with an explicit instruction that Commerce calculate the benchmark based on the data in the Cushman & Wakefield report.

Respectfully submitted,

/s/ *David L. Simon*

David L. Simon
LAW OFFICES OF DAVID L. SIMON, PLLC
1025 Connecticut Ave., N.W., Ste. 1000
Washington, D.C. 20036
Email: dlsimon@dlsimon.com

February 20, 2025

*Counsel to Kaptan Demir Çelik Endüstrisi ve Ticaret A.Ş.*

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This brief complies with the guidelines set forth in the Standard Chambers Procedures. This brief contains **7,612** words on numbered pages (that is, excluding only the Cover Page, the Table of Contents, and the Table of Authorities).

2. This brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 12-point font.


<u>/s/ David L. Simon</u>
David L. Simon

Date: February 20, 2025

*Counsel to Kaptan Demir Çelik Endüstrisi ve Ticaret A.Ş.*

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| KAPTAN DEMIR ÇELIK ENDÜSTRISI VE TICARET A.Ş.,<br><br>Plaintiff,<br><br>and<br><br>ICDAS ÇELIK ENERJI TERSANE VE ULASIM SANAYI, A.S.,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br>and<br><br>REBAR TRADE ACTION COALITION,<br><br>Defendant-Intervenor. | Court No. 23-cv-00131 |

## <u>ORDER</u>

Upon consideration of the Comments Of Kaptan Demir Çelik Endüstrisi Ve Ticaret A.Ş. on Commerce's Final redetermination on Remand, and all other papers and proceedings herein, and upon due deliberation, it is hereby

**ORDERED** that this case is remanded to Commerce for reconsideration of the LTAR benchmark for the Nur parcel consistently with the opinion accompanying this Order; and it is further

Kaptan Demir Çelik Endüstrisi Ve Ticaret A.Ş. v. United States
Court No. 23-cv-00131

      **ORDERED** that Commerce shall file its final results of redetermination on remand

within 60 days of the date of this order.

      **SO ORDERED**.

Dated: _____     _____
         New York, NY                               JUDGE