**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

---

**KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S.,**

<div align="center">Plaintiff,</div>

and

**ICDAS CELIK ENERJI TERSANE VE USLASIM SANAYI, A.S.,**

<div align="center">Plaintiff-Intervenor,</div>

v.

**UNITED STATES,**

<div align="center">Defendant,</div>

and

**REBAR TRADE ACTION COALITION,**

<div align="center">Defendant-Intervenor.</div>

---

Before: Hon. Gary S. Katzmann,
Judge

Court No. 23-00131

---

## DEFENDANT-INTERVENOR REBAR TRADE ACTION COALITION'S COMMENTS IN SUPPORT OF REMAND DETERMINATION

Alan H. Price, Esq.
John R. Shane, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.
Stephen A. Morrison, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for the Rebar Trade Action Coalition*

Dated: April 7, 2025

Ct. No. 23-00131

<h1 style="text-align:center"><u>TABLE OF CONTENTS</u></h1>

<div align="right">**Page**</div>

I.   INTRODUCTION ..................................................................................................1

II.  BACKGROUND ..................................................................................................1

III. COMMERCE'S DETERMINATION TO USE THE COLLIER REPORT
     AS THE LAND BENCHMARK IS SUPPORTED BY SUBSTANTIAL
     EVIDENCE...........................................................................................................5

     A.   Commerce Compared the Merits of the C&W Report and Colliers
          Report .......................................................................................................7

     B.   Kaptan's Argument Regarding Commerce's Basis For Selecting
          Data from Cerkezkoy Is Unexhausted and Meritless ..............................9

     C.   The Record Does Not Establish that the Colliers Report Contains
          Data from OIZs .......................................................................................10

     D.   Kaptan's Argument that the Colliers Report Does not Contain Actual
          Prices from the Private Market is Unexhausted and Incorrect .............11

     E.   Commerce's Determination That Kaptan Failed to Support Its Claim
          That There is a Correlation Between Economic Trends and Lease
          Rates is Supported by Substantial Evidence...........................................12

     F.   The Cerkezkoy Data Are Not Aberrational.............................................14

     G.   Commerce Reasonably Explained its Determination that the
          Colliers Report was More Contemporaneous than the C&W Report...................15

IV.  CONCLUSION...................................................................................................17

<div align="center">i</div>

Ct. No. 23-00131

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Boomerang Tube LLC v. United States*,
　856 F. 3d 908 (Fed. Cir. 2017)..................................................................9, 11, 14

*Canadian Solar Inc. v. United States*,
　537 F. Supp. 3d 1380 (Ct. Int'l Trade 2021) ...........................................................5

*Coal. for Fair Trade in Hardwood Plywood v. United States*,
　610 F. Supp. 3d 1344 (Ct. Int' Trade 2022)...........................................................15

*Dep't of Homeland Security v. Regents of the Univ. of California*,
　591 U.S. 1 (2020)...................................................................................................16

*Jinan Farmlady Trading Co. v. United States*,
　228 F. Supp. 3d 1351 (Ct. Int'l Trade 2017) ...................................................13, 15

*Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*,
　736 F. Supp. 3d 1318 (Ct. Int'l Trade 2024) .........................................................1

*Mosaic Co. v. United States*,
　647 F. Supp. 3d 1358 (Ct. Int'l Trade 2023) ...........................................................5

*Özdemir Boru San. ve Tic. Ltd. Sti. v. United States*,
　273 F. Supp. 3d 1225 (Ct. Int'l Trade 2017) ........................................................12

*Özdemir Boru San. ve Tic. Ltd. Sti. v. United States*,
　282 F. Supp. 3d 1352 (Ct. Int'l Trade 2018) ........................................................12

*Qingdao Sea-Line Trading Co. v. United States*,
　766 F.3d 1378 (Fed. Cir. 2014)........................................................................12, 15

*In re Section 301 Cases*,
　628 F. Supp. 3d 1235 (Ct. Int'l Trade 2023) ........................................................16

**Regulations**

19 C.F.R. § 351.511(a)(2)(i) .....................................................................................11

**Administrative Materials**

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules,*
　*From the People's Republic of China*, 81 Fed. Reg. 46,904 (Dep't Commerce
　July 19, 2016)........................................................................................................16

**Ct. No. 23-00131**

*Steel Concrete Reinforcing Bar From the Republic of Turkey*,
 88 Fed. Reg. 34,129 (Dep't Commerce May 26, 2023) ...................................................1, 2, 5

Ct. No. 23-00131

## I.    INTRODUCTION

On behalf of Defendant-Intervenor the Rebar Trade Action Coalition ("RTAC"), we respectfully submit the following comments in support of the final remand determination issued by the U.S. Department of Commerce ("Commerce") in this action. *See* Final Results of Redetermination Pursuant to Court Remand, *Kaptan Demir Celik Endustrisi ve Ticaret A.S., et al. v. United States*, Court No. 23-00131; Slip Op. 24-116 (CIT Oct. 21, 2024) (Jan. 21, 2025), ECF No. 53-1 ("Remand Results"). Commerce's Remand Results were filed in response to the court's order in *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 736 F. Supp. 3d 1318 (Ct. Int'l Trade 2024).

## II.    BACKGROUND

### A.    The Court's Remand

Plaintiff Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan") appealed Commerce's final determination in the 2020 administrative review of the countervailing duty order on Turkish steel concrete reinforcing bar ("rebar"). *See Steel Concrete Reinforcing Bar From the Republic of Turkey*, 88 Fed. Reg. 34,129 (Dep't Commerce May 26, 2023) (final results of countervailing duty admin. rev. and rescission, in part; 2020) ("*Final Results*"). Kaptan challenged, *inter alia*, Commerce's choice of the benchmark by which to value the Government of Turkey's ("GOT") provision of land for less than adequate remuneration ("LTAR") to Kaptan's affiliate Nur Gemicilik ve Ticaret A.S. ("Nur"). *See Kaptan*, 736 F. Supp. 3d at 1330-33. The Court remanded Commerce's determination to use RTAC's proffered benchmark source, a publicly available real estate report prepared by Colliers International ("Colliers Report"), with instructions to address Kaptan's claims that the data contained in the Colliers Report were aberrational. *See id*.

Ct. No. 23-00131

### B.     <u>The Remand Proceedings</u>

On remand, Commerce reaffirmed its use of the Colliers Report as the benchmark source. *See* Draft Results of Redetermination, *Kaptan Demir Celik Endustrisi ve Ticaret A.S., et al. v. United States*, Court No. 23-00131; Slip Op. 24-116 (CIT Oct. 21, 2024) (Dec. 16, 2024) at 12-19, P.R.R. 15 ("Draft Remand").[1] In doing so, Commerce compared the Colliers Report with Kaptan's proffered source of benchmark data, a study that Kaptan had commissioned from Cushman & Wakefield ("C&W Report"). Commerce explained that its preference was to use benchmarks that were (1) contemporaneous; (2) conducted by independent, third-party sources; and (3) not commissioned for the purposes of use in administrative proceedings or litigation. *Id*. at 13-17. Commerce explained that the Colliers Report was the superior benchmark with respect to these factors, as the data in the C&W Report was less contemporaneous than that of the Colliers Report, and the C&W report had been commissioned by Kaptan for use in the administrative proceeding, unlike the fully independent Colliers Report. *Id*. at 13, 16-18.

Addressing the court's holding that the agency had not adequately addressed Kaptan's concerns regarding the comparability of the properties/land covered by the Colliers Report with Nur's land, Commerce explained that record evidence did not indicate that the Colliers data was aberrational or otherwise unsuitable. *Id*. at 17-19. Commerce explained that, contrary to Kaptan's claims, nothing on the record demonstrated that "rent amounts in Turkey are strictly in line with the per capita GDP of cities," or that differences in the level of development of the land, levels of competition and market size, and physical distance from Istanbul made the properties in the

---

[1]     The administrative record associated with the *Final Results* is divided into a Public Record (P.R.), ECF No. 26-1 and a Confidential Record ("C.R."), ECF No. 26-2. The administrative record associated with the Remand Results is divided into a Public Remand Record ("P.R.R."), ECF No. 55-1, and a Confidential Remand Record ("C.R.R."), ECF No. 55-2.

Ct. No. 23-00131

Colliers Report unrepresentative of Nur's property. *Id.* at 17. Commerce also noted that in utilizing the Colliers Report, it calculated its benchmark using only the property values for the area with population density and GDP most similar to that of the area in which Nur's land was located. *Id.* at 19.

Kaptan filed comments opposing Commerce's continued use of the Colliers Report on three grounds. *See* Letter from Law Offices of David L. Simon, PLLC to Sec'y Commerce, re: *Steel Concrete Reinforcing Bar from Turkey; Kaptan comments on draft results of redetermination* (Dec. 27, 2024), C.R.R. 5, P.R.R. 16 ("Kaptan Cmts."). First, Kaptan argued that Commerce had not sufficiently explained its determination not to use the C&W Report. *Id.* at 8-13. Second, Kaptan alleged—for the first time in this proceeding—that the data in the Colliers Report included properties in "Organized Industrial Zones" ("OIZs"),[2] and were thus unusable because they reflected government lease rates. *Id.* at 14-18. Finally, Kaptan argued that the properties covered by the C&W Report were "more comparable" with Nur's land than those covered by the Colliers Report. *Id.* at 18. Specifically, Kaptan argued that (1) Trabzon, the city where Nur's land is located, lagged behind the Istanbul region in a number of economic indicators; (2) the C&W Report included properties specific to Trabzon; and (3) the Colliers Report provided "no transparency" regarding its methodology. *Id.* at 21-25.

In light of Kaptan's arguments, Commerce further explained its remand determination. Commerce noted that it had not "rejected" the C&W Report, but that, based on numerous factors, it determined that the Colliers Report was preferable as a source of benchmarking data. Remand

---

[2]    OIZs are areas established under Turkish law to attract investors by providing "pre-installed infrastructure and public structures." *See* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Steel Concrete Reinforcing Bar from the Republic of Turkey: Rebuttal Comments and Benchmark Information* (Nov. 10, 2022) at Attach. 4, C.R. 118, P.R. 123 ("RTAC Benchmark Rebuttal").

Ct. No. 23-00131

Results at 30-33. Commerce found that the C&W Report not only was commissioned for use in the administrative proceeding, but it also incorporated and/or was based on data that Kaptan supplied to C&W. *Id.* at 31-32. These facts reasonably called into question the objectivity and neutrality of the report's data. *Id.* Commerce also found that, even if one accepted at face value Kaptan's claim that the C&W Report's valuation standards were clearer than those in the Colliers Report, that would not "address or resolve" the agency's concern that the C&W Report was not objective or neutral. *Id.* at 32. Commerce disagreed that the Colliers Report was unreliable, noting that Colliers International is a "well-known independent party" and that nothing on the record indicated that the data did not represent fair market prices. *Id.* at 32-33.

Commerce also disagreed with Kaptan's speculative claim that the Colliers Report included properties in OIZs. Commerce explained that the claim was based on the report's use of the generic qualifier "the" in connection with the equally generic phrase "industrial zones." *Id.* at 33-34. Commerce reasonably interpreted the record as indicating that the phrase "the industrial zones" was merely meant to designate areas in which industrial properties, as opposed to commercial and retail properties covered elsewhere in the report, were located, and not to refer to specific types of government-granted property. *Id.* at 33. In this regard, Commerce noted that the Colliers Report made no reference to "Organized Industrial Zones, OIZs, government-granted industrial zones, or" other geographically-bounded areas established under particular Turkish industrial-promotion laws. *Id.*

Finally, Commerce addressed Kaptan's arguments that, because the properties covered by the Colliers Report were located in a geographically and developmentally distinct area of Turkey from that in which Nur's land was located, the Colliers Report data could not reasonably be used to benchmark the value of Nur's land. Commerce found that Kaptan had not pointed to any record

Ct. No. 23-00131

evidence demonstrating that these differences translated into specific or quantifiable effects, "such as data showing a consistent increase in land values in more distant provinces, provinces with higher GDPs, provinces with higher trade levels, or in areas with more developed land." *Id.* at 35. Commerce also disagreed with Kaptan's claim that the Colliers Report was less suitable because it did not disclose its valuation methodology, noting that the C&W Report did not clearly identify the specific data sources that it used or provide the underlying data. *Id*. at 35-36.

Accordingly, Commerce stated that it was again relying on the Colliers Report, and, as it had in the *Final Results*, was limiting its use of that data to industrial lease rates in the Cerkezkoy region. *See* Remand Results at 19-20, 36.

## III.   <u>COMMERCE'S DETERMINATION TO USE THE COLLIER REPORT AS THE LAND BENCHMARK IS SUPPORTED BY SUBSTANTIAL EVIDENCE</u>

Commerce's remand determination is supported by substantial evidence and otherwise in accordance with law. As instructed in the court's order, the agency fully addressed the concerns raised by Kaptan and provided a detailed, reasoned explanation as to why the Colliers Report provided preferrable benchmark data. In doing so, Commerce considered the alleged flaws in the Colliers Report and explained why it nonetheless found the Colliers Report to be reliable.

Commerce has broad discretion to weigh the relevant factors in selecting benchmarks. *See e.g.*, *Mosaic Co. v. United States*, 647 F. Supp. 3d 1358, 1365 (Ct. Int'l Trade 2023); *Canadian Solar Inc. v. United States*, 537 F. Supp. 3d 1380, 1391 (Ct. Int'l Trade 2021). Commerce did so here, weighing all the factors and arguments by the parties regarding the two benchmarks and concluded that the Colliers Report was more reliable than the C&W Report and that the record did not establish that the Colliers Report was unrepresentative of Nur's land.

In particular, Commerce explained that the Colliers Report was more reliable and contemporaneous than the C&W Report and that Kaptan's claims that the Colliers Report was

Ct. No. 23-00131

unreliable and distortive were unfounded. *See* Remand Results at 13-20, 30-36. Commerce is correct on all counts. Whereas the C&W Report was commissioned for use in the underlying administrative proceedings, the Colliers Report is a regularly published report by a well-known independent party, and there is no indication that the data provided does not reflect fair market prices. *Id*. at 32.

The Colliers Report is also more contemporaneous than the C&W Report—both with respect to the period of review and the year in which Kaptan obtained the land use rights at issue here. The rental rates contained in the Colliers Report are based on 2020 prices, contemporaneous with the 2020 period of review. *Id*. at 18. The C&W Report, on the other hand, is based on 2022 rental rates that had been adjusted to reflect currency devaluation. *Id*. at 18; *see also* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Steel Concrete Reinforcing Bar from the Republic of Turkey: Submission of Benchmark Information* (Oct. 31, 2022) at Exhibit 1, P.R. 22 ("RTAC Benchmark").

Nor are the data in the C&W Report more comparable to the land used by Kaptan than the data in the Colliers Report. Commerce found that there was no record evidence demonstrating that economic indicators highlighted by Kaptan established that the Colliers Report was not representative of the land at issue or that the C&W Report data was more representative than the Colliers Report. Remand Results at 17-19, 35-36. As Commerce explained, nothing on the record established that any of these economic factors "resulted in a measurable difference in comparability" and that, "{u}nless such factors are adequately substantiated, Commerce cannot determine their relevance." *Id*. at 35-36.

In sum, Commerce's determination to use the Colliers Report was supported by substantial evidence, as Commerce explained in detail why the Colliers Report was more reliable than the

Ct. No. 23-00131

C&W Report and addressed the arguments raised by Kaptan challenging this determination. As such, Commerce's remand determination should be affirmed as supported by substantial evidence and otherwise in accordance with law.

Kaptan raises seven arguments challenging Commerce's remand determination before the court. First, Kaptan argues that Commerce rejected the C&W Report *ab initio*. Kaptan's Cmts. on Commerce's Final Redetermination on Remand (Feb. 20, 2025) at 6-13, ECF No. 58 ("Kaptan's Br."). Second, Kaptan argues that Commerce's basis for selecting benchmark data from Cerkezkoy is "a total fabrication without evidentiary support." *Id*. at 13-14. Third, Kaptan argues that Commerce refused to acknowledge the likelihood that the Colliers Report data reflected government prices. *Id*. at 15-19. Fourth, Kaptan argues that Commerce erred in claiming that the Colliers Report reflects private market prices. *Id*. at 19-20. Fifth, Kaptan argues that Commerce created a novel "rule" that respondents must demonstrate that different rental rates between provinces are proportional to differences in economic indicators. *Id*. at 20-23. Sixth, Kaptan argues that the magnitude of difference between the benchmark rates derived from the C&W Report and the Colliers Report invalidates the Colliers Report. *Id*. at 23-24. Finally, Kaptan argues that Commerce's evaluation of the contemporaneity of the benchmark data is an unsupported change in practice and exceeds the scope of the remand order. *Id*. at 24-27. As discussed below, each of these arguments is unpersuasive and should be rejected.

A.  **Commerce Compared the Merits of the C&W Report and Colliers Report**

Kaptan argues that Commerce rejected the C&W Report "*ab initio*." Kaptan is wrong. The agency evaluated the C&W Report in comparison to the Colliers Report on a number of factors including (1) contemporaneity; (2) reliability based on the expertise of the firm preparing the report, the firm's evaluation standards, and whether the report was produced independently or for

Ct. No. 23-00131

use in the administrative proceeding; and (3) comparability to Nur's land. Remand Results at 19. Only after evaluating both the C&W Report and the Colliers Report across these factors did Commerce determine that the Colliers Report constituted the best available benchmark data. *Id*. at 19 ("Given the information available on the record, the Colliers Report represents the best available benchmark. Because the Colliers Report is at least produced by an independent source and contemporaneous, we consider it strictly preferable to the C&W Report."); *see id*. at 13-20, 30-36. Kaptan's argument is thus without merit.

Kaptan claims that Commerce ignores indicia of the independence and objectivity of the C&W Report, but this argument fails to acknowledge Commerce's analysis. Kaptan's Br. at 9-11. Commerce took note of Kaptan's points, but explained that the C&W Report was, in part, based on data received from Kaptan and that the C&W Report did not provide the underlying information used by C&W in its valuation. Remand Results at 31-32. Accordingly, lacking information regarding C&W's valuation process, and the fact that the report was potentially influenced by information provided by Kaptan, Commerce determined that the factors highlighted by Kaptan were not enough to overcome the concerns raised by the fact that Kaptan paid for creation of the report, and likely did so for the purposes of this proceeding, as well as other evidence that the C&W Report lacked objectivity and neutrality. *Id.* at 31-32.

Kaptan also claims that no record evidence supports the fact that the C&W Report was prepared for purposes of this proceeding. Kaptan's Br. at 8. This claim is belied by the record. Kaptan commissioned the C&W Report in 2022, but specifically requested that the C&W Report reflect rental prices in the year 2020—the period of review ("POR") of the proceeding underlying this appeal. *See* Letter from Law Offices of David L. Simon, PLLC to Sec'y Commerce, re: *Steel Concrete Reinforcing Bar from Turkey; Kaptan public benchmark report (resubmission)* (Jan. 14,

Ct. No. 23-00131

2025) at Exhibit 1, p. 3, P.R.R. 21-24 ("Upon request of the client, value estimation will be given for the year of 2020.") ("Kaptan Benchmark"). There would be no commercial reason for Kaptan to commission a land valuation report to determine the value of the rent on Nur's land for a period of time in the past. Accordingly, Commerce reasonably concluded that the C&W Report was commissioned for use in connection with this countervailing duty proceeding.

**B.    Kaptan's Argument Regarding Commerce's Basis for Selecting Data from Cerkezkoy is Unexhausted and Meritless**

Kaptan next argues that Commerce's basis for limiting its use of the Colliers Report to properties from Cerkezkoy—because Cerkezkoy had the most similar population density to Trabzon—is unsupported by the record. Kaptan's Br. at 13-14. Specifically, Kaptan argues that the record is devoid of any information on the population density of Cerkezkoy and Trabzon. *Id.* This argument is unexhausted, as Kaptan did not raise it in its remand comments. *See* Kaptan Cmts. To preserve this claim for judicial review, Kaptan was required to exhaust its administrative remedies by bringing it to Commerce in the first instance. *See Boomerang Tube LLC v. United States*, 856 F. 3d 908, 912-13 (Fed. Cir. 2017). Commerce explained that this was its basis for limiting its use of data in the Colliers Report in its draft remand determination and, thus, Kaptan could have raised this issue in its comments before the agency. *See* Draft Remand at 19.

Even if Kaptan had preserved this claim, it should fail. Kaptan's argument that the record does not contain population density information is incorrect. RTAC placed on the record information on the population density of various locales in Turkey, as Commerce noted. *See* Remand Results at 6. Specifically, RTAC's rebuttal benchmark submission provided information showing the population density of Surmene, Trabzon and Cerkezkoy, Tekirdag, as well as other locations. *See* RTAC Benchmark Rebuttal at Attach. 2, Ex. 2 and Attach. 3, p. 3. A review of this information confirms Commerce's conclusion that Surmene, Trabzon is most similar in population

9

Ct. No. 23-00131

density to Cerkezkoy, Tekirdag. *Id.*; *see* Remand Results at 6. Thus, Kaptan's claim that population density information is not on the record is factually incorrect and, therefore, its grounds for challenging Commerce's reliance on data for Cerkezkoy are misplaced.

C.     **The Record Does Not Establish that the Colliers Report Contains Data from OIZs**

Kaptan next argues that Commerce is precluded from using data from Cerkezkoy because it contains rental rates for properties in OIZs. Kaptan's Br. at 15-19. However, nothing in the Colliers Report suggests that the land values for Cerkezkoy include land that is located in an OIZ. Devoid of context, Kaptan points to language from the Colliers Report that states: "{W}e have examined the industrial zones within the province of Kocaeli . . ., and the province of Tekirdag (which includes the districts of Cerkezkoy and Corlu)." *Id.* at 15 (quoting RTAC Benchmark at Exhibit 1, p. 9). As an initial matter, being zoned for industry does not equate to land being in an OIZ. Moreover, the context of this sentence indicates that this language is used to show that provinces surrounding Istanbul are also being analyzed in the report. Specifically, the report states that it examines the industrial market for four regions within the city of Istanbul *and* in the Kocaeli and Tekirdag provinces. RTAC Benchmark at Exhibit 1, p. 9.

Kaptan argues that "Organized Industrial Zone" is a term of art specific to the Turkish real estate market, and Colliers International's use of the words "the industrial zones" indicates that it was referring to an OIZ. Kaptan's Br. at 16. However, this argument cuts against Kaptan's claim. As Commerce aptly noted, if the Colliers Report had intended to convey that the rental land in Cerkezkoy was located in an OIZ, it would have specifically referred to them as such—but it did not. *See* Remand Results at 33. Instead, the report's reference to examining "industrial zones" in these provinces serves only to distinguish the report's examination of properties zoned for industry

Ct. No. 23-00131

and properties zoned for other uses, such as office, retail, residential, and hotel use that are also discussed in the report. *See* RTAC Benchmark at Exhibit 1.

      **D.**    **Kaptan's Argument that the Colliers Report Does not Contain Actual Prices from the Private Market is Unexhausted and Incorrect**

Kaptan argues that Commerce cannot use the Colliers Report because it does not meet 19 C.F.R. § 351.511(a)(2)(i)'s requirement that tier one benchmarks be based on actual prices from the private market. *See* Kaptan's Br. at 19-20. Again, Kaptan failed to raise such an argument in the remand proceedings, *see generally* Kaptan Cmts., and has thus waived this argument on appeal. *See Boomerang Tube,* 856 F. 3d at 912-13. The language used by Commerce that Kaptan challenges, *see* Kaptan's Br. at 19, was included in the draft remand determination and Kaptan should have addressed Commerce's reasoning in its remand comments. Draft Remand at 17.

Regardless, Kaptan's claim is unpersuasive. Kaptan claims that the lease rates in the Colliers Report do not contain actual transactions or specific transaction values because it "reflect{s} average unit rental rates." Kaptan's Br. at 20. Kaptan reads a requirement into Commerce's regulation that does not exist. Commerce's regulations state that the agency will normally measure the adequacy of remuneration based on market determined prices "resulting from actual transactions in the country in question." 19 C.F.R. § 351.511(a)(2)(i). As Commerce recognized, the Colliers Report meets this requirement because it is based on actual prices from the private market. *See* Remand Results at 18. Kaptan appears to interpret this as a requirement that the Colliers Report needs to provide individual transactions to be usable as a benchmark. Kaptan's Br. at 20. But such a limitation is not supported by Commerce's regulations. Nor does the regulation prohibit the use of average prices based on actual transactions or require that the proposed benchmark include all individual data points that go into the benchmark price. Indeed,

Ct. No. 23-00131

Kaptan's argument is absurd—an average price is necessarily made up of multiple individual prices. Regardless, nothing on the record suggests that the Colliers Benchmark is not comprised of actual transaction rates, and thus Kaptan's claim is meritless.

      **E.**      **Commerce's Determination That Kaptan Failed to Support Its Claim That There is a Correlation Between Economic Trends and Lease Rates is Supported by Substantial Evidence**

Kaptan argues that Commerce is creating a new evidentiary standard that parties must overcome in order to show that certain benchmark data is not comparable to the land being valued.[3] *See id*. at 21-23. But this is not the case. It is axiomatic that "{t}he burden of creating an adequate record lies with the interested parties, not with Commerce," *see Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014), and parties must provide information that support their desired result. *See Jinan Farmlady Trading Co. v. United States*, 228 F. Supp. 3d 1351, 1356-57 (Ct. Int'l Trade 2017) (upholding Commerce's determination that data was not aberrational where plaintiff failed to provide any evidence that the data was aberrational). Here, Kaptan failed to support its claim that various economic factors impacted Turkish real estate prices

---

[3]      Kaptan also argues that under the court's decision in the *Ozdemir* cases, land benchmarks in Istanbul and the Istanbul region are inappropriate as benchmarks for land located in less-developed areas in Turkey. *See* Kaptan's Br. at 21 (citing *Özdemir Boru San. ve Tic. Ltd. Sti. v. United States*, 273 F. Supp. 3d 1225, 1250-53 (Ct. Int'l Trade 2017) ("*Özdemir I*")); *see also Özdemir Boru San. ve Tic. Ltd. Sti. v. United States*, 282 F. Supp. 3d 1352 (Ct. Int'l Trade 2018) ("*Özdemir II*")). However, in *Ozdemir I*, the U.S. Court of International Trade found that Commerce failed to address arguments that the specific data on the record indicating that land prices for Istanbul and Yaklova were aberrational on their face. *See Ozdemir I*, 273 F. Supp. 3d at 1252. On remand, Commerce removed these data from the benchmark, finding that they were aberrational, but made no finding that prices from these areas were not usable benchmarks because they were from highly developed areas. *Ozdemir II*, 282 F. Supp. 3d at 1352. Furthermore, in *Ozdemir I*, data for land from Tekirdag, the province from which Commerce has valued land in this case, was included in the dataset. On remand, the court upheld Commerce's benchmark, which continued to use the land prices from properties in Tekirdag. *See Ozdemir II*, 282 F. Supp. 3d at 1352-53 (noting that on remand, Commerce only removed the data points for Istanbul and Yalova from the benchmark data); *Ozdemir I*, 273 F. Supp. 3d at 1251 (listing all data included in the benchmark, including land located in Tekirdag province).

in such a manner that the Cerkezkoy land prices were not comparable to land prices in Trabzon. Kaptan is thus asking Commerce to make the assumption that these economic factors necessarily render the land prices non-comparable.

Kaptan further argues that Commerce has created an "unreasonable" burden. *See* Kaptan's Br. at 22. However, Kaptan fails to explain how providing this information would create an unreasonable burden on it, other than simply stating that "finding location specific rent valuations" is difficult. Kaptan's Br. at 22. Kaptan's claim that providing such a linkage is "impossible," deals in hypotheticals and ignores the fact that, here, it simply did not provide support for its argument. Kaptan's Br. at 22. Commerce analyzed the economic data provided by Kaptan and concluded that this data did not substantiate Kaptan's claims, nor did Kaptan demonstrate the proportional effect of these economic factors on Turkish land prices. Remand Results at 35-36. While Kaptan alleged that differences in economic indicators between Trabzon and Cerkezkoy established that rent prices in Cerkezkoy could not be comparable to rent prices in Trabzon, it failed to support this claim. The data placed on the record by Kaptan—including the distance from Istanbul, gross domestic product per capita, value of foreign and trade—did not show any correlation to land rental prices, nor did Kaptan provide a coherent explanation of how this data showed any correlation to differences in land rental prices. *See* Remand Results at 35-36. Thus, contrary to Kaptan's claims, there is no basis for concluding that Commerce has "no choice but to choose the C&W Report." Kaptan's Br. at 23. The court should thus decline to disturb Commerce's reasoned explanation for not reaching Kaptan's desired result.

Kaptan alternatively argues that "the fundamental difference" between the Colliers Report and C&W Report is "simply proximity" to Nur's land. *Id*. at 22-23. But this is not what it argued in its comments on remand. Instead, Kaptan rested its argument on its claim that the properties in

Ct. No. 23-00131

the Colliers Report were not comparable to Nur's land because of disparities in economic wealth between Trabzon and the Istanbul area. *See* Kaptan Cmts. at 22. Kaptan's characterized this issue as one of complex macroeconomic differences between the greater Istanbul region and Trabzon, which meant that Commerce had no reason to address the simple question of whether proximity to Nur's land alone was a sufficient basis for finding that the C&W Report was a better benchmark than the Colliers Report with regard to comparability. Furthermore, Kaptan has failed to explain why such properties would be more comparable. Indeed, while there is no dispute that the properties in the C&W Report are nearer to Nur *in proximity*, this does not indicate that they are more comparable properties *overall*. Nur's land is industrial property, yet of the thirteen properties included in the C&W Report, only one is zoned for industry, while the rest are related to other uses such as "Private Use," "Tourism," or simply "Field" and are thus less comparable than the data in the Colliers Report, which is based *only* on industrial properties. *See* Kaptan Benchmark at Exhibit 1, p. 23.

### F.    The Cerkezkoy Data Are Not Aberrational

Kaptan argues that "the sheer magnitude of the difference" between the reported lease rates in the Colliers Report and C&W Report invalidate the use of the Cerkezkoy data as the land benchmark. Kaptan's Br. at 23. As an initial matter, Kaptan did not raise this argument before the agency and has thus waived it on appeal. *See Boomerang Tube*, 856 F. 3d at 912-13. Before the agency, Kaptan only argued that the C&W Report was a more comparable benchmark than the Colliers Report, but did not allege that the Colliers data was aberrational. Kaptan Cmts. at 18-25.

Even if this argument is properly before the court, it is unpersuasive. As Kaptan concedes, *its own benchmark* could contain aberrational data. Kaptan's Br. at 24. Indeed, its only evidence that the Colliers Report, and not the C&W Report, is aberrational is that the lease rates for

properties in the C&W Report are all lower than the average rate in the Colliers Report. *See id*. at 23-24. This alone does not establish that the Colliers Report is aberrational. In fact, of the properties listed in the C&W Report, the only property that is zoned for industrial use has a rental price of 10.63 lira per square meter, which is double the average of the non-industrially zoned properties and more than five times the lowest rate. *See* Kaptan Benchmark at Exhibit 1, p. 23. Thus, not only is the single industrial rate in the C&W Report in line with the average rate of 17 Turkish lira in the Colliers Report, but the Colliers Report data is within the range of prices otherwise on the record. *See* RTAC Benchmark at Exhibit 2.

Further, Commerce addressed the issue underlying Kaptan's concerns, explaining that nothing on the record established that the data in the Colliers Report was not comparable to land that Nur was provided rent-free. Remand Results at 19-20, 35-36. Commerce cannot make connections that are not supported by the record or conduct an analysis of whether the Colliers Report (or the C&W Report) is aberrational because Kaptan failed to place on the record information supporting its claim that the data in the Colliers Report was aberrational. *See Qingdao Sea-Line* 766 F.3d at 1386; *Jinan Farmlady Trading*, 228 F. Supp. 3d at 1356-57; *Coal. for Fair Trade in Hardwood Plywood v. United States*, 610 F. Supp. 3d 1344, 1369-70 (Ct. Int'l Trade 2022) (sustaining Commerce's determination that data was not aberrant where plaintiff's attempt at demonstrating aberrancy was "not without reason underpinning it" but relied on assumptions that were not supported by record evidence).

### G.  Commerce Reasonably Explained its Determination that the Colliers Report was More Contemporaneous than the C&W Report

Finally, Kaptan argues that Commerce has deviated from its established practice by stating that it was evaluating the contemporaneity of the benchmarks based on the time at which Kaptan acquired its land use rights (as opposed to being contemporaneous with the POR). *See* Kaptan's

Ct. No. 23-00131

Br. at 24-27. Kaptan further attacks Commerce's explanation as "*post hoc* rationalization" that exceeds the scope of the court's remand order. *Id*. at 25. Neither of these arguments is convincing.

As an initial matter, absent a directed verdict by the court, an agency is authorized to offer new explanations for its actions on remand. *See, e.g.*, *In re Section 301 Cases*, 628 F. Supp. 3d 1235, 1241-45 (Ct. Int'l Trade 2023) (holding that on remand an agency may provide "a fuller explanation of its reasoning at the time of the agency action") (citing to *Dep't of Homeland Security v. Regents of the Univ. of California*, 591 U.S. 1, 20, 140 S. Ct. 1891, 207 (2020)). Here, the court's order required that Commerce fully address Kaptan's arguments, one of which went to the reliability of the benchmarks. *See Kaptan*, 736 F. Supp. 3d at 1330-33. As contemporaneity is one of the well-established factors that Commerce relies on to determine what benchmarks to select, *see* Issues and Decision Memorandum accompanying *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, From the People's Republic of China*, 81 Fed. Reg. 46,904 (Dep't Commerce July 19, 2016) (final results of countervailing duty admin. rev.; 2013) at Comment 7 ("{Commerce} preference, where possible, is to rely on contemporaneous data over non-contemporaneous data" in selecting benchmarks), Commerce reasonably addressed this issue in order to comply with the court's requirement that the agency fully explain its benchmark selection.

Here, regardless of whether contemporaneity is measured in relation to the time at which Kaptan received its land use rights or in relation to the POR, the Colliers Report is superior. The Colliers Report, which contains data for lease transactions that occurred in the year 2020, is contemporaneous with the 2020 POR, and more contemporaneous with the year in which Kaptan received its land use rights, than is the C&W report data which contains land pricing "mostly from 2022." Remand Results at 18. And here, Commerce adequately explained its determination to

Ct. No. 23-00131

measure contemporaneity in relation to the time at which Kaptan received its land use rights, explaining that contemporaneity with the time at which Kaptan first received the land use rights was appropriate because it would best reflect the terms at which Kaptan would have been able to negotiate a long-term lease had it signed a commercial lease, rather than a government subsidized lease. *Id*. at 35.

IV.    <u>**CONCLUSION**</u>

For these reasons, RTAC requests that the court sustain Commerce's determination to use the Colliers Report as the benchmark for measuring the benefit conferred to Kaptan by the GOT's provision of land for LTAR.

<div style="margin-left:40%">

Respectfully submitted:

*/s/ John R. Shane*

Alan H. Price, Esq.
John R. Shane, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.
Stephen A. Morrison, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Rebar Trade Action Coalition*

</div>

Dated: April 7, 2025

17

CERTIFICATE OF COMPLIANCE

Pursuant to Chambers Procedure 2(B)(1), the undersigned certifies that these comments comply with the word limitation requirement. The word count for Defendant-Intervenor Rebar Trade Action Coalition's Comments in Support of Remand Determination, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 5,424 words.

_/s/ John R. Shane_
(Signature of Attorney)

John R. Shane
(Name of Attorney)

The Rebar Trade Action Coalition
(Representative Of)

April 7, 2025
(Date)